UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:20-mj-00114-JFA |
| | ) | |
| | ) | |
| ZACKARY ELLIS SANDERS, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT ZACKARY ELLIS SANDERS' MOTION FOR REVOCATION
OF DETENTION ORDER AND REQUEST FOR EXPEDITED HEARING

Defendant Zackary Ellis Sanders, by and through his undersigned counsel, and pursuant to 18 U.S.C. § 3145(b), respectfully moves the Court to revoke the order of detention imposed by Magistrate Judge John F. Anderson on March 20, 2020. Mr. Sanders also requests an expedited hearing of this matter pursuant to 18 U.S.C. § 3145(b), which requires that such motions be determined promptly.

I.     PROCEDURAL BACKGROUND

On March 19, 2020, Mr. Sanders was charged, by Criminal Complaint, with a violation of 18 U.S.C. § 2251(a) and (e). On March 20, 2020, Mr. Sanders was arrested, and brought before The Honorable John F. Anderson. Following a detention hearing, Magistrate Judge Anderson determined that the government proved, by clear and convincing evidence, that "no condition or combination of conditions of release [would] reasonably assure the safety of any other person and the community." *See* ECF 11, at 2.

In arriving at this conclusion, Magistrate Judge Anderson found that Mr. Sanders did not introduce sufficient evidence to rebut the presumption under 18 U.S.C. § 3142(e). *Id.* Additionally, in determining that Mr. Sanders would be detained, Magistrate Judge Anderson

1

relied upon the alleged weight of the evidence against Mr. Sanders and the length of incarceration Mr. Sanders could face if convicted. *Id.* at 2.

Mr. Sanders now moves this Court for review of Magistrate Judge Anderson's detention order, as the factors set forth in 18 U.S.C. § 3142 weigh in favor of Mr. Sanders' release.

II. LEGAL STANDARD

18 U.S.C. § 3145(b) provides that when a "person is ordered detained by a magistrate judge[, this Court may hear] a motion for revocation . . . of the order." This statute also requires such motions to "be determined promptly." *Id.* The district judge's review of a magistrate judge's release order is *de novo*. *See United States v. Clark*, 865 F.2d 1433, 1437 (4th Cir. 1989).

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Accordingly, the Bail Reform Act of 1984 provides that a defendant must be released on their personal recognizance or an unsecured personal bond "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Under circumstances in which a personal recognizance bond is insufficient, the officer must choose "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(c)(1)(B).

Any conditions set upon release are intended to be preventative and not punitive in nature. *See United States v. Salerno*, 481 U.S. 739, 747 (1987). And importantly, the Bail

Reform Act explicitly does not modify or limit the presumption of innocence. *See* 18 U.S.C. § 3142(j).

To support a finding that the defendant should be detained, "[t]he facts the judicial officer uses to support a finding . . . that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." *See* 18 U.S.C. § 3142(f)(2). In making this finding, the Judge must take the following factors into account:

>   (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
>   (2) the weight of the evidence against the person;
>
>   (3) the history and characteristics of the person, including –
>
>   (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
>   (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
>   (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*See* 18 U.S.C. § 3142(g).

Section 3142 also lists a number of offenses that give rise to a rebuttable presumption that there are no conditions that will reasonably assure the defendant's presence or ensure the safety of the community. *See* 18 U.S.C. § 3142(e). The conduct charged in the criminal complaint against Mr. Sanders triggers the rebuttable presumption set forth in 18 U.S.C. § 3142(e)(3)(E), which applies to certain offenses involving minor victims. Once a rebuttable

3

presumption is created, "the burden of production shifts to the defendant to come forward with evidence to suggest that the presumption is unwarranted in his or her particular case." *United States v. Boyd*, 484 F. Supp. 2d 486, 488 (E.D. Va. 2007) (citing *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991)). This burden of production is "not a heavy one to meet." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986); *see also United States v. Blauvelt*, No. CRIM. WDQ-08-0269, 2008 WL 4755840, at *2 (D. Md. Oct. 28, 2008) (citing Bruce D. Pringle, *Bail and Detention in Federal Criminal Proceedings*, 22 COLO. LAW 913, 920 (1993) ("[C]ourts have found that the burden of rebutting the presumption is not great. The defendant need only present some credible evidence indicating that there are conditions that could be imposed that would reasonably assure the safety of the community or another person. Thereafter, the Court considers the factors under 18 U.S.C. § 3142(g), as it would in a non-presumption case."). Evidence favorable to a defendant that falls under a category listed in 18 U.S.C. § 3142(g) can rebut the presumption, including evidence of marital, family and employment status; ties to and role in the community; lack of criminal record; and other types of evidence contemplated by Section 3142(g)(3).

Importantly, although the defendant must produce evidence to rebut the presumption, the presumption "does not also shift to him the ultimate burden of persuasion concerning the risk of flight and danger to community safety. Rather, the Government at all times retains the burden of persuasion." *United States v. Tyson*, No. 7:11-CR-105-3F, 2011 WL 4443253, at *1 (E.D.N.C. Sept. 23, 2011) (citing *United States v. Quartermaine*, 913 F.2d 910, 916 (11th Cir.1990)).

### III. THE BAIL REFORM ACT FACTORS CALL FOR MR. SANDERS' RELEASE

Mr. Sanders does not dispute the fact that the nature and circumstances of the charged offense are serious, and that they give rise to a presumption against release pursuant to 18 U.S.C.

4

§ 3142(e). However, while a presumption arises in this case, the Bail Reform Act specifically contemplates release for individuals charged with offenses similar to conduct attributed to Mr. Sanders. *See* 18 U.S.C. § 3142(c)(1)(B) (setting forth certain mandatory conditions of release specifically for cases involving minor victims). The conditions set forth in Section 3142(c)(1)(B), as well as the additional conditions proposed below will reasonably assure Mr. Sanders' appearance, as well as the community's safety.

1. The Nature and Circumstances of the Offense

As stated above, Mr. Sanders acknowledges that the charged offense is serious. Notwithstanding, the allegations in the Criminal Complaint are just that – allegations. Nothing has been proven beyond a reasonable doubt, and as the Bail Reform Act emphasizes, nothing in the statute modifies or limits the presumption of innocence. *See* 18 U.S.C. § 3142(j).

Additionally, this Court has released defendants charged with crimes both similar and identical to the offenses charged against Mr. Sanders. In *United States v. Logan McCauley*, the defendant was charged with production of child pornography, in violation of 18 U.S.C. § 2251(a). *See United States v. Logan McCauley*, Case No. 18-cr-00330 (TSE), at ECF 1. Following a detention hearing, this Court released the defendant on several conditions, including home detention, travel restrictions, location monitoring, and residence with a suitable third-party custodian. *Id.* at ECF 12. Notably, Mr. McCauley was alleged to have engaged in sexual intercourse with a minor child, and to have recorded that conduct on his phone. *Id.* at ECF 2, at 1-2.

In *United States v. Milton Smith, Jr.*, the defendant was initially charged with one count of receiving child pornography, in violation of 18 U.S.C. § 2252(a)(2). *See United States v. Milton Smith, Jr.*, Case No. 15-cr-00042 (TSE), at ECF 1. Following a detention hearing, this

Court released the defendant on several conditions, including home detention with electronic monitoring, travel restrictions, and residence with his father, who would serve as a suitable third-party custodian. *Id*. at ECF 18. Mr. Smith was subsequently indicted and charged with one count of conspiracy to produce child pornography, in violation of 18 U.S.C. § 2251(a) and (e), and one count of conspiracy to distribute and receive child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1). *Id.* at ECF 32. Even though he was indicted on production charges, Mr. Smith was still permitted to remain on pretrial release. Indeed, he remained out of custody until, following his conviction, the Court ordered him to self-surrender to the Bureau of Prisons. *Id.* at ECF 236.

These cases demonstrate that, although the charge against Mr. Sanders is very serious in nature, this Court has found that certain conditions exist that would reasonably assure the appearance of defendants charged with the same and similar offenses, while also safeguarding the community. For this reason, Mr. Sanders respectfully submits that this factor weighs in favor of his release.

    2. <u>The Weight of the Evidence against Mr. Sanders</u>

Mr. Sanders respectfully disagrees with Magistrate Judge Anderson's finding that the alleged weight of the evidence weighs in favor of Mr. Sanders' detention. The criminal complaint in this matter was accompanied by an affidavit in support of the criminal complaint, which was sworn out by Federal Bureau of Investigation Special Agent Jeremy Obie. *See* ECF 4. The charge in this case concerns alleged correspondence between Mr. Sanders and a 14-year old minor, in violation 18 U.S.C. § 2551(a). *Id.* at ¶¶ 3, 15. There is not alleged to have been any physical, in-person contact between Mr. Sanders and the alleged minor. Paragraph 5 of

6

Special Agent Obie's affidavit references 18 U.S.C. § 2256(1), and defines the term "minor" as "any person under the age of 18 years." *Id.* at ¶ 5.

During Mr. Sanders' initial appearance and detention hearing on March 20, 2020, Special Agent Obie testified that he had viewed the website through which Mr. Sanders allegedly communicated with the minor. *See* Exhibit 1, at 9:18-19 (Mar. 20, 2020 Hearing Transcript). Special Agent Obie confirmed that there is a warning posted on the website that visitors must be eighteen years or older to enter the website. *Id.* at 10:13-18. He also testified that the alleged minor had pubic hair. *Id.* at 11:14-17. Special Agent Obie also confirmed that neither he nor anyone at the Federal Bureau of Investigation had reviewed a government-issued ID, passport, or any other similar documents to determine whether the alleged minor was actually under the age of eighteen. *Id.* at 11:18-23.

Given this, the government has not produced any evidence that the individual with whom Mr. Sanders was communicating was actually a minor, as defined by 18 U.S.C. § 2256(1). Instead, it is just as probable that the individual was above the age of eighteen, given his physical characteristics and the government's complete lack of investigation into the individual's actual age, and that this individual and Mr. Sanders were engaged in role playing. *Id.* at 12:18-13:9. For these reasons, the weight of the evidence weighs in favor of Mr. Sanders' release.

3. <u>Mr. Sanders' History and Characteristics</u>

Mr. Sanders' personal history and characteristics also weigh heavily in favor of his release. As stated before Magistrate Judge Anderson, Mr. Sanders has no criminal history. Indeed, after the search warrant in this case was executed on February 12, 2020 at Mr. Sanders' residence, Mr. Sanders did not attempt to flee or endanger anyone in the community. To the contrary, Mr. Sanders was cooperative during the execution of the search warrant. Mr. Sanders

has strong family ties to Virginia. Indeed, he was raised in Virginia, and graduated from high school in Virginia in 2013. In 2017, Mr. Sanders graduated with a Bachelor's degree from New York University. Since graduating, Mr. Sanders has moved back to Virginia, where he resides with his parents. Mr. Sanders has no history of drug or alcohol abuse.

Throughout his school years, Mr. Sanders was the victim of intense, pervasive, and continual emotional and physical bullying. Much of this bullying stemmed from Mr. Sanders' sexual orientation. This bullying has left lasting scars on Mr. Sanders. As a result of being constantly bullied, Mr. Sanders suffered from depression and anxiety throughout his middle and high school years, to the point where he had to take many classes online as a high school student, as he often could not bear going to school.

Even though he was a constant victim of bullying, Mr. Sanders did his best to support other members of the LGBTQ community throughout his school years, serving as the Youth Director of GLSEN Northern Virginia (Gay, Lesbian, Straight Education Network), working to promote inclusivity and prevent bullying through his membership in the GSA (Gay Straight Alliance), and serving as his school's representative to the Safe Community Coalition, which addressed issues such as alcohol and drug use, trafficking, and other dangers facing his fellow students. When he was in middle school, Mr. Sanders was the first youth to be awarded the McLean Community Center's H. Gordon Randall Volunteer Service award, an award which had previously been awarded only to adults. As a middle and high school student, Mr. Sanders received a Volunteer Service Award from the Fairfax County Government four years in a row for his volunteer work, and in high school, Mr. Sanders received the Rising Star Award from the Fairfax County Government for his extensive volunteer work in the community.

Mr. Sanders also has a history of strong community involvement outside of school. Mr. Sanders is currently the Co-Chair of the Annual Volunteer Christmas Breakfast for the Homeless in Falls Church, Virginia. Mr. Sanders has been involved with this event for over ten years and has been the Co-Chair of the event for at least the past four years.

Mr. Sanders' parents have supported him throughout his life, and remain ready and willing to support him by serving as third-party custodians under any guidelines set by this Court. As stated previously, Mr. Sanders lives at home with his mother, Dr. Risa Sanders, a clinical psychologist, and his father, Dr. Jay Sanders, a physician. *See* Exhibit 1, at 15:16-18. Mr. Sanders' father works from home, and his mother will be working from home for the foreseeable future. Mr. Sanders' parents are also willing to lock their laptop computers, cell phones, and any electronic devices with access to the internet in a secure location in the house, to which Mr. Sanders would not have access.

Mr. Sanders' mother, Risa Sanders, confirmed, under oath, at Mr. Sanders' March 20, 2020 hearing that she and Mr. Sanders' father would be willing to serve as third-party custodians for Mr. Sanders if he is released. *See* Exhibit 1, at 19:2-4. Dr. Sanders also confirmed that no individuals under the age of eighteen visit their home, that she would be willing to have Mr. Sanders electronically monitored at their home, and that she would take steps to ensure the Mr. Sanders would not have internet access in the house. *Id.* at 18:25-19:11. Dr. Sanders also confirmed that her electronic devices are "not accessible to anyone anyway because [she] is in a profession that requires HIPAA compliance, so no one goes near [her] devices, and same for [her] husband." *Id.* at 21:20-24.

It is also critical for the Court to take into account the current health emergency facing the United States. Incarceration poses a grave public health threat during this crisis. Indeed,

9

"[b]eing incarcerated is a major threat to an individual's physical and mental health. Infectious diseases like tuberculosis and influenza spread rapidly in confinement, and there is every reason to expect that COVID-19 will do the same." *See* Brendan Saloner and Sachini Bandara, *To Protect Inmates and the Nation from COVID-19, Release Offenders Who Pose No Threat*, USA TODAY (Mar. 17, 2020), https://www.usatoday.com/story/opinion/policing/2020/03/17/protect-nation-covid-19-release-inmates-who-pose-no-threat/5072004002/. According to Tyler Winkelman, co-director of the Health, Homelessness, and Criminal Justice Lab at the Hennepin Healthcare Research Institute in Minneapolis, "[a]ll prisons and jails should anticipate that the coronavirus will enter their facility." *See* Nicole Wetsman, Prisons and Jails are Vulnerable to COVID-19 Outbreaks, THE VERGE (Mar. 7, 2020), https://www.theverge.com/2020/3/7/21167807/ coronavirus-prison-jail-health-outbreak-covid-19-flu-soap. COVID-19 "spreads quickly in closed spaces, like cruise ships, nursing homes — and jails and prisons." *Id.* It is vitally important to acknowledge that inmates do not live under quarantine. Instead, as stated by Dr. Amanda Klonsky, scholar of education and mass incarceration, and the Chief Program Officer of The Petey Greene Program, a prison education organization:

> The American criminal legal system holds almost 2.3 million people in prisons, jails, detention centers and psychiatric hospitals. And they do not live under quarantine: jails experience a daily influx of correctional staff, vendors, health care workers, educators and visitors — all of whom carry viral conditions at the prison back to their homes and communities and return the next day packing the germs from back home.

Dr. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, THE NEW YORK TIMES (Mar. 16, 2020), https://www.nytimes.com/ 2020/03/16/opinion/coronavirus-in-jails.html; *see also* Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007),

10

https://doi.org/10.1086/521910 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise").

As of March 26, 2020, there were over 68,534 confirmed cases of COVID-19 in the United States, and at least 990 reported deaths resulting from the virus. *See* Mitch Smith, *et al.*, *Coronavirus in the U.S.: Latest Map and Case Count*, THE NEW YORK TIMES (Mar. 26, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html. Virginia alone has reported 392 cases, adding 101 of those additional cases on March 25, 2020. *See* Dana Hedgpeth, *Live updates: Jobless claims spike in the Washington region; known coronavirus cases in D.C. area top 1,200*, THE WASHINGTON POST (Mar. 26, 2020), https://www.washingtonpost.com/dc-md-va/2020/03/26/coronavirus-dc-maryland-virginia-updates/. Virginia has already reported thirteen deaths from Coronavirus. *See* Vernon Freeman Jr., *4 additional COVID-19 deaths reported in Virginia, raising total to 13: COVID-19 cases in Virginia increase by 100, nears 400 cases statewide*, WTVR (Mar. 25, 2020), https://www.wtvr.com/news/coronavirus/covid-19-cases-in-virginia-increase-by-100-nears-400-cases-statewide.

It is not a question of if, therefore, but when COVID-19 will spread to the detention center where Mr. Sanders is currently housed. Virginia jails have not even begun to test inmates, even though inmates in other states, including New York, have already tested positive for the virus. *See* Kate Masters, *No cases of COVID-19 in Virginia prisons, officials say — but no inmates have been tested*, NBC 12 (Mar. 23, 2020), https://www.nbc12.com/2020/03/23/no-cases-covid-virginia-prisons-officials-say-no-inmates-have-been-tested/; *see also* Martin Kaste,

Prisons and Jails Worry About *Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming coronavirus-incubators.

Mr. Sanders suffers from serious health issues, which require immediate and serious health care by Mr. Sanders' physicians. Mr. Sanders was admitted to the hospital twice in January for Optic Neuritis. *See* Exhibit 2 (Letter from Rahul Dave, MD Ph.D.). Mr. Sanders "is undergoing medical evaluation for causes [of the Optic Neuritis], including multiple sclerosis." *Id.* His physician, Rahul Dave, MD Ph.D., the Director of the Neuroimmunology and MS Center at the VCU College of Medicine's Inova Neurosciences Institute, states the following regarding Mr. Sanders' serious health condition and the repercussions that incarceration will have on Mr. Sanders' health:

> This is a high risk condition that can result in permanent blindness if not evaluated in a timely fashion. [Mr. Sanders] will require regular followups with several subspecialists and has to undergo specialized testing. All of this will be impeded by jail time.

*Id.* On February 24, 2020, Mr. Sanders was seen by Martin G. Prosky, M.D., F.A.C.P. at Northern Virginia Gastrointestinal Associates. *See* Exhibit 3 (Letter from Martin G. Prosky, M.D., F.A.C.P.). Mr. Sanders is under Dr. Prosky's "care for evaluation of several serious digestive tract problems . . . [which] include difficulty swallowing, abdominal pain, chest pain, and rectal bleeding." *Id.* In his letter to the Court, Dr. Prosky states the following regarding Mr. Sanders' treatment and prognosis:

> I first saw [Mr. Sanders] in my office on February 24, 2020. At that time I felt that it was essential to perform an upper endoscopy and colonoscopy. These tests were delayed because of the coronavirus pandemic. It is still essential that these tests be done and I anticipate that I will be performing them quite soon. It is for this reason that I would recommend that [Mr. Sanders] be discharged from the Alexandria Detention Center and returned to his home. This will allow me to

>complete his medical evaluation, which obviously would not be possible, if he were kept at the detention center.

*Id.* Dr. Prosky ends his letter with the hope that Mr. Sanders will be released from custody in an expeditious manner, "[a]s these are serious medical problems and require immediate attention." *Id.*

Mr. Sanders is also facing serious dental issues. Mr. Sanders was seen on February 19, 2020 by George Papastergious DDS of George Papastergious, DDS, PLC Cosmetic and Restorative Dentistry in Vienna, Virginia. *See* Exhibit 4 (Letter from George Papastergious DDS). During this visit, Dr. Papastergious found, *inter alia*, "[m]ultiple proximal caries on [Mr. Sanders'] molars and bicuspids." *Id.* Mr. Sanders was "informed of these findings and was asked to return to the office to evaluate the effectiveness of the treatment on his periodontal status and to treat the dental caries so that damage to the dental nerves does not occur." *Id.* Mr. Sanders was "informed that time was of the essence with respect to his re-care appointments," and it was "explained to Mr. Sanders that failure to treat his periodontal condition could result in compromised alveolar bone with increased periodontal bleeding and loss of bone." *Id.* Additionally, "failure to treat [Mr. Sanders'] dental caries could result in unrelenting pain and the necessity for more invasive procedures including infection management, root canal therapy, and or extraction of the compromised teeth." *Id.*

Mr. Sanders is also under the care of Dr. Timothy Egan at Fairfax ENT & Facial Plastic Surgery. *See* Exhibit 5 (Letter from Timothy Egan, MD). Dr. Egan explained Mr. Sanders' condition in his letter to the Court:

>[Mr. Sanders] is a 24-year old male with a history of chronic sinusitis and optic neuritis. I first saw him on January 23, 2020, and at that time, he was noted to have purulent drainage [in his] left nasal cavity consistent with acute rhinosinusitis. I prescribed Augmentin 875 mg twice daily for 21 days. While recovering from his acute sinusitis, [Mr. Sanders] had a flareup of his optic

13

> neuritis, which required an additional round of high dose steroids. He was seen in follow-up on February 13 and mentioned that his sinus congestion, purulent rhinorrhea, and nasal congestion were improved. I ordered a CT scan of the sinuses, but to the best of my knowledge, this has not been completed. It is currently unknown whether his acute chronic sinusitis is a causative factor for his optic neuritis. It is my expert medical opinion that any underlying sinusitis should be promptly [and] thoroughly addressed to minimize the risk [to Mr. Sanders'] vision. Further treatment options would depend on the results of a CAT scan of the sinuses.

*Id.*

According to the Centers for Disease Control, COVID-19 is even more dangerous for individuals with serious underlying medical conditions. *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, *Information for Healthcare Professionals: COVID-19 and Underlying Conditions* (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html. Given Mr. Sanders' several serious health issues, as outlined above, a COVID-19 infection could have devastating consequences.

Mr. Sanders' lack of criminal history, his pattern of volunteer work, his longstanding ties to Virginia, and the immediate danger to his health due to prolonged incarceration and the rapidly spreading COVID-19 virus, we respectfully submit, all weigh heavily in favor of Mr. Sanders' release.

    4.  <u>Any Danger Posed by Mr. Sanders' Release</u>

As stated above, Mr. Sanders has no criminal history. Additionally, he has no history of violence or violent behavior. Indeed, the government has provided no evidence, let alone clear and convincing evidence, that Mr. Sanders poses any danger whatsoever to the community, should he be released.

IV.    PROPOSED CONDITIONS OF RELEASE

Section 3142(c)(1)(B) provides that in any case involving a minor victim, any release order must contain, at a minimum, the following conditions:

1. Abide by specified restrictions on personal associations, place of abode, or travel;

2. Avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense;

3. Report on a regular basis to a designated law enforcement agency, pretrial services agency, or other agency;

4. Comply with a specified curfew;

5. Refrain from possessing a firearm, destructive device, or other dangerous weapon; and

6. Submit to electronic monitoring.

*See* 18 U.S.C. § 3142(c)(1)(B)(iv)-(viii). In addition to those conditions, Mr. Sanders respectfully proposes the following conditions, which will reasonably assure his appearance as required, and will safeguard the safety of the community:

1. Release into the custody of his parents;

2. Surrender of his U.S. Passport;

3. Home detention, with permission to leave his home for meetings with his attorneys or medical appointments;

4. No access to the internet; and

5. No contact with minor children.

## V. CONCLUSION

For the foregoing reasons, and any other reasons appearing to the Court, Mr. Sanders respectfully requests that this Court grant his request for pretrial release, subject to the conditions set forth above.

Respectfully submitted,

    /s/ Steven J. McCool, Esq.
STEVEN J. McCOOL
Virginia Bar No. 89860
McCOOL LAW PLLC
1776 K Street, N.W., Suite 200
Washington, D.C. 20006
Telephone: (202) 450-3370
Fax: (202) 450-3346
smccool@mccoollawpllc.com

*Counsel for Zackary Ellis Sanders*

CERTIFICATE OF SERVICE

    I hereby certify that on this 27th day of March 2020, the foregoing was served electronically on the counsel of record through the U.S. District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

                                                              /s/ Steven J. McCool, Esq.
                                                              STEVEN J. McCOOL