***PUBLIC VERSION***

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

UNITED STATES OF AMERICA,

                    Plaintiff,

     v.

ZACKARY ELLIS SANDERS,

                    Defendant.

Case No. 1:20-cr-00143
Honorable T.S. Ellis, III
Pretrial conference: Jan. 15, 2021

**HEARING REQUESTED**

<u>**MR. ZACKARY ELLIS SANDERS'S MOTION TO COMPEL THE GOVERNMENT TO PRODUCE MATERIAL, OR, IN THE ALTERNATIVE, TO SUBMIT MATERIAL FOR *IN CAMERA* INSPECTION**</u>

The Government continues to conceal *Brady* material helpful to Mr. Sanders's defense. In its latest maneuver to thwart Mr. Sanders's discovery rights, the Government took the extraordinary step of significantly altering its trial plan—as set forth to this Court—for no other reason than to deprive the defense of material helpful to Mr. Sanders's motions to suppress. The Government's transparent gamesmanship would be a clever litigation tactic, were it not for its sacrosanct obligations under *Brady*; the prosecutors' ethical duties; and the Government's own internal guidelines, as set forth in the United States Attorney's Office Manual ("USAM")—all of which require the Government to produce the requested *Brady* material to the defense.

Mr. Sanders's motions to suppress should have been determined based on an honest record, and not the incomplete and manipulated record before the Court. Indeed, the Government has now taken the extreme measure *of reversing its trial plan strictly to avoid producing discovery related to Mr. Sanders's motions to suppress. Compare* Notice of Intent to Introduce Evidence Under Federal Rule of Evidence 414 ("Original Notice") (ECF No. 127) *with*

***PUBLIC VERSION***

Amended Notice of Intent to Introduce Evidence Under Federal Rule of Evidence 414

("Amended Notice") (ECF No. 133). The Government amended its notice and revised its trial

plan for the sole purpose of continuing to conceal *Brady* material highly relevant to Mr.

Sanders's motions to suppress. Specifically, the Government continues to withhold, *inter alia*:

    (1) How Special Agent Ford linked Mr. Sanders to the website "█████" ("the Target
         Website") in the first instance, as although the Government has purported to provide
         Mr. Sanders with the entire "tip," *there is no document establishing that link*;

    (2) The FBI's screenshot of the Target Website's homepage (the first and potentially *only*
         page an Internet user would access), *which the Government has never denied
         possessing*; and

    (3) Related material demonstrating that Special Agent Ford understood when he
         submitted his Affidavit[1] that there was no evidence of Mr. Sanders viewing or
         downloading illegal material, as Paragraph 23 of the Affidavit clearly suggested.

As the Government is well aware, the above material will demonstrate to the Court that:

(1) the ███████████████████ did not connect Mr. Sanders with the Target

Website, and it was instead Special Agent Ford who either guessed or assumed there was some

connection;[2] (2) even if Mr. Sanders went to the Target Website on May 23, 2019—which the

Government has no proof of, *see infra* at 13-14ßßßßßß—the homepage was innocuous and did

not suggest, let alone advertise, that the website contained child pornography; and (3) the Special

---

[1] "Affidavit" refers to Special Agent Ford's Affidavit in Support of the Search Warrant.

[2] As the Court is aware, the only document that mentions Tor or names █████ is the ███'s
October 25, 2019 ████████ related to a different operation (████████████),
which "does not state that [the IP address associated with Mr. Sanders's family home] created or
accessed the five images or videos identified in the Report." Memorandum Opinion (ECF No.
73) at 4. Nor does it mention the IP address at all. The Government initially described that
███████████ as merely providing "contextual information related to the [███]'s tip,"
rather than constituting part of the tip. Gov't Opp'n (ECF No. 41) at 5. Neither that ████ nor
any other document connects Mr. Sanders (or the IP address associated with his family's home)
to any website at all. *Cf.* Gov't Opp'n (ECF No. 41) at 1 (claiming that "an IP address was used
to access [material] on May 23, 2019, *on a site hosted on The Onion Router*") (emphasis added);
Gov't Brief (ECF No. 53) at 1 (claiming that the tip stated that "an IP address was used to access
[material] *on a website hosted on The Onion Router*") (emphasis added).

***PUBLIC VERSION***

Agent knew when he submitted the Affidavit that there was no evidence that Mr. Sanders had engaged in actual activity on the Target Website (such as registering an account, logging in, or viewing or downloading illegal content), as Paragraph 23 of the Affidavit so clearly suggests.

Because the Government has never allowed Mr. Sanders to see the information it continues to withhold, even if this Court finds that Mr. Sanders "cannot possibly know, but may only suspect, that particular information exists which meets [*Brady*'s] requirements . . . he is not required . . . to make a particular showing of the exact information sought and how it is material and favorable." *United States v. King*, 628 F.3d 693, 703 (4th Cir. 2011). Instead, if he "make[s] some plausible showing" that the information he seeks exists, the Government must produce the material to the Court for *in camera* inspection. *Id.* at 703.

Accordingly, and notwithstanding the Government's "Amended Notice," this Court should order the Government to produce the *Brady* material to the defense, or, in the alternative, to submit that material to the Court for *in camera* inspection. *Id.* at 703. Mr. Sanders respectfully requests a hearing on this Motion.

## <u>BACKGROUND</u>

Before the Government submitted its Original Notice regarding its intent to introduce evidence at trial about the Target Website and Mr. Sanders's purported activity on it, Mr. Sanders sought and was denied discovery critical to his motions to suppress. In the course of litigating those motions, the Government never told this Court why the Special Agent re-iterated portions of the ███ tip, while also adding additional language, in Paragraph 23 of the Affidavit, when he knew that the actual evidence demonstrated—at most—that Mr. Sanders merely visited the homepage of the Target Website a single time. The Government's refusal to ever explain the Special Agent's state of mind, combined with its most recent litigation strategy in amending its

Original Notice only after realizing its implications for discovery, demonstrate beyond question that the Government is concealing information critical to the correct resolution of Mr. Sanders's motions to suppress.

## A.     Mr. Sanders's motions to compel

From early in this case, Mr. Sanders sought disclosure of whether the Government has actual evidence that Mr. Sanders viewed illegal content on the Target Website, as opposed to evidence that he had (at most) simply visited the homepage (the first and potentially only page every user would visit) one time, at one second.  To support his theory, Mr. Sanders requested communications or documents reflecting the Special Agent's contemporaneous understanding of what Mr. Sanders did on the Target Website and how he had been connected to it, because that would show that the Special Agent understood that Paragraph 23 greatly exaggerated the state of the FBI's evidence.  The defense also requested a screenshot of the homepage—the website's equivalent of a brick-and-mortar storefront's display case—because it would show that the Target Website did not display or advertise illegal content.  Because the Government refused to produce the requested material, Mr. Sanders moved to compel it.  ECF Nos. 37, 45, 58, 65, 79, and 104.

While litigating Mr. Sanders's motions to compel, the Government had ample opportunity to say it has evidence—contrary to what is suggested by its failure to mention or disclose it—that the Internet user went to the Target Website, went beyond the homepage, or that the homepage advertised illegal content.  The Government never did so—despite submitting an additional affidavit from Special Agent Ford himself.  Gov't Brief (ECF No. 53), Ex. 2.

Instead of claiming that what Mr. Sanders sought did not exist, the Government argued that Mr. Sanders could not meet a heightened materiality standard for its production.  *See, e.g.,*

Gov't Opp'n (ECF No. 41) (claiming Mr. Sanders sought "additional, irrelevant information to which he is not entitled"); Government Reply to Response to Supplemental Briefing (ECF No. 67) at 1 (claiming that "none of [Mr. Sanders]'s latest assertions satisfy his burden of proving the materiality of the information").

At the July 31, 2020 hearing on the motion to compel, the Government again did not deny that it has evidence that the Government, including Special Agent Ford, understood the state of the evidence differently than what Paragraph 23 of the Affidavit suggested:  instead, the Government ducked the question, and again re-iterated that Mr. Sanders had to earn this discovery.  Counsel for the Government stated, "[s]o while he is making a big deal of the fact that we have not denied it, he actually needs to provide specific facts to indicate that we do in fact have it."  Renewed Motion to Compel (ECF No. 89), Ex. 20 (July 31 Transcript) at 33.

The Court declined to compel the requested discovery.

**B.      Mr. Sanders's motions to suppress**

The discovery Mr. Sanders requests—and that the Government plainly possesses—is relevant to two of Mr. Sanders's motions to suppress:  his Motion to Suppress Based on False and Misleading Material Information in Affidavit Paragraph 23 (Motion to Suppress No. 2) (ECF Nos. 85-86) and his Motion Based on Materially Misleading Statements and Omissions Regarding TOR, the Target Website, and the Subject Premises (Motion to Suppress No. 3) (ECF Nos. 83-84).

The Government admitted it has no evidence that the Internet user ever accessed any particular page or viewed any particular content on the Target Website.  At a hearing on September 11, 2020, Government counsel represented that the Government "do[es]n't know

***PUBLIC VERSION***

precisely what the content is" that Mr. Sanders allegedly accessed and could only describe it as "some sort of content." Sept. 11 Hearing Transcript, attached as Ex. 1, at 25.

## C.      The Court's memorandum opinions

The requested material would undermine the Government's factual and legal assertions before this Court and, in turn, numerous factual and legal assertions from the Court's three prior Memorandum Opinions.  Those assertions include, but are not limited to, the following:

- That the Government had evidence—and that Special Agent Ford believed there was actual evidence—that the Internet user went beyond the homepage of the Target Website. *See* Renewed Motion to Compel (ECF No. 89), Ex. 20 (July 31 Transcript) at 33 ("THE COURT: What do you say to his argument that he just made that the tip really was that they only went to the front door, they didn't go in? MR. CLAYMAN: I would say that is contradicted by the face of the tip, which says that they did go in, they did access illegal content").

- That the Special Agent's addition of "via a website" in Paragraph 23 "adds no information because it is obvious that the [███]'s original tip describes an internet user's *activity on a website*." Memorandum Opinion (ECF No. 73) at 10 (emphasis added).

***PUBLIC VERSION***

- That "an internet user cannot access child sexual abuse and exploitation material without accessing a website that *advertises* and distributes child pornography."[3] *Id.* at 11 (emphasis added).

- That "[t]he idea that Special Agent knew that the language was misleading is pure speculation," and that the Court had "correctly" concluded there was "no evidence . . . that Special Agent Ford thought [Mr. Sanders] . . . *did not view child sexual abuse and exploitation material*."  Memorandum Opinion (ECF No. 107) at 6.

- When Government counsel retreated from his argument made at the July 31 hearing and stated instead that the Affidavit provided only "probable cause to believe that on a specific date someone in the defendant's home *accessed a specific hidden service* dedicated to child pornography and that this individual likely *accessed that site with the intent to view the content on it*," not that the person actually went in and viewed illegal content. Ex. 1 (Sept. 11 Hearing Transcript) at 24.

- When the Court then reversed its two previous findings about the tip describing an Internet user's activity *on a website*, *see supra* at 6, and instead concluded that "the fact that the [███] informed the FBI that defendant's IP address *accessed the Tor hidden service* ███████ clearly invites and warrants the reasonable inference that the IP address user was purposeful in his efforts to reach the ████████ website and its illegal content."

---

[3] Respectfully, the Court appears to have misunderstood that Internet users can easily (and often do) access and view online content without visiting a website on the open Internet or without visiting a Tor Onion Service website.  For example, a person can view online content via email (such as Outlook or Apple Mail) or via a web-based application including social media and social messaging applications (such as Kik, Telegram, Facebook messenger, TikTok, Slack, Microsoft Teams, or Instagram), without opening a web browser and navigating to a website. Emails and social media applications are common ways that people communicate and share content online. *See, e.g.,* Mansoor Iqbal, *App Download and Usage Statistics (2020)*, (Oct. 30, 2020), https://www.businessofapps.com/data/app-statistics/.

***PUBLIC VERSION***

Memorandum Opinion (ECF No. 113) at 13.  In rejecting Mr. Sanders's claim that an Internet user could easily access the Target Website a single time without intending to view any illegal content, the Court relied heavily on its "thorough examination" of the screenshots that the Government had cherrypicked, *id.* at 10, even though Mr. Sanders is not alleged to have accessed any of that content.  In any event, it is obvious that the Government is in possession of the screenshot of the homepage, but continues to conceal that evidence because it contradicts the Government's (and, in turn, the Court's) position that every part of the website displayed or advertised child pornography.  Again, the Government has *never denied* possessing this exculpatory screenshot.

**D.      The Government's Rule 414 notices**

After the Court denied Mr. Sanders's pretrial motions, the Government noticed its intent to introduce testimony from FBI Special Agent Ford "that [Mr. Sanders] accessed a hidden service on [Tor] with the intent to view child pornography."  Original Notice (ECF No. 127) at 3.  The Original Notice further stated "that the [FBI] executed a search warrant to search [Mr. Sanders's] residence in February 2020 based on information that someone using an IP address associated with [Mr. Sanders's] residence accessed child exploitation material on a Tor hidden service dedicated to child pornography in May 2019."  *Id.* at 3.

While Special Agent Ford's knowledge of the Target Website has always been directly relevant to the Fourth Amendment suppression issues Mr. Sanders raised in his pretrial motions—and the Government has never denied being in possession of such discovery[4]—the

---

[4] As the Court is aware, the defense respectfully believes that the Court clearly erred in denying Mr. Sanders's motions to compel this critical discovery.  *See, e.g.*, Renewed Motion to Compel Discovery or in the Alternative Motion for Reconsideration of Court's Order Denying Motion to Compel Discovery (ECF Nos. 88-89).

***PUBLIC VERSION***

Government's Original Notice meant that the discovery was also now relevant for trial. Mr.

Sanders therefore requested the trial discovery that ineluctably followed from the Government's

notice. *See* Discovery Letter, attached as Ex. 2. Specifically, Mr. Sanders requested:

1) A "screenshot of ████████ 's homepage;" and

2) "[D]iscovery (in whatever form) regarding how the FBI connected the Internet user with
   IP address ████████ (who was identified as part of ████████ ) with having
   visited ████████ , which was referenced in connection to another person's case as part of
   ████████ ."

Ex. 2. The defense requested that, "[i]f the Government refuses to produce the screenshot,

please let us know immediately so we can seek appropriate relief from the Court." *Id.* at 2. Mr.

Sanders emphasized that he needed to know the Government's position on this request so that he

could "seek the Court's intervention, if necessary." *Id.* at 2.

The Government did not respond to Mr. Sanders's discovery letter. On November 16,

2020, the defense sent a follow-up email requesting the Government's position on Mr. Sanders's

requests by the close of business on November 17, 2020. Emails, attached as Ex. 3, at 1. Mr.

Sanders underscored the need for a response by 5:00 pm that next day so he could "decide

whether to move to compel the production of that information." *Id.* at 1.

At 4:18 pm on November 17, 2020, the Government abruptly withdrew its Original

Notice and substituted the Amended Notice, which deleted any discussion of the Target Website

and Special Agent Ford's intended testimony. Amended Notice (ECF No. 133). The

Government represented to the Court that the reason for its change of plans was its belated

realization that the evidence was "not a pertinent part of the government's case-in-chief." *Id.* at

3. Just one minute after filing its Amended Notice, the Government then informed Mr. Sanders

that the discovery he had requested was now "not relevant." Ex. 3 (Emails) at 1.

## <u>ARGUMENT</u>

The Government is required to produce the requested material to the defense under *Brady*, the ethical rules, and the Government's own internal Guidelines (including the USAM). The requested material is also *Giglio* and, separately, Rule 16 material, because it relates to the credibility of potential Government witness Special Agent Ford.  Even if this Court does not compel the Government to produce the material to the defense, the Court should order the Government to submit the material for *in camera* inspection.

**I.    THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE THE REQUESTED MATERIAL PURSUANT TO ITS DISCOVERY OBLIGATIONS.**

**A.  The Requested Material is *Brady*.**

The standard for production is well-established:  The Fifth Amendment imposes a constitutional obligation on the Government to disclose to the defendant all helpful "evidence . . . material either to guilt or to punishment."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018) (same).  That includes evidence helpful to suppression.  *Biles v. United States*, 101 A.3d 1012, 1020 (D.C. 2014).  Prosecutors therefore have a constitutional "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  That duty is an "independent" one, separate and apart from "the adversarial part of the prosecutor's responsibilities."  *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 558 (4th Cir. 1999).  Because FBI agents are "part of the prosecution, . . . the taint on the trial is no less if they, rather

than the [prosecutor], were guilty of nondisclosure." *Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964).[5]

The Government's *Brady* obligations are enforced not just by *Brady* and its progeny, but also by the prosecutor's ethical duties.  Rule 3.8 of the Virginia State Bar Rules of Professional Conduct requires a prosecutor to "make timely disclosure . . . of the existence of evidence which the prosecutor knows tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment."  Va. RPC 3.8(d).  Prosecutors have "the responsibility of a minister of justice and not simply that of an advocate," which "carries with it specific obligations to see that the defendant is accorded procedural justice."  Va. RPC 3.8 *cmt.* 1.  Furthermore, because prosecutors are "public officials charged with administering justice honestly, fairly and impartially," the "duty of honesty and candor to the Court" is an "obligation [that] lies most heavily upon [prosecutors]."  *Morales v. Portuondo*, 165 F.Supp.2d 601, 612 (S.D.N.Y.2001).

The Government's ethical obligations as prosecutors to disclose material evidence are at least equal to what is constitutionally required.  *See, e.g., Cone*, 129 S. Ct. at 1783 n.15 ("Although the Due Process Clause . . . only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations").  Thus, not only do the Fifth Amendment and Rule 16 require disclosure, so too the Government's ethical obligations.

---

[5] While lack of "materiality" may be a defense post-conviction to suppression of *Brady* information, a determination of materiality pretrial is not appropriate.  *See United States v. Carter*, 313 F. Supp. 2d 921, 925 (E.D. Wis. Apr. 12, 2004) (noting "in the pre-trial context, the court should require disclosure of favorable evidence under *Brady* and *Giglio* without attempting to analyze its 'materiality' at trial"); *Cone v. Bell*, 556 U.S. 449, 470 n.15 (2009) (citations omitted) (noting the Court had "often observed" that pre-trial, prosecutors should "resolv[e] doubtful questions in favor of disclosure").

***PUBLIC VERSION***

The Government's own policies also require disclosure in these circumstances.  The USAM acknowledges that because "it is sometimes difficult to assess the materiality of evidence before trial, prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence."  USAM Policy Regarding Disclosure of Exculpatory and Impeachment Information, § 9-5.001.B.1.  As a result, prosecutors are instructed to "seek all exculpatory and impeachment information from all the members of the prosecution team"—including "law enforcement officers and other government officials participating in the investigation," *id.* at § 9-5.001.B.2—and to "err on the side of inclusiveness when identifying the members of the prosecution team," *id,* at § 9-5.002.A.  Thus, prosecutors are instructed to review an "investigative agency's entire investigative file, including documents such as FBI Electronic Communications (ECs), inserts, emails, etc. . . . for discoverable information."  *Id.*; *see also* Deputy Attorney General Guidance Memo for Prosecutors Regarding Criminal Discovery, Steps 1.B.5-6, available from https://www.justice.gov/archives/dag/memorandum-department-prosecutors (requiring prosecutors to "have candid conversations with the federal agents with whom they work regarding any potential *Giglio* issues," and instructing that "the format of the information does not determine whether it is discoverable").  Exculpatory and impeachment information includes information that "*might have a significant bearing on the admissibility of prosecution evidence*."  USAM Policy Regarding Disclosure of Exculpatory and Impeachment Information, § 9-5.001.C.2 (emphasis added).

Here, the Government's tactical maneuver in substituting its "Amended Notice" for its Original Notice was plainly done for one purpose and one purpose alone:  to avoid providing the defense with *Brady* material that undermined factual and legal representations the Government

***PUBLIC VERSION***

(and, subsequently, the Court) made during the litigation of Mr. Sanders's motions to suppress. That is clear both from the timing of the Government's Amended Notice (*i.e.*, almost immediately before Mr. Sanders had indicated he would file a motion to compel) and from its content (*i.e.*, eliminating all references to ██████ and Special Agent Ford).  It is also clear from the nature of the *Brady* material requested by Mr. Sanders.  Each item is addressed in turn:

1. *Information about how the FBI linked Mr. Sanders to any Tor Onion Service website at all, including one called* ██████.

The Government in its Original Notice alleged that Mr. Sanders's IP address was linked to a Tor Onion Service website, which we know from other discovery the FBI believes is called ██████.



But how the FBI made that link remains a mystery, because there is no document connecting the Internet user's IP address to any such website.  The only document from the ████ that names "██████" and identifies it as a Tor Onion Service website is an ██████████, Gov't Brief (ECF No. 67), Ex. 1, pertaining to a different operation ██████████).  That ████ lists five files that someone else—not the Internet user in this case—allegedly shared. Gov't Reply to Response (ECF. No. 67) at 2-3, n.1.  As this Court has observed, the ████ "*does not* state that the Target IP address created or accessed the five images or videos identified."  Memorandum Opinion (ECF No. 113) at 2, n.2 (emphasis in original).  Nor does it ever mention the IP address ultimately linked to Mr. Sanders.  Gov't Brief (ECF No. 67), Ex. 1.

The ████ identified the Internet user in this case as part of ██████████, but ████ ██████ involved more than one website; thus, the mere fact that the Internet user was identified as part of ██████████ is not enough to connect this Internet user to any specific website.  Since the time this Court ruled on Mr. Sanders's motions to suppress, the defense independently obtained information, not previously available, that ██████████ involved

13

numerous websites, and not just ████.[6]  *See* Chief Constable's Update, attached as Ex. 4, at

11 ("███████████ is the ████'s response to hidden *services*, specifically criminally

motivated by Child Sexual Abuse and Exploitation *sites* and *services*."  *Id.* (emphases added).

As a result, an Internet user identified under ███████████ did not necessarily access ███

████ at all, and the three ████ documents, taken together, are insufficient to connect the Internet

user in this case to a specific Tor Onion Service website, let alone to ██████.  The fact that

descriptive language in the Intel Log matched descriptive language in the ███████████ is

an insufficient basis to connect the two, as there are numerous sites that such a description could

refer to.[7]

     The outstanding discovery will show that the ████ never made the connection between

the Internet user and the Target Website.  Instead, it appears that the FBI guessed or simply

assumed that the ████ was referring to ███████, when the ████ easily could have been

referring to another website within ███████████ or some other online content (such as

content shared by email, a social media app, or a messaging app).  *See supra*, n.3.

---

[6] This March 2020 report was not previously available to the defense.  Although the defense
frequently conducted Internet searches that would have located this document prior to when the
Court ruled on Mr. Sanders's motion to suppress, it was not until after the Court's rulings that
the document became locatable by the defense.  This is likely due to the fact that it is a PDF
document, not an HTML document, and there was a delay in it being indexed by Google.  *See*
Jonathan Griffin, *Does Google Index PDF Files and Content?*, The Search Review (Feb. 20,
2020), https://www.thesearchreview.com/google-we-index-pdfs-just-like-any-other-web-page-
29318/ (explaining why PDF files may not be indexed as frequently as HTML results).

[7] *See, e.g.,* Ben Wallace, Minister of State (Home Office), Crime (Overseas Production Orders)
Bill (Dec. 3, 2018), available from https://www.theyworkforyou.com/debates/?id=2018-12-
03b.587.2 (UK Member of Parliament explaining the existence of "hurtcore sites," which are
"forums . . . dedicated to the discussion, and the sharing of images and videos" that could fit the
same description as the one used in the ██████ or ███████████).

***PUBLIC VERSION***

2.   *The screenshot of the Target Website homepage.*

The Government has never denied possessing a screenshot of the Target Website

homepage and, as this Court is aware, the Government has produced screenshots from other

sections of the website (that the FBI captured in January 2019) that the Court relied upon in

denying Mr. Sanders's motions to suppress.  Memorandum Opinion (ECF No. 113) at 10

(finding "unavailing to [Mr. Sanders] . . . the claim that the ███████ website included legal as

well as illegal content. . . . *A thorough examination of screenshots of the* ███████ *website*

*provided by the FBI reveal defendant's claim to be baseless*" (emphasis added)); *id.* at 16

(concluding that Mr. Sanders's "claim that the site included legal content . . . does not make it so.

. . . [T]hat claim is contradicted by screenshots of the site provided by the FBI").  The four

screenshots that the Government has disclosed are of pages that an Internet user could choose to

visit only *after* visiting the homepage.  Motion to Suppress No. 3 (ECF No. 84), Ex. 7

(Declaration of Seth Schoen).  And three of the four could only be viewed *after* a user registered

an account and logged in.  There was no evidence (either now or at the time the Special Agent

submitted his Affidavit) that the Internet user in this case ever did so.[8]  Nor is there any evidence

that the Internet ever visited *any* of the pages captured in the screenshots the Government chose

to disclose.  Given that reality, the screenshot the Government continues to withhold is—

ironically—the most probative of them all.

---

[8] It is incorrect that Mr. Sanders "admitted to accessing and receiving child pornography through
. . . the ███████ website."  Memorandum Opinion (ECF No. 113) at 4.  Mr. Sanders did not
admit to visiting the Target Website that is referenced in the Affidavit, which the audio recording
of Mr. Sanders's entire law enforcement interview clearly reveals.  Instead, Mr. Sanders referred
to a different website with a similar name.  The Government would be able to confirm that Mr.
Sanders cooperated with the FBI to provide the usernames and passwords for two websites that
did not include ███████.

***PUBLIC VERSION***

The Government's lack of any evidence regarding the Internet user's actions supports the defense's view that, even if the FBI has a basis for connecting the Internet user to the Target Website, the evidence does not reflect any activity by the Internet user except visiting the homepage (the first and perhaps only page a visitor would see), which did not advertise or display child pornography.  The screenshot of the homepage—which is uniquely in the Government's possession, given that the ███ shut down the website in June 2019—would therefore have been most helpful to the defense.

### 3.  Related material reflecting the Special Agent Ford's state of mind

The Government has never denied that it possesses undisclosed material regarding the Special Agent's understanding of the Internet user's activity on May 23, 2019.  If the Government's characterization of the material that constitutes the tip is to be trusted, then the Special Agent knew that *there is no document linking Mr. Sanders to the Target Website*.  And even if Mr. Sanders visited the Target Website, the Special Agent must have known there is no evidence that he went beyond the website's homepage (the first and potentially only page a user would visit).  *See* Special Agent Ford's 1057 at 2 (stating that the Internet user had "accessed ███," not that the Internet user had viewed child pornography or taken any other action on ███); Gov't Opp'n (ECF No. 41) at 11 ("The FLA tip and the SW Affidavit say that an IP address was used to access child sexual abuse material via a website. The *FBI form and government filing say that an Internet user accessed a specific website* that advertised child pornography") (emphasis added).

If there was evidence that the Internet user went beyond the homepage, the Special Agent would have said so in his Affidavit and the Government would have said so in the course of litigating this case.  Instead, the Government has admitted there is no evidence that the Internet

user ever registered an account, logged in, visited any particular portion of the website, or viewed any particular content, all of which are necessary steps for viewing illegal content. *See, e.g., supra* at 5-6; *see also* Gov't Opp'n (ECF No. 41) at 10 ("at no point does the SW Affidavit state that the defendant had registered an account on this website, nor does it state that the defendant accessed any specific material on the site beyond the material described in the FLA's tip"); Ex. 1 (Sept. 11 Hearing Transcript) ("Mr. CLAYMAN: . . . Admittedly, we don't know precisely what the content is, but we have never claimed to know exactly what it is, or exactly the definition of child pornography under the United States Code.  We also never claimed that the tip alleges that he downloaded that content. All the tip says is that he accessed content on this site and that we know that this site is dedicated to child pornography").  To the extent the Special Agent realized the foregoing, that is *Brady* material that the Government must produce to the defense, or, at a minimum, to the Court for *in camera* inspection.

**B.  The requested material is also *Giglio*.**

Because all three categories of requested material would undermine the "reliability" of Special Agent Ford's testimony and therefore "may well be determinative of guilt or innocence," failure to disclose the evidence affecting Special Agent Ford's "credibility" violates the Government's obligations under *Giglio* (a subset of *Brady*).  *Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also United States v. Bagley*, 473 U.S. 667, 676 (1985) (rejecting any "distinction between impeachment evidence and exculpatory evidence"); *see also United States v. Quinn*, 537 F. Supp. 2d 99, 109 (D.D.C. 2008) (government conceded and court held that when the prosecution "has information about a witness who it is planning to call in its case in chief that indicates the witness has lied to the government about material matters during the course of the investigation, that information is *Brady* material").

***PUBLIC VERSION***

The requested material would show that the Special Agent knew (or at minimum should have known) that the ███ never actually connected Mr. Sanders to the Target Website (or any other Tor Onion Service website); that even if Mr. Sanders visited the Target Website, there was no evidence that he went beyond the homepage (again, the first and potentially only page any user would visit); and that there was no evidence of Mr. Sanders's actual activity online, let alone on the Target Website.  That material would show that the Special Agent either jumped to conclusions that were unfounded or knowingly misled the Magistrate.  Either scenario goes directly to whether this Court should credit any of the Special Agent's assertions in the Affidavit and the Government's representations about the evidence underlying it.  Both also go directly to the Special Agent's credibility, both for suppression and should he testify at trial.

## II.   THE REQUESTED DISCOVERY SEPARATELY FALLS UNDER RULE 16 BECAUSE IT RELATES TO THE STATE OF MIND AND CREDIBILITY OF POTENITAL GOVERNMENT WITNESS SPECIAL AGENT CHRISTOPHER FORD.

The requested discovery must be produced under Rule 16(a)(1)(E) because it pertains to Special Agent Ford's credibility.  Under Rule 16(a)(1)(E), the government must make available to Mr. Sanders any requested items that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i).  Mr. Sanders is able to show materiality under this rule, because there is at least "some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor," including in litigating his motions to suppress.  *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (quotation marks and citations omitted).  "[E]vidence is material as long as there is a strong indication that it will play an important role," including in "assisting impeachment or rebuttal."  *Id.* at 621.

In this case, Special Agent Ford made obviously reckless or knowingly false statements about, *inter alia*:

***PUBLIC VERSION***

- The identification of the Internet user's IP address (by suggesting that it was a reliable identification, Affidavit ¶ 23, when there was no evidence connecting the Internet user to the Target Website and the method the ███ used to identify the Internet user likely would not have been able to produce a reliable or accurate identification, *id.* ¶ 25).[9]

- What the Internet user did on May 23, 2019 (by conveying to the Magistrate that there was actual evidence that the Internet user had viewed illegal pornography, , Affidavit ¶ 23, when he knew well there was none);

- The Target Website (by claiming that it advertised child pornography, *id.* ¶ 15, when the homepage did no such thing, and by suggesting there was evidence that the Internet user had viewed that the content captured in the screenshots the Government disclosed, *id.* ¶¶ 17-21, when he knew there was none);

- How an Internet user likely would have encountered the Target Website (by suggesting that someone who visited the website would have been looking for illegal content, *id.* ¶ 27, when the homepage screenshot would show that the information a search engine would crawl would be innocuous and so a person

---

[9] Dr. Richard Clayton, Director of the Cambridge Cybercrime Centre at the University of Cambridge, explained that any other method that does not interfere with an Internet user's computer would not accurately identify an Internet user based on a single visit ("law enforcement will need to assume that every result they get from a traffic confirmation attack is potentially a false positive and . . . will need to look for multiple identifications . . . before acting upon the data") or exists only in theory but not in practice ("The global passive adversary attack is a theoretical idea and does not work in the real world. NSA/GCHQ attempted and failed. Police forces such as the FBI and ███ have far less resources and technical capabilities than these organisations who in practice do all the 'heavy lifting' for the police"). Motion to Suppress Based on False and Misleading Material Information in Affidavit Paragraph 25 (Motion to Suppress No. 4), Ex. 9 (Declaration of Dr. Richard Clayton) at 8.

***PUBLIC VERSION***

could easily come across the Target Website without having an interest in or

attempting to view child pornography); and

- Evidence of the Internet user's intent (by suggesting anyone who downloaded the

  Tor Browser and visited the Target Website intended to view child pornography,

  *id.* ¶¶ 6, 28-30, 37-46, when it is more likely than not that someone who visited

  this website at one time, at one second, and never returned—which is at most

  what the Special Agent had—did not intend to view illegal content).

## III.   IN THE ALERNATIVE THE COURT SHOULD INSEPCT THE MATERIAL *IN CAMERA*.

At minimum, this Court must order the Government to produce the requested information

for *in camera* inspection to determine whether it must be disclosed before it can deny Mr.

Sanders's request.  *United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018).  This is not "a

typical *Brady* case," because Mr. Sanders has not "discovered exculpatory evidence after trial,

which [he] alleges the government unconstitutionally suppressed;" instead, the Government is

actively depriving Mr. Sanders of the material in question.  *Id*. at 217–18 (4th Cir. 2018)

(quotation marks and citations omitted).  And at no point has this Court examined what the

Government is withholding to rule on the materiality or helpfulness of the information.

Even if the Court finds this is a case where "it is impossible to say whether requested

information" is helpful or material, "a defendant need only make some plausible showing" that it

exists.  *King*, 628 F.3d at 703 (quotation marks and citations omitted).

That means that even if the Government claims that the requested information will

"contain nothing helpful" for Mr. Sanders, he remains entitled to *in camera* review.  *Id.* at 703.

This Court "cannot solely rely on the government's good faith as a basis to avoid review."

*Abdallah*, 911 F.3d at 218.

***PUBLIC VERSION***

The Government may attempt to argue that Mr. Sanders is using *Brady* as an open-ended discovery tool. That is incorrect. The defense has identified information favorable to Mr. Sanders, and the Government has refused to produce it not because it does not exist, but because: "the Court has determined that [his] request is not material;" the Government believed its initial Notice did "not alter that determination;" and the Government had since "withdrawn [its] initial notice under Rule 414" and explained that the Government no longer intends to introduce at trial evidence about the Target Website or Mr. Sanders's possible activity on the Target Website. Ex. 3 (Emails) at 1.

Because Mr. Sanders has made the requisite showing that the information he seeks plausibly exists, he is "entitled to have the information . . . submitted to the trial court for *in camera inspection*" to determine if it is "subject to disclosure." *King,* 628 F.3d at 703.

## CONCLUSION

Throughout this case, the Government has refused to explain the Special Agent's state of mind when he re-iterated portions of the tip, and added additional language, in Paragraph 23 of the Affidavit, that plainly overstated the quality of the Government's evidence. That fact, when combined with the Government's most recent litigation maneuver, tells this Court precisely what the Government was trying to hide: that the Special Agent never saw any evidence that the Internet user went to the Target Website, went to any particular portion of the Target Website, viewed any particular content, or that the website's homepage advertised illegal content. In other words, there was no evidence available to the Special Agent showing that the Internet user did anything more than, at most, access an innocuous homepage a single time without going any further.

***PUBLIC VERSION***

After Mr. Sanders requested the information he now seeks to compel, the Government responded by withdrawing its intent to introduce evidence at trial about the Target Website and Mr. Sanders's purported activity on the Target Website.  Original Notice (ECF No. 126); Amended Notice (ECF No. 133); Ex. 3 (Emails).  That abrupt about-face demonstrates beyond question that the information the Government is withholding would have substantiated Mr. Sanders's claims for suppression.  Continuing to withhold that information violates Mr. Sanders's Fifth Amendment rights, the prosecutor's ethical obligations, and the Government's own internal guidelines. This Court should order the Government to produce the requested information.  Even if this Court finds that Mr. Sanders has not made the requisite materiality showing, Mr. Sanders has made a plausible showing that the information the Government is withholding exists, and he is therefore entitled to *in camera* inspection.

Respectfully submitted,

*/s/ Jonathan Jeffress*

Jonathan Jeffress (#42884)
Emily Voshell (#92997)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C.  20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: evoshell@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com

*Counsel for Defendant Zackary Ellis Sanders*

***PUBLIC VERSION***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of November 2020, the foregoing was served electronically on the counsel of record through the U.S. District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

*/s/ Jonathan Jeffress*
Jonathan Jeffress

***PUBLIC VERSION***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

UNITED STATES OF AMERICA,

                                   Plaintiff,

        v.

ZACKARY ELLIS SANDERS,

                                   Defendant.

Case No. 1:20-cr-00143
Honorable T.S. Ellis, III
Pretrial conference: Jan. 15, 2021
**Filed Under Seal**

**[PROPOSED] ORDER**

        This matter having come before the Court on Mr. Sanders's Motion to Compel the

Government to Produce Material, or, in the Alternative, to Submit Material for *In Camera*

Inspection, and having reviewed any Government's Opposition thereto, it is, for good cause

shown, **ORDERED** that the Motion is **GRANTED**.  [The Government is **ORDERED** to

produce the requested material to [Mr. Sanders]/[this Court] for *in camera* inspection.]

        It is so ORDERED.

                                        _____
                                        THE HONORABLE T.S. ELLIS

Date: _____

Alexandria, Virginia