**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

UNITED STATES OF AMERICA,

                Plaintiff,

  v.

ZACKARY ELLIS SANDERS,

                Defendant.

Case No. 1:20-cr-00143
The Honorable Judge Ellis

Pretrial Conference: January 15, 2021
Trial Date: February 9, 2021

**EVIDENTIARY HEARING
REQUESTED**

<u>**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS**</u>

      Zackary Ellis Sanders, by and through undersigned counsel, respectfully moves the Court to suppress any statements taken from him by law enforcement in violation of the United States Constitution. The motion to suppress is made pursuant to Fed. R. Crim. P. 12(b)(3). An evidentiary hearing on this motion is respectfully requested.

      Mr. Sanders moves to suppress statements that the Government intends to introduce from February 12, 2020, the date the search warrant was executed at the Sanders' family home. The statements must be suppressed for two reasons. First, law enforcement never gave Mr. Sanders *Miranda* warnings, despite the clearly custodial environment of the interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Specifically, twenty-six armed agents and officers arrived at Mr. Sanders' home at 6:05 a.m., banged on the door, pointed guns at his parents, yelled an obscenity and pointed a gun at Mr. Sanders (who was naked and sleeping when they arrived), separated Mr. Sanders from his parents, and interrogated him for at least three hours and eighteen minutes. The facts here are nearly identical to those in *United States v. Hashime*, 734

F.3d 278 (4th Cir. 2013), in which the Fourth Circuit found that an individual was in custody when he underwent an hours-long interrogation during the execution of a search warrant in his home under similar circumstances.  Second, the interrogation was coercive and thus involuntary. The agents repeatedly threatened to take away the entire family's electronic devices—on which they all relied for work—unless Mr. Sanders provided them information and passwords. Additionally, Mr. Sanders' characteristics—he had slept for less than two hours, he had no prior experience with law enforcement, and he had recently been treated with extremely powerful steroids that can interfere with cognition, behavior, and mood—contribute to a finding that his statement was not voluntarily made.  Mr. Sanders's statements should be suppressed and he respectfully requests a hearing to show the same.

## PROCEDURAL BACKGROUND

Mr. Sanders was indicted on June 24, 2020. The Government, in its November 2, 2020 Notice of Intent to Present Evidence Under Federal Rule of Evidence 414 (ECF No. 127), provided Mr. Sanders with notice, for the first time, of its intent to use portions of his statement at trial.  On November 17, 2020, the Government withdrew its November 2, 2020 notice and filed an Amended Notice of Intent to Present Evidence Under Federal Rule of Evidence 414 (ECF No. 133).

In its Amended Notice, the Government wrote that it:

> may introduce testimony that, during the search of his home, the defendant voluntarily agreed to be interviewed by law enforcement and admitted that he previously received child pornography using a mobile messaging application and that he accessed and downloaded child pornography from websites on a dark web network known as The Onion Router ("Tor").

Amended Notice (ECF No. 133) at 4.  The Government went on to provide notice that it hopes to introduce "testimony about and excerpts of this recorded interview" regarding "(1) other prior

instances in which he received child pornography using a mobile messaging application; (2) the process by which he found hidden services on Tor on which there was child pornography; and (3) other prior instances in which he downloaded and stored child pornography material from these hidden services." *Id.* The Government concluded its 414 notice by stating that it "may seek to admit some of the above evidence under Federal Rule of Evidence 404(b), for which it will provide separate notice." *Id.* at 5.

Prior to the Government's 414 Notices (and prior to the initial Motions deadline), Mr. Sanders was not on notice that the Government intended to introduce his statements as evidence at trial. Now that notice has been provided (and in advance of the Motions in Limine deadline), Mr. Sanders respectfully moves this Court to suppress those statements.

## FACTUAL BACKGROUND[1]

On February 12, 2020, at 6:05 a.m., twenty-six FBI Washington Field Office and task force members arrived, in the dark, at the home of Zackary Sanders and his parents to execute a search warrant. Ex. 1 (February 14, 2020 FD-302 Report) at 1. They banged on the door and started repeatedly ringing the doorbell. Ex. 2 (Declaration of Dr. Risa Sanders) at 1. Mr. Sanders's parents (Dr. Risa Sanders, age 62, a psychologist, and Dr. Jay Sanders, age 82, a medical doctor) came to the door, in their pajamas, fearing a possible home invasion. Dr. Risa Sanders was so sure that there was a home invasion that she yelled to her husband multiple times not to open the door. *Id.* at 1. Instead, they found over two dozen law enforcement officers on their lawn—enough to fill their entire driveway. *Id.* Multiple officers had their guns drawn. *Id.* One in particular had a "long gun" pointed at the Sanders. *Id.*

---

[1] Mr. Sanders reserves the right to supplement the factual record, including with any evidence and testimony from the evidentiary hearing on this Motion.

Dr. Jay Sanders opened the door and the home's alarm system started blaring.  *Id*.  Dr. Risa Sanders writes, in her attached declaration, that she had never been around guns and that she "was scared for [her] life." Ex. 2 at 2.

The FBI asked the Sanders who else was in the home.  *Id*.  Dr. Risa Sanders replied that their son, Zackary Sanders, was inside.  The FBI then rushed inside.  The FBI asked where Zackary's room was.  Risa Sanders, "so frightened she could barely speak," motioned towards Zackary's room.  *Id*.  Multiple agents then ran upstairs.  One shouted "don't fucking move" to Zackary, who was 24 years old at the time and had never had any prior dealing with law enforcement.  Ex. 3 (Excerpts of Transcript of Zackary Sanders's February 12, 2020 recoded statement) at 6.  At least one had a gun drawn.  *Id*.  Risa Sanders writes that she "was scared to death they were going to shoot Zack."  Ex. 2 at 2.  They then went into Zackary's room, shone lights in Zackary's eyes, and tackled Zackary, who had been asleep and naked.  They told Zackary to get on his knees.  *See* Ex. 3 at 7.  Zackary pleaded that he needed his pants and his contacts.  Ex. 2 at 2.  Zackary cannot see without his contacts, and was extremely disoriented. *Id*.  Before the agents reached for his pants, Zackary explained there was a pocketknife in the pocket.  *See* Ex. 3 at 7.  After what felt like several minutes, Mr. Sanders was given his pants and allowed to get off his knees.

Meanwhile, Dr. Jay and Dr. Risa Sanders, still in their pajamas, were moved by law enforcement to the living room.  Ex. 2 at 3.  Law enforcement led Zackary downstairs to the dining room.  *Id*.  A few minutes later, law enforcement took Zackary to his mother's office, where they began interrogating him.  They closed the doors to the office and one agent stood outside, blocking the door from being able to be opened outwards.  Despite displaying their weapons, separating him from his parents, and restricting his ability to move freely in his home,

4

which was swarming with law enforcement officers, Special Agents Jeremy Obie and
Christopher Ford chose not to read him *Miranda* warnings.

Before the agents started recording the interrogation, they told Mr. Sanders that they were
could take every single electronic device in the home, including the router, cable box, all phones,
all iPads, and all computers.  They then began recording.  Within seconds of the recording's
start, Mr. Sanders said that he did not want to talk—"I—I don't think I want to talk.  I mean, you
guys just barged into my house"—and asked if he needed a lawyer—"Like you just barged in. I
mean, should I have a—like a—don't I need like a lawyer or something before I answer?" Ex. 3
at 3-4.  Special Agent Obie said that he was not there to provide legal advice, that Zackary was
not under arrest, and that Zackary "can do whatever you want to do," but told Zackary that "the
faster we can talk, the faster we can get to the—the bottom of the truth, the sooner we get out."
*Id.* at 4, 7.  At no point during the interrogation did the agents tell Zackary that he was free to
leave.

Zackary then asked if his mother could be in the room with him.  *Id.* at 7.  Special Agent
Ford replied, "[n]ah, nah, no."  *Id.*  Zackary brought up an attorney again, "Um, yeah. I mean, I
feel, though, if any of these questions are like leading to like incriminating to any thorough --
any like law breaking, I should have-- … A lawyer with me." *Id.* at 8.  He continued, "I mean, I
don't know what the questions are, but like, if any of it like is related to doing anything wrong.
Obviously, I feel like I should have the advice of a lawyer." *Id.*  Again, rather than inform Mr.
Sanders that he had the right to an attorney, the agents said that they could not give him legal
advice and that he could stop at "some point" if he wanted.  *Id.* at 9.

Throughout the interview, the agents' words and actions made it clear that a person in
Zackary Sanders's position would not feel free to leave.  The agents told Zackary multiple times

that if he did not give them truthful information, they were going to take all of the devices in the home.  This was particularly coercive because, as the agents knew, Zackary ran his business using his electronic devices, and both of his parents practiced out of their home and also depended on their electronic devices for work.  Those statements included the following:

- o "but if you're not truthful with us, we're going to have to take all your stuff and then that's potentially going to affect your business." *Id*. at 76.

- o "So we – I'm just trying to give you the opportunity -- same with your phone. If you just give me the log[in] []to your phone, I can go in, I can clear it and s- -- you can keep your phone, but if not, we're taking your phone, we're taking all the devices in your house, unless you can be like, nope, here's the password to this so we can keep it here. So it's up -- that completely up to you, but it's – we're going to take it regardless. Not regardless, but if we'd be clear it, we're not going to take it. Like, we don't want to take your parents' stuff, we don't want to take your stuff, but that's on you." *Id*.

- o "We take all your stuff and you're not being truthful with us, it's going to be—it's –it's an issue." *Id*. at 87.

- o "So basically we look and see what's on the devices. And if you're like truthful with us and help us and say, hey, yeah, this stuff in my room -- we can just focus on your room so we don't have to take your routers. We don't have to take all your stuff." *Id*. at 90.

- o In response to Zackary's question about what would happen if he did not provide his passwords to his devices, "We take it" and "And it—you might not see it for a—a long time." *Id*. at 145-46.

Additionally, the agents confronted Zackary with evidence throughout the interrogation. The agents told Zackary, "your IP address came back to a website that was advertising child pornography."  *Id*. at 86.  The agents also said that with "certain technologies" they had traced activity on Tor "back to this residence."  *Id*. at 110.[2]  They told him that they found a thumb

---

[2] Notably—and contrary to what Special Agent Ford averred in the search warrant affidavit submitted to the Magistrate—the agents stated that "*we*" (meaning the FBI, and not the Foreign Law Enforcement Agency), "with certain technologies," "traced" activity on Tor "back to his residence." (at 110).

drive with child pornography in his room. *Id*. at 87.  A few minutes later, he said that "you are making a claim that you found something" and the agents replied "There's no claim.  It's fact." *Id*. at 93.

The agents also kept urging Zackary to be honest, alleged that he was not being truthful, and told him that it was a crime to lie to a federal agent.  They told him, "there's certain things I can tell that you are keeping from us, but we're going to find that end of the day."  *Id*. at 77.  They scolded him "[b]e honest" about Tor.  *Id*. at 86. They warned him, "[a]nd also just—just to be perfectly clear; right? So it is a crime to lie to a federal agent—like—that—that is actual crime."  When Zackary replied that he had not lied, Special Agent Ford said "well—" and Special Agent Obie said, "[l]ike I said, it is a crime.  So we're asking you to be honest."  *Id*. at 91.  Mr. Sanders replied, "Yeah" and Special Agent Obie warned, "Crime can give jail time if needed-- if need be; right? This is why we're saying honesty is key because you don't want that on top of everything."  *Id*.  Later in the interrogation, Special Agent Ford interrupted Zackary and said, "But let's go back to being honest; okay?"  *Id*. at 129. Zackary replied, "Back to being?"  *Id*.

Zackary also asked three times more for his mother to be allowed in the room during the interrogation.  *Id*. at 8, 88, 92.  The agents denied his requests to see his mother twice before agreeing to allow Dr. Risa Sanders to come into the room.  However, the agents would not let them speak alone without being recorded.  Instead, the Special Agents Ford and Obie kept the recorder running and stood directly outside the glass-paned doors of the office, along with multiple other agents, watching Zackary and his mother.  Ex. 2 at 5.

Further, when Mr. Sanders's mother first came into the room, she, too, inquired about a lawyer, saying "maybe we should get a lawyer rather than continuing to—because if they're

saying they found something bad, then probably we should get a lawyer[.]" *Ex.* 3 at 106.  The agents ignored her.  She also mentioned that both she and Zackary had been hospitalized recently.  The agents asked no follow-up questions regarding the hospitalization.  Had they done so, they would have learned that Zackary had recently been diagnosed with a rare condition, optic neuritis, and that he had been receiving heavy doses of a steroid, solu-medrol, throughout the month of January.  Ex. 4 (Excerpts of Zackary Sanders's January 2020 medical records); *see also* Ex. 2 at 2-3 (explaining that Zackary received steroids throughout the month of January, including on January 28-31, 2020).  That steroid can cause disturbances of mood, behavior, and cognition.  Ex. 5 (Article entitled *Psychiatric Adverse Effects of Corticosteroids*).  They would have also learned that Dr. Risa Sanders had recently undergone a mastectomy and, a few weeks prior, had been rushed to the hospital by ambulance in the middle of a chemotherapy session because she became so ill.  Ex. 2 at 5.  Instead, the agents proceeded to threaten to take the entire family's electronic devices, pointing out that all three family members needed those devices for business, unless Zackary continued speaking with the agents.  Ex. 3 at 108-09.

Throughout the interrogation, it was clear that Zackary was extremely nervous and uncomfortable.  He said the following to the agents:

- o "I'm very uncomfortable with probably answering anything." *Id*. at 10.

- o He told the agents twice that he was "nervous." *Id*. at 79, 88.

- o "Every time you make a noise or give me a look like that--.. make me very uncomfortable." *Id*. at 87.

- o "[T]his is kind of scary[.]"  *Id*. at 89.

- o "I'm very stressed right now and I haven't even slept since yesterday"  *Id*. at 95-96.

- o "You're scaring me a little"  *Id*. at 97.

After three hours and eighteen minutes of interrogation, the agents completed their search and left. From the moment they arrived to the moment they left, they commandeered the Sanders's family home. None of the Sanders were free to move around the house. At least two armed agents stayed with Dr. Risa and Dr. Jay Sanders in the living room, watching over them, as the twenty-six members of law enforcement took over the home. Ex. 2 at 3, 6. Dr. Risa Sanders explains that she was not allowed to change her clothes or use the bathroom without an agent accompanying her and commanding her to leave the door open. *Id*. at 3. When Dr. Risa Sanders came to her home office, where Zackary was being interrogated, she "was bothered to see the agents in my office, treating it like it was their own, because I have confidential patient information in there." *Id*. at 4. She writes, "[t]hey just took over my desk without asking me." *Id*. She also asked the agents if she could get Zackary a soda (the agents did not ask Zackary if he needed anything to eat or drink at any point in the interrogation) and the agents went to get it themselves. Ex. 3 at 115-16. She explains, "[t]hat really bothered me, that I couldn't go by myself to get a coke for my own son in my own house." Ex. 2 at 5-6. She describes the scene: "Law enforcement camped out in every room on the main floor of our house. It was like they had commandeered my home. I did not feel like I was free to move around in my own house. I did not feel like I was free to leave." *Id*. at 6.

Zackary Sanders was also in the presence of armed agents the entire time, from the moment he was confronted, naked, at gunpoint, to the moment the agents left. He did not leave his mother's office once during the hours-long interrogation. The only "break" he received was to talk to his mother for several minutes while agents watched and recorded them.

When the agents left, the Sanders family was surprised to see that most of the house looked untouched, except for Zackary's room, which had been ransacked. *See* Ex. 2, Attachment

A (Photo attachment to Dr. Risa Sanders's Declaration).  As Dr. Risa Sanders explained, "[i]t

was very clear to me that law enforcement was there for Zack. … It seemed very targeted."  Ex.

2 at 3.

## ARGUMENT

### I.   MR. SANDERS'S STATEMENTS WERE OBTAINED IN VIOLATION OF HIS *MIRANDA* RIGHTS.

*Miranda* requires suppression of Mr. Sanders's statements during the government's case-

in-chief because he was not apprised of his right against self-incrimination prior to undergoing

custodial interrogation. *See, e.g., Pennsylvania v. Muniz*, 496 U.S. 582, 110 S. Ct. 2638, 2643-44

(1990).  A person is in "custody" under *Miranda* when he "has been . . . deprived of his freedom

of action in any significant way."  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Whether a

person is in custody depends upon "how a reasonable man in the suspect's position would have

understood his situation."  *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).  "The operative

question is whether, viewed objectively, 'a reasonable man in the suspect's position would have

understood his situation' to be one of custody." *United States v. Colonna*, 511 F.3d 431, 435 (4th

Cir. 2007) (quoting *Berkemer*, 468 U.S. at 422).  In other words, a court must decide "whether 'a

reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and

leave.'"  *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007) (quoting *Thompson v.

Keohane*, 516 U.S. 99, 112 (1995)) (alteration in original).

As the Fourth Circuit explained in *Hashime*, 734 F.3d at 283, relevant facts to the

custodial inquiry include, but are not limited to, "the time, place and purpose of the encounter,

the words used by the officer, the officer's tone of voice and general demeanor, the presence of

multiple officers, the potential display of a weapon by an officer, and whether there was any

physical contact between the officer and the defendant," as well as the "suspect's isolation and

separation from family" and "physical restrictions." *Id.* (finding defendant in custody and suppressing statement) (internal citations and quotations omitted).  The "ultimate inquiry" looks at the "totality of the circumstances to determine whether they indicate an individual's freedom of action is curtailed to a degree associated with formal arrest." *United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007) (finding defendant in custody and suppressing statement).

### A.  The totality of the circumstances show that Mr. Sanders was in custody.

As in *Hashime*, 734 F.3d 278, and *Colonna*, 511 F.3d 431, the totality of the circumstances here makes clear that Mr. Sanders, though not subject to formal arrest, was in custody.  No reasonable person in Mr. Sanders's position would have felt free to terminate the encounter. Mr. Sanders, as in *Hashime*, "had awoken at gunpoint to a harrowing scene: his house was occupied by a flood of armed officers" who restricted his and his parents' movements. *Hashime*, 734 F.3d at 284.  Twenty-six officers commandeered the home and controlled the Sanders' every movement within it. *See Colonna*, 511 F.3d at 435. (the "home was inundated with approximately 24 officers who gave Colonna and his family members instructions; that is, they told them where to sit and restricted their access to the home.")  Risa Sanders was not even allowed to use the bathroom or change her clothes without an agent following her, demanding that the door stay open.  Decl. at 3.

The agent's initial coercive and terrifying approach of Mr. Sanders in his bedroom was also similar to *Hashime*.  Agents woke Mr. Sanders, who had been in bed asleep and naked after working until 4:00 a.m.  Ex. 3 at 23-24; *Hashime*, 734 F.3d at 280 ("An officer entered Hashime's bedroom and pointed a gun at him. Hashime was in bed, naked and asleep, having gone to bed at 5 AM that morning.").  One officer approached Mr. Sanders with "his gun out" and was "shouting—don't fucking move."  Ex. 3 at 6.  *See Hashime*, 734 F.3d at 280 (officer

entered Hashime's bedroom, pointed a gun at him, and ordered him to get up).  As Mr. Sanders explained in the interrogation, "[t]hat really freaked me out."  Ex. 3 at 6.  Mr. Sanders was tackled to the ground and then put on his knees, still naked.  Several other agents then came behind the first and found Mr. Sanders's pants and got him off his knees.  *Id*. at 6-7.

Armed agents then brought Mr. Sanders downstairs and isolated him from his parents. *See Hashime*, 734 F.3d at 284 (noting that defendant was isolated from his family members throughout the interrogation); *see also United States v. Freeman*, 61 F. Supp. 3d 534, 544-46 (E.D. Va. 2014) (finding interrogation by two agents in separate room from family, where defendant was not "freely moving around," deprived defendant "of his freedom of action in a significant way.") (internal citation and quotation omitted).  Though the agents told Mr. Sanders that he was not under arrest, he was never told that he was free to leave and he was never read *Miranda* warnings. *See Colonna*, 511 F.3d at 435 ("at no time was he given *Miranda* warnings or informed that he was free to leave.")  Meanwhile, Mr. Sanders's parents were in the living room, being guarded by at least two agents at all times.  Dr. Risa Sanders was not even allowed to use the bathroom without being followed and told to leave the door open. *See Hashime*, 734 F.3d at 284 (noting "the suspect and his family's loss of control over their home" as factor weighing in favor of custody).

Mr. Sanders asked multiple times to see his mother—a request the agents repeatedly denied.  Ex. 3 at 8, 88, 92.  Though his mother was eventually allowed in the room for about nine minutes of the three-hour-plus interrogation, that encounter, too, was coercive.  When she came in the room, Risa Sanders almost immediately mentioned an attorney, saying "maybe we should get a lawyer rather than continuing to—because if they're saying they found something bad, then probably we should get a lawyer[.]"  *Id*. at 106.  The agents ignored her.  Mr. Sanders then asked

if the two could speak privately. *Id*. at 107. The agents told him no. Risa Sanders asked why

and said that they had both been hospitalized in the last couple of months. *Id*. The agents

ignored her again, and proceeded to discuss their investigation and threatened to take all of the

electronic devices in the home, claiming that they did not want to do that because it would be a

"burden," especially because all three of the Sanders "have your businesses here." *Id*. at 108-09.

The agents eventually agreed to leave the room, but stood immediately outside the glass doors,

watching Zackary and his mother, with the recorder running. As Risa Sanders writes in her

declaration, "we did not really have any privacy, because the agents were watching us and they

were still recording us." Ex. 2 at 5. This brief encounter, which the agents used as an

opportunity to bully both Risa and Zackary Sanders into Zackary continuing to talk to the agents

by holding their electronic devices that they used for business hostage, did not lessen the

custodial nature of the interrogation.

The length of the interrogation, too, weighs in favor of finding that Mr. Sanders was in

custody. Agents interrogated Mr. Sanders for at least three hours and eighteen minutes. As the

Fourth Circuit explained in *Hashime*, "the sheer length" of three hours of questioning (which

"the government would prefer to characterize as an 'interview,' but which was plainly an hours-

long interrogation") was an objective consideration weighing in favor of a finding of custody.

734 F.3d at 285. *See also Colonna*, 511 F.3d at 435 (three-hour interview characterized as "full-

fledged interrogation"); *United States v. Knowles*, No. 2:15-875-RMG, 2016 WL 6952107, at

*2–3 (D.S.C. Nov. 28, 2016) (finding defendant in custody where interview was "well over one

hour long").

During the interrogation, the agents repeatedly made comments communicating to Mr.

Sanders that he was not free to leave. The agents confronted Mr. Sanders with a thumb drive

they said contained child pornography that they found in his room and told him that his "IP address came back to a website that was advertising child pornography." Ex. 3 at 86, 87. *See United States v. Martin*, No. CR RDB-17-0069, 2018 WL 6606232, at *7 (D. Md. Dec. 17, 2018 ("During the interrogation, the agents confronted the Defendant with incriminating evidence discovered on his property, which may certainly cause a reasonable person to feel compelled to cooperate with the police.").

The agents also told Mr. Sanders multiple times to be honest and stated or implied that he was lying. Special Agent Ford told him, "And there's certain things I can tell that you are keeping from us, but we're going to find that end of the day." Ex. 3 at 77. Special Agent Ford later warned, "We take all your stuff and you're not being truthful with us, it's going to be—it's –it's an issue." *Id*. at 87. *See Hashime*, 734 F.3d at 283 (finding that the following statement "undercut the government's claim that Hashime was consistently told that he could leave at any time and did not need to answer any questions": "During the interrogation, one of the officers told Hashime that, with respect to his prior sexual history with minors, 'I need to know, and I need you to be completely honest with me here even if you're afraid, I don't care if you say I don't want to answer that or I'm afraid to answer it, but I need to know the truth.'").

At one point, immediately after Special Agent Ford told Mr. Sanders that the FBI would seize all of the family's electronic devices if Mr. Sanders withheld information, Special Agent Obie told Mr. Sanders three times that it was a crime to lie to a federal agent; the third time he added in "[c]rime can give jail time if needed." Ex. 3 at 90-91. *See Colonna*, 511 F.3d at 435 ("Although Colonna was not placed under formal arrest, he was told twice that lying to a federal agent was a federal offense.").

14

Perhaps most critically, the agents told Mr. Sanders multiple times that they would take all of the family's electronic devices—on which the agents knew each family member depended for business—if Mr. Sanders did not give them the information they wanted. *See* Ex. 3 at 75 ("So -- but if you're not truthful with us, we're going to have to take all your stuff and then that's potentially going to affect your business."). This is key because, as the Fourth Circuit recognized in *Hashime*, a "suspect may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search." *Hashime*, 734 F.3d at 284 (internal quotations and citations omitted). Any reasonable person in Mr. Sanders's position—who not only depended on his electronic devices for his business, but knew that both his mother (for her psychology practice) and his father (for his telemedicine consulting practice) depended on theirs—would have felt that he could not end the interrogation until satisfying the agents' demands. This is all the more egregious considering that the agents, unlike in *Hashime*, never told Mr. Sanders that he was free to leave.

### B. The agents' statements that Mr. Sanders was not under arrest and did not have to answer questions do not negate the custodial nature of the interrogation.

Though the agents told Mr. Sanders at the beginning of the interrogation that he was not under arrest and told him several times that he did not have to talk, the Fourth Circuit has made clear that such warnings are not dispositive of the custody question. "Indeed, there is no precedent for the contention that a law enforcement officer simply stating to a suspect that he is 'not under arrest' is sufficient to end the inquiry into whether the suspect was "in custody" during an interrogation." *Colonna*, 511 F.3d at 435. Nor is the fact that the interrogation took place in Mr. Sanders's home dispositive. *Hashime*, 734 F.3d at 2984 (finding that though courts

are "less likely" to consider the home custodial, "the particular facts" of that case, which are strikingly similar to those here, show that Hashime was in custody).

Rather, this Court must look at the totality of the circumstances to determine custody. *Id*. For the reasons stated above, the time (6:05 a.m.), location (in a separate room from his family), the words used by the officer (confrontation with evidence, multiple warnings not to lie and threat of a criminal charge if he did, and the threat to take all electronic devices), presence of multiple officers (twenty-six), display of a weapon (gun pointed at Mr. Sanders), the isolation from his family, and the law enforcement commandeering of the home, all weigh in favor of finding Mr. Sanders was in custody. Further, though Mr. Sanders was told he was not under arrest, he was never told that he was free to leave. These circumstances, taken together, undermine any claim that the agents' statements were enough to make a person in Mr. Sander's circumstances feel free to leave.

Because the agents failed to give Mr. Sanders *Miranda* warnings and because he was in custody, his statements must be suppressed.

## II.   MR. SANDERS'S STATEMENTS WERE INVOLUNTARY.

Mr. Sanders's statements should also be suppressed because they were not voluntarily made. "The test for determining whether a statement is voluntary under the Due Process Clause is whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997). The inquiry is "whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Pelton,* 835 F.2d 1067, 1071 (4th Cir.1987). A statement is only admissible if it is given "freely and voluntarily." *Braxton*, 112 F.3d at 780. It is the

Government's burden to prove by a preponderance of the evidence that a statement was voluntary. *Id*. This, too, is determined by looking at the totality of the circumstances. *Id*. at 781. Those circumstances include the "characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Pelton,* 835 F.2d at 1071 (internal quotation and citation omitted).

The circumstances of the interrogation were clearly coercive. "[C]oercion can be mental as well as physical, and the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960)) (internal quotation marks and alterations omitted). Here, the agents used the threat of taking all of the Sanders's electronic devices to get Mr. Sanders to talk and to provide them with passwords. The agents were aware that Mr. Sanders used his electronic devices to run his food and beverage business and that he did not have his business information stored elsewhere. *See* Ex. 3 at 16, 218. They were aware that his mother was a psychologist, who kept confidential client information on her devices. They were aware that his father invented telemedicine and used electronic devices for his work. *See id*. at 108-09 (agents claiming they were not trying to take all of the devices if they did not have to because it would be a "burden" on all three of the Sanders because they have their businesses there). As Risa Sanders avers in her declaration, it would be "ruinous" if the agents took all of the devices and Zackary "very much knew" that. Ex. 2. at 5.

The Fourth Circuit found a *Miranda* waiver unduly coercive, and thus involuntary in *United States v. Giddins*, 858 F.3d 870 (4th Cir. 2017), where the officers forced the defendant to choose between giving up his Fifth Amendment rights or "incurring adverse economic

consequences." *Id*. at 881.  There, law enforcement threatened to "indefinitely retain" the car the defendant used to get to work unless he signed a *Miranda* waiver and answered their questions. *Id*. at 882.  The Fourth Circuit found law enforcement's actions "unduly coercive," noting the economic consequences: "Giddins relied on his car to get him to his job, and it was the means of maintaining his livelihood." *Id*. at 883.

The consequences Mr. Sanders faced if forced to give up his electronic devices were similarly devastating.  Mr. Sanders runs a small business by himself.  He kept the entirety of his business information, including contracts and vendor information, on his electronic devices.  Ex. 2 at 4.  He was also aware of the severe economic and professional consequences that his parents would face if their devices were seized.  It would be devastating for his mother's devices to be seized, which he knew contained confidential patient information.  It would be devastating for his father's devices to be seized, which he knew his father used to run his entire telemedicine consulting business.  The agents not only knew that, they used it to their advantage as they manipulated Mr. Sanders into talking to them and giving up his passwords.

Mr. Sanders's personal characteristics also weigh in favor of finding his statement involuntary.  Mr. Sanders was 24 years old at the time of the execution of the search warrant and had never had any encounters with law enforcement before.  As Mr. Sanders told the agents, he went upstairs to bed after working until 4:00 a.m.—the agents arrived at 6:05 a.m.  Ex. 3 at 23-24, Ex. 1 at 1.  He was thus operating on less than two hours of sleep.  He repeatedly told the agents that he was nervous, "freaked out," scared, and uncomfortable.  *See* p. X, *supra*. Further, as Mr. Sanders told the agents, Ex. 3 at 67-68, he was hospitalized twice in January and received IV steroids.  His most recent treatment was at the Fairfax Inova Schar Cancer Institute, where he received 1000 mg. of Solu-Medrol through an IV on January 30th and 31st, 2020—less than two

weeks before the warrant was executed.  Research has found side effects such as mood disturbances, cognitive disturbances, and behavioral disturbances for patients given much lower doses.  Ex. 5.[3]  Taken together, Mr. Sanders's personal characteristics also contribute to finding his statement involuntary.

Finally, for the reasons stated above, the setting of the interview was also coercive.  The Sanders' family home was commandeered by law enforcement for hours.  He was isolated from his parents and interrogated for over three hours without being given *Miranda* warnings, even after he mentioned a lawyer and said that he did not want to talk.  Taken together, the economic coercion, Mr. Sanders's personal characteristics, and the custodial setting of the interrogation, render Mr. Sanders's statements involuntary.  His statements should be suppressed for that reason too.

## CONCLUSION

For the foregoing reasons, Mr. Sanders respectfully requests that this Court suppress the statements taken during the February 12, 2020 interrogation and that the Court hold an evidentiary hearing on this motion.

Respectfully submitted,

*/s/ Jonathan Jeffress*

Jonathan Jeffress (#42884)
Emily Voshell (#92997)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West

---

[3] The attached article, *Psychiatric Adverse Effects of Corticosteroids*, discusses the effects of corticosteroids.  Solu-Medrol is a systemic corticosteroid.  *See* Prescriber's Digital Reference, available at https://www.pdr.net/drug-summary/Solu-Medrol-methylprednisolone-sodium-succinate-1881.

Washington, D.C.  20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: evoshell@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com

*Counsel for Defendant Zackary Ellis Sanders*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of December, 2020, the foregoing was served electronically on the counsel of record through the U.S. District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

<u>*/s/ Emily Voshell*</u>
Emily Voshell