Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

UNITED STATES OF AMERICA,

               Plaintiff,

v.

ZACKARY ELLIS SANDERS,

               Defendant.

Case No. 1:20-cr-00143

### Declaration of Dr. Risa Sanders

I, Dr. Risa Sanders, Declare under the penalty of perjury that:

1. My name is Risa Sanders. I live in McLean, VA. Zackary Ellis Sanders ("Zack") is my son. Jay Sanders is my husband and Zack's father.

2. I am a psychologist. I have a Ph.D. in Psychology. I keep my patient's hard copy files in my home and I also keep privileged client information on my electronic devices (phone, laptop, and iPad).

3. On February 12, 2020, I was woken by a loud pounding and yelling at my front door just after 6:00 a.m. My husband and I had both been asleep. Then someone kept ringing the bell. I thought that my home was being invaded and that it was a robbery. I was screaming, "Don't open the door, it's a home invasion." My husband Jay went downstairs. I ran after him. I told Jay again not to open the door. My husband Jay yelled back that they were pointing guns at us. Jay then opened the door and my home security alarm started going off. Jay and I were both still in our pajamas. It felt terrorizing.

1

4. When we opened the door, we saw many—probably at least 20—law enforcement officers, many with their guns drawn. There were so many officers that they filled the whole driveway in front of our house. I remember very distinctly that one had a long weapon that was pointed at us. I was focused on the guns. I've never been around guns and I was scared for my life. I was just staring at the long part of this giant weapon. I was also worried about my husband, who was 82 at the time, having a heart attack, because we were both so frightened.

5. They asked us who else was in the house. I said my son. They said what's his name. I said Zack. They asked where he was. I turned and raised my hand towards his room. I was so frightened I could barely speak.

6. Multiple law enforcement officers then went inside and started shouting Zack's name. After a few moments, some of the officers moved us into the foyer.

7. I remember very distinctly that one large officer was on the stairs with a gun pointing at Zack's room and shouting at Zack. I remember Zack pleading that he needed his contacts because he cannot see without them and also begging for his pants. Zack does not have glasses, so he couldn't have seen at all without his contacts. I was scared to death they were going to shoot Zack.

8. Zack had been going through a lot of medical issues recently. He was diagnosed with a rare condition called optic neuritis. Because of that, he received extraordinarily high doses of IV steroids during his January 2-4, 2020 hospitalization. He received oral steroids in mid-January and then was hospitalized again at the end of January, on January 28-29, 2020, and received IV steroids during that hospitalization. He received extremely high doses of IV steroids again outpatient on January 30-31, 2020. Zack has also

experienced severe bullying in the past, which I know makes him feel extremely frightened in confrontational situations.

9.  Law enforcement moved me and my husband to the living room. We were still in our pajamas. Law enforcement stayed with us there, watching us, as other members of law enforcement moved all over the house.

10. Law enforcement took Zack to the dining room at first.  From where Jay and I were in the living room, we could see law enforcement lead Zack into the dining room and then we could not see Zack anymore.

11. It was very clear to me that law enforcement was there for Zack. They did not seem very interested in me or Jay or our belongings. Jay and I both had electronic devices and they only gave a very cursory look at our devices. They also only really searched Zack's room and did not search other parts of the house. I took two photographs of Zack's room that shows how they ransacked his room, which I'm attaching. The rest of the house looked essentially untouched. It seemed very targeted.

12. I stayed in the living room during most of the time that law enforcement was in my home. Jay was with me most of that time. There were at least two agents with us, watching over us in the living room. I did not feel like I could move freely around the house.

13. At some point, I asked if I could get dressed. I was not allowed to go get dressed by myself. A female agent followed me and stood outside the door. I was told that I had to leave the door open while I got dressed.

14. Multiple times, I asked if I could use the bathroom. I was never allowed to go to the bathroom by myself. A female agent followed me each time and stood outside the door.

If there wasn't a female agent in the living room at the time, I had to wait until they called for one. I was told that I had to leave the door open while I used the bathroom.

15. Jay and I asked multiple times if we could see the warrant. Law enforcement told us that we couldn't see it until they were done.

16. I asked multiple times if I could see Zack. I was worried about my son. I also asked at least three times for a lawyer. I said that I wasn't comfortable without one. The agents did not take me to see Zack when I asked. The agents did not stop what they were doing to let me get a lawyer. Instead, they told me that if I got an attorney, they would take all of the electronic devices in the whole house and then leave. I felt pressured not to get an attorney because I have confidential client information on my electronic devices from my practice as a psychologist and so I did not want them to take the devices. I was also scared that Jay would not be able to continue his business without his electronic devices, because his work is in consulting and all of his work is on his electronic devices. Zack also relies entirely on his electronic devices to operate his businesses. He keeps all of his contracts, his vendor information, his contacts, and his employee information for his food and beverage business on his electronic devices. He is the owner of his food and beverage business and he ran his business by himself. His entire lighting design portfolio for his theatrical productions is also on those devices, as well as all of our vacation photos.

17. Eventually, an agent came and got me and let me go to where Zack was in my office. No one had ever asked me if they could use my office. I was bothered to see the agents in my office, treating it like it was their own, because I have confidential patient information in there. They just took over my desk without asking me.

18. When I came in the room, Zack told me that the agents had said they were going to take all of the electronic devices and asked me if he should talk to the agents. I responded by saying that maybe we should get a lawyer, rather than continuing to talk. The agents ignored that comment entirely. The agents never told Zack that he had a right to a lawyer in my presence.

19. Zack and I then both asked if we could meet alone, without being recorded. The agents told us no. I explained that both Zack and I had been hospitalized in the last couple months. They did not ask why we had been hospitalized or ask any follow up questions. If the agents asked, I would have told them that I had been in the hospital because I had a mastectomy four months earlier and I had just finished a round of chemotherapy a few weeks prior, and I became so ill at my oncologist's office that I needed to be rushed to the hospital by ambulance. Instead, they again mentioned taking all of the devices in the house, and told us that would affect our (my and Zack's and Jay's) businesses. To me, this implied that if Zack did not agree to talk to them, they were going to take devices that had my confidential client information, Jay's devices that he needed for his business, and devices that Zack needed to run his business. That would be ruinous for all of us. Zack very much knew just how ruinous that would be.

20. The agents did not want to leave the room at all. Eventually, they agreed to leave. But they kept the recorder running and they stood right outside the doors to my office. The doors to my office are glass, so we did not really have any privacy, because the agents were watching us and they were still recording us.

21. After talking to Zack for a little bit, the agents came back into the room. I asked if I could get Zack a coke from the refrigerator. The agents went to get it themselves. That really

bothered me, that I couldn't go by myself to get a coke for my own son in my own house. One agent then accompanied me to make sure I made it back to the living room. Zack stayed in the office for a long time after I left.

22. From the moment law enforcement arrived to the moment they left, I was always in the presence of at least one officer or agent. From what I could tell, the same was also true for Zack and Jay. Law enforcement was all over our house. There were members of both the FBI and Fairfax County police. Law enforcement camped out in every room on the main floor of our house. It was like they had commandeered my home. I did not feel like I was free to move around in my own house. I did not feel like I was free to leave.

DONE this 17th day of December 2020.

_____

Dr. Risa Sanders

# Attachment A



