**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20-cr-00143 |
|         Plaintiff, | Honorable T.S. Ellis, III |
|   v. | Pretrial conference: Jan. 15, 2021 |
| ZACKARY ELLIS SANDERS, | Trial: Feb. 9, 2021 |
|         Defendant. | **HEARING REQUESTED** |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO MOTION TO COMPEL THE GOVERNMENT TO PRODUCE MATERIAL, OR, IN THE ALTERNATIVE, TO SUBMIT MATERIAL FOR *IN CAMERA* INSPECTION**

Jonathan Jeffress (#42884)
Emily Voshell (#92997)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C.  20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: evoshell@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com

*Counsel for Defendant Zackary Ellis Sanders*

This Court should grant Mr. Sanders's motion to compel for at least the following two reasons:  (1) the record is now clear that the Government committed a serious *Brady* violation by suppressing for 224 days exculpatory screenshots of the target website, thereby inducing this Court to draw incorrect and prejudicial conclusions about the state of the evidence; and (2) the Government fails to rebut Mr. Sanders's showing that additional evidence exists and that he is therefore entitled, at a minimum, to *in camera* inspection.  Especially in light of the Government's (now uncovered) concealment of evidence critical to Mr. Sanders's motions to suppress and its failure to offer any legitimate explanation for amending its Rule 414 Notice, the Court should order the Government to produce the requested material.

First, the Government's Opposition reveals serious *Brady* violations that have prejudiced Mr. Sanders and undermined the fairness of these proceedings.  Immediately before filing its Opposition, the Government disclosed two exculpatory screenshots of the target website, including a screenshot of its homepage, that it had deliberately withheld for 224 days.  Much worse, the Government withheld that evidence notwithstanding Mr. Sanders's diligent efforts to compel *precisely that material,* repeatedly characterizing Mr. Sanders's requests for that evidence as a "fishing expedition."  The suppressed evidence demonstrates that the homepage, the online equivalent of a storefront display case, and the first and potentially only page a user would visit, displayed only legal content and was not suggestive of illegal content.  Homepage, attached as Ex. 1; Fifth Declaration of Dr. Matthew Miller, attached as Ex. 2; Declaration of Seth Schoen, Ex. 7 to ECF No. 84 at ¶¶ 66-67.  The newly disclosed evidence directly undermines the Government's—and, in turn, the Court's—characterizations of the target website and what an Internet user who visited only once would have seen there.

Second, the Government's Opposition fails to rebut Mr. Sanders's showing that it

continues to withhold other highly relevant evidence, but instead presses the incredible claim that the requested items are not *Brady* or otherwise material to preparing Mr. Sanders's defense. The requested material that the Government possesses—but has refused to disclose—concerns the FBI's contemporaneous understanding of the FLA tip and the target website. Notably, at no time does the Government in its Opposition deny amending its Rule 414 Notice *precisely because it sought to continue concealing this discovery*. Thus, there is no question that, at a bare minimum, the Government should produce the material for *in camera* inspection. *United States v. King*, 628 F.3d 693, 703 (4th Cir. 2011) (a defendant who "make[s] some plausible showing" that the sought information exists is entitled, at a minimum, to the Court inspecting it *in camera*).

Even though the Government has argued that the requested information will "contain nothing helpful" for Mr. Sanders, he remains, at minimum, entitled to *in camera* review. *King*, 628 F.3d at 703. This Court "cannot solely rely on the government's good faith as a basis to avoid review." *Abdallah*, 911 F.3d at 218. This is particularly so in light of the Government's deliberate suppression—until December 18, 2020—of evidence that strongly supported Mr. Sanders's motions to suppress.

## OVERVIEW OF CASE

At the outset, the defense respectfully asks the Court to consider the seriousness of this matter. Under the Government's proposed plea offer—to Production of Child Pornography, 18 U.S.C. § 2251(a)—the Court would be required to sentence Mr. Sanders to a minimum of 15 years in federal prison. Mr. Sanders is 25 years old and was significantly younger at the time of the alleged offenses. He had *never been arrested* prior to this case. His parents, Drs. Jay and Risa Sanders, are 82 and 63 years' old, respectively. His mother has been battling cancer. Thus, if Mr. Sanders were to accept the current plea offer, or be convicted at trial, he would likely

never see his parents outside of prison again.  A 15-year sentence for a person as young as Mr. Sanders is also devastating because of the inevitable institutionalization that takes place when young men are committed to prison for such lengthy terms.

Mr. Sanders and his family should not be condemned to the draconian fate of Mr. Sanders spending (at least) fifteen years in prison.  The allegations are that teenagers interacted with Mr. Sanders online and then privately sent him sexually explicit photos and videos; these are not allegations of rape or murder, as a mandatory minimum of 15 years would suggest.[1]  Mr. Sanders is not alleged to have taken any photos or videos himself, nor is he alleged to have sent any photos or videos.  Mr. Sanders is also not alleged to have distributed illegal content in any way.  There is no indication that Congress had any sense when legislating the 15-year mandatory minimum for this offense that it would be applied to mere "sexting" of this kind.

To the extent such a lengthy sentence of imprisonment is the Government's ambition, however, its conduct must match its seriousness of purpose; the Government must comply with its Constitutional and ethical duties.  It has not done so here.  The Government's late disclosure of *Brady* material that directly undercuts this Court's findings confirms that the Government cannot be trusted to honor its most important obligations.  For this reason, and because *in camera* inspection would be appropriate regardless, the Court should grant Mr. Sanders's Motion and order the production of the material or, in the alternative, *in camera* inspection.

## BACKGROUND

To assist the Court in understanding the magnitude of the *Brady* violation the Government revealed last week—and its import for Mr. Sanders's position that the Government

---

[1] Furthermore, ██████████████████████████████████████████████
████████████████████████████████████████████████████████

continues to withhold other significant discoverable material—the defense reviews below Mr.

Sanders's repeated requests for the suppressed screenshot evidence.  The defense likewise

reviews the severe prejudice the Government inflicted by misrepresenting critical facts to the

Court; thwarting the Court's efforts to resolve correctly the motions to suppress; failing to

correct incorrect statements the Court subsequently made in its orders and opinions; and

improperly withholding the requested material until December 18, 2020.  This chronology

explains why the Court's incorrect conclusions were no accident, but instead the direct result of

the Government structuring disclosures based on its desire to "win," and not on its

Constitutional, statutory, and ethical obligations as prosecutors.  *See also In the Matter of Court*

*Operations Pursuant to Federal Rule of Criminal Procedure 5(f) and the Due Process*

*Protections Act*, Standing Order on Due Process Protections Act (DPPA) (Oct. 26, 2020) ("the

United States District Court for [EDVA] ORDERS the United States to adhere to the disclosure

obligations set forth in *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.").

I.      **Mr. Sanders's Motions to Suppress and for a *Franks* Hearing.**

This case stems from an exhaustive search of a family home and all electronic devices

within it.  The warrant for the search was based on an affidavit that included an uncorroborated,

vague, and conclusory tip from an FLA[2] that an IP address "access[ed] online child sexual abuse

and exploitation material" on one date, at one time.  Intel Log, Ex. 2 to ECF No. 37.

As the Court is aware, the issue underlying Mr. Sanders's motion for a *Franks* hearing is

that the Special Agent swore in his Affidavit in support of the search warrant ("Affidavit") that

---

[2] The reliability of the FLA is in serious question, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ECF No. 138 at 4-5, and because it is currently defending
itself against allegations that it misled judicial authorities and foreign law enforcement agencies
in another case involving a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ warrant.  Third Declaration of
Matthew Ryder QC, attached as Ex. 3.

an Internet user "accessed online child sexual abuse and exploitation material via a website," Affidavit at ¶ 23, when in fact he knew that the evidence was, at most, that the user had merely "accessed [the Target Website]," as the Special Agent himself wrote in his internal report.  FD-1057, Ex. 1 to ECF No. 45, at 2; *see also infra* n.9 and n.10.

Other portions of the Affidavit itself make crystal-clear the Special Agent's understanding that the Internet used had only visited (*i.e.,* accessed) the target website—and not viewed any illegal material.  *See* Affidavit ¶ 6 (describing the basis for probable cause as the Internet user merely "acce*ss[ing] the TARGET WEBSITE*" (emphasis added)); *id.* ¶ 29 (same); *id.* ¶ 30 (summarizing the basis for probable cause as "any user who *accessed the TARGET WEBSITE* has . . . knowingly *accessed the TARGET WEBSITE with intent to view child pornography*" (emphasis added)).  The Special Agent would not have five times described the user's activity as having "accessed the website if there was evidence of viewing child pornography.  But just as the misleading nature of Paragraph 23 has led this Court to draw incorrect conclusions about the Government's evidence, ECF No. 73 at 10-11 (concluding that the Special Agent's addition of "via a website" in Paragraph 23 "adds no information because it is obvious that the FLA's original tip *describes an internet user's activity on a website*" (emphasis added)); ECF No. 107 at 6 (concluding that the Court had "correctly" concluded there was "no evidence . . . that Special Agent Ford thought [Mr. Sanders] . . . did not view child sexual abuse and exploitation material"), it surely led the Magistrate to do the same.

Early in the case, the Government represented that, notwithstanding Special Agent Ford's internal report and the other paragraphs of the Affidavit, the Special Agent believed there was actual evidence of Mr. Sanders viewing child pornography on the target website.  July 31 Hearing Transcript, Ex. 20 to ECF No. 89, at 33 ("███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ "). *But see infra* at n.5.

As the litigation continued and the Government's initial position on the evidence steadily eroded, however, the Government switched horses.  The Government then began to argue that, *even if Special Agent Ford knew the evidence was merely that Internet user only visited the website once*, at one second, that was still enough for probable cause purposes, and the misleading nature of Paragraph 23 should just be ignored.  *See* ECF No. 101 at 14 (arguing that even if the user "████████████████████████████████

████," there is probable cause . . . where there is evidence that the defendant "was curiosity shopping for child porn on a Tor [website] but never actually viewed an image") (quotation marks and citations omitted) (emphasis added); *see also id.* at 19-20 ("*in the absence of evidence of membership to or downloads from a child pornography site*, courts have looked to other facts about the site, *including the explicit nature of its title and welcome page*, in determining whether accessing the site provides probable cause") (emphases added).  As part of its new strategy, the Government sought to portray—inaccurately—the illegal aspects of the website as immediately discernible to an Internet user, as this would make evidence of just one visit to the site (which, as the Special Agent well knew, was all the FBI had) more incriminating.

To support the above theory, the Government sought to rely on screenshots of the website.  But what the Government did next was wrong on many levels:  it disclosed the screenshots that would help its case but suppressed the ones that did not.[3]  In particular, while

---

[3] Given that the website was shut down in June 2019, the Government also knew it would be extremely difficult (if not impossible) for the defense to find such screenshots on its own.

disclosing screenshots suggestive of illegal content an Internet user could access only after registering and logging in (which there is no evidence the Internet user did in this case), the Government deliberately suppressed the screenshots of the website's homepage and announcements page—the first pages an Internet user would see, and the only ones he could see without registering and logging in—as the Government knew that those screenshots undermined its argument against suppression under the Fourth Amendment.  Ex. 1 (Homepage); Announcements Page, attached as Ex. 4.

## II.      The Government's Suppression of the Recently Disclosed Screenshots.

The Government has been in possession of the screenshots of the target website's homepage and announcement pages since January 2019.  It nevertheless chose to withhold those screenshots for 224 days.  The Government suppressed the screenshots from when Mr. Sanders first requested them, on May 8, 2020, to when the Government disclosed them at 4:46 pm on December 18, 2020, just before it filed its Opposition (ECF No. 167) to Mr. Sanders's Motion (ECF No. 135).  On July 27, 2020, months before, in opposing Mr. Sanders's Motion to Compel (ECF No. 37), the Government chose to disclose selectively four screenshots that described content the Internet user was *not* alleged to have accessed while suggesting that he "intended to." At the same time, however, the Government withheld the screenshot of the homepage, the one page that the Internet user *would have* accessed, because the Government knew it would undermine the Government's position on Mr. Sanders's soon-to-be-filed motions to suppress.

The withheld screenshots demonstrate that the Special Agent materially misled the Magistrate about the target website in the Affidavit because nowhere on its homepage or announcements page did the target website allude to, describe, or "advertise[]" child pornography, and there was no evidence that the Internet user ever went beyond the homepage.

Affidavit ¶¶ 15-21.  In fact, as one of the screenshots demonstrates, the homepage was not even suggestive of illegal content.  Ex. 1 (Homepage).  Instead, any illegal content was only viewable *after* a person registered an account, logged in, and took additional affirmative steps, and there is no evidence that the Internet user in this case ever did so.  Declaration of Seth Schoen, attached as Ex. 7 to ECF No. 84 at ¶¶ 66-67, 78-83.  Thus, an Internet user who visited the website just once without ever registering, logging in, or ever returning, *could not have* viewed any illegal content and any inference that the person intended to view child pornography is unwarranted. *See* Ex. 2 (Fifth Declaration of Dr. Matthew Miller); *see also* Declaration of Seth Schoen at 10 ("Someone who visits a web site only once is more likely to have found the content of that site was either not what they expected or not what they were looking for, compared to someone who visits a web site repeatedly").  By suggesting that the opposite was true, the Special Agent misled the Magistrate (and the Government misled this Court), about what the Internet user's activity in visiting the website a single time likely consisted of.

## A. The Defense's Repeated Requests for the Screenshots.

Mr. Sanders has been requesting the suppressed screenshots from early in this case.  The reason the defense was eager to obtain this evidence was its belief that the screenshots would demonstrate that the evidence the Special Agent believed he had was most consistent not with probable cause, but with the Internet user visiting the target website and stopping right there, *i.e.*, without intending to or actually viewing illegal content.

Mr. Sanders first requested the screenshots on May 8, 2020 in a letter to the Government. Specifically, he asked for "all material related to the layout of the target website, *including, but not limited to, the home page that a viewer would see prior to entering registration information*, the pages that would be available to a non-registered user."  May 8, 2020 Letter, attached as Ex.

5, at 2 (emphasis added).  The Government did not respond to this letter.  Instead, in an email on

May 27, 2020, Government counsel cancelled a planned telephone call and informed the defense

that the Government was refusing to provide any further discovery in the matter pre-indictment.

In a follow-up letter of June 8, 2020, Mr. Sanders provided the Government with further

information supporting his request for the screenshot of the homepage and again explained why

it was material to preparing his defense.  Mr. Sanders explained that "(1) the website was not

exclusively dedicated to child pornography; (2) there was no allegation that the Internet user ever

actually registered an account to the website; and (3) there was no specific description of the

content the Internet user allegedly accessed."  June 8, 2020 Letter, attached as Ex. 6, at 2.  In

other cases, including *United States v. Matish*, 193 F. Supp. 3d 585, 603 (E.D. Va. 2016), where

the Government alleged that an Internet user's online activity was a sufficient basis for probable

cause, the Government had much more than it did here.  Mr. Sanders emphasized that that

difference. *Id.* at 3 ("the affidavit in this case did not allege that any child pornography was

visible on the website's homepage or accessible prior to registering an account and logging in; . .

. that the website homepage prohibited re-posting material from other websites; that the

homepage referenced compressing large files for distribution; or that the website had a name

suggestive of child pornography").  Mr. Sanders then sent further specific requests related to the

homepage on June 22, 2020.  June 22, 2020 Letter, attached as Ex. 7, at 3-5.

On July 7, 2020, the Government produced discovery that primarily consisted of

evidence obtained during the search, not the application for the search warrant:  only two

documents were related to the FLA's tip, and the discovery did not contain any screenshots of

the target website, let alone one of the homepage.  In response, Mr. Sanders sent a follow up

letter noting that the Government had not provided discovery responsive to his previous requests

that was material to filing a motion to suppress and for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).  July 7, 2020 Letter, attached as Ex. 8 at 1-2.  As a result, Mr. Sanders noted that if he did not receive responses the next day, he would file a motion to compel.  *Id.* at 4.

Notwithstanding Mr. Sanders's repeated efforts to obtain discovery material to his motion to suppress and for a *Franks* hearing, the Government refused to provide it and Mr. Sanders was forced to file a Motion to Compel (ECF No. 37) on July 13, 2020.  Mr. Sanders noted that the website in this case was distinguishable from those in other cases because there was no allegation that the homepage displayed (or was suggestive) of child pornography and that, for determining probable cause, "there is a significant difference between the Internet user simply visiting the home page [that displayed only legal material] and actually registering an account, logging in, and clicking on specific illegal content."  ECF No. 37 at 5-6; *see also id.* at 17 (similar); *see also* ECF No. 48 at 3-4 (similar).

Despite Mr. Sanders's four separate discovery letters setting forth specific requests (as well as additional emails and voicemails), it was only after the defense filed a Motion to Compel (ECF No. 37), and just a few hours before the Government filed its Opposition, that on July 27, 2020, at 4:11 pm, the Government provided "four non-contraband screen shots of that Tor site taken by law enforcement," none of which included the homepage.  July 27, 2020 Email, attached as Ex. 9; *see also* ECF No. 48 at 9, n. 4 (noting that "just before the Government filed its opposition, it provided . . . four screenshots of the target website" that the FBI took in January 2019 of pages that were not the homepage and that there was no allegation that the Internet user took the steps required to view the information contained in the four screenshots).

On July 28, 2020, one day after receiving the four screenshots that were *not* the homepage, in a phone call with the Government, the defense again "requested . . . a screenshot of

the homepage of the target website," which, as the defense noted on July 30, 2020, it still had not yet received. ECF No. 48 at 9-10, n.9; *see also id.* at 12, n. 5 ("With respect to the particular 'display case' at issue here (the homepage of the target website), the Government has not yet produced a screenshot of that page. Based on the defense's understanding, however, the homepage contained no illegal [content] whatsoever or any reference thereto").

In additional briefing, Mr. Sanders further explained why the Government's evidence showed that, at most, the Internet user merely visited the initial homepage on one date at one time and went no further, which, because the homepage was innocuous, has never been enough for probable cause. Mr. Sanders explained why, "[i]f there was evidence that the Internet user did anything more than visit the initial homepage, the Special Agent would have included that in the Affidavit, instead of twisting and embellishing the [FLA]'s tip." ECF No. 58 at 9. Mr. Sanders also emphasized the defense's belief—which we now know was fact—that the Government was "continuing to withhold a screenshot of the initial homepage," and that it was "clear from the other screenshots already provided that the initial home page would not show or advertise illegal content," as otherwise the Government would have disclosed it. *Id.* at 9, n.9.

Having been denied the benefit of the screenshot and other information he had requested, Mr. Sanders filed his motions to suppress without that critical evidence. Mr. Sanders explained that Paragraphs 15 and 17-21 of the Affidavit were materially misleading: first, the website did not advertise child pornography and instead had pages with legal content; and second, paragraphs 17-21 misleadingly described content the Internet user was not alleged to have visited and were not on the homepage. ECF No. 84 at 18-19. As the Court would later point out, however, the defense was unable to substantiate its position in the absence of the screenshot the Government was suppressing. *See, e.g.,* ECF No. 73 (finding that Mr. Sanders's "theory [about

11

the homepage and the nature of the website] does not satisfy the defendant's burden of setting

forth facts to show that the government possesses additional information helpful to the defense").

**B.  What the Government has said about the website and its homepage.**

From the beginning, the Government insisted that the target website "advertise[d]" child

pornography, even though the FLA never said so and the screenshot the Government withheld

for 224 days shows that the homepage—the first and potentially only page a user would access—

does no such thing.  *See, e.g.,* Affidavit ¶ 15 ("The TARGET WEBSITE was . . . dedicated to the

*advertisement* . . . of child pornography") (emphasis added); ECF No. 15 at 1 ("an investigation .

. . revealed that an individual *accessed a website that advertises child pornography*") (emphasis

added); ECF No. 57 (the target website was "known by law enforcement to *advertise* [child

sexual abuse material]") (emphasis added).  Instead, the homepage does not even suggest that the

website contains illegal content.  Ex. 1 (Homepage).

In its Opposition to the Motion to Compel, the Government began repeating what has

become a well-worn refrain:  it accused Mr. Sanders of trying to "fish" for information, that Mr.

Sanders's view was "unsupported," and that the site "advertise[d] child pornography."  ECF No.

43 at 1; *see also id.* at 19 ("The defendant's sole interest . . . is to fish for information . . . the

defendant speculates that the government must be withholding some additional, unspecified

information . . . the defendant is only guessing as to what other material exists").  Indeed, in the

Government's Opposition, "speculative" appeared seven times, "conclusory" appeared eight

times, and "fish" or "fishing expedition" appeared nine times, ECF No. 43, *even though the

Government was referring to evidence that was in the Government's possession all along*.

The Government used the four screenshots it had selectively disclosed to support its

misleading argument, even though they were of pages the Internet user was not alleged to have

viewed.  The Government explained that these screenshots were "taken by U.S. law enforcement" and they "corroborate the description of the site in the SW Affidavit."  ECF No. 43 at 5.  The Government failed to disclose to this Court and the defense, however, that it was continuing to withhold additional screenshots that *contradicted* the description of the website in the Affidavit and the claim that the website advertised child pornography.  The Government's possession of the screenshots demonstrate that Mr. Sanders's requests were not a "fishing expedition" at all, but rather were for evidence the Government well knew it possessed.

At the hearing on the Motion to Compel, Government counsel claimed, contrary to what the two withheld screenshots conclusively showed, that ███████████████████ ██████████████████████████████████████████████████████████████████ ██████*."* July 31 Hearing Transcript, Ex. 20 to ECF No. 89, at 20 (emphasis added). Government counsel also inaccurately asserted that the Government did not "████████ ██████████████████████████████████████████████." *Id.* at 26.

Like a broken record, the Government continued to argue that Mr. Sanders's requests were "nothing more than . . . an impermissible fishing expedition to find some hypothetical document or communication to support his otherwise unfounded theories," despite sitting on evidence that the Government knew supported the defense's position.  ECF No. 57 at 6; *see also* ECF No. 70 at 6 (similar).  Ignoring Mr. Sanders's arguments about the website's homepage being the first page any user visits when accessing a website, and therefore possibly the only page a user ever visits, as well as the lack of any evidence to show that the Internet user in fact went beyond that homepage and viewed illegal content,[4] the Government argued that Mr.

---

[4] Furthermore, when the FLA identified content that someone else shared, it identifies specific files; that the FLA did not do so here further told the Government that there was no evidence that the Internet user viewed illegal content.  Supplemental Brief (ECF No. 58) at 9.

Sanders could not "point to any evidence to prove that the tip was actually referencing the homepage and not what it says: that the IP address was used to access online child sexual abuse material on the website." *Id.* at 3.[5]   The Government dismissed Mr. Sanders's requests, including for the homepage screenshot, as "theoretical, "premised on semantics and conjecture," and told this Court it "should not permit [Mr. Sanders] to base requests for further discovery *on the faulty premise that he is right*."  ECF No. 70 at  2 (emphasis added).

In opposing Mr. Sanders's Motions to Suppress, the Government suggested there was no evidence that the homepage was innocuous.  The Government noted that while Mr. Sanders "asserts that the Affidavit misleadingly described the Target Website as dedicated to the . . . advertisement of child pornography, . . . the only basis he appears to have for his claim is . . . a post on the site stating that it was created to host images and videos of '18 (twinks) and younger.'"  ECF No. 101 at 26; *c.f.* Ex. 1 (Homepage) and Ex. 4 (Announcements Page).  The Government suggested there was no were pages, such as the homepage or announcements page, with exclusively legal content, or that someone who visited such pages would not know about the password-protected content the website contained.

### C.  What the Court has said about the website.

This Court has twice relied upon the Government's misrepresentations in denying Mr. Sanders's motions to compel, including with respect to the content of the target website.  The Court reasoned that the Special Agent's addition of "'via a website' adds no information because

---

[5] At the hearing on September 11, 2020, the Government stated instead that the Affidavit provided only "probable cause to believe that . . . someone . . . *accessed a specific hidden service* dedicated to child pornography," not that someone actually went in and viewed illegal content. Sept. 11 Hearing Transcript, attached as Ex. 1 to ECF No. 135, at 24 (emphasis added); *see also id.* at 25 ("Mr. CLAYMAN: . . . we don't know precisely what the content is, but we have never claimed to know exactly what it is . . . All the tip says is that he accessed content on this site").

it is obvious that the FLA's original tip describes an internet user's activity on a website."
Memorandum Opinion (ECF No. 73) at 73.   What the Court missed, however, due to the
Government's lack of candor, was that an Internet user could have accessed the target website
without understanding that it contained any illegal content and that the Government had no
evidence that the Internet user engaged in any activity on the website besides at most viewing the
innocuous homepage.   *See* Ex. 1 (Homepage); Ex. 2 (Fifth Declaration of Dr. Matthew Miller);
Declaration of Seth Schoen, attached as Ex. 7 to ECF No. 84 at ¶¶ 78-83.

In denying Mr. Sanders's motion to compel, the Court relied heavily on the
Government's assertion that "evidence showed that an individual 'accessed a website that
*advertises* child pornography.'"   ECF No. 73 at 11 (citing ECF No. 15) (emphasis added).   The
Court reasoned that one "cannot access child sexual abuse and exploitation material without
accessing a website that *advertises and distributes* child pornography," and that "there is no
evidence—either in documents generated by the FLA *or by the FBI*—that Special Agent Ford
thought defendant merely visited [the] home page and did not view child sexual abuse and
exploitation material."   ECF No. 73 at 11 (emphases added); *see also* ECF No. 107 (similar).
The Court concluded that Mr. Sanders had not "put forward non-conclusory arguments as to why
the requested discovery would be helpful" to him or that "the government possesses *any*
*potentially favorable evidence* that [it] has not provided."   ECF No. 73. at 13 (emphasis added).

The Court's erroneous conclusions were the direct result of the Government's failure to
abide by its obligations under *Brady* and Rule 16, its ethical duties (*e.g.,* Rule 3.1 (prohibiting a
lawyer from "assert[ing] . . . an issue" that is frivolous); Rule 3.3 (a)(1), (3)-(4) (prohibiting a
lawyer from "mak[ing] a false statement of fact or law" and "offer[ing] evidence that the lawyer
knows to be false," or failing to correct false statements or evidence); Rule 3.8(c) (prohibiting a

prosecutor from "instruct[ing] or encourage[ing] a person to withhold information from the defense")), and its own United States' Attorney's Office Manual (§ 9-5.001.C.2).

### D.  What the Court has said about the other screenshots

In denying Mr. Sanders's motions to suppress, the Court reasoned that the Magistrate had a substantial basis for finding probable cause because the Affidavit describes "the steps the Target IP Address user had to take to navigate through Tor and then to the [target] website *and its offerings*."  Memorandum Opinion (ECF No. 113) at 9 (emphasis added).  Based on the content contained in the four screenshots the Government selectively disclosed and described in the Affidavit, the Court reasoned that the Internet user's "purpose was to access the website *and its illegal content*."  *Id.* at 10 (emphasis added).  Without the benefit of the actual homepage of the website, the Court concluded that the Special Agent's "description of the [target] website is accurate and without any materially misleading omissions."  ECF No. 113 at 16.

The Court found "unavailing" Mr. Sanders's argument that the website had legal and illegal content, based only on the selectively disclosed screenshots.  *Id.* at 10.  The Court relied on its "*thorough examination of screenshots of the [target] website provided by the FBI*" to find Mr. Sanders's claim "to be baseless."  *Id.* at 10 (emphasis added).  The Court cited to the target website's board index, *id.* at 10, which was only accessible after a user went past the homepage, registered an account, and logged in, which the Internet user in this case was not alleged to have done.  The Court described board index in great detail:

> The [target] website's board index is divided into categories for 'Ages 0-5,' 'Ages 6-13,' and 'Ages 14+'.  Even the subforum for 'Regular Porn' has a subheading of '[t]eens and under.'  Nonetheless, *even assuming that there might have been some legal content on the [target] website*, . . . the Affidavit need only set forth facts— which it does here—to show a fair probability that child sexual abuse and exploitation material would be found. . . .

ECF No. 113. at 10-11 (citations omitted) (emphasis added).

16

The Court dismissed entirely Mr. Sanders's claim that the homepage was innocuous, which the withheld screenshot now proves.  As the Court reasoned, "The defendant claims that the Affidavit inaccurately describes the [target] website as being 'dedicated to the advertisement . . . of child pornography,' when in reality the site did not advertise child pornography. . . . The defendant claims that the Affidavit incorrectly describes the [target] website because the site contains both legal and illegal content.  *This is not so*."  *Id.* at 16 (emphasis added).

Again, the Court relied exclusively on the screenshots the Government had cherrypicked to conclude that the "claim that the site included legal content—citing '18' and 'hurtcore' content—does not make it so. . . . [T]hat claim is *contradicted by screenshots of the site provided by the FBI*, which display the [target] website's board index.'" *Id.* at 16 (emphasis added). Again, that board index was only accessible after a user registered an account and logged in and was not visible on the homepage—the screenshot of which the Government withheld all along. Ex. 1 (Homepage); Ex. 2 (Fifth Declaration of Dr. Matthew Miller).

**E. What the Government has said about the other screenshots.**

The Court's memorandum opinions relied on the Government's selectively disclosed screenshots, which the Government had described in detail in its Opposition to Mr. Sanders's motions to suppress, even though there was no allegation that the Internet user had ever registered an account, logged in, or viewed any of the content the Government described.  The Government wrote, "█████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████." Government Opposition (ECF No. 101) at 4 (emphasis added) (citations omitted).

In its recently filed Opposition (ECF No. 167), the Government fails to disclose to the Court that it only provided Mr. Sanders with the additional screenshots *immediately before it filed its Opposition*.  Incredibly, despite the Court's reliance on the other four screenshots the Government selectively disclosed, the Government claims that the screenshot of the innocuous homepage "is not Rule 16, *Giglio*, or *Brady* material" because "[t]he Affidavit does not describe the homepage,"  ECF No. 167 at 7, n.2, and because it would have had "no bearing on the Court's probable cause finding or the validity of any statements in the Affidavit," *id.* at 8, n.7.

## DISCUSSION

For months, the Government told this Court that no screenshot of the target website supported Mr. Sanders's defense theory:  The Government dismissed as untrue Mr. Sanders's claims that the first and potentially only page any user would visit was innocuous, that the target website did not advertise illegal content, and that there was legal content a user could access.

The Government's December 18th disclosures reveal, however, that its repeated denials were false:  The screenshots directly contradict the Affidavit, the Government's assertions before this Court, and this Court's findings—which the Government then failed to correct.  *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (evidence is material if "there is a strong indication" that it will allow Mr. Sanders "significantly to alter the quantum of proof in his favor" by supporting suppression of the evidence against him).  One screenshot shows that the homepage *did not allude to, display, or advertise any illegal content whatsoever*.  Ex. 1 (Homepage).  Instead, the homepage was innocuous.  The other screenshot shows that even if a user went further, a second page was innocuous as well.  Ex. 4 (Announcements Page).  There are clearly additional screenshots the Government continues to withhold that would further show no illegal content could be viewed unless and until a user registered an account and logged in.

18

These screenshots are clearly material and exculpatory because, contrary to what the Special Agent represented to the Magistrate and to what Government repeatedly has represented to the Court, they demonstrate that an Internet user could have easily accessed the target website by clicking on search results that were in no way suggestive of illegal content and without intending to view or ever viewing illegal content. *See, e.g.*, *United States v. Falso*, 544 F.3d 110, 120-21 (2d Cir. 2008) (finding no probable cause for possession of child pornography when defendant "appear[ed]" to have "gained access or attempted to gain access" to cpfreedom.com).

Had the Government also disclosed these two screenshots on July 27, 2020, instead of selectively disclosing four other screenshots of content that the Internet user was not alleged to have accessed, this Court would have seen what the Special Agent intentionally withheld from the Magistrate, would have questioned the Special Agent's credibility and the Government's assertions about other discovery it claimed was not material or exculpatory, and would not have been able to issue the findings it did in denying Mr. Sanders's motions to suppress.

Instead, the Court would have realized that much more was required for probable cause than the scant, conclusory evidence here. *See, e.g., United States v. Bosyk*, 933 F.3d 319, 322 (4th Cir. 2019) (finding probable cause where FBI described message with hyperlink with *thumbnail images depicting man sexually molesting toddler*, and records from a file sharing site showed defendant had visited that filesharing link within hours of it being posted to *download* child pornography), *cert. denied*, 140 S. Ct. 1124 (2020) (emphases added); *United States v. Richardson*, 607 F.3d 357 (4th Cir. 2010) (finding probable cause where investigation linked defendant's email accounts, used to *distribute* child pornography, to address) (emphasis added); *United States v. Bynum*, 604 F.3d 161 (4th Cir. 2010) (finding probable cause where someone with a specific screen name at address *uploaded* suspected child pornography) (emphasis added).

## **CONCLUSION**

Had the Government timely produced the screenshot of the target website's homepage, his Court would have seen that the Special Agent materially misled the Magistrate about the nature of the website, the Internet user's purported activity, the state of the Government's evidence, and what inferences were reasonable to draw from the FLA's tip.

The Government has not been candid about the true state of its evidence and the inferences that can be drawn from it.  It has refused to explain the Special Agent's state of mind when he re-iterated portions of the tip, and added additional language, in Paragraph 23 of the Affidavit, which plainly overstated the state of the Government's evidence.  That fact, when combined with the Government's amendment of its Rule 414 Notice in response to Mr. Sanders's renewed request for discovery, which the Government failed to explain, and the Government's suppression of the innocuous screenshots, tells this Court what the Government was trying to hide:  the Special Agent never saw any evidence that the Internet user went to the target website, went to any particular portion of the website, viewed any particular content, or that the homepage advertised illegal content.  In other words, there was no evidence showing that the Internet user did anything more than, at most, access an innocuous homepage a single time without going any further. That is not sufficient.

The Government is continuing to withhold additional material that would have further substantiated Mr. Sanders's claims for suppression.  Continuing to withhold that information violates the Government's most important obligations.  This Court should order the Government to produce the requested information.  Even if this Court finds that Mr. Sanders has not made the requisite materiality showing, Mr. Sanders has made a plausible showing that the information exists, and respectfully he is therefore entitled to *in camera* inspection.

Respectfully submitted,

*/s/* _____
Jonathan Jeffress (#42884)
Emily Voshell (#92997)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C.  20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: evoshell@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com

*Counsel for Defendant Zackary Ellis Sanders*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of December 2020, the foregoing was served electronically on the counsel of record through the U.S. District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

*/s/ Emily Voshell*
Emily Voshell
