# EXHIBIT 3

# Zachary Deubler

| | |
|---|---|
| **From:** | Nina Ginsberg |
| **Sent:** | Wednesday, February 24, 2021 7:41 PM |
| **To:** | Clayman, William G (USAVAE); Prabhu, Jay (USAVAE) |
| **Cc:** | Jon Jeffress; Jade Chong-Smith; Zachary Deubler; Nina Ginsberg |
| **Subject:** | RE: US v. Sanders |

Hi Bill,

Thanks for the update. Given the breadth of the charges, in order to prepare for trial we need to examine forensic copies and the forensic/extraction reports for the 8 devices containing evidence on which the government intends to rely, including the iPhone. The iPhone is the logical place to start because of the critical information stored on that device. We will also need Mr. Sanders to be present for at least some of the sessions to review the government's evidence and to assist us and our expert effectively prepare the defense.

I believe the devices identified below contain evidence relating to each of the counts contained in the indictment, These devices may also contain evidence relating to the 404(b) and 414 evidence the government is seeking to introduce:

Production/receipts counts for alleged minor victims 1 (counts 1 and 7), 3 (counts 3 and 9), 5 (counts 5 and 11), and 6 (count 6):
- 1B27 iPhone

Production/receipt counts for alleged minor victim 2 (counts 2 and 8)
- 1B19 iPad

Production/receipt counts for alleged minor victim 4 (counts 4 and 10)
- 1B22 iPad

Possession (count 12)
- 1B1 SanDisk Thumb Drive
- 1B2 HP Laptop
- 1B3 Lexar Thumb Drive
- 1B5 HP Laptop
- 1B6 HP Laptop

In addition to examining forensic copies and forensic extraction reports for the 8 devices, we will need to examine forensic copies of the devices belonging to the alleged minor victims and related forensic/extractions reports in the possession, custody, or control of the government. We do not need to examine the devices belonging to any alleged victim about whom the government will not present evidence, either in its case in chief or in rebuttal.

In the meantime, in response to your offer to examine specific contraband or artifacts, Zach Deubler and I would like to review the contraband images/videos and the unsanitized chats at issue in this case. As it was explained to me, there are 7 folders that were previously made available to the defense team – one folder for each alleged minor victim (containing the contraband images/videos and the unsanitized chats with each of the alleged victims), and a seventh folder containing all of the images the government intends to rely on for the possession counts. If at all possible, I would like to be able to review this evidence with Mr. Sanders present. If there are chats between Mr. Sanders and any of the alleged victims that were not previously provided, we would also like to review those chats. Lastly, if you have put together your "storyboards," we'd like to review them as well.

When I spoke to Jay after I entered my appearance, I told him I didn't think the April 26 trial date was realistic. Now I'm convinced that's true. Would you please discuss the government's position on a continuance among yourselves, including how much time you think will be necessary to accommodate our request to review the digital evidence.

Jay also said he was willing to listen to my concerns about disputed issues in this case. There are serious *Brady* and Rule 16 issues I'd like to discuss notwithstanding Judge Ellis's rulings, including the government's resistance to disclosing the method(s) used by the FLA to identify the IP address associated with Mr. Sanders' devices. I have never had a case in this Court where the government has refused to provide this type of information where the constitutionality of a search has been litigated. Even in cases involving classified evidence, similar information has been provided under CIPA so that these issues could be fully litigated.

I mentioned to Jay that I have a murder case with Mike Ben'Ary where the Marshal's Service concealed the fact that they used a stingray to locate the defendant in order to execute a fugitive warrant. The gun used in the Virginia murder was found during a search of the hotel room where the defendant was located. A Prince William County detective obtained a search warrant for the hotel room based on evidence observed in plain view during the execution of the fugitive warrant. Mike initially took the position that the government did not have to disclose this information, but only because he did not believe the Marshal's Service whose only involvement was executing a fugitive warrant was part of the prosecution team in the murder case. One of the reports Mike provided in discovery affirmatively stated that no technical measures had been used to locate the defendant. For his own reasons, Mike decided to ask the Marshal's Service if they used a stingray. He did so after we showed him documents produced in FOIA litigation proving that the Marshal's Service had a history of instructing its agents and local partners to conceal their warrantless use of stingrays. Information regarding the government's efforts to conceal the degree to which Operation Pacifier was a joint operation between the FBI and its international partners in the PlayPen case was similarly revealed as a result of successful FOIA litigation. Mike told us that he spoke with the Marshal's general counsel who assured him that they did not use a stingray to locate the defendant. We filed a motion to suppress the search of the hotel room. After Judge Ellis denied our motion to compel discovery, we noticed a hearing on the motion to suppress and issued witness subpoenas to the 15 members of the Marshal's Service and local law enforcement officers involved in the arrest. Judge Ellis approved issuance of 4 of the subpoenas and said that he would consider hearing from additional officers if he needed more evidence after an initial hearing. Mike then had the FBI question the Deputy U.S. Marshals and local law enforcement officer primarily involved in the arrest. The Marshal's Service was eventually forced to admit to the FBI and Mike that they had used a stingray to locate the defendant. Before Mike learned about the stingray, he signed a pleading falsely stating that a stingray had not been used.

There's no question that the FLA is part of the prosecution team in this case for *Brady* purposes and that the government has an affirmative obligation under *Brady* and *Giglio* to determine whether its law enforcement team members are in possession of exculpatory material. Evidence that a law enforcement entity "interfered" with a U.S. computer without a U.S. warrant is clearly exculpatory as is information regarding the reliability of the method used by the FLA to identify IP addresses based on a single visit to a web site. So too is information tending to establish the existence of a joint venture between the FBI and the FLA. The existence of a joint venture was litigated before Judge Lee and in the Fourth Circuit in U.S. v. Abu Ali. Judge Lee authorized Rule 15 depositions in Egypt and appointed me as cleared counsel for the limited purpose of litigating the existence of a joint venture which could not be decided without classified evidence.

We'll eventually uncover what happened in this case like they did in the PlayPen case. I can't understand why the government would not insist on knowing how the FLA identified the IP address and disclose that information to attorneys covered by a protective order unless there was something to hide. As you can imagine, I would like the opportunity to discuss this further.

Best,
Nina