# EXHIBIT 2

KeyCite Yellow Flag - Negative Treatment

Judgment Affirmed as Modified by  State v. Burr,   N.J.,   June 11, 2008

392 N.J.Super. 538
Superior Court of New Jersey,
Appellate Division.

STATE of New Jersey, Plaintiff–Respondent,

v.

Franklin Jack BURR, II, Defendant–Appellant.

Argued Sept. 26, 2006.

|

Remanded Nov. 16, 2006.

|

Resubmitted March 23, 2007.

|

Decided May 8, 2007.

**Synopsis**

**Background:** Defendant was convicted in the Superior Court, Law Division, Middlesex County, of second-degree assault and third-degree endangering the welfare of a child. Defendant appealed.

**Holdings:** After remand for hearing to explore scope of proffered testimony by defense expert, the Superior Court, Appellate Division, Weissbard, J.A.D., held that:

[1] proffered testimony from expert that defendant suffered from Asperger's Disorder was sufficiently relevant to be admissible;

[2] admission of statements made by child victim to police investigator during videotaped interview under tender years exception to hearsay rule did not violate defendant's confrontation rights;

[3] statements made by child victim to police investigator during videotaped interview possessed particularized guarantee of trustworthiness to be admissible under tender years exception to hearsay rule;

[4] probative value of statements made by child victim to police investigator during videotaped interview was not substantially outweighed by risk of unfair prejudice, waste of time, or needless presentation of cumulative evidence; and

[5] trial judge, prior to granting request made by jury during deliberations for a second opportunity to view videotape of police investigator's interview with child victim, was required to make an inquiry into jury's need for a video replay and then balance that need against any resulting prejudice.

Reversed and remanded for a new trial.

West Headnotes (12)

**[1]** **Criminal Law** 🗝 **Mental condition or capacity**

Proffered testimony from expert that defendant suffered from Asperger's Disorder was sufficiently relevant to be admissible in trial for second-degree assault and third-degree endangering the welfare of a child; while defendant did not claim that his mental condition served to negate the mental state required for the offenses, the testimony could have given jurors a better understanding of defendant's conduct of placing child victim and other children on his lap and negated the inference that defendant engaged in such actions for improper motive of seeking sexual gratification or as way to prepare them for sexual abuse. N.J.S.A. 2A:84A, App. A, Rules of Evid., N.J.R.E. 401.

1 Cases that cite this headnote

**[2]** **Criminal Law** 🗝 **Reception and Admissibility of Evidence**

**Criminal Law** 🗝 **Admissibility**

A trial court's determination regarding the admissibility of evidence, including expert opinion evidence, is entitled to deference, and is reviewed under the abuse of discretion standard.

1 Cases that cite this headnote

**[3]** **Criminal Law** 🗝 **Reception and Admissibility of Evidence**

An appellate court should disturb an evidentiary ruling of the trial court only when a clear error of judgment is established.

1 Cases that cite this headnote

**[4]    Criminal Law** 🗝 **Relevancy in General**

In determining whether proffered evidence is relevant, the trial court should inquire as to whether a logical connection exists between the evidence and a fact in issue; in other words, if the evidence renders a desired inference more probable or logical, then the evidence should be admitted. N.J.S.A. 2A:84A, App. A, **Rules of Evid., N.J.R.E. 401.**

2 Cases that cite this headnote

**[5]    Criminal Law** 🗝 **Relevancy in General**

The test for relevancy of proffered evidence is a broad one that generally favors admissibility. N.J.S.A. 2A:84A, App. A, **Rules of Evid., N.J.R.E. 401.**

1 Cases that cite this headnote

**[6]    Criminal Law** 🗝 **Relevancy in General**

Although trial courts are afforded broad discretion in making determinations regarding relevancy of proffered evidence, the court should be mindful of the full factual setting of the case and should allow a certain amount of leeway to the proponent of the evidence. N.J.S.A. 2A:84A, App. A, **Rules of Evid., N.J.R.E. 401.**

**[7]    Witnesses** 🗝 **Defendants in Criminal Prosecutions**

Trial court did not unduly burden defendant's constitutional right to testify in trial for second-degree assault and third-degree endangering the welfare of a child by excluding evidence that he suffered from Asperger's Disorder, where defendant did not assert on appeal, nor did his remarks to trial court suggest, that he would have testified if evidence of Asperger's Disorder had been admitted at trial.

3 Cases that cite this headnote

**[8]    Criminal Law** 🗝 **Use of documentary evidence**

Admission of statements made by child victim to police investigator during videotaped interview under tender years exception to hearsay rule did not violate defendant's confrontation rights in trial for second-degree assault and third-degree endangering the welfare of a child; while victim, who testified at trial, was not specifically cross-examined on the videotaped interview, the videotape and her trial testimony, on which she was cross-examined at length, were consistent. N.J.S.A. 2A:84A, App. A, 🚩 **Rules of Evid., N.J.R.E. 803(c)(27).**

10 Cases that cite this headnote

**[9]    Infants** 🗝 **Other hearsay exceptions; trustworthiness and reliability**

Statements made by child victim to police investigator during videotaped interview possessed particularized guarantee of trustworthiness to be admissible under tender years exception to hearsay rule in trial for second-degree assault and third-degree endangering the welfare of a child; victim's statements were spontaneous in that she freely recounted the events after only minimal open-ended questioning by investigator, investigator questioned victim without anyone else in the room, record contained no strong support that victim had a motive to fabricate, victim's mental state throughout the interview appeared to be calm, victim used terminology that would be expected of a young child, and victim's story remained largely consistent from her conversation with her mother, to her interview with investigator, to her trial testimony. N.J.S.A. 2A:84A, App. A, 🚩 **Rules of Evid., N.J.R.E. 803(c)(27).**

4 Cases that cite this headnote

[10]    **Infants** 🔑 Other hearsay exceptions; trustworthiness and reliability

**Sex Offenses** 🔑 Admissibility of Victim's Complaints, Statements, and Declarations

In determining whether a child sex abuse victim's hearsay statements possess particularized guarantees of trustworthiness to be admissible under the tender years exception to the hearsay rule, a court considers various factors, including whether the statement was made spontaneously, whether the account is repeated with consistency, the mental state of the declarant, the use of terminology unexpected of a child of similar age, lack of a motive to fabricate, use of interrogation, and manipulation by adults. N.J.S.A. 2A:84A, App. A, 🚩 Rules of Evid., N.J.R.E. 803(c)(27).

16 Cases that cite this headnote

[11]    **Criminal Law** 🔑 Evidence calculated to create prejudice against or sympathy for accused

Probative value of statements made by child victim to police investigator during videotaped interview was not substantially outweighed by risk of unfair prejudice, waste of time, or needless presentation of cumulative evidence in trial for second-degree assault and third-degree endangering the welfare of a child; interview occurred closer in time to the alleged assault than the trial and was conducted by an investigator who gave victim a neutral opportunity to explain what happened outside of anyone else's presence. N.J.S.A. 2A:84A, App. A, Rules of Evid., N.J.R.E. 403.

5 Cases that cite this headnote

[12]    **Criminal Law** 🔑 Reading minutes of or restating testimony

Trial judge, prior to granting request made by jury during deliberations for a second opportunity to view videotape of police investigator's interview with child victim in trial for second-degree assault and third-degree endangering the welfare of a child, was required to make an inquiry into jury's need for a video

replay and then balance that need against any resulting prejudice.

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*1137** Vincent J. Sanzone, Jr., Elizabeth, argued the cause for appellant.

Simon Louis Rosenbach, Assistant Prosecutor, argued the cause for respondent (Bruce J. Kaplan, Middlesex County Prosecutor, attorney; Mr. Rosenbach, of counsel and on the brief).

Before Judges WEISSBARD, PAYNE and GRAVES.

**Opinion**

The opinion of the court was delivered by

WEISSBARD, J.A.D.

**\*542** Defendant, Franklin Jack Burr, II, appeals from his conviction for second-degree sexual assault, *N.J.S.A.* 2C:14–2b, and third-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4a. After merging the endangering into the sexual assault, **\*\*1138** the trial judge imposed a six-year term of imprisonment, subject to the No Early Release Act, 🔖 N.J.S.A. 2C:43–7.2, as well as Megan's Law, including community supervision for life. In addition, the judge imposed a concurrent three-year term for violation of probation involving an earlier offense. We reverse.

**\*543** I

A.A. [1] was born in December 1994. Between October and November 2002, A.A.'s parents enrolled her and her older brother, B.A., in piano lessons at a private location. Defendant was their piano instructor, and the children took weekly lessons on an individual basis with him.

In approximately March 2003, defendant left that facility and began giving piano lessons at a local community center (the Center). Because defendant was a good teacher and A.A. and B.A. were fond of him, the children continued to take lessons with him at the Center. Defendant's wife also taught piano at

the Center and gave lessons to both A.A. and B.A. [2] At some point, defendant also began tutoring B.A. in math and science at the Center. A.A. was usually present during B.A.'s math tutoring, and defendant would sometimes involve her in the lessons. A.A.'s mother, R.T., respected and trusted defendant and had no concerns about him teaching A.A. prior to January 2004.

On January 7, 2004, R.T. arrived at the Center to pick up her children between 6:15 and 6:30 p.m., which was a little earlier than usual because B.A. had a school event that evening. R.T. opened the door to the first classroom and saw A.A. and defendant in the corner of the room by the teacher's desk. She described them as being in a "compromised position," with A.A. standing with her knees bent and defendant behind her. [3] R.T. immediately told **544 A.A. to gather her things and called for B.A. who was down the hall in a piano lesson with defendant's wife.

When R.T. and A.A. arrived at their car, R.T. asked A.A. what she was doing in the corner with defendant. According to R.T., A.A. began to cry and said that she did not want to go back there anymore and that defendant makes her sit on his lap, "puts his hand in [her] pants," touches her "front," and "squeez[es] [her] butt." A.A. indicated that the inappropriate touching had been occurring since they were at the first location and she did not tell her parents sooner because she didn't think they would believe her.

R.T. spoke with A.A.'s father when he returned home from work that night, and they ultimately decided to pursue the matter to assure that defendant could get help and would not harm any other children. They reported the matter to the local Police Department one week after the incident, and the police transported R.T. and A.A. to the Middlesex County Prosecutor's Office, where they met with Investigator Lisa Collins. Collins spoke with R.T. about the matter outside of A.A.'s presence and then conducted a videotaped interview of A.A.

**1139 During the interview, A.A. indicated that defendant would touch her at her waist, her buttocks, and her "private part" after her piano lesson when he closed the classroom door and taught her math. He would also "squeeze" her "butt" while she was walking to the classroom and would make her sit on his lap when she was in the classroom. A.A. explained that the touching occurred over her clothing and, when she wore a skirt, over her underwear. She described defendant's touching as placing his hand over her private part and keeping

his hand still. A.A. indicated that defendant never asked her to touch any parts of his body and never showed her any parts of his body.

*545 At trial, A.A. testified that defendant would often slap or squeeze her buttocks when she was walking through the piano area at the first location. She indicated that other people were around when this would happen but that "nobody was looking." According to A.A., the touching increased when the lessons switched location to the Center. There, A.A. said that she would get her piano lesson first from defendant's wife, and would then enter a classroom with defendant where he would teach her math and language. While she was walking down the hallway to the classroom, defendant would slap or squeeze her buttocks, and she would run to the classroom. A.A. explained that when she was sitting at the desk in the classroom, defendant would put a chair on the other side of the desk "and then he would touch the outside of my private part" by reaching underneath the desk. She specified that the touching always occurred over her clothing and that she felt so uncomfortable when she wore a skirt that she never wore a skirt to class again. A.A. also indicated that defendant would often pull her onto his lap, but that when he did so, he would not touch her anywhere other than putting his hand around her waist. A.A. denied ever trying to climb onto defendant's lap when he was giving piano lessons to other students.

A.A. testified that the inappropriate touching occurred "every time I went to class" but occurred only after, not during, the piano lesson. On the day that her mother entered the classroom, A.A. said that she was sitting on defendant's lap and saw her mother look through the blinds. She then got up and went with her mother to the car. According to A.A., her mother asked her what she was doing on defendant's lap, and she first responded "nothing." However, after her mother repeatedly asked her what happened, she cried and began to tell the story.

Pursuant to a pre-trial ruling, the State also presented A.A.'s statements to her mother on January 7, 2004, as well as her subsequent videotaped interview by the Prosecutor's Office.

Defendant's wife testified on behalf of the defense. She explained that A.A. "liked to be with [defendant] very much" and *546 was always smiling in his presence. A.A. would sometimes disturb defendant's conversations with other people in order to get his attention and always appeared comfortable around him. Another witness, P.M., whose eight-year-old son took piano lessons from defendant, testified that

921 A.2d 1135

A.A. would try to hang on to defendant and climb onto his lap during his son's lessons; however, defendant would gently put her aside. Likewise, P.M.'s wife recalled that A.A. would be disruptive during her son's lessons and would try to climb onto defendant's lap and show him the work that she had completed. She also noted that there were always a lot of people in the hallway at the Center and that the classroom door was open.

The owner of a daycare facility located in the Center also testified for the defense. She explained that the door to defendant's piano classroom was usually open because **\*\*1140** the daycare children would have to run through his classroom to get to her main room. She also stated that her daughter, D.M., took lessons from defendant and would often sit on his lap because she could not reach the keyboard. D.M. confirmed that the reason she sat on defendant's lap during her piano lesson was that the "keyboard was too high and ... the chairs were too low and I couldn't reach the keyboard."

## II

On appeal, defendant presents the following arguments for our consideration:

*POINT I:* A.A.'S TESTIMONY WAS MANIPULATED AND COERCED BY HER MOTHER AND THEREFORE WAS TAINTED TO SUCH AN EXTENT THAT ALL OF A.A.'S TESTIMONY MUST BE DISCOUNTED AS AGAINST THE WEIGHT OF THE EVIDENCE, AND THEREFORE, THE DEFENDANT IS ENTITLED TO A JUDGMENT OF ACQUITTAL OR NEW TRIAL

A. The Testimony Of [R.T.] Was False, Belied, And Her Dishonesty Tainted And Corrupted The Testimony Of A.A. And Therefore, The Entire Trial Was Polluted

B. [R.T.]'s Attempt To Bolster A.A.'s Credibility Backfired And Further Proved That A.A.'s Story Could Not Be True

**\*547** C. The Testimony Of A.A. Cannot Support A Conviction, And Only Confirms That Her Testimony Was Not The Product Of Her Observations, But That Of Her Mother's Coercive And Undue Influence

1. A.A.'s allegations of sexual assault against Mr. Burr at [a private location] are false

2. A.A.'s allegations against Mr. Burr regarding sexual assault at [the Center] are false

D. The Nature Of The Allegations Is Inconsistent To Sexual Activity

*POINT II:* THE TRIAL COURT IMPERMISSIBLY ALLOWED THE JURY TO VIEW THE VIDEOTAPE OF A.A. AT TRIAL AND DURING THEIR DELIBERATIONS

A. The Tender Years Exception

To The Hearsay Rule Is Unconstitutional On Its Face, For Allowing Testimony Not Subject To Cross–Examination

B. *Crawford* Does Not Carve Out An

Exception Where The Witness Testifies At Trial

C. Notwithstanding *Crawford* The Trial Court Nevertheless Abused Its Discretion For Admitting The Video Tape Under Well Settled New Jersey Law

D. The Trial Court Abused Its Discretion By Allowing The Tape Into Evidence

E. This Court Abused Its Discretion By Showing The Videotape To The Jury During Deliberations

*POINT III:* THE COMMENTS MADE BY THE PROSECUTOR DURING SUMMATIONS WERE IMPROPER AND PREJUDICIAL AND DENIED THE DEFENDANT A FAIR TRIAL

A. The Prosecutor Committed Plain Error By Asking The Jury To Believe The Testimony Of A.A. Based On The Testimony Of The State's Other Witnesses

B. The Prosecutor Made Numerous Prejudicial Comments To The Jury For The Sole Purpose Of Inflaming The Jury And Depriving The Defendant Of A Fair Trial

*POINT IV:* THE VERDICT MUST BE SET ASIDE BECAUSE THE DEFENDANT WAS NOT ALLOWED TO INTRODUCE EVIDENCE OF HIS MEDICAL DISABILITY THAT **\*\*1141** WOULD HAVE EXPLAINED HIS BEHAVIOR

A. Evidence Of Mental Disease Or Defect Is Not Limited To Cases That Present A Diminished Capacity Defense

B. The Asperger's Evidence Was Relevant To Show That Mr. Burr Would Not Know That A Child Sitting On A Man's Lap Is Inappropriate

C. The Evidence Was Relevant To Show That Mr. Burr Did Not Engage In A Pattern Of Manipulation And Deceit

D. The Evidence Was Relevant To Explain Mr. Burr's Odd Appearance And Behavior

*POINT V:* DEFENDANT'S TRIAL COUNSEL WAS INEFFECTIVE AND AS A RESULT THE DEFENDANT DID NOT RECEIVE A FAIR TRIAL AND HENCE IS ENTITLED TO A NEW TRIAL

**\*548** A. Trial Counsel Was Ineffective By Not Pleading The Affirmative Defense Of Diminished Capacity Pursuant To *N.J.S.A. 2C:4–2*

B. Trial Counsel Was Ineffective By Refusing Mr. Burr's Request To Show The Jury The Desk In Which A.A. Was Sitting At The Time Of The Alleged Touching To Show That Her Story Was A Lie

C. Trial Counsel Was Ineffective Because No Objections Were Made To The Improper And Inflammatory Summation By The Prosecutor

*POINT VI:* THE DEFENDANT IS ENTITLED TO RE–SENTENCING

A. The Defendant Is Entitled To Re–Sentencing And Immediate Release From Imprisonment Because No Judgment Of Conviction Has Been Entered Against The Defendant

B. The Imposition Of Sentence Of Megan's Law Community Supervision Was Imposed While The Defendant Was Not Present In Court, And Hence, That Sentence Was Illegal

We may dispose of several issues summarily. Because of our disposition resulting from Point IV, we have no need to address defendant's sentencing argument or his ineffective assistance of counsel claim. In any event, the latter is best left to post-conviction relief (PCR) proceedings in the first

instance. *State v. Preciose,* 129 *N.J.* 451, 609 *A.*2d 1280 (1992). We reject defendant's argument that the verdict was against the weight of the evidence as without sufficient merit to warrant extended discussion in a written opinion. *R.* 2:11–3(e)(2). The State's proofs, outlined above, met the *State v. Reyes,* 50 *N.J.* 454, 458, 236 *A.*2d 385 (1967), standard. We reject defendant's invitation to conduct our own independent evaluation of the evidence, including the credibility of the victim and her mother. That is simply not our function. In any event, we note that defendant never moved for a new trial, arguably precluding appellate review. *R.* 2:10–1; *State v. Smith,* 262 *N.J.Super.* 487, 511–12, 621 *A.*2d 493 (App.Div.), *certif. denied,* 134 *N.J.* 476, 634 *A.*2d 523 (1993). Finally, we also reject defendant's attacks on the prosecutor's summation, none of which were raised at trial. *R.* 2:11–3(e)(2). This said, the forceful arguments advanced by defendant in Point I expose the weaknesses in the State's case that demonstrate why the errors we discuss below cannot be deemed harmless. *R.* 2:10–2.

**\*549** III

Defendant contends that he suffers from Asperger's Disorder, a recognized condition [4] that would serve to explain certain of **\*\*1142** his behaviors with the child-victim. Specifically, it is argued that his illness would explain why the child was permitted or encouraged to sit on defendant's lap, a practice the prosecutor referred to as "grooming," a prelude to the alleged subsequent sexual assault. The issue arose as follows. During a court appearance in May 2004, the judge became alarmed by defendant's odd appearance and demeanor, [5] and wanted his competency to stand trial evaluated. Defendant was then admitted to the Ann Klein Forensic Center (AKFC) for evaluation. The discharge summary from the AKFC stated that defendant demonstrated signs of Asperger's Disorder, as well as signs of an unspecified psychiatric or personality disorder, and concluded that "further evaluation is needed for formulating a definitive diagnosis."

Defendant's attorney referred him to Dr. Richard Kleinmann, a psychiatrist, for a psychiatric evaluation in the context of his application to be released on bail. Defendant first met with Kleinmann in March 2004 and again in June and July 2004. On June 15, 2004, Kleinmann issued a brief letter stating that his "clinical impression" of defendant is that his "primary psychiatric diagnosis is Asperger's Disorder, a type of autism which can present with serious difficulties in social

interactions because the **\*550** individual is very limited in his ability to correctly interpret the emotions, feelings, and wishes of others."

Kleinmann's lengthy and more detailed psychiatric evaluation report, dated July 6, 2004, reconfirmed the diagnosis of Asperger's Disorder, which is an "uncommon form of autism found in individuals of normal or above-normal intelligence," that results in serious difficulties in social interaction and "significant impairment in social, occupational and other important areas of functioning." The report stated that "[i]t is difficult to overestimate the challenges posed to an individual with Asperger's Disorder trying to negotiate a path through a world peopled with non-autistic people." Kleinmann's report concluded:

> While I am unable to predict future behavior, my clinical impression is that [defendant] is not a sexual predator and is very unlikely to act in such a manner in the future if released on bail. Indeed, having this disorder actually makes improper sexual behavior less likely because individuals with Asperger's Disorder are not charismatic and are perceived, even by children, as different and bizarre.

During pretrial proceedings, the State brought a motion in limine to preclude expert medical testimony at trial concerning the fact that defendant has been diagnosed with Asperger's Disorder. Defendant's attorney explained that the defense was not seeking to offer evidence of the disorder to show that defendant committed the alleged acts but did not understand that his conduct was wrong, but rather to show that defendant's ability to make certain social judgments is impaired. In particular, defense counsel expressed concern that the jury might draw improper inferences from the fact that defendant allowed young female piano students to sit on his lap and from the fact that defendant's appearance may seem odd or alarming. **\*\*1143** She urged that defendant "should be able to show the jury a full picture of what it is that [he] is suffering from and why he may make inappropriate social judgments, not criminal judgments, but inappropriate social judgments." It was not contended that the Asperger's evidence would demonstrate diminished capacity.

In granting the State's motion to preclude the expert testimony, the trial court stated:

> **\*551** As to perceptions of [defendant] as bizarre or weird or eccentric, it may be true that people looking at [defendant], even when [defendant] is acting appropriately, may draw the conclusion that he is odd or unusual or strange. I don't know that his appearance is related to Asperger's disease or Asperger's Syndrome. [Defense counsel] in her argument referred to, I believe the relative of hers who suffers from Asperger's Syndrome, and I have pointed out before that there's a relative, at least my nephew in my family who is fifteen years of age who suffers from Asperger's Syndrome. When I spend time with him I can certainly see the difference in how he deals socially with others between him and his siblings. There's no question about it.

> But I am satisfied there is no basis to have Doctor Kleinmann testify ... as to the condition of Asperger's Syndrome. I don't know the relevance of his condition insofar as it relates to this case.... [T]here is no ... contention that [defendant] cannot formulate the mental attitude of purposefulness or knowledge sufficient to commit the crimes in question.

> In terms of his close interaction with the victim placing the victim on his lap, assuming that for the moment, for the purpose of this argument it can be shown that he did that or touching her buttock or reaching under her skirt on the one occasion, I don't believe that the fact that the defendant suffers from a disease which affects his appearance or his manner relates to that.

> I, therefore, will grant the motion of the State to strike testimony of Doctor Kleinmann....

[1] On appeal, defendant argues that the trial court's decision to preclude him from introducing evidence of Asperger's Disorder denied him a fair trial. Defendant contends that evidence of his mental impairment was relevant to explain his appearance and mannerisms to the jury, who likely found him to be odd or strange, and to rebut the State's argument that defendant "forced A.A. to sit on his lap with a pattern of coercion designed to eliminate her social barriers." Stated another way, defendant asserts that the Asperger's evidence was relevant to show that he did not know that it was inappropriate to have a child sit on his lap and that, by letting a child sit on his lap, he was not engaging in a pattern of

manipulation and deceit referred to as "grooming" by the prosecutor.

In an earlier opinion on this matter, filed November 16, 2006, we addressed Dr. Kleinmann's report and the Asperger's issue as follows:

> We consider the issue thus framed to be of significance but conclude that the record before us provides an inadequate basis for disposition. As noted, Dr. **\*552** Kleinmann's report was issued in the context of a bail application and, even though lengthy, was not as thorough as would likely be the case if he were presented as a witness at trial. In addition, he was not, obviously, subjected to cross-examination. If the judge had not excluded the testimony in limine, we assume that a hearing would have been held pursuant to _N.J.R.E._ 104(a) to explore the scope of the expert's proposed **\*\*1144** testimony as it related to the issues in the case. _N.J.R.E._ 401; _State v. Darby_, 174 _N.J._ 509, 519–20, 809 _A.2d_ 138 (2002); _State v. Davis_, 96 _N.J._ 611, 619, 477 _A.2d_ 308 (1984).

> Accordingly, we remand for the purpose of such a hearing at which the witness will proffer his proposed trial testimony, subject to cross-examination. The hearing is to be completed within forty-five days of receipt of this opinion by the parties. Upon completion, a transcript should be filed with us. _R._ 2:6–11; _R._ 2:6–12.

The remand has now been completed and the record returned to us. On February 16 and 22, 2007, Dr. Kleinmann testified at great length and was cross-examined by the assistant prosecutor. We see no need to set out the testimony in detail. It suffices to say that Kleinmann, under vigorous cross-examination, maintained his diagnosis of Asperger's Disorder. Asked to state the degree of severity of the condition in defendant, the witness stated that he "would categorize it as severe." He summarized the condition as follows:

> It's a developmental disorder and it's now being diagnosed as early as thirty months of age where the child exhibits unusual patterns of speech and a lack of interest in playing with friends, often very self associated, unable to decipher the unspoken aspects of communication; unable to interpret facial gestures as interested or disinterested, angry or curious, unable to look at a person, by looking at the eye and be able to read what the person is feeling.

Q. Doctor, let me ask you this, do people who suffer from Asperger's syndrome suffer in the social environment and if so how do they suffer in the social environment?

A. They suffer in the social environment in many ways. Can you clarify that, by what you mean by social environment?

Q. How did they interact with other people?

A. It's difficult.

Q. Explain to the Court?

A. Their behaviors are often annoying. They are seen as weird. Their speech is often too loud, it's monotone. There's no music, there's no melody in the speech. Because there's a lack of ability to determine whether a person is interested or not interested they often alienate other people because they will start to expound a subject that is of interest to them without any understanding that the person is not interested.

**\*553** Q. Sorry, go ahead.

A. In addition to the difficulty with understanding non-spoken speech they have difficulty understanding verbal communication, the use of idioms, double entendres is a skill that they lack and which cannot readily be developed, and that's so important in our speech. It's a profound, it's a very profound disability.

I would say among the patients I've treated I have patients with paranoid schizophrenia who have been able to compensate for their disorder with medication.

For a person with Asperger's Disorder of a severe type there's no medication that we have available and the social skills training now being done with young children, but ... social skills training basically started in the late 1980's, early 1990's, it's very difficult to train an adult with Asperger's Disorder in terms of how to improve their deficits.

Dr. Kleinmann was of the opinion that people with this disorder do not have "the ability to manipulate people easily." They also have problems maintaining proper distance from other persons. Focusing on **\*\*1145** defendant's behavior with the child-victim in this case, the following colloquy ensued:

> Q. Let me ask you this, Doctor, would Mr. Burr know that a child, based on his medical condition, would Mr. Burr

know that a child sitting on his lap while he's giving piano lessons to the child might be considered inappropriate?

A. I don't think I can answer that in a yes or no. Again, some patients with Asperger's Disorders would have a sense that something is unusual here. How they would react in that situation, if they do have that awareness, how they respond could vary. If they feel uncomfortable they may feel uncomfortable but not know how to respond or they could seek a pretext to stand up or something and then to seek advice from another adult. So, I can't answer that in a yes or no sense; but I can say that in a pool of patients with Asperger's Disorder with significant impairment there will be some individuals that could conceivably allow the child to remain on their lap unaware of the implications of that behavior.

Q. Why?

A. Because this is not knowledge that they have.

Q. Why, what's in their brain that's different than ours, that's what we want to know?

A. Well, it's what we call the social brain. It's the frontal and temporal lobes and the connections between these parts of the brain. These individuals, it doesn't come to them. I mean, we teach our own children ages two, three, four, five, how to act in certain situations. Don't let people touch you in private places, don't touch other people in private places, they pick this up, they absorb it, they assimilate it, it becomes part of their cultural ability.

Q. Why would people with Asperger's, I mean, maybe this is a hard question for you to answer, but why do these people that suffer from Asperger's can't relate in a social environment? What is it that they don't understand?

**\*554** A. They act in a, there's a rigidity of behavior. As long as behaviors go along in the expected way they can do pretty well. After all, intellectually there's no impairment, and there are some very gifted scientists and college professors PhD's who do very well and they have Asperger's Disorder, but it's the social abilities, the ability to be in a situation to absorb all the variables and then to pick the best course of action, and they don't have this ability.

Referring to Kleinmann's report, we have the following:

Q. Now, Doctor, in your report on page four you state Mr. Burr presents a more odd and eccentric than he does a sexual deviate. What did you mean by that?

A. In my clinical experience working with patients that have acted inappropriately with children, there are certain abilities utilized in order to take advantage of the child. Okay, certain behaviors, isolate the child away from a caregiver, build up a trusting relationship, look for a child who is in a vulnerable situation and then inculcate certain behaviors, stand back, watch to see if there's an objection to the behavior and if there's no objection to continue on that course.

In my opinion a person with Asperger's Disorder, particularly a person with a severe disability of this nature, would be unable to do those things. That's not to say that a sexual offense is impossible. I could conceive of a situation, if, for example, there could be a physical rape or assault but in terms of manipulation of a child in order to get sexual gratification I would say that's very unlikely.

**\*\*1146** Q. Somebody who suffers from Asperger's as severely as Mr. Burr would he normally be able to engage in this sort of manipulation for purposes of sexual gratification?

A. In terms of manipulation of another child.

Q. Of a child, yes?

A. Of a child's behavior, I would say no, not with the severity of the disorder.

Q. Why?

A. Because, again, the lack of the theory of mind, that skill is not there. If you want to call it a skill, that ability.

With respect to defendant's situation in a trial setting, the doctor had this to say:

Q. How would, generally, somebody with Asperger's have the ability or inability to communicate, especially in a trial setting?

A. I think there's two primary handicaps, speaking generally, with respect to a patient with Asperger's Disorder. The first handicap in testifying, even sitting in the courtroom under the gaze of the jury, is that the jury is assessing the patient's demeanor. They are assessing

whether humor is being shown. They are assessing the facial animation. They are assessing facial gestures, are they seeing unusual behaviors that strike them as eccentric or odd. Those eccentric or odd behaviors to a person on the jury might be seen as someone who is a child molester.

Q. How about communicating, how would someone with Asperger's be able to communicate in a trial setting while testifying?

**\*555** A. It would be difficult, especially difficult doing this verbally.

Q. How, explain?

A. Because the defect in communication is much more pronounced in verbal communication than written communication. There are many patients with Asperger's Disorder who are very fluent in written communication. Were you to read an article or book by them about Asperger's Disorder you would ask yourself how could a person with such fluency have written this. But the problem is while they can do this writing, they cannot do this verbally. It's not only that they become confused under cross examination with a multitude of questions, it's also that the, it's not uncommon for patients with Asperger's Disorder to suffer from sensory overload.

It suffices to observe that on cross-examination, the prosecutor closely questioned Dr. Kleinmann on whether defendant has Asperger's at all, casting some doubt on defendant's bona fides in that fundamental respect. However, our determination does not involve whether the doctor, or defendant for that matter, will be found credible by a jury at trial, but only whether the proffered evidence was admissible.

**[2]** **[3]** A trial court's determination regarding the admissibility of evidence, including expert opinion evidence, is entitled to deference, and is reviewed under the abuse of discretion standard. *State v. Fortin*, 178 *N.J.* 540, 591, 843 *A.*2d 974 (2004), after remand, 189 *N.J.* 579, 597, 917 *A.*2d 746 (2007); *State v. Johnson*, 120 *N.J.* 263, 294, 576 *A.*2d 834 (1990). Accordingly, we should disturb an evidentiary ruling of the trial court only when a " 'clear error of judgment' is established." *State v. Loftin*, 146 *N.J.* 295, 357, 680 *A.*2d 677 (1996) (quoting *State v. Koedatich*, 112 *N.J.* 225, 313, 548 *A.*2d 939 (1988)).

We conclude that the trial court committed reversible error in excluding expert testimony regarding defendant's diagnosis of Asperger's Disorder. The trial court primarily based its reasoning on the fact that the expert evidence did not suggest, and defendant did not argue, that his mental **\*\*1147** condition served to negate the mental state required for the charged crime. The State similarly argues on appeal that evidence of defendant's mental disorder was properly excluded because the evidence did **\*556** not suggest that defendant was unable to purposefully molest a young child.

While the diminished capacity statute, *N.J.S.A.* 2C:4–2, allows the admission of evidence of a "mental disease or defect ... whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense," its language does not address the admission of evidence of a mental disease or defect when that evidence is being offered for a purpose other than negating the mens rea of the charged crime. *See N.J.S.A.* 2C:4–2. Indeed, the Court has explained that the diminished capacity defense "was intended to operate in the *limited sense* of being relevant to proof of any essential mental element of a crime." *State v. Breakiron*, 108 *N.J.* 591, 603, 532 *A.*2d 199 (1987) (emphasis added). Accordingly, the case law discussing and applying *N.J.S.A.* 2C:4–2 focuses only on whether evidence of a mental disease or defect is relevant to negate the mental state of the charged crime. *See, e.g., State v. Reyes*, 140 *N.J.* 344, 354–58, 658 *A.*2d 1218 (1995); *Breakiron, supra,* 108 *N.J.* at 607–21, 532 *A.*2d 199; *State v. Nataluk,* 316 *N.J.Super.* 336, 343–47, 720 *A.*2d 401 (App.Div.1998). Because *N.J.S.A.* 2C:4–2 and the case law interpreting it do not address the issue presented here, i.e., the admissibility of evidence of a mental condition when that evidence is not being offered to support a finding of diminished capacity, the trial court's focus on whether Asperger's Disorder was relevant to a diminished capacity defense was misplaced.[6]

**\*557** **[4]** **[5]** Because the diminished capacity statute addresses only a narrow issue that is not applicable to these facts, evaluating the admissibility of defendant's Asperger's Disorder should have been guided by our more general rules of evidence. Our court rules allow the admission of "all relevant evidence" that is not otherwise excluded by law. *N.J.R.E.* 402; *see also State v. Darby,* 174 *N.J.* 509, 519, 809 *A.*2d 138 (2002) (referring to relevancy as "the hallmark

of admissibility of evidence"). Relevant evidence is defined as any evidence that has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. In determining whether proffered evidence is relevant, the trial court should inquire as to whether a "logical connection" exists between the evidence and a fact in issue. *Darby, supra,* 174 *N.J.* at 519, 809 *A.*2d 138 (quoting **1148 *State v. Hutchins,* 241 *N.J.Super.* 353, 358, 575 *A.*2d 35 (App.Div.1990)). Stated another way, if the evidence renders a desired inference more probable or logical, then the evidence should be admitted. *Ibid.* (citation omitted); *State v. Davis,* 96 *N.J.* 611, 619, 477 *A.*2d 308 (1984) (citing *State v. Deatore,* 70 *N.J.* 100, 116, 358 *A.*2d 163 (1976)). The test for relevancy is a broad one that generally favors admissibility. *Ibid.*

Consistent with these principles, our courts have allowed evidence of a mental illness, defect, or condition when such evidence was deemed relevant to an issue at trial. Closest to the present situation is *State v. Sexton,* 311 *N.J.Super.* 70, 88, 709 *A.*2d 288 (App.Div.1998), *aff'd,* 160 *N.J.* 93, 733 *A.*2d 1125 (1999), where defendant, convicted of reckless manslaughter and weapons offenses, was barred from presenting evidence of his **mental impairment** which resulted in special education placement in school. The trial judge in that case, as here, had accepted the State's argument **558 that to allow the proffered evidence "would open a 'back door' into the diminished capacity defense." *Ibid.* We disagreed, noting that "[e]vidence of defendant's mental ability is potentially relevant to the reasonableness of his perceptions at the time [the victim] told him the gun was not loaded." *Ibid.* As such, the evidence was relevant to whether defendant possessed "the requisite reckless state of mind," as well as "to the jury's evaluation of defendant's demeanor and credibility as a witness at trial." *Ibid.* We commented on the absence of experts or school personnel to substantiate testimony by defendant and his mother concerning his school placement but left open the door to such testimony on retrial. *Ibid.* Of course, in this case, we do have such expert testimony. *See also State v. B.H.,* 183 *N.J.* 171, 185, 870 *A.*2d 273 (2005) (stating that evidence of battered woman syndrome has been deemed admissible to support claim of self-defense and for purposes of bolstering victim's credibility by explaining why abused woman might continue to live with abuser); *State v. Jarbath,* 114 *N.J.* 394, 408, 555 *A.*2d 559 (1989) (recognizing that defendant's deficient mental and emotional condition was relevant not only to culpability but also to capacity to assimilate punishment, i.e., whether term of imprisonment should be imposed); *State v. King,* 387 *N.J.Super.* 522, 904 *A.*2d 808 (App.Div.2006) (permitting psychiatric testimony regarding defendant's narcissistic and **antisocial personality disorders** as relevant to support claim of false confession); *State v. Johnson,* 216 *N.J.Super.* 588, 603, 524 *A.*2d 826 (App.Div.) (recognizing that evidence of a witness's mental defects has "unquestionable relevance" in assessing credibility), *certif. denied,* 107 *N.J.* 647, 527 *A.*2d 467 (1987); *Rosegay v. Canter,* 187 *N.J.Super.* 652, 654–55, 455 *A.*2d 610 (Law Div.1982) (stating that mental condition of plaintiff was relevant because it was made an element of her claim and was related to defendant's defenses); *State v. Len,* 108 *N.J.L.* 439, 441, 158 *A.* 749 (Sup.Ct.1932) (acknowledging that defendant can testify as to his mental condition at time of crime when relevant to claim of self-defense).

**559 In *Missouri v. Boyd,* 143 *S.W.*3d 36 (Mo.App.2004), the defendant was convicted of murder for allegedly stabbing the victim to death in a wooded area; thereafter, he allegedly led a friend through the woods to see the body. *Id.* at 38. The defendant maintained his innocence at trial and offered evidence of the fact that he suffered from **Asperger's Disorder** to (1) show that he was too uncoordinated to single-handedly overpower and stab the victim, (2) show that he could not have navigated the woods and led others to the victim's body, (3) provide an innocent explanation for the State's focus on his unusual interests, including violent books, and (4) show that he had unusual susceptibility to being framed. *Id.* at 38–39. The trial court granted the State's motion to **1149 exclude the evidence, concluding in part that it did not fall within the Missouri statute that permits evidence of a mental disease or defect when the defendant claims that he lacks responsibility for his conduct because of such a condition.[7] *Id.* at 39–40.

The appellate court reversed, first finding that the trial court improperly relied on the statute in excluding the evidence, because that statute governs the admissibility of mental disease or defect evidence in lack of responsibility proceedings only, not in all instances. *Id.* at 41–44. The court explained that the defendant was not arguing that evidence of **Asperger's Disorder** was relevant to establish a lack of responsibility for the murder, but rather was maintaining his innocence and arguing that the evidence was relevant to support the fact that he did not commit the crime; thus, the statute was inapplicable. *Id.* at 44.

Next, the court determined that the expert offers of proof regarding defendant's mental disability were adequate and relevant to the defense. *Id.* at 45–46. Finally, the court found that the exclusion of the evidence regarding Asperger's Disorder raised a reasonable probability of affecting the outcome of the trial **\*560** and therefore mandated reversal.

*Id.* at 46–47. *See also* United States v. Rahm, 993 F.2d 1405 (9th Cir.1993).

[6] Here, although defendant did not suggest that evidence of Asperger's Disorder might make it physically impossible for him to have committed the crime, as in *Boyd,* defendant did offer the evidence to assist the jury in understanding why he might act in a way that appears socially unacceptable to others. *See* United States v. Hall, 93 F.3d 1337, 1343 (7th Cir.1996). In this regard, the trial court stated that it failed to see how Asperger's Disorder related in any way to defendant's close interactions with A.A. Although trial courts are afforded broad discretion in making relevancy determinations, Verdicchio v. Ricca, 179 N.J. 1, 34, 843 A.2d 1042 (2004), the court should be mindful of the "full factual setting" of the case and should allow "a certain amount of leeway" to the proponent of the evidence. *Lowenstein v. Newark Bd. of Educ.,* 35 N.J. 94, 105, 171 A.2d 265 (1961).

We conclude that the trial court misapplied its discretion in determining that Asperger's Disorder was not relevant to any of the issues in the case. As the condition is described by Dr. Kleinmann in his report and testimony, Asperger's Disorder appears highly relevant to the fact that defendant placed A.A. and at least one other child, D.M., on his lap during their piano lessons, and to the inferences that would logically be drawn from that evidence at trial. More specifically, it is logical that most adults would draw a negative inference from the fact that an adult male, who is accused of molesting a child, would routinely have young girls sit on his lap during their piano lessons. Jurors would most likely conclude from this evidence that the accused individual did not have innocent intentions in having the children sit on his lap but rather did so with an ulterior, improper motive related to sexual abuse. Indeed, even if the jurors had not already done so on their own, the prosecutor repeatedly urged them to draw that very inference during closing argument: "What eight or nine year old child is going to try and sit on somebody's lap if it hadn't already been welcomed before ... he groomed her so that she **\*561** would feel **\*\*1150** comfortable to sit on his lap." The prosecutor proceeded to discuss D.M.'s testimony about

sitting on defendant's lap and suggested that defendant was also "grooming" her to be comfortable with him, under the guise of making sure that she could reach the piano keys.

Evidence that defendant suffers from Asperger's Disorder and evidence that explains the manifestations of the disorder, particularly impairments in social interaction, could certainly have affected the jury's view of defendant's conduct and served to negate the inference that defendant allowed young children to sit on his lap with the purpose of grooming them for sexual abuse. Notably, Kleinmann recounted conversations with defendant in which defendant described having difficulty interacting with others in various social settings throughout his life. Kleinmann cautioned defendant to do "a better job" anticipating the reactions of others and told defendant that he needed a " 'map' of how to deal with other people." Defendant responded, "[y]es—I need a map—is it too late for me to get a map?"

Clearly then, Kleinmann's testimony would have given jurors a better understanding of defendant's behavior, which could have effectively negated the inference that defendant had the improper motive of seeking sexual gratification by having children sit on his lap. The trial would have been a more fair and complete adversarial process if, in evaluating the evidence and the inferences urged by the State, jurors were aware that defendant's mental disability prevents him from viewing the world as others do in terms of acceptable social interactions. The fact that Kleinmann was not absolutely certain in all of his opinions is no basis for exclusion, Rahm, supra, 993 F.2d at 1411–12, nor is the possibility that a jury may ultimately fail to be persuaded by his opinions because they rely to a significant degree on statements made to him by defendant. United States v. Finley, 301 F.3d 1000, 1009 (9th Cir.2002).

Moreover, the exclusion of evidence of Asperger's Disorder could reasonably have impacted the verdict. Testimony regarding **\*562** defendant allowing children to sit on his lap was heard from at least four witnesses at trial: R.T., A.A., D.M., and D.M.'s mother. That testimony was then reemphasized repeatedly during the State's closing argument. The jury was clearly troubled by this testimony and focused on the issue during deliberations, as it requested a readback of A.A.'s testimony, as well as portions of the testimony of both D.M. and her mother that specifically concerned D.M. sitting on defendant's lap. Thus, excluding evidence that would have shed light on defendant's seemingly inappropriate behavior

—which was definitely on the minds of the jury during deliberations—was clearly capable of producing an unjust result, thereby warranting reversal. *R.* 2:10–1; *United States v. Rahm, supra,* 993 *F.*2d at 1415; *see also State v. Pillar,* 359 *N.J.Super.* 249, 278–79, 820 *A.*2d 1 (App.Div.), *certif. denied,* 177 *N.J.* 572, 832 *A.*2d 322 (2003).

[7]   Defendant also argues that the trial court's refusal to allow Asperger's evidence deprived him of a fair trial by preventing him from testifying on his own behalf due to concerns that the jury would misconstrue his odd appearance and behavior and therefore find him to be not credible. As a result, defendant argues that the jury simply saw an odd, eccentric man who never explained his actions: "[t]hey just looked at him and saw a strange man with little girls sitting on his lap." Without question, the fact that defendant suffers from Asperger's Disorder impacted his decision not to testify at trial. In informing the trial court that he would not testify, defendant stated:

> **1151  Because of my autistic condition I always put my foot in my mouth. I always say something that irritates people and gives the wrong impression. It's dangerous for me to get up and speak because all my life I say things that annoy people when I didn't intend to do it. I can't trust myself to speak. My lawyers can't trust me to speak. It's not a good idea for somebody like me in any situation, especially in a court.
>
> ....
>
> My lawyers urged me many times not to get up and speak because of my autistic condition, they know that I always say things that embarrass myself and upset other people.

*563  Although defendant based his decision not to testify at least in part on the basis of his mental disability, he does not assert on appeal, and his remarks to the trial court do not suggest, that he would have testified if evidence of Asperger's Disorder had been admitted at trial. To the contrary, his comments indicate that he and his lawyers agreed that he should not testify due to concerns that he might say something that would be perceived by the jury as irritating or inappropriate. In addition, the trial court properly instructed the jurors that they could not consider the fact that defendant did not testify in reaching their verdict. Thus, defendant's argument that the trial court unduly burdened his constitutional right to testify by excluding the evidence of Asperger's Disorder is not highly persuasive. Nonetheless,

admitting the evidence would have given the jury a clearer lens through which to view defendant's behavior, including his demeanor while testifying, if he had chosen to do so. [8]

At retrial, the parties are free to address, and the judge to decide, how much of Kleinmann's proffered testimony is admissible. The hearing transcripts provide a complete record on which to make that determination, subject, of course, to the views we have expressed herein.

## IV

A.A. first revealed to her mother that defendant had molested her on January 7, 2004. One week later, on January 14, 2004, R.T. reported the matter to the local Police Department, which transported R.T. and A.A. to the Middlesex County Prosecutor's *564  Office. Investigator Collins met R.T. and A.A. upon their arrival. After speaking with R.T. alone, Collins met separately with A.A. and conducted a videotaped interview of the child. Collins had no prior or subsequent conversations with A.A., other than introducing herself to the child before the interview.

The admissibility of Collins's videotaped interview with A.A. was the subject of a pretrial hearing on October 13, 2004. Both R.T. and Collins testified at the hearing. Following the testimony, defendant first argued that *N.J.R.E.* 803(c)(27), known as the tender years exception to the hearsay rule, was invalidated by the United States Supreme Court decision in *Crawford v. Washington,* 541 *U.S.* 36, 124 *S.Ct.* 1354, 158 *L.Ed.*2d 177 (2004). The trial court rejected the argument, finding **1152  that *Crawford* did not encompass the situation presented here.

Defendant next argued that A.A.'s videotaped statement should not be admitted at trial because it was not made spontaneously. To that end, defendant explained that A.A. had a motive to fabricate an accusation against defendant because her mother had told her not to sit on anyone's lap and she needed to fabricate a story to explain her actions. Defendant further argued that A.A.'s language on the videotape reflected her mother's vocabulary rather than her own. The trial court disagreed, finding that A.A.'s videotaped statement was inherently trustworthy within the meaning of *Idaho v. Wright,* 497 *U.S.* 805, 110 *S.Ct.* 3139, 111 *L.Ed.*2d 638 (1990).

The issue of the admissibility of the videotape resurfaced during trial following A.A.'s in-court testimony. At that time, defendant argued that the tape should not be played for the jury because it was merely a repetitive, corroborative statement of A.A.'s trial testimony, and was thus unduly prejudicial. The trial court rejected the argument, finding that the tape "is evidential" because the jury already heard testimony that the matter was referred to the Prosecutor's Office shortly after A.A.'s disclosure, and the jury thus "has a right to hear what statement was made by the child thereafter in Investigator Collins's presence."

**\*565** Consistent with the trial court's rulings, the videotape was played for the jury during Collins's testimony. At the request of the jury, the tape was again played during deliberations.

### A. Constitutionality of 🔖 *N.J.R.E. 803(c)(27)*

On appeal, defendant first contends that 🔖 *N.J.R.E. 803(c)(27)* is unconstitutional on its face in light of the United States Supreme Court decision in *Crawford*. More specifically, defendant argues that *Crawford* renders the tender years exception unconstitutional because the rule allows the admission of testimonial hearsay that has not been the subject of cross-examination. We reject defendant's argument as unsupported by the facts of this case.

The so-called "tender years" exception to the hearsay rule provides that "[a] statement by a child under the age of twelve relating to sexual misconduct with or against that child is admissible" at trial if (a) the proponent of the hearsay statement provides sufficient notice of the intent to offer the statement at trial, (b) the court finds, pursuant to a pretrial hearing, that the statement is trustworthy, and (c) the child testifies at the trial, or the child is unavailable as a witness and corroborating proof of the sexual abuse is offered. 🔖 *N.J.R.E. 803(c)(27)*; *see also* 🔖 *State v. R.B., 183 N.J. 308, 318, 873 A.2d 511 (2005)*. The predecessor to this rule, former *Evidence Rule* 63(33), was first proposed by the Court in ⚠️ *State v. D.R., 109 N.J. 348, 371–77, 537 A.2d 667 (1988)*, which recognized the need for a more liberal admissibility rule regarding out-of-court statements made by young victims of sexual abuse. *See* Biunno, *Current N.J. Rules of Evidence,* comment to 🔖 *N.J.R.E. 803(c)(27)* (2006). The Court found that testimony by the victim is often "indispensable" in child sex abuse cases because these

cases often suffer from a lack of witnesses and an absence of physical evidence. 🔖 ⚠️ *D.R., supra, 109 N.J. at 358–59, 537 A.2d 667.* The Court also noted that a child victim's spontaneous out-of-court statement may be highly credible, and that the stress of testifying and the lapse of time between the assault and the trial may impair **\*566** the child's ability to testify credibly in court. 🔖 ⚠️ *Id. at 359–60, 537 A.2d 667.*

The United States Supreme Court's decision in *Crawford* originated from a **\*\*1153** Washington State court decision in which the trial court allowed the State to play a tape-recorded statement made by the defendant's wife during police interrogation, in which she described the defendant's stabbing of the victim; the wife did not testify at trial due to the state marital privilege. 🔖 *Crawford, supra, 541 U.S. at 38–41, 124 S.Ct. at 1357–58, 158 L.Ed.2d at 184–86.* The Washington Court of Appeals reversed, finding that the wife's statement did not possess particularized guarantees of trustworthiness, but the Washington Supreme Court found the statement to be sufficiently reliable and reinstated the defendant's conviction. 🔖 *Id. at 41–42, 124 S.Ct. at 1358–59, 158 L.Ed.2d at 186–87.*

The United States Supreme Court reversed and remanded, holding that the admission of the wife's tape-recorded statement violated the defendant's Sixth Amendment right to be confronted by the witnesses against him. 🔖 *Id. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.* The Court explained that testimonial hearsay evidence may not be admitted against a defendant unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. *Ibid.* In reaching that conclusion, the Supreme Court dramatically changed course, reversing its decades-earlier decision in 🔖 *Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980),* which had held that an unavailable witness's out-of-court statement may be admitted at trial as long as it falls within a " 'firmly rooted hearsay exception' " or bears " 'particularized guarantees of trustworthiness.' " 🔖 *Crawford, supra, 541 U.S. at 60–68, 124 S.Ct. at 1369–74, 158 L.Ed.2d at 198–203* (quoting 🔖 *Roberts, supra, 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608).* In *Crawford,* the Supreme Court stated that its holding was consistent with the Framers' understanding of the Confrontation Clause, which was that testimonial statements of witnesses are not admissible when the witness does not appear at trial, unless the witness is unavailable to testify and the defendant **\*567** had a prior

opportunity for cross-examination. *Id.* at 59, 124 *S.Ct.* at 1369, 158 *L.Ed.*2d at 197.

In *Davis v. Washington,* and its companion case, *Hammon v. Indiana,* ––– *U.S.* ––––, 126 *S.Ct.* 2266, 165 *L.Ed.*2d 224 (2006), the Supreme Court expounded on the meaning of "testimonial," as that term was used in *Crawford.* We discussed *Davis* and *Hammon* recently in *State v. Buda,* 389 *N.J.Super.* 241, 912 *A.*2d 735 (App.Div.2006), and need not go over the territory so thoroughly covered by Judge Stern in that opinion, nor the same ground exhaustively addressed by Judge Sabatino in *State v. Kent,* 391 *N.J.Super.* 352, 364–68, 918 *A.*2d 626 (App.Div.2007). It suffices to note that *Davis* held that "testimonial hearsay" includes "interrogations solely directed at establishing the facts of a past crime in order to identify (or provide evidence to convict) the perpetrator."

*Davis, supra,* ––– *U.S.* at ––––, 126 *S.Ct.* at 2276, 165 *L.Ed.*2d at 240. Here, A.A.'s videotaped statement was taken by an investigator for the County Prosecutor a week after A.A. had first reported the alleged abuse to her mother, and the purpose of the interview was to create or preserve evidence with which to prosecute defendant. The taped statement was unquestionably testimonial hearsay. *See* *State v. Pitt,* 209 *Or.App.* 270, 147 *P.*3d 940, 943–45 (2006); *Snowden v. State,* 156 *Md.App.* 139, 846 *A.*2d 36, 47 (2004), *aff'd,* 385 *Md.* 64, 867 *A.*2d 314 (2005).

Most importantly for present purposes, *Crawford* clearly stated, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.... The Clause does not bar admission of a statement so **\*\*1154** long as the declarant is present at trial to defend or explain it."

*Crawford, supra,* 541 *U.S.* at 59 n. 9, 124 *S.Ct.* at 1369 n. 9, 158 *L.Ed.*2d at 197 n. 9.

As we have noted, *N.J.R.E.* 803(c)(27) provides for admissibility in two circumstances, first when the child "testifies at trial," and second, when the child is unavailable as a witness but there is corroborating proof of the sexual abuse. In this case, the second part of the rule does not apply because there is no claim that A.A. **\*568** was unavailable; in fact, she was available. As a result, we express no view on whether the "unavailable" prong of the tender years exception

survives *Crawford,* although we entertain considerable doubt that it does.

**[8]**   In this case, the child testified, which fell within the first prong of 803(c)(27), and she was available for and was in fact subjected to cross-examination, thereby satisfying *Crawford. See* *People v. Sharp,* 355 *Ill.App.*3d 786, 292 *Ill.Dec.* 118, 825 *N.E.*2d 706, 712 (2005); *Elkins v. State,* 918 *So.*2d 828, 832 (Miss.App.2005), *cert. denied,* 921 *So.*2d 1279 (Miss.2006), *cert. denied,* ––– *U.S.* ––––, 126 *S.Ct.* 2865, 165 *L.Ed.*2d 898 (2006); *Commonwealth v. Cesar,* 911 *A.*2d 978, 982–83 (Pa.Super.2006). This case does not present a situation where a child victim takes the stand but cannot remember sufficient details of the offense to provide meaningful testimony or is unable or refuses to respond to questions posed on cross-examination. In such instances, an argument could be made that while technically "available" for testimony, no realistic opportunity for cross-examination is presented. *See* *Sharp, supra,* 292 *Ill.Dec.* 118, 825 *N.E.*2d at 711–12. Here, A.A. testified fully on direct and cross-examination.

Nonetheless, defendant argues that *Crawford* was violated in this case because A.A. was cross-examined only as to her trial testimony and was not cross-examined regarding the videotape, which was played for the jury after her testimony concluded. However, we conclude that no Confrontation Clause violation occurred. Even though A.A. was not specifically cross-examined on the videotaped statement, the videotape and her in-court testimony, on which she was cross-examined at length, were consistent; the videotape contained no allegations that were not brought forth during A.A.'s trial testimony. In fact, defendant admits that any cross-examination of A.A. specifically directed at the videotaped interview would not have added anything new to the trial. In this regard, defendant's brief states:

> Here, [defendant] had no such opportunity to cross-examine his accuser regarding her statements on the tape. [A.A.] testified in court, and then she was cross- **\*569** examined regarding her trial testimony. Then Inv. Collins testified, and the State introduced the tape. Cross-examination was not reopened after that; the witness had long been excused.

> But even if she were made available, any cross-examination that would have occurred would have been a *de facto* nullity. There would have been little difference

Case 1:20-cr-00143-TSE   Document 329-2   Filed 05/06/21   Page 17 of 21 PageID# 5684

between the questions from that cross-examination and the prior one, except for the fact that the witness would have a much harder time remembering what she said on the earlier occasion.

Thus, as defendant himself recognizes, his accuser was thoroughly cross-examined regarding her allegations against him, and further cross-examination specifically on her consistent videotaped statement would not have brought forth any additional information. Defendant exercised his right to confront A.A. when she was cross-examined at length by his counsel. Accordingly, **1155 there was no Confrontation Clause violation here.

## B. Admission of Videotape During Trial

### 1. Trustworthiness

**[9]** Defendant argues that, even if the tender years exception is constitutional post-*Crawford*, the trial court nonetheless erred in admitting the videotaped statement at trial. We disagree.

*N.J.R.E.* 803(c)(27) provides that, as a prerequisite for admissibility, the court find a "probability that the statement is trustworthy," based on "the time, content and circumstances of the statement." This requirement is separate from and in addition to the parts of the Rule, discussed earlier, that were designed to address confrontation concerns. We have held that in making the determination whether a statement offered under the Rule is trustworthy, the trial court should evaluate the "totality of the circumstances" surrounding the statement. *State v. Roman,* 248 *N.J.Super.* 144, 152, 590 *A.2d* 686 (App.Div.1991).

**[10]** In *State v. D.G.,* 157 *N.J.* 112, 125–26, 723 *A.2d* 588 (1999), the Court looked to *Idaho v. Wright,* 497 *U.S.* 805, 817, 110 *S.Ct.* 3139, 3147, 111 *L.Ed.2d* 638, 653 (1990), for an identification of appropriate factors bearing upon the trustworthiness of a hearsay statement by a child sexual abuse victim. However, in doing so, **570** *Wright* was identifying factors that bore on whether such a statement met the requirements of the Confrontation Clause as it was understood at that time. As discussed earlier, *Crawford* has entirely changed the Confrontation Clause landscape, rendering "defunct" the reliability test set out in *Wright*. *Sharp, supra,* 292 *Ill.Dec.* 118, 825 *N.E.2d* at 713. Nevertheless, the need for a trustworthiness analysis remains

under *N.J.R.E.* 803(c)(27), and the same factors identified in *Wright,* and endorsed by *D.G.,* are appropriate for guidance in that context. *See Roman, supra,* 248 *N.J.Super.* at 152–53, 590 *A.2d* 686; *State v. R.M.,* 245 *N.J.Super.* 504, 516–18, 586 *A.2d* 290 (App.Div.), *certif. denied,* 126 *N.J.* 338, 598 *A.2d* 895 (1991); *State v. M.Z.,* 241 *N.J.Super.* 444, 450–52, 575 *A.2d* 82 (Law Div.1990). Specifically, these factors include whether the statement was made spontaneously, whether the account is repeated with consistency, the mental state of the declarant, the use of terminology unexpected of a child of similar age, lack of a motive to fabricate, use of interrogation, and manipulation by adults. *D.G., supra,* 157 *N.J.* at 125, 723 *A.2d* 588 (citing *Wright, supra,* 497 *U.S.* at 821–22, 827, 110 *S.Ct.* at 3150, 3153, 111 *L.Ed.2d* at 656, 659–60); *see also Biunno, supra,* comment to *N.J.R.E.* 803(c)(27). The list is non-exhaustive, and courts are afforded considerable leeway in their evaluation of appropriate factors. *Ibid.*

Here, the trial court reviewed the factors outlined above, and the record supports its conclusion that A.A.'s videotaped interview was sufficiently reliable to be admissible under *N.J.R.E.* 803(c)(27). A.A.'s statements during the interview were spontaneous in that she freely recounted the events after only minimal open-ended questioning by Collins.[9] *Compare D.G., supra,* 157 *N.J.* at 131, 723 *A.2d* 588 (rather than conducting neutral interview to provide child with fair opportunity to describe events, detective assumed that child's earlier statement to family member **571** was accurate and persistently questioned child until she eventually repeated **1156 it to her satisfaction). Additionally, Collins questioned A.A. without anyone else in the room, minimizing the possibility that A.A.'s answers were manipulated or coerced in any way.

Defendant contends, however, that A.A.'s allegations were coerced by her mother, who repeatedly questioned her after finding her on defendant's lap. While the trial testimony revealed that R.T. broadly asked A.A. what she was doing in the corner of the classroom or why she was sitting on defendant's lap, there was no evidence that R.T. suggested to A.A. that defendant sexually assaulted her. As the trial court reasonably concluded: "A statement by a child's mother that says, what happened in there or what was going on in the classroom is hardly the kind of prompting or suggestive questioning that I think militates against the credibility of the statement."

Case 1:20-cr-00143-TSE   Document 329-2   Filed 05/06/21   Page 18 of 21 PageID# 5685
State v. Buff, 392 N.J.Super. 538 (2007)

921 A.2d 1135

Furthermore, the record contains no strong support regarding a motive to fabricate. No evidence was presented to suggest that A.A. or her family had any problems with defendant or that falsely accusing him would benefit them in any way. In contrast, the evidence showed that they respected and trusted defendant and felt that he was a good teacher. Although A.A.'s mother instructed her not to sit on anyone's lap and A.A. may have been sitting on defendant's lap when her mother walked into the classroom, it is unlikely that an eight-year-old child would fabricate a detailed story of sexual abuse occurring over an extended period of time simply to avoid her mother's disapproval.

Turning to the remaining factors, A.A.'s mental state throughout the interview appeared to be calm; her responses to the questions show that she was engaging and did not appear to be under stress. In addition, A.A. used terminology that would be expected of a young child, referring to her "butt" and her "private part" when asked by Collins to label body parts on a diagram and in recounting the events. There was no evidence of coaching by an adult, who would likely use biologically accurate terms such as "vagina."

**\*572** Finally, A.A.'s story remained largely consistent from her conversation with her mother, to her interview with Collins, to her trial testimony. As the trial court reasonably found:

> [T]he fact of the matter is that based on the testimony of Investigator Collins that I heard and based on the testimony that the child's mother provided here the statement is largely consistent. There is very little variance, although there's certainly some variance as to details, but it is not a situation in which the child alleges that she was touched on her breast on one occasion and on her buttock on another or where [on] one occasion the defendant committed an act of penetration and on another did not. There is a consistency to what is provided here.

Based on the foregoing, we conclude that the trial court did not abuse its discretion in finding that A.A.'s videotaped interview was sufficiently trustworthy to be admitted at trial

under *N.J.R.E.* 803(c)(27). The court's findings in this regard are supported by sufficient credible evidence in the record. *See State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.2d* 809 (1964).

### 2. Prejudice

**[11]** Defendant further argues that the videotape should have been excluded at trial under *N.J.R.E.* 403 based on the prejudicial effect of cumulative, repetitious testimony. Again, we disagree.

Relevant evidence may nonetheless be excluded by the trial court if "its probative value is substantially outweighed by the risk of ... undue prejudice ... waste of time, or needless presentation of cumulative **\*\*1157** evidence." *N.J.R.E.* 403. Our Supreme Court has noted that, when considering the admissibility of repetitive corroborative statements under the tender years exception to the hearsay rule, the trial court "should be cognizant of its right under *N.J.R.E.* 403 to exclude evidence, if it finds in its discretion, that the prejudicial value of that evidence substantially outweighs its probative value." *D.G., supra,* 157 *N.J.* at 128, 723 *A.2d* 588. The Court repeated this caution in *State v. Smith,* 158 *N.J.* 376, 730 *A.2d* 311 (1999), when it stated that, "trial courts, in a proper case, must serve as gatekeepers when repetitive corroborating hearsay evidence is proffered pursuant to *N.J.R.E.* 803(c)(27)." *Id.* at 391, 730 *A.2d* 311.

**\*573** Here, the interview had probative value, as it occurred closer in time to the alleged sexual assault than the trial, and was conducted by an investigator who gave A.A. a neutral opportunity to explain what happened outside of anyone else's presence. In addition, as the trial court noted, the tape was probative in showing that shortly after A.A. disclosed the events, the family referred the matter to the Prosecutor's Office, where A.A. made allegations that were largely consistent with those made to her mother and those recounted at trial.

Moreover, the facts of *Smith* are very similar to those presented here. In *Smith,* an eight-year-old child was interviewed by a detective regarding an alleged sexual assault committed against her, and the interview was recorded on video. *Id.* at 378–79, 730 *A.2d* 311. The child testified at trial, before closed-circuit television, and provided testimony

that was duplicative of the videotaped interview. 🔶*Id.* at 379, 730 *A.*2d 311. Despite noting that a trial court may exclude repetitive evidence offered under 🚩*N.J.R.E.* 803(c)(27) pursuant to *N.J.R.E.* 403, the Court found that the videotaped statement was properly admitted at trial because it was sufficiently reliable to satisfy the trustworthiness inquiry required by 🚩*N.J.R.E.* 803(c)(27). 🔶*Id.* at 391, 730 *A.*2d 311.

This case does not contain any unique facts to suggest that admission of the videotaped interview was any more prejudicial to the defense than it was in *Smith*. As in *Smith*, the trial court properly considered the trustworthiness factors set forth in *Wright, supra,* and found that the videotape was sufficiently reliable to be admitted under 🚩*N.J.R.E.* 803(c)(27); that finding was supported by credible evidence in the record. Thus, the admission at trial of the videotape was not an abuse of discretion and does not constitute reversible error.

*See* 🔶*Smith, supra,* 158 *N.J.* at 389–91, 730 *A.*2d 311.

## C. Admission of Videotape During Jury Deliberations

[12] During deliberations, the jury submitted a note requesting the transcript of A.A.'s testimony, the transcript of every **\*574** witness's testimony, and a second opportunity to view the videotape of Collins's interview with A.A. The trial judge informed the jury that it could not receive transcripts but could request a read-back of a particular witness's testimony; he also indicated that the court reporter was already preparing A.A.'s in-court testimony for a read-back. Additionally, the judge granted the jury's request to view A.A.'s videotaped interview again, and it was promptly replayed in the courtroom. The jurors then returned to the jury room to resume deliberations. They were later brought back into the courtroom for a full read-back by the court reporter of A.A.'s trial testimony. The only additional information sought by the jury during deliberations was a read-back of portions of the testimony of the daycare facility owner **\*\*1158** and her daughter, D.M., concerning D.M. sitting on defendant's lap.

On appeal, defendant argues that the trial court abused its discretion in permitting a replay of the videotape during jury deliberations because showing the videotape a second time was unduly prejudicial in emphasizing the complaining witness's testimony.

Our research has not revealed any cases dealing with the precise issue of replaying a witness's videotaped *pre-trial* statement. However, there are some decisions on the related issue of the replay of a witness's videotaped *trial* testimony. In 🟨🔶*State v. Michaels,* 264 *N.J.Super.* 579, 625 *A.*2d 489 (App.Div.1993), *aff'd,* 🔶136 *N.J.* 299, 642 *A.*2d 1372 (1994), a child sexual abuse case, the trial court granted the jury's request for a video replay of the closed-circuit television testimony of the children who alleged abuse. 🔶*Id.* at 586, 625 *A.*2d 489. Although reversing on other issues, we chose to comment on the issue of video playbacks during jury deliberations since there were no New Jersey cases on point. 🔶*Id.* at 641, 625 *A.*2d 489. Citing several federal cases, we found that it is impermissible to allow the jury to view videotaped testimony *in the jury room,* but that replaying videotaped testimony in its entirety at the jury's request in open court is subject to judicial discretion. 🟨🔶*Id.* at 643–44, 625 *A.*2d 489; *see also* 🟨*State v.* **\*575** *Muhammad,* 359 *N.J.Super.* 361, 380, 820 *A.*2d 70 (App.Div.) (stating that video replays of testimony during deliberations in response to jury request are commonplace), *certif. denied,* 178 *N.J.* 36, 834 *A.*2d 408 (2003).

In *Michaels,* we recognized that replaying video testimony provides certain advantages over reading back transcribed testimony, but nonetheless concluded that a trial court should be afforded discretion in responding to a jury's request for a replay. *Michaels, supra,* 264 *N.J.Super.* at 644, 625 *A.*2d 489. We explained:

> It is clear that videotaped testimony provides more than conventional, transcribed testimony. The witness' actual image, available in a video replay, presents much more information than does a transcript reading. In essence, the witness is brought before the jury a second time, after completion of the defense case, to repeat exactly what was testified to in the State's case. The witness's words and all of the animation, passion, or sympathy originally conveyed are again presented to the jury. It is difficult to deny that there is an advantage that may be gained in such circumstances. However, we cannot say that the replay of child-testimonial videotapes is prejudicial *per se* or that because of the impact of the visual image, the trial judge should be divested of discretion to accede to a jury's request for a replay. A court exercises wide discretion in granting or denying a jury's request to rehear testimony during deliberations.

[*Ibid.*]

However, we cautioned against the "routine replaying" of videotaped testimony and directed that the trial court should first attempt to satisfy the jury's request for a video replay by offering a reading of the written transcript. *Ibid.* The trial judge should also inquire whether the jurors are seeking something from the video that they cannot get from an impartial read-back of the testimony. *Id.* at 644–45, 625 A.2d 489. After taking these steps, if the trial court determines that the jury's request for a video replay is "reasonably necessary to its deliberations," it should then exercise its discretion "to balance that need against any possible prejudice in each particular case." *Id.* at 645, 625 A.2d 489.

**\*\*1159** Here, the trial judge granted the jury's request to view the videotape without first offering an impartial reading of the transcribed interview. The judge did not inquire as to what the jurors were seeking by viewing the tape again and did not balance the **\*576** jury's need against possible prejudice to defendant. [10] Without information as to the trial court's reasoning in permitting the jury to view A.A.'s videotaped interview a second time, it is difficult to assess whether the trial court misapplied its discretion in allowing the playback.

Our independent assessment of the circumstances here suggests that allowing the video replay may have unduly prejudiced defendant. The jury heard A.A.'s allegations repeated several times throughout the trial: A.A.'s mother testified as to the child's allegations, A.A. provided in-court testimony, and A.A.'s videotaped interview was played during Collins's testimony. During deliberations, the jury again heard A.A.'s in-court testimony as read back by the court reporter, and again viewed the videotape. Notably, the video, which allowed the jury to view A.A.'s demeanor for a second time, did not contain any cross-examination. Thus, the jury was able to review A.A.'s demeanor when asserting her allegations but not when answering questions on cross-examination. Given all of these circumstances, A.A.'s allegations against defendant were emphasized in a way that the case presented by the defense was not.

Given our caution in *Michaels, supra,* 264 N.J.Super. at 644–45, 625 A.2d 489, the trial judge, at a minimum, should have inquired into the jury's need for a video replay and balanced that need against any resulting prejudice. However, because of our reversal on other grounds, we need not decide if this error alone would require a new trial. On retrial, the issue may not arise again, but if it does, this opinion will hopefully provide guidance.

Reversed and remanded for a new trial.

**All Citations**

392 N.J.Super. 538, 921 A.2d 1135

## Footnotes

1    All initials have been changed to protect the identity of the victims.

2    Although A.A.'s mother testified that B.A.'s piano lessons were usually with defendant's wife, while A.A.'s lessons were usually with defendant, both A.A. and defendant's wife confirmed that typically it was the wife who gave lessons to both A.A. and B.A.

3    R.T. had testified during pretrial proceedings that when she opened the door to the classroom, she saw A.A. and defendant sitting in the corner very close to one another, and she presumed that A.A. was sitting on defendant's lap. According to R.T., defendant and A.A. became startled when the door opened and jumped up. R.T. gave a similar statement to Investigator Collins at the Middlesex County Prosecutor's Office.

4    The American Psychiatric Association recognizes Asperger's Disorder as a distinct diagnosis. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 75–77 (4th ed. 1994) (DSM–IV). According to the DSM–IV, the "essential features" of the disorder are "severe and sustained impairment in social interaction ... and the development of restricted, repetitive patterns of behavior, interests, and activities." *Id.* at 75. In order to constitute Asperger's Disorder, the "disturbance must cause clinically significant impairment in social, occupational, or other important areas of functioning." *Ibid.*

5   Defendant apparently appeared in court with a bag or large sign draped over his head. When the court questioned his dress and demeanor, defendant answered by quoting from the Book of Deuteronomy.

6   In *State v. Watson,* 261 *N.J.Super.* 169, 618 *A.*2d 367 (App.Div.1992), *certif. denied,* 133 *N.J.* 441, 627 *A.*2d 1145 (1993), we made the seemingly broad statement that "no evidence of mental disease or by way of explanation of defendant's conduct is relevant (or even admissible) unless it bears on whether he had the requisite mental state to commit the [crime], i.e., whether he acted purposely or knowingly." *Id.* at 178– 79, 618 *A.*2d 367 (citing *State v. Pitts,* 116 *N.J.* 580, 609, 562 *A.*2d 1320 (1989)). However, this statement was made in the context of evaluating whether evidence of defendant's mental condition was sufficient to justify a diminished capacity instruction. *Ibid.* Moreover, in support of the proposition, *Watson* cited to *Pitts, supra,* 116 *N.J.* 580, 562 *A.*2d 1320, where the Court asserted that "the only evidence of mental disease that should be admitted *in respect of diminished capacity* 'is that relevant to the question of whether defendant had the requisite mental state to commit the crime.' " *Id.* at 609, 562 *A.*2d 1320 (quoting *Breakiron, supra,* 108 *N.J.* at 618, 532 *A.*2d 199) (emphasis added). Thus, the statement made in *Watson* appears limited to situations in which a defendant offers evidence of a mental disease or defect for purposes of establishing diminished capacity; it does not address whether such evidence could ever be offered for another purpose.

7   One of the specific purposes for which evidence of a mental disease or defect may be admitted under the Missouri statute mirrors our diminished capacity statute: "to prove that the defendant did or did not have the state of mind which is an element of the offense." *Boyd, supra,* 143 *S.W.*3d at 41.

8   Defendant also argues that the Asperger's evidence was relevant simply to explain his "odd appearance" to the jury. This argument is less persuasive. While there is some evidence in the record suggesting that defendant had an odd or unusual appearance, his appearance was not an issue raised during trial and there was no evidence, as defendant argues, that the jury convicted him merely because he "looked the part of [a] child molester." Rather, the judge reminded the jury throughout its charge that the verdict must be based on the evidence presented at trial and that the verdict must be reached "without passion, prejudice or sympathy."

9   Collins asked broad questions such as: "What is it that [defendant] did to you?" and "[W]hen would this happen?"; and "[W]hat happened next?" A.A. freely responded without further prompting.

10  Defense counsel objected to replaying the videotape without first informing the jury that they could request a read-back of specific testimony and then asking whether the jury still wanted the replay. However, the trial judge granted the jury's request for the replay without further inquiry.

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.