# EXHIBIT 1

1

               **UNITED STATES DISTRICT COURT**
          **FOR THE EASTERN DISTRICT OF VIRGINIA**
                 **ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|    v. | ) |
| | ) Criminal No. 20-143 |
| ZACKARY ELLIS SANDERS, | ) |
| | ) |
|       Defendant. | ) |
| _____ | ) Alexandria, Virginia |
| | |
| | April 2, 2021 |

              TRANSCRIPT OF MOTION HEARING
          BEFORE THE HONORABLE T. S. ELLIS
           UNITED STATES DISTRICT JUDGE

      APPEARANCES:

   For the Government:    JAY V. PRABHU, AUSA
                       WILLIAM CLAYMAN, AUSA

   For the Defendant:     NINA J. GINSBERG
                       JONATHAN STUART JEFFRESS
                       JADE CHONG-SMITH

   COURT REPORTER:      PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                    401 COURTHOUSE SQUARE
                    NINTH FLOOR
                    ALEXANDRIA, VIRGINIA  22314

   PROCEEDINGS REPORTED BY STENOTYPE SHORTHAND.
   TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

2

```
 1                      P R O C E E D I N G S

 2                        (12:08 P.M.)

 3            THE DEPUTY CLERK:  The Court calls Criminal Case

 4     United States of America versus Zachary Ellis Sanders, Case

 5     Number 2020-CR-143.

 6            May I have appearances please, first for the

 7     government.

 8            MR. PRABHU:  Good afternoon, Your Honor.  Jay Prabhu

 9     and William Clayman for the government.

10            THE COURT:  Who will argue today?

11            MR. PRABHU:  I will, Your Honor.

12            THE COURT:  Who's on for the defendant?

13            MS. GINSBERG:  Good morning, Your Honor.  Nina

14     Ginsberg, Jon Jeffress, and Jade Chong-Smith for Mr. Sanders.

15            THE COURT:  And you'll argue today?

16            MS. GINSBERG:  Yes.  Yes, I will.

17            THE COURT:  And good morning to you, Mr. Sanders.

18            THE DEFENDANT:  Good morning.

19            THE COURT:  All right.  As I understand it, there are

20     motions to continue before the Court, supplements to it,

21     basically three grounds.  One, the defendant argues that he

22     has not had adequate opportunity to view the evidence.

23     Secondly, that he has an eye problem.  And third, that they

24     want more time to do a psychological examination into

25     possible autism and other problems.
```

1          Do I have that about right, Ms. Ginsberg?

2          MS. GINSBERG:  Yes, Your Honor, you certainly do.

3          THE COURT:  All right.  Now, there is also a motion

4    to file redacted versions of transcripts and exhibits on the

5    public record.

6          I think, Ms. Ginsberg, what I understood this to be

7    is that certain exhibits have been filed under seal, and you

8    believe that the sealed portions can be separated from

9    portions that should be in the public documents, so you would

10   like redacted versions on the public record.  Is that right?

11         MS. GINSBERG:  Your Honor, we did file that motion.

12   I wasn't aware the Court was going to address that today.

13   But the government has asked for an additional two weeks to

14   see if they can make additional redactions that we can all

15   agree on, which may obviate any need for the Court to rule on

16   this motion.

17         THE COURT:  All right.  That's fine.

18         MS. GINSBERG:  I think that is a fair way of

19   proceeding.

20         THE COURT:  We will put that to one side, then.

21         Then, there is a motion requiring the Alexandria

22   Detention Center to provide medical treatment prescribed by a

23   neurologist.  They have a different view about that.

24         I don't get in between choosing which doctor

25   treatment schedule gets to be done.  So I'm not going to rule

4

1    on that today.

2         As I understand it, your doctor says he should have

3    certain treatment.  The Alexandria Detention Center doctors

4    say otherwise.

5         MS. GINSBERG:  Your Honor, at present, what I believe

6    the situation is, is our doctor has written a letter

7    prescribing certain treatments and follow-up diagnostic

8    testing.  I believe the Alexandria jail is willing to provide

9    that treatment.  Right now, as I understand the situation, as

10   of yesterday evening, the jail wanted to have him

11   taken -- have Mr. Sanders taken to an emergency room to have

12   the treatments and testing performed, which would require

13   that he be put into quarantine for a period of 14 days at the

14   end of each visit outside the jail.  The treating doctor has

15   said that all of these -- the treatment and diagnostic

16   testing can be done at an outpatient facility.

17        Our concern is the very severe restrictions on

18   Mr. Sanders when he is in quarantine.  But it will also mean

19   that for that period we will have almost no contact with him

20   at all.  My experience has been, with another client who was

21   quarantined, that I was unable to communicate with him.  They

22   wouldn't take him out for phone calls or the Webex sessions,

23   and we were hoping that the Court would instruct the jail to

24   conform with the treating doctor's suggestion that the

25   treatment be provided in an outpatient setting, which as I

5

1    understand from the jail, the problem with the emergency room

2    is that there all kinds of people coming in and out.  It's

3    not a COVID-safe environment as a private outpatient, just a

4    regular outpatient facility would otherwise be.

5           THE COURT:  And Mr. Prabhu, do you know what the

6    position of the government or the jail is in this regard?

7           MR. PRABHU:  I've spoken with the marshals, Your

8    Honor.  They believe that the quarantine procedures that are

9    in place are appropriate and --

10          THE COURT:  I don't doubt that.

11          MR. PRABHU:  -- and that treatment that is being

12   recommended is by the ADC's neurologist, so there is no

13   dispute about that.  It is purely a matter of location and

14   timing.  And the government believes that is best left to ADC

15   and their healthcare team to determine that.

16          THE COURT:  You realize it impacts the issues before

17   the Court today?

18          MR. PRABHU:  We do understand that.  And we are

19   supportive of Mr. Sanders receiving appropriate treatment.

20          THE COURT:  All right.  Let's go to the continuance.

21   What I want to do, Ms. Ginsberg, is I'm going to issue an

22   order denying your request because I'm persuaded that he's

23   going to get the treatment.  He isn't going to get it in the

24   way that would be less impactful, as they say, on you all,

25   but I will take that into account.

6

1          Let's move on here to the motions before the Court to

2     continue the trial.

3          To begin that discussion, I want Mr. Prabhu -- I'm

4     going to get to you, but first I want some facts.

5          Mr. Prabhu, would you outline in some detail all of

6     the efforts and all of the opportunities that you have given

7     to this defendant, all of his counsel -- previous counsel,

8     current counsel -- whenever to review evidence in this case.

9          MR. PRABHU:  Yes, Your Honor.  Well, for the first

10    seven months that this case was pending, there were no

11    requests, and the government made available the evidence for

12    review.  So for seven months, there were no requests at all.

13         THE COURT:  You say the government made it available.

14    What did you do?

15         MR. PRABHU:  We said, if you want to review the

16    computers, you can do so, we'll make arrangements to do so.

17    When they made that request the first --

18         THE COURT:  Before you go there, I want to be clear

19    what you said to them and how.

20         MR. PRABHU:  We informed defense counsel --

21         THE COURT:  Do you have a letter?  Do you have an

22    e-mail?

23         MR. PRABHU:  There were e-mails, Your Honor, yes.

24         THE COURT:  Dated what?

25         You see, the issue is what opportunity has this

7

1    person had to review the evidence.  I need facts.

2            MR. PRABHU:  I understand, Your Honor.  I have dates

3    that reviews were actually done.

4            THE COURT:  Well, that isn't as relevant as -- that

5    is relevant -- but also dates where you offered to make it

6    available and you say for seven months nothing was done.

7    Well, I want to know how did you make it available to them.

8    What did you tell them?

9            MR. PRABHU:  Your Honor, we have repeated e-mails.

10   We can certainly supplement the --

11           THE COURT:  Submit those, please.

12           MR. PRABHU:  We will.

13           On October 22, 2020, defense counsel reviewed

14   materials, and again on March 12, 2021.  With the defendant,

15   they reviewed it on November 19, 2020; December 8, 2020; and

16   February 2, 2021.  With the defense forensic examiners, there

17   were reviews in January, on the 5th, the 6th, the 27th, the

18   28th; March 16th of this year, and March 29th through

19   yesterday, with the examiners.  Their access has always been

20   negotiated as the COVID requirements of quarantine would

21   allow.  Some has been in our office.  Some has been at the

22   FBI office.  But we have not denied their requests.

23   Sometimes we weren't able to do exactly what they wanted due

24   to the conditions, but they have not been denied the

25   opportunity to review the material.

8

```
1              Your Honor, in a case like this, you have chats with
2    contraband in them.  And they have been able to go through --
3    the defense and their examiner have been able to go through
4    that.  The more difficult part is allowing the defendant
5    himself to review those materials because there are
6    restrictions on allowing defendants access to contraband.  We
7    have tried to do our best to give them open access.  And in
8    fact, in my years of practicing here, we actually have given
9    more access than we normally do.
10             THE COURT:  I take it the defendant has had an
11   opportunity to see all of the e-mails?  There is no
12   contraband in the e-mails?
13             MR. PRABHU:  Chats, Your Honor.
14             THE COURT:  Chats.
15             MR. PRABHU:  There is, actually, because he is
16   interacting allegedly with minors, and videos are made, and
17   they are part of the chat.  He does have the ability to
18   review the chats without the embedded images or videos, and
19   they can print those out.
20             THE COURT:  Why can't he see those?
21             MR. PRABHU:  He has seen them, Your Honor.
22             THE COURT:  Of course he has seen them.
23             MR. PRABHU:  They want more access to them.
24             THE COURT:  He has seen them since --
25             MR. PRABHU:  Yes.
```

9

1          THE COURT:  -- he has been indicted?

2          MR. PRABHU:  Yes.  They just want extended access to

3     those chats.  We think that is appropriate for his defense

4     counsel and forensic examiners, but it is very difficult to

5     arrange his ability to do that because it's contraband.  We

6     can't just print out things and give it to defense counsel so

7     they can give it to him.

8          THE COURT:  But has he seen them at least once?

9          MR. PRABHU:  Yes.

10          THE COURT:  All of them?

11          MR. PRABHU:  We made them all available.  We're not

12     in the room when that happens.  It's an FBI examiner sitting

13     with them, so I don't know exactly what they looked at, but I

14     know that every one was made available to them.

15          THE COURT:  Is there any evidence that you're

16     obligated to show them in discovery that you haven't made

17     available to them?

18          MR. PRABHU:  No, Your Honor.

19          THE COURT:  All right.

20          MR. PRABHU:  Your Honor, if I may, the one thing that

21     has been raised by the defense is his ability to see things

22     apparently is in question, and that is certainly relevant, as

23     the Court alluded to earlier.  If he can't review the chats

24     and the paperwork with his eyes, that is an issue.  But as I

25     said, they actually knew that he was having eye problems

—10—

1    before he was even arrested, and it did not come up until

2    very, very recently that this was an issue preventing them

3    from doing what they want to do.  So I think the Court should

4    take that into consideration, as well.

5         THE COURT:  What are you saying?  You're saying, in

6    effect, it has been exaggerated?

7         MR. PRABHU:  The preliminary nature of what we have

8    seen that's been established is very different than what

9    they're also saying, that he might have a more serious

10   condition related to his sight.

11        THE COURT:  As I will indicate to Ms. Ginsberg, a

12   person with a sight problem is not thereby innocent of an

13   alleged crime.

14        MR. PRABHU:  The government agrees, Your Honor.

15        THE COURT:  Of course not.

16        All right.  Ms. Ginsberg, I know you haven't been

17   involved in this case, but the discovery has been made

18   available to your predecessor, and that counts.

19        MS. GINSBERG:  I understand.  But let me, if I can --

20   I disagree with the representations that the government has

21   made.

22        THE COURT:  Were you there?

23        MS. GINSBERG:  No.  But I have -- honestly, I have to

24   rely on the representations of my co-counsel, which I have no

25   basis to doubt, and I do have information based on

1    discussions that I have had with the government since I have

2    been involved.

3              First, if I may, with respect to the vision issue,

4    Mr. Sanders' vision issue was made a great deal worse after

5    he contracted COVID while he was incarcerated at the jail.

6    It was at that point that we reached out to his treating

7    physician.  And his treating physician wrote a letter, which

8    was provided to the jail in February, saying that it was

9    imperative that he be seen by the treating physician based on

10   the reported symptoms he was displaying, and it took almost

11   six weeks before he was actually taken by the jail to a

12   neurologist to be examined.

13             So this is not something that -- you know, the

14   suggestion, if that's what the government was suggesting,

15   that the symptoms are sudden and were known all along, I

16   think that is unfair.

17             THE COURT:  You're not saying that.  You're simply

18   saying that once he had COVID, it exacerbated the symptoms.

19             MS. GINSBERG:  That's correct, Your Honor.

20             THE COURT:  Go on.

21             MS. GINSBERG:  As Your Honor correctly points out, I

22   was not involved originally in this case, so I was not

23   present for the earlier discovery sessions, but what I

24   understand about them --

25             THE COURT:  But you understand that you're, in

1    effect, charged with having been there.  In other words, a

2    defendant does not get, simply by hiring another

3    lawyer -- because those lawyers are still involved; aren't

4    they?

5              MS. GINSBERG:  Yes.

6              THE COURT:  -- so just by hiring another lawyer say,

7    oh, you have to go through all of that all over again because

8    I'm new.

9              MS. GINSBERG:  But the point --

10             THE COURT:  That's true; isn't it?

11             MS. GINSBERG:  That's absolutely true.  Your Honor,

12   that's not what we're asking.  In fact, I will tell the Court

13   that the government made available to me the same documents,

14   the same digital evidence that was previously made available

15   as a courtesy.

16             Let me try and explain what the problem is.  The

17   evidence that has -- Mr. Sanders was permitted to -- was

18   transported to the U.S. Attorney's Office on three separate

19   occasions to view the evidence.  What was made available was

20   -- the evidence that is the government's case-in-chief that

21   had been copied into a format that was viewable on the

22   computer that was available at the U.S. Attorney's Office,

23   that computer was not sufficiently -- it didn't have enough

24   memory or power to allow Mr. Sanders or counsel who were with

25   him to search the computer.  It crashed repeatedly while they

1    were there.  Mr. Sanders, on two occasions, was brought over

2    for three-hour sessions an hour late.  So he has had probably

3    a total of six hours to review thousands of pages of chats

4    with embedded images and videos; hundreds, if not thousands,

5    of separate videos, images, that are the basis for the

6    possession charge.  They are not in a format that was at all

7    searchable.  So, essentially, the government said, we're

8    giving you --

9              THE COURT:  You know, the searchable thing doesn't

10   move me.  If I produced a whole bunch of documents to you, I

11   don't have to produce an index.

12             MS. GINSBERG:  No, Your Honor --

13             THE COURT:  You are not entitled to a searchable

14   index, but I take your point, however, that it made it a

15   little more difficult for you.  But you're not entitled --

16             MS. GINSBERG:  Your Honor, we didn't need the

17   government to produce an index.  In their native forms, you

18   can search for certain documents on a hard drive.

19             THE COURT:  Yes, but you don't have to have that.

20             MS. GINSBERG:  Well, Your Honor, we are not able to

21   find other documents that -- and other images and other chats

22   that would be the basis for our defense.  We are not limited

23   to the government's case, and we can't be, and we can't

24   effectively represent --

25             THE COURT:  That's quite true.

1          MS. GINSBERG:  What the government has basically said

2     is, here, we're giving you what we're going to put on in our

3     case.

4          Until this week, we have not had the ability for our

5     expert to access forensic copies of the hard drives of the --

6          THE COURT:  Do you have that now?

7          MS. GINSBERG:  Our expert spent four full days --

8          THE COURT:  I don't care how long he spent.  Do you

9     have it now?

10          MS. GINSBERG:  We have had a substantial chance.  I'm

11     not certain that we won't have to go back.  But they spent

12     four days extracting data because they are not allowed to

13     remove any of the contraband images.  So they spent

14     four days, not even reviewing, but extracting, going through

15     files and identifying types of files and then literally going

16     image by image, screen shot by screen shot, and removing the

17     alleged child pornographic images and videos so that the

18     expert could copy onto his own hard drive what could be

19     removed from the FBI facility to bring back to us to give us

20     a chance to begin to review that material.  There's over

21     2,000 pages that they were able to extract over a period of

22     four days.

23          During that period of time, what was represented to

24     be a much more sophisticated and better computer at the FBI

25     facility, that computer crashed at least twice.

15

1       I guess my point is this is not an easy task, and I

2  will tell Your Honor that there is a -- to look at these

3  chats in isolation and just in terms of what the government

4  wants to put on in its case will not allow Mr. Sanders to put

5  on a defense.  And it is necessary --

6       THE COURT:  Let me ask Mr. Prabhu, are you limiting

7  them to what you intend to put on?

8       MR. PRABHU:  No, Your Honor.

9       THE COURT:  Of course not.  That would be improper.

10      MS. GINSBERG:  We have not had an effective way, or

11 any way, to even access that evidence until this week, where

12 a forensic examiner could go to the FBI and set up a process

13 where he could do this type of extraction.

14      The evidence that has been made available at the U.S.

15 Attorney's Office is a much smaller group of evidence,

16 category of evidence.

17      THE COURT:  Well, nobody stopped you all from doing

18 all of this sooner.

19      MS. GINSBERG:  Well, Judge, I can tell you since I

20 have been in the case, on February 15th, I wrote -- I spoke

21 with --

22      THE COURT:  You have been acting with alacrity, but

23 how long before February 15th was nothing done?

24      MS. GINSBERG:  Well, Judge, the expert actually went

25 to the FBI I believe in January and was unable to

1    perform -- the computers didn't work.  The cellphone on which

2    almost all of the data, the relevant data, is stored could

3    not be loaded onto the appropriate government computer.  He

4    was there for two days and had to leave, having done about an

5    eighth of what he went there intending to do.

6            When I got involved, I communicated -- I know as

7    early as February 15th -- with the government about going to

8    the FBI facility with our expert.  And it took until --

9    because of COVID-related concerns, I think concerns -- I

10   don't blame the government for this -- but also the D.C.

11   Capitol riot case apparently is taking up a lot of agents'

12   time and equipment at the FBI.  It literally took from

13   February 15th until March 29th to arrange for our expert, and

14   a lawyer to accompany him, to go to the FBI and do this

15   evaluation this week.

16           I understand the Court's frustration.  I hope the

17   Court can understand our frustration.

18           And I certainly think the government has been acting

19   in good faith.  I don't understand why it has taken as long

20   as it has to make some of these arrangements.  But I trust

21   the government when they say the problem exists and we have

22   to work with it.

23           THE COURT:  It seems to me that the opportunity to

24   review the evidence you now have no complaints about; is that

25   correct?

17

1        MS. GINSBERG:  Well, I don't -- I think we may have

2    to go back to the FBI.  But here's the point we are at now,

3    is that there are thousands of pages.  We are still not able

4    to go to the jail.  We are not, because of the protective

5    order, allowed to leave any of the evidence with Mr. Sanders.

6    We are literally reduced to reviewing thousands of pages of

7    chats, and these are without the context of the images.  But

8    there's over 2,000 pages of chats that I believe comprise the

9    government's case-in-chief.  They're the chats with the six

10   alleged minor victims.  We are literally reduced to holding a

11   page up to a screen on a Webex session, holding it up to the

12   computer screen, and letting Mr. Sanders read on his computer

13   screen what we are holding up here without the ability to

14   make any meaningful notes.  I mean, he can't possibly write

15   down everything that is written in these chats and make notes

16   about them.  Every time we start it, it is almost like

17   starting over again, because to refer back to a previous set

18   of chats that we had already reviewed, we have to basically

19   start that process again, find them.  Frankly, it's a

20   nightmare.  But we're doing the best we can.  And then the

21   issue with his eyesight has just complicated the whole

22   process that much further.

23        Again, I understand the government's position.  They

24   have made evidence available.  I believe that during the

25   early months of this case that counsel was reviewing the

1    actual discovery that they had physically produced but we're

2    still unable to share with Mr. Sanders because of COVID

3    restrictions at the jail and because of the protective order.

4         So I really don't believe it is for want of effort.

5    I think both sides have been reasonably diligent within the

6    constraints that unfortunately exist in this period of time.

7         THE COURT:  All right.  Mr. Prabhu, what can be done,

8    if anything, to expedite this to make it reach a conclusion

9    fairly quickly?

10        I will ask you the same question, Ms. Ginsberg.

11        MR. PRABHU:  So just some points of clarification.

12   On July 7, 2020 --

13        THE COURT:  Now that you're behind the screen, you

14   can remove your mask.

15        MR. PRABHU:  Thank you, Your Honor.

16        On July 7th of last year, the defense was provided

17   with an electronic copy of the 2,200 pages of chats.  They

18   have the chats.  The only thing that wasn't in there was the

19   images and videos because those were contraband -- potential

20   contraband and --

21        THE COURT:  So they have that, and it's obviously

22   searchable since they have it in a disk or something;

23   correct?

24        MR. PRABHU:  Correct.

25        In a related point, Ms. Ginsberg mentioned, before

19

1    she came on the case in early January, January 5th and 6th,

2    an examiner went to the FBI to look at a phone.  They were

3    unable to access it.  That was actually remedied at the end

4    of January, January 27th and 28th.  They did successfully get

5    a download off the phone.  So just with those clarifications.

6         Your Honor, I'm just not aware that the defendant

7    needs to be a forensic examiner in the case, which is

8    basically what they're suggesting.  There are things,

9    obviously, they need to check with their client, and there

10   are restrictions on the ability of him to review contraband

11   and where that contraband goes.  And so we have to make it

12   available here at the U.S. Attorney's Office.  We have done

13   that on several occasions.  We have not denied them the

14   opportunity to do that.  It's just we need to know exactly

15   what they need and why -- you know, and how long they need

16   the material for.  So that's the solution.  It can't just be

17   he needs more time generally because there are thousands of

18   pages.  There really needs to be more of a focus on what they

19   need to show him.  And obviously, with his health conditions,

20   that's complicated particularly now because they can't

21   interact with him in the same way.  And that's relevant,

22   obviously, to the Court's decision on a continuance --

23        THE COURT:  They can interact with him.  There is no

24   reason why, for example, he can't be in the custody of the

25   marshals, taken to the U.S. Attorney's Office and an office

1      provided there for counsel and the defendant to meet and

2      discuss the evidence.  Right?

3              MR. PRABHU:  That's true, Your Honor.  And we've made

4      those arrangements.

5              THE COURT:  All right.  Let's do that.  It seems to

6      me to be an easy solution.

7              No, it can't be at your office, Ms. Ginsberg.

8              MS. GINSBERG:  No, Your Honor.  I was going to say

9      that this is the first time the government has even suggested

10     they would arrange to bring Mr. Sanders back to the

11     U.S. Attorney's Office.  I have asked that he be allowed to

12     do that, and Mr. Prabhu has told me that he did not believe

13     that Mr. Sanders should have additional access to the child

14     pornography and that it was not necessary for him to see all

15     of this evidence.

16             THE COURT:  What exactly do you want your client to

17     see?

18             MS. GINSBERG:  Well, Your Honor, to start with --

19     just to start with -- the 23,000 -- 2,300 pages of chats that

20     the government has indicated it will introduce in its

21     case-in-chief.  He has not had a chance to read all of those

22     chats.  That's the government's case.

23             THE COURT:  That's in your possession.

24             MS. GINSBERG:  But we can't bring it to the jail and

25     leave it there because of the protective order.  And we're

1    holding the pages up on a monitor during the Webex sessions

2    that we are able to arrange, schedule with the jail.  That is

3    the dilemma.  That is the beginning of the dilemma.  That has

4    nothing to do with the thousands of pages of chats that the

5    expert was able to extract and remove from the FBI during

6    this past week that we have good reason to believe contained

7    evidence that is both exculpatory and relevant to presenting

8    the defendant's theory of the case.

9         And that is without even --

10        THE COURT:  I take it you're not -- and I'm not

11   asking you to, unless you're eager to do it -- tell me what

12   your theory of the case is.

13        MS. GINSBERG:  Well, Your Honor --

14        THE COURT:  You'd prefer not to.

15        MS. GINSBERG:  I'd prefer not to, at least in the

16   government's presence.

17        THE COURT:  That's all right.  Go on.

18        MS. GINSBERG:  But, Your Honor, it is the defendant's

19   right to see all of the evidence that the government intends

20   to introduce at trial.  There are --

21        THE COURT:  The only thing he has not been given an

22   opportunity to see are the contraband pictures within that

23   evidence; is that right?

24        MS. GINSBERG:  He's seen some of those, but he has

25   not been given an adequate opportunity to see all of them.

22

1          THE COURT:  You mean all of the contraband?

2          MS. GINSBERG:  All of the contraband.

3          THE COURT:  He certainly has had access to all of the

4     chats.

5          MS. GINSBERG:  He has had the limited access that I

6     described.  He was at the U.S. Attorney's Office perhaps for

7     six hours total, maybe seven -- I wasn't there so I don't

8     want to be held to an inaccurate answer -- but certainly less

9     than eight hours.  It has taken me more than that with the

10    documents in front of me in a printed-out format where I can

11    make notes.  It's not -- he has had an inadequate -- I will

12    tell the Court he has not read the 2,300 pages of chats.  He

13    has not been able to read the 2,300 pages of chats.

14         THE COURT:  What does he need in order to be able to

15    do that?

16         MS. GINSBERG:  More time and access.  We asked the

17    government --

18         THE COURT:  You're not going to get unlimited time,

19    and you're not going to get the time you've asked for, which

20    I think is unreasonable.  But I am going to give you more

21    time, but it is going to be with the admonition that you

22    better use it to its full extent because there will be no

23    more.

24         MS. GINSBERG:  I understand.

25         Your Honor, we tried to alleviate some of this

1    problem by asking the government several weeks ago if they

2    would allow us to provide Mr. Sanders with physical copies of

3    the printed-out chats that have been sanitized, that have no

4    images in them, and that are redacted, to redact all of the

5    identifying information of --

6          THE COURT:  You have that?

7          MS. GINSBERG:  We will -- we will -- we have

8    sanitized copies.  We offered to redact all of the personal

9    identifying information of the victims.

10         THE COURT:  All right.  Mr. Prabhu, any objection to

11   giving them that?

12         MR. PRABHU:  The Court's indulgence.

13         THE COURT:  They have all the chats -- "they" meaning

14   the defense -- have all the chats.

15         MR. PRABHU:  That's correct.

16         THE COURT:  What she is asking is, can she make it

17   available to Mr. Sanders if she sanitizes it; that is,

18   removes all the names and identifiers.  Is that right?

19         MS. GINSBERG:  That's correct, and Mr. Prabhu was not

20   willing to allow us to do that.

21         THE COURT:  Any objection to it now, Mr. Prabhu?

22         MR. PRABHU:  There is a problem because the Adam

23   Walsh Act specifically prevents defendants from gaining

24   access to some of that victim information.  We're willing to

25   work with --

24

1        THE COURT:  Well, if it is all redacted, he doesn't

2    have access to it.

3        MR. PRABHU:  The issue is sending it to the jail

4    doesn't -- under the protective order nor under the Adam

5    Walsh Act -- I think it is 18 U.S.C. 3509 -- prevents us from

6    releasing that information into uncontrolled spaces like

7    that.  So providing even a sanitized version that doesn't

8    have the names but that has identifying information, "I'm in

9    high school," "I'm doing this, doing that," we're not allowed

10   to release it in that manner.  Defense counsel has had a

11   complete chat without images since July and certainly could

12   have gone through it with some specificity with their client

13   in discussions.  But what they're asking for is something

14   that I don't think under 3509 we're allowed to do.

15       THE COURT:  Ms. Ginsberg.

16       MS. GINSBERG:  Your Honor, we could certainly -- as

17   far as the protective order is concerned, the Court could

18   certainly modify it.  I don't believe that the Adam Walsh Act

19   prevents us from providing copies of these chats with

20   personal identifying information removed.  And we're

21   certainly willing to cooperate with the government --

22       THE COURT:  But you have that; don't you?

23       MS. GINSBERG:  But we can't give them to Mr. Sanders.

24       THE COURT:  What prevents you from now giving

25   it to --

25

1        MS. GINSBERG:  The government has said we're not

2   allowed.

3        THE COURT:  The government is not allowed.

4        MS. GINSBERG:  They've said, we could not -- one,

5   that it is in violation of the protective order, which is

6   probably technically true but which the Court could certainly

7   modify.  But they would not agree to review our proposed

8   redactions so that we could hopefully come to an agreement

9   about a copy of these pages that could be given to

10  Mr. Sanders to review at the jail.

11       THE COURT:  All right.  How many pages is this?

12       MS. GINSBERG:  At this point, the evidence the

13  government has produced to us --

14       THE COURT:  How many pages?

15       MS. GINSBERG:  Approximately 2,800 pages.

16       THE COURT:  All right.

17       MR. PRABHU:  Your Honor, may I just refer to the

18  section that we're talking about in --

19       THE COURT:  Yes, let me get it out here.  3509, you

20  say?

21       MR. PRABHU:  Correct, Your Honor.  And it is Section

22  (d)(1).  So if you're -- I have the 2020 version in front of

23  me.  This is 2021.  But in the 2020 version, it is on

24  page 1043.  I don't know what version the Court has.

25       THE COURT:  What provision?

26

```
 1              MR. PRABHU:  It's 3509(d)(1).  It's entitled "Privacy
 2     Protection."  And it's the section, "Confidentiality of
 3     Information."
 4              THE COURT:  All right.  Just a minute.
 5              (Pause)
 6              THE COURT:  Yes.  Go on.
 7              MR. PRABHU:  It says, "A person acting in a capacity
 8     in connection with a criminal proceeding shall keep all
 9     documents that disclose the name or any other information
10     concerning a child in a secure place to which no person who
11     does not have reason to know their contents has access."
12              It is the "any other information" that gives the
13     government concern.  We would not be able to control these
14     chats.  Obviously, the defense counsel, as officers of the
15     Court, under a protective order, we trust and assume they
16     will handle the material properly.  It is the issue of
17     sending what would be boxes of paper to the jail, and
18     it -- we would lose control over it.
19              THE COURT:  Yes, I understand that.
20              But the defendants currently have all that
21     information.  What they suggested is redacting the personal
22     identifiers, and you point out that that might still not be
23     enough under this provision you have called my attention to.
24              MS. GINSBERG:  Judge, I have a possible suggestion.
25     I don't know if it is a good one.
```

1              THE COURT:  All right.

2              MS. GINSBERG:  But I'm aware -- I was not involved in

3       the *Mosawi* case.

4              THE COURT:  Yes, I know.

5              MS. GINSBERG:  But I'm aware that the jail made

6       available a space where Mr. Mosawi could be provided all of

7       the evidence, and I think it may have included -- may or may

8       not have included classified evidence, but it certainly

9       included evidence that he would not otherwise --

10             THE COURT:  *Mosawi* is different, I can assure you.  I

11      have some knowledge of that.  And I have some knowledge of it

12      from another case that I had -- two other cases that involved

13      essentially similar matters.

14             I think that you have all of the information.  You

15      want to be able to show it to your client.

16             MS. GINSBERG:  And Judge, as the protective order is

17      written now, we are prohibited from sharing any discovery

18      with Mr. Sanders, leaving copies of any discovery, not even

19      these chats, but any discovery, any printouts from the

20      computers that have directory file listings, anything.  The

21      protective order is so broad as to prevent us from sharing

22      any discovery produced in this case.  So I think what I'm

23      hearing is bringing to mind that we probably should get

24      together with the government and make an effort to agree to

25      modifications of the protective order, but that does not

28

1    solve the problem Your Honor is considering right now.

2         THE COURT:  What I'm going to do, Mr. Prabhu, is to

3    have you and Ms. Ginsberg figure out a process by which we

4    can get through this.  He doesn't have to see every last

5    piece of paper.  He is entitled to see all of the evidence

6    you intend to present against him, and he is entitled to see

7    exculpatory evidence.  His experts are going through that,

8    and perhaps they'll find it.

9         But in any event, we need to figure out a way that he

10   can sit down and look at all of these e-mails because they're

11   all material to the government's accusation of production of

12   child pornography, which of course is the more serious of the

13   allegations.  So we need to figure out how to do this.  It

14   isn't out of the question that there could be a separate

15   space at the U.S. Attorney's Office or separate space at the

16   jail where the defendant and one or more of his counsel,

17   within limits, Ms. Ginsberg, can get together with him and

18   review this material quickly.

19        So I want that to be explored, how we can get it done

20   promptly.

21        The other part is to make sure that the defendant's

22   experts complete their review of everything.  The defendant

23   doesn't have to be given an electronic means of searching and

24   accessing evidence.  I don't know any law that requires that,

25   Ms. Ginsberg, do you?

29

 1          MS. GINSBERG:  Your Honor, I think it depends on the

 2     context.

 3          THE COURT:  The answer is no.  You don't know of any

 4     law that requires that.

 5          MS. GINSBERG:  I know of a law that requires him to

 6     be given meaningful access to the evidence --

 7          THE COURT:  All right.

 8          MS. GINSBERG -- however that need be construed.

 9          THE COURT:  All right.  I don't construe it as

10     requiring an electronic index or searchable index or anything

11     of that sort.  If it exists, it would make sense to provide

12     it, but they don't have to create it, the government does not

13     have to create it.

14          I'm going to work backwards on this.  I'm going to

15     grant a continuance, but let me be clear, it is the last one.

16     This case has been pending far too long.  It needs to be

17     tried.  I'm going to continue this case until the 15th of

18     June at 10:00 a.m. with a jury.  That is two and a half

19     months from now.

20          MS. GINSBERG:  Judge, before you set it in stone, I

21     have a trial scheduled in front of Judge Alston the week of

22     June 14.

23          THE COURT:  How long is your trial before Judge

24     Alston?  What is it?

25          MS. GINSBERG:  It's a child pornography case.  It

30

1    could be as much as a week.

2           THE COURT:  Do you intend to file a motion to

3    continue that one?

4           MS. GINSBERG:  No, that was just recently continued

5    to that date.  That is the date that case will be tried.

6           THE COURT:  Well, I'm going to set another date when

7    this case will be tried because this isn't the first

8    continuance.  You understand that?

9           MS. GINSBERG:  I do, Your Honor.  I do.  And it

10   is -- I understand the Court's concern.

11          At the risk of suggesting something the Court may not

12   like, the government -- both the defense and the government

13   are available the week of July 11th.

14          THE COURT:  No, that isn't a date that I have

15   available.

16          MS. GINSBERG:  We're also available the week of

17   July 25th.

18          THE COURT:  What is the earliest day in July that you

19   have available?

20          MS. GINSBERG:  July 11, Your Honor.  I think both the

21   government --

22          THE COURT:  July 11th is a Sunday.

23          MS. GINSBERG:  The 12th.  I'm sorry.  I'm looking at

24   my calendar.  It starts on Sunday.  July 12th.

25          THE COURT:  I have trials on all of those days.

```
 1              MS. GINSBERG:  I believe both the government and my
 2      co-counsel are in trial the week of June 28th.  Separate
 3      trials.
 4              THE COURT:  I can do June 15th or June 8th.  It is
 5      going to be very hard to find any other dates.  In the
 6      meantime, your client is incarcerated.  Don't you want to get
 7      this case resolved, prove his innocence and have him
 8      released?
 9              MS. GINSBERG:  Yes, but if we can't effectively
10      prepare, he will not be able to have his innocence --
11              THE COURT:  And he will remain incarcerated.
12              MS. GINSBERG:  And he will remain incarcerated, which
13      he would prefer rather than going to trial unprepared.
14              THE COURT:  What about June 15th?
15              MS. GINSBERG:  That is the week I'm in trial before
16      Judge Alston.
17              THE COURT:  Is that a production case?
18              MS. GINSBERG:  It's a possession case.
19              THE COURT:  A possession case takes how long?
20              MS. GINSBERG:  Your Honor, it's -- the second charge
21      is the second offense.  It is going to involve expert
22      testimony.  It may not take the entire week, but it will also
23      take preparation.  It is a case that will be -- a case which
24      I would like to see resolved, but I'm not optimistic that
25      that is an option.  He is facing a 10-year mandatory minimum
```

32

 1    because it is a second offense.  It is a case where there is

 2    a legitimate question not only as to his intent but whether

 3    the images are in fact child pornography as opposed to child

 4    erotica.

 5            THE COURT:  That's a distinction I'm not familiar

 6    with.  Is it in the cases?

 7            MS. GINSBERG:  If it is not legally child

 8    pornography, then it is not illegal.

 9            THE COURT:  I have never heard of erotica.

10            MS. GINSBERG:  Child erotica --

11            THE COURT:  Is that in any case?

12            MS. GINSBERG:  It is.

13            THE COURT:  What case?

14            MS. GINSBERG:  It is in lots of art books in book

15    stores and museums.

16            THE COURT:  What case is it cited in?

17            MS. GINSBERG:  I don't remember right now, Judge.  I

18    wasn't prepared to answer that.

19            THE COURT:  All right.  When you get home, send it to

20    me in a pleading.  I'm curious to know --

21            MS. GINSBERG:  I'll do that.

22            THE COURT:  -- what legal meaning is given to child

23    erotica.

24            MS. GINSBERG:  I will do that, Your Honor.

25            THE COURT:  I would be surprised.

1        MS. GINSBERG:  Judge, there are cases that I have

2    read -- I can't recall what they are right now -- that have

3    made a distinction between child erotica and child

4    pornography.

5        THE COURT:  All right.  In argument, I'm not sure any

6    court has.

7        MS. GINSBERG:  Oh, I think so.  But Your Honor, I

8    will do my best to send those to you.

9        THE COURT:  I will be glad to be educated.

10       I have no dates other than June 8th, June 15th.

11   June 29th, is that date available?

12       MR. PRABHU:  I'll be in trial, Your Honor.

13       THE COURT:  Where?

14       MR. PRABHU:  Here.

15       THE COURT:  In --

16       MR. PRABHU:  In front of Judge Brinkema.

17       THE COURT:  What kind of case?

18       MR. PRABHU:  It's another child pornography case.

19   June 23rd.  And it's going to take more -- probably a full

20   week.

21       THE COURT:  Is that a production case?

22       MR. PRABHU:  I don't think so, Your Honor.  I'm

23   getting cases confused now.  No, I think that was a

24   distribution case.

25       MS. GINSBERG:  Judge, Mr. Jeffress and

34

1    Ms. Chong-Smith are in trial before Judge Trenga the week of

2    June 28th.

3              THE COURT:  Let's work backwards then.

4              How about June 8th?

5              MS. GINSBERG:  Judge, that is the week before my

6    trial before Judge Alston, and I'm concerned that that will

7    not give us sufficient time to do the autism assessment and

8    integrate that into a defense --

9              THE COURT:  I don't think an autism assessment needs

10   to be done before trial.

11             MS. GINSBERG:  I think it bears -- it could bear

12   significantly on Mr. Sanders' intent, his understanding of

13   the -- well, I was hoping I didn't have to discuss this in

14   front of the government.  But Your Honor under *McCauley*, his

15   purpose, what his primary purpose was in either exchanging or

16   soliciting images is the crux of the *McCauley* case.

17             THE COURT:  No, the crux of the *McCauley* case -- I

18   was there -- is whether or not flicking the camera on as a

19   spur of the moment in the course of the act satisfied that,

20   and the real issue was whether the instruction I gave was

21   correct.  It wasn't.  I said, "a purpose."  I should have

22   said, "a motivating purpose."

23             MS. GINSBERG:  As I understood *McCauley*, it has to be

24   a primary purpose --

25             THE COURT:  No, it does not.  I was there.  A

1    motivating purpose.  Read the opinion carefully.

2         MS. GINSBERG:  Well, I will certainly do that.  But

3    Your Honor, based on the discussions I have had with the

4    autism experts, a diagnosis of autism has a direct bearing on

5    what his purpose was.

6         THE COURT:  I have a little experience with autism.

7    You know, autism encompasses a broad range of behaviors and

8    conditions.  There is something called the autism spectrum,

9    with which I have some familiarity, firsthand familiarity.

10   He's not low on the autism spectrum.  If he has autism at

11   all, he's very high on it.

12        MS. GINSBERG:  Judge, I don't know if you had a

13   chance to look at the initial scorings that were attached to

14   one of our filings, but I beg to differ with you.  And I

15   think that he has a right to have us determine whether his

16   diagnosis is severe enough to impact issues that are relevant

17   to his defense.

18        I have a nephew who has Asperger's disease, and he

19   graduated at the top of his class at Columbia Law School, but

20   he has very severe deficits in other areas, and he could

21   easily be someone you would hire as a law clerk in this

22   courthouse.

23        THE COURT:  I probably have.  I know judges who

24   probably should be on the spectrum, but I don't think, in any

25   event, that's going to result in a basis for a claim of

36

1    innocence.

2            If you would like, I will hear it ex parte.  That

3    might help you.

4            MS. GINSBERG:  It might.  Judge, it would.

5            THE COURT:  Let me do that.

6            MS. GINSBERG:  I guess I have to ask you to at least

7    trust my judgment that I believe what I'm saying.  I may be

8    wrong, but I truly believe that this is an issue.

9            THE COURT:  I understand that's what you believe, but

10   it is my job, if you're wrong, to ignore it.  You see what I

11   mean?  I don't know whether you're right.  You may truly

12   believe it, but you may be wrong, and it may be pellucidly

13   clear that you're wrong.  I need to understand it.

14           Would you all leave.  Everyone in the courtroom

15   leave, please, and I will hear more about this.

16           (Courtroom cleared)

17           THE COURT:  All right.  The courtroom has now been

18   cleared.

19           MS. GINSBERG:  Your Honor, I'm not --

20           THE COURT:  Let me go back.  I have experience with

21   autism, as well.  I have experience with people low on the

22   autism scale, very low.  The only way I could communicate

23   with them is to be pinched, and they would point.  They don't

24   have conversations with me.  Lots of things like that.  I've

25   had a very close relationship with people high on the autism

1    scale.  As you say, some people graduate from law school.

2    It's a broad range.  They don't know what causes autism, and

3    they don't know how to treat it or cure it.  They can only

4    ameliorate it.  So you're not speaking to somebody who knows

5    nothing about autism.

6           MS. GINSBERG:  Judge, I thought I knew something

7    about autism until I spoke with a physician and a doctor who

8    -- a lawyer who specialized in this area.  And frankly, I'm

9    not comfortable making these representations --

10          THE COURT:  Yes, I meant ex parte.  Go ahead and

11   depart, please.  I have to decide whether I'm going to let

12   her have this additional time.

13          MR. PRABHU:  May the government be heard briefly

14   before that, Your Honor?

15          THE COURT:  Yes.

16          MR. PRABHU:  Your Honor, my understanding is that the

17   evaluation -- the initial evaluation that has been conducted

18   actually was a conversation between the defendant's mother

19   and a clinician.  The important thing to know is his mother

20   is a clinical psychologist who deals with mental health

21   issues, and she reported to the doctor that they hired that

22   he has deficits.  I don't think that is the basis for really

23   moving forward with some defense side -- some defense side

24   analysis.  If there are questions about the defendant's

25   competency, there is -- under 18 U.S.C. 4241(a), the Court

38

1    can order an evaluation of the defendant --

2            THE COURT:  I understand that.  I've done it several

3    times in the last two weeks.

4            MR. PRABHU:  Absolutely, Your Honor.  And so that's

5    the appropriate place to go, not to have some fishing

6    expedition conducted by the defense.

7            THE COURT:  All right.

8            MR. PRABHU:  So if it goes to competency --

9            THE COURT:  I've heard you.  Thank you.  Let's move

10   on.

11           MR. PRABHU:  Thank you.

12           THE COURT:  I will call you back as soon as it is

13   time to have you back.  Your comments about 4241 are well

14   taken, and I will have them in mind.

15           (Assistant United States Attorneys left the

16   courtroom)

17           (Ex parte hearing follows)

18   ██████████████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████

22        █████████████████████████████████████

23        ███████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25        ███████████████████████████

39



40



41



42





44



19          (The Assistant United States Attorneys returned to

20     the courtroom)

21          THE COURT:  All right.  Mr. Prabhu, I'm focusing on

22     July 6th or 13th or 12th.

23          MR. PRABHU:  The 13th or 12th would be good with the

24     government, Your Honor.

25          THE COURT:  All right.  Let's set it for the 12th, at

45

1      10:00 a.m., with a jury.

2              Now, that takes care of I think the motions for a

3      continuance.  It doesn't solve all the problems.  But this is

4      the date, Ms. Ginsberg.

5              MS. GINSBERG:  I understand, Your Honor.

6              THE COURT:  Now, I do want to follow up, I do want to

7      make sure, Mr. Prabhu, that we do everything that's

8      reasonable to be done to give Ms. Ginsberg and her client

9      access to -- you don't have to create a searchable index, but

10     you have to give them the materials so they can sit down and

11     review it.  Maybe have an office in the U.S. Attorney's

12     Office, would be a way to do it, or we can set up a room here

13     in the courthouse for you to do it.

14             MR. PRABHU:  Your Honor, we have done that and made

15     it available.  The question is what do they want to see and

16     how long do they need to look at it.  The issue that we have

17     is they say they want to see everything, and that is just not

18     feasible.  They have access to everything, but they want us

19     to set up much more than a basic computer.  They want a

20     computer that can analyze these thousands of lines of chat

21     and images and videos at the U.S. Attorney's Office.  It's a

22     different animal.  They can go do that at the FBI easily

23     because they have better computers than we do.  They have a

24     design setup for that kind of review.  But if they want to do

25     it with their client, we need them to focus on what they

46

1    actually need to go through with him.

2         THE COURT:  Would it be helpful, Mr. Prabhu --

3    because I do want to solve this one additional problem.  Let

4    me make it clear, Ms. Ginsberg, I'm not going to get in the

5    middle of doctors saying there ought to be this and there

6    ought to be that and it ought to be at an emergency room or

7    it ought to be here.  I don't want to get in the middle of

8    that.  So if you want to submit anything else, and

9    Mr. Prabhu, I'll deal with it, but on the paper I have seen,

10   including what was filed at 8:00 last night, I don't have

11   enough to rule on that.

12        MS. GINSBERG:  I understand the Court's position.

13   I'm concerned that if he is taken to an emergency room and

14   this goes on over a period of time, he will be quarantined,

15   and we will not -- it will postpone our ability to

16   communicate with him and to have him review evidence.  I

17   understand the problem with telling the jail how to do their

18   business.

19        THE COURT:  Well, you can work that out.  Talk to

20   Mr. Prabhu about it, and I will address it in a more informed

21   way when you provide me with information about how immediate

22   it is, how immediate it isn't.  Maybe he can go until after

23   the trial before he gets it.  Maybe he can't.  Maybe he has

24   to have it right now.  I don't have any of that information.

25   So you file whatever you have with documentation, share it

1    with Mr. Prabhu, and we'll see what we can do.  But in the

2    meantime, I want to do what I can to facilitate and expedite

3    your review of the evidence.

4         Now, Mr. Prabhu, would it be better if a room in the

5    courthouse was set aside for them to meet?  You would bring

6    the material here.  They would meet with their client, review

7    it here.  When they finish at the end of the day, you would

8    collect the information and take it back.

9         MR. PRABHU:  That is potentially a workable solution.

10   Just to be clear, the FBI handles our evidence when they're

11   providing it to the defense, and they would have controls in

12   place.  We've had some issues related to this when they've

13   been doing reviews at the FBI office, such as taking

14   materials that have contraband in them and attempting to

15   remove them from the FBI facility.

16        THE COURT:  That can't be done.

17        MR. PRABHU:  Correct.

18        THE COURT:  And it won't be done here at the

19   courthouse.

20        MR. PRABHU:  Correct.  There would have to be some

21   protections that the FBI would have to oversee what evidence

22   they're taking, what they're doing.

23        THE COURT:  You don't have any problem with that,

24   Ms. Ginsberg?  You don't plan to take anything away with you?

25        MS. GINSBERG:  Certainly, I don't plan to take any

48

1    contraband.  You can be quite sure of that.

2           MR. PRABHU:  So a room here would be easier for the

3    government than having it at the U.S. Attorney's Office

4    because of the limitations on what we can bring into our

5    office.

6           THE COURT:  I prefer a room here anyway because it

7    makes it clear to both sides that I want procedures adhered

8    to.  Let's plan to do it that way.

9           I think, Ms. Ginsberg, you can't expect to have

10   anybody present other than you and one other lawyer and the

11   defendant because, otherwise, we don't have room enough to do

12   it.

13          MS. GINSBERG:  Your Honor, I would hope we could

14   rotate amongst ourselves.

15          THE COURT:  You can do that if you wish.  But it is

16   going to be something like a jury room or a witness room.

17   You see what I'm saying?

18          MS. GINSBERG:  Absolutely.

19          THE COURT:  And the FBI would then bring all those

20   chats, complete with the film that goes with it, or whatever

21   it is, I don't know how you have it, so that he can see it

22   all and they can see it all, and if it takes several days, it

23   takes several days.  And it may be over a lunch period, so

24   somebody won't get fed.

25          MR. PRABHU:  Yes, the only concern the government

49

1    would have with that is we need to know what they want to

2    review.  It can't be everything all at once because that is a

3    massive amount of material.  So if it is clear in advance

4    what they want to review, we can make that available and make

5    that happen.

6              THE COURT:  What is it, Ms. Ginsberg?

7              MS. GINSBERG:  Your Honor, we can prioritize and

8    provide that information to the government.  It is not

9    possible to review it all in one sitting at any rate.

10             THE COURT:  Yes, I can appreciate that.  But I would

11   think that three sittings would be plenty.  But we'll see.  I

12   don't foreclose more, and I'll make a room available here in

13   the courthouse.  I don't know which room right now.  But I'll

14   have to consult with my colleagues to make sure that it isn't

15   a place that is going to cause them any inconvenience, as

16   well.

17             MS. GINSBERG:  Judge, just in terms of planning, I do

18   have a copy of a letter from the neurologist that the jail

19   took Mr. Sanders to this week.  He says that he

20   required -- the doctor says, "Mr. Sanders requires IV

21   infusions for five consecutive days immediately in order to

22   preserve his visual function.  It can be done in an

23   outpatient setting.  If left untreated, optic neuritis

24   results in permanent visual deficits."

25             THE COURT:  All right.

50

1          MS. GINSBERG:  And then he recommends additional --

2          THE COURT:  Do you have that letter there?

3          MS. GINSBERG:  I have a copy for the Court, yes.

4          THE COURT:  And that's the jail's --

5          MS. GINSBERG:  This is the doctor that the jail chose

6     to take him to.

7          THE COURT:  We'll make it a part of this record.

8          MS. GINSBERG:  It was attached to one of our

9     pleadings, but I know that we filed them very late, and I

10    apologize for that.

11         THE COURT:  Yes, you did.

12         MS. GINSBERG:  Judge, we did the best we could.

13         THE COURT:  I'm sure you think so.

14         Was this letter furnished to the jail, as well?

15         MS. GINSBERG:  Yes, it was, Your Honor.  And I

16    believe Mr. Jeffress has been speaking with the Captain at

17    the jail.  We're heaping to try and work out some

18    arrangements that are consistent with this doctor's

19    recommendations.

20         THE COURT:  All right.  So the jail is responding

21    positively?

22         MS. GINSBERG:  Well, so far, they are.  But so far

23    they wanted to take Mr. -- one day this week in response to

24    this letter, they wanted to take him to an emergency room to

25    have an infusion, and we knew we had a hearing scheduled

1    today and he would not be able to attend that hearing, he

2    would be put in quarantine upon being returned from the

3    emergency room, and we would not be able to communicate with

4    him, and he would not be able to be present in the court.  So

5    he declined to go to the emergency room that day, notified us

6    and asked us to try and make different arrangements, and we

7    have tried to do that.

8              THE COURT:  Have you tried to do that?

9              MS. GINSBERG:  Mr. Jeffress has been doing that.  I

10   don't want to speak for him.

11             THE COURT:  Where is he?

12             MS. GINSBERG:  He's right there, Your Honor.

13             THE COURT:  Have you been successful?

14             MR. JEFFRESS:  Your Honor, I think Ms. Ginsberg

15   described it accurately --

16             THE COURT:  Have you been successful in making

17   arrangements?

18             MR. JEFFRESS:  Not yet.  No.  The issue has been the

19   quarantine, as Ms. Ginsberg said.

20             THE COURT:  Well, what you, I guess, are aiming to

21   try to do is to have him treated in something other than a

22   public emergency room.

23             MR. JEFFRESS:  That's exactly right, Your Honor.

24             THE COURT:  Then, my question is, have you been

25   successful in making arrangements to do that?

 1          MR. JEFFRESS:  Not yet.  ADC still has not been

 2     willing to do that.  We sent them a letter yesterday laying

 3     this all out, and to Chief Williams.  I haven't had a

 4     response since then.  I called them this morning and got

 5     Mr. Graves' voicemail, left a message about this, told him I

 6     had to come to court and would like to give a report to the

 7     judge.  But I did not hear back in time for this hearing.  So

 8     it is ongoing, Your Honor.

 9          THE COURT:  All right.  I'm glad, however, that he

10     was here, so at least he's been able to get something done.

11          But I take it what you want to do, and it needs to be

12     coordinated with this discovery process, is he needs to have

13     this treatment promptly, and that should come before the

14     discovery effort, by the way.  Let's get him treated first,

15     five consecutive days in something other than a public, so he

16     doesn't have to go into quarantine.  Well, it may be that if

17     he goes to the hospital, he goes into quarantine.

18          MR. JEFFRESS:  There are outpatient -- when

19     Mr. Sanders had this before, there are outpatient places that

20     can do IV treatments, which is what is prescribed here, that

21     are not at hospitals and would not be in that kind of

22     setting.  And I'm hopeful that they would allow him to go to

23     that.  We can suggest venues for that to them.  And then they

24     would allow him to return without quarantine since it doesn't

25     have the risks of a hospital.

1      THE COURT:  All right.  Do this:  Do it now by

2  telephone.  I will reconvene this matter at 3:00 today, and

3  let's see where we are.  But what I have done is I have

4  continued the matter until July the 12th, and that means that

5  I've done so in order to facilitate discovery, completion of

6  discovery, which there's some difficulty in.  And the motion

7  for a continuance is at this time denied in all other

8  respects.  I will consider, Ms. Ginsberg, if you give me more

9  information about this other matter --

10      MS. GINSBERG:  Yes, Your Honor.

11      THE COURT:  -- but you may need to move ahead with

12  alacrity on that, too.

13      MS. GINSBERG:  We expect to, Your Honor.  And I'm

14  hopeful that the July 12th trial date will accommodate all of

15  those --

16      THE COURT:  Good.  All right.

17      And of course, Ms. Ginsberg and Mr. Prabhu, you can

18  return to court if there is anything I can do reasonably and

19  appropriately to ensure that we do not lose the July 12th

20  trial date.

21      MS. GINSBERG:  Yes, sir.

22      THE COURT:  So first things first.  At 3:00 today, I

23  want to know -- in my mind, the first thing is to have the

24  defendant's eyes treated.  That's number one.  Now, that

25  doesn't foreclose Ms. Ginsberg and her colleagues from

54

1    talking to Mr. Prabhu about precisely what they would like to

2    see and so forth.  And then I will let you know through the

3    Deputy Clerk what room here in the courthouse will be used,

4    and you can submit an order that sets out how it will

5    proceed; in other words, begin at such-and-such a time, the

6    FBI will make available the stuff, the FBI will leave,

7    Ms. Ginsberg and one of her colleagues and the defendant will

8    be brought in.  The marshals will have to be around, of

9    course, because he's in custody.  The marshals will have to

10   be there.  He will go through the stuff, and if it takes more

11   than one day, we'll see.  We'll cross that bridge when we

12   come to it.  Let's see how much we can get done.  But he does

13   need to see all of this material.

14           Any questions, Mr. Prabhu?

15           MR. PRABHU:  No, Your Honor.

16           THE COURT:  Ms. Ginsberg?

17           MS. GINSBERG:  No, Your Honor.

18           THE COURT:  All right.  Let's move ahead, and I will

19   see you again at 3:00.

20           MS. GINSBERG:  Yes, sir.  And thank you for your

21   patience.

22           THE COURT:  I don't have much of that.

23           MS. GINSBERG:  Well, I think you have more than you

24   think.

25           (Recess taken)

55

1      (3:08 p.m.)

2              THE COURT:  Ms. Ginsberg, refresh my recollection on

3      what we have to accomplish today that we haven't already

4      done.

5              MS. GINSBERG:  Judge, Ms. Chong-Smith spoke with both

6      the doctor and the jail, so I think she should report to the

7      Court.

8              THE COURT:  All right.

9              MS. GINSBERG:  I did want to give Your Honor a 10th

10     Circuit case I found that refers to legal child erotica since

11     Your Honor asked.

12             THE COURT:  All right.

13             MS. GINSBERG:  I thought that might add a little bit

14     of levity to the afternoon.

15             THE COURT:  I agree, especially when I see the

16     context.

17             MS. GINSBERG:  And the only other thing that I think

18     we need to address is that we have on the Court's docket for

19     next Friday six or seven motions, motions in limine, and

20     voir dire issues and --

21             THE COURT:  No, voir dire isn't on for tomorrow, just

22     the --

23             MS. GINSBERG:  Motions in limine.  We weren't sure if

24     the Court wants to go ahead with that next week or if that

25     should --

1          THE COURT:  Yes.  Yes.  We're going to get it done.

2     It's over.  There will be no more motions in limine.

3          I'm very curious.  Do you know -- oh, here it is.

4          MS. GINSBERG:  I think it is headnote 10.

5          THE COURT:  Ah, here it is.  All right.

6          Well, it's not a judge saying that there is either a

7     distinction or the same thing.  It's something having to do

8     with a search warrant.

9          MS. GINSBERG:  I'm sure I can find more, but this is

10    the best I could do in a few minutes.

11         THE COURT:  All right.  Well, I'm sure you can, too,

12    because this wasn't good enough.

13         MS. GINSBERG:  I will do better next time.

14         THE COURT:  This is just a characterization of some

15    marshal in a search warrant.

16         Go ahead.  What have you learned?

17         MS. CHONG-SMITH:  Good afternoon, Your Honor.  Jade

18    Chong-Smith on behalf of Mr. Sanders.

19         I spoke with Integrated Neurology Services, which is

20    the doctor that ADC selected for Mr. Sanders to visit on

21    March 30th, and they said that the five consecutive days of

22    IV infusion could be done right there in their offices.

23         THE COURT:  Right where?

24         MS. CHONG-SMITH:  At Integrated Neurology Services in

25    Alexandria.

1      THE COURT:  Good.  There would be no resulting

2   quarantine.

3      MS. CHONG-SMITH:  Yes.

4      And they said they could accommodate that beginning

5   Monday.  It is very straightforward.  It takes usually one to

6   two hours per day, and they would have room to accommodate

7   any marshals or officers who would be there, as well.

8      I did speak to Chief Williams at Alexandria Detention

9   Center, and he said that the plan was still from ADC that

10   Mr. Sanders would go to the emergency room.

11      THE COURT:  No.  That's what we want to avoid; isn't

12   it?

13      MS. CHONG-SMITH:  Yes.

14      THE COURT:  Why would he go to the emergency room?

15      MS. CHONG-SMITH:  So Chief Williams was not able to

16   answer that question, but that was a decision made by

17   Dr. Graves, who is not a neurologist and who was not the

18   treating neurologist on March 30th.

19      THE COURT:  Do we have to worry about it, then?

20      MS. CHONG-SMITH:  So, at this point, I think the

21   decision by ADC is to take him to the emergency room, and

22   that would result in quarantine.

23      THE COURT:  I thought you said that the doctor ADC

24   referred him to said he could do it right there.

25      MS. CHONG-SMITH:  Yes.  And so ADC is not taking the

58

1    recommendation of the neurologist that it took Mr. Sanders to

2    on March 30th.

3              THE COURT:  Is that neurologist the one that the ADC

4    selected?

5              MS. CHONG-SMITH:  Yes, it is.

6              THE COURT:  And who is it at ADC who says that he

7    shouldn't go there and get it done?

8              MS. CHONG-SMITH:  It's a Wellpath nurse who is the

9    administrative head of the medical unit who is in charge of

10   that decision.  But we're concerned because he is not in fact

11   a neurologist, and he's not the person who --

12             THE COURT:  You're not understanding me.  The person

13   who wants to do the treatment at his office is not a

14   neurologist?

15             MS. CHONG-SMITH:  No, that is the neurologist that

16   Mr. Sanders saw on March 30th.  They're able to do that

17   treatment at their offices.  It is Alexandria Detention

18   Center that has a different plan, which is to go to the

19   emergency room.

20             THE COURT:  All right.  Let me go back.  Is the

21   March 30th doctor somebody Alexandria selected?

22             MS. CHONG-SMITH:  Yes, it is, Your Honor.

23             THE COURT:  And they don't want to follow that?

24             MS. CHONG-SMITH:  They have at this point

25   communicated to us that the plan is to go to an emergency

1    room, which would result in quarantine.

2         MR. PRABHU:  Just as a point of clarification, my

3    understanding is that person does not work for ADC, so he

4    can't speak for ADC.  We don't know who he has talked to at

5    ADC about the treatment plan --

6         THE COURT:  Who is "he"?

7         MR. PRABHU:  The doctor, Simon Fishman.

8         THE COURT:  Oh, he's the one who said he can do it in

9    his office?

10        MR. PRABHU:  Correct.  So he doesn't work for ADC.

11   He's the person who they directed Mr. Sanders to, but we

12   don't know what the communication is between him and ADC and

13   whether he's communicated his treatment plan to them and

14   whether they'll accept that.

15        THE COURT:  All right.  Let's do this.  We need to

16   get him this treatment, number one.  We need to get it done

17   soon.  And number three, we need to get it done so that it

18   doesn't put him in quarantine.  Now, there are a number of

19   ways to do it, but I don't want to call up somebody at ADC.

20        MS. CHONG-SMITH:  Your Honor, all of Mr. Sanders'

21   records from the March 30th visit and that letter that

22   Ms. Ginsberg provided you were also provided to ADC, and I

23   spoke to Chief Williams just at 2:15 p.m. this afternoon

24   about ADC's position that the plan is still to go to the

25   emergency room.  So unless there is a court order or some

60

1       other direction from --

2               THE COURT:  Well, there will be, but there shouldn't

3       have to be.  This kind of minutiae -- do you have a number

4       for him?

5               MS. CHONG-SMITH:  For Chief Williams?

6               THE COURT:  Yes.

7               MS. CHONG-SMITH:  Yes, Your Honor.

8               THE COURT:  Mr. Prabhu, you could probably help in

9       this regard.

10              MR. PRABHU:  I have spoken with the marshals about

11      this issue, and as it was explained to me -- this is not any

12      medical folks being involved -- but their concern was they

13      have certain protocols in place, and sending him to an

14      outpatient venue would not necessarily meet their current

15      protocols, and that was their big concern.

16              MS. CHONG-SMITH:  I spoke with Integrated Neurology

17      Services this afternoon, and they said they do follow best

18      COVID practices because so many of their patients are

19      immunocompromised, so they are very strict with masks.  They

20      have Plexiglas barriers, and all of their staff have been

21      vaccinated.

22              And I spoke to Nazaire, the supervisor at the U.S.

23      Marshals Office just before this hearing, and he said that

24      they're not responsible for transport or deciding where

25      Mr. Sanders goes.  They'll approve whatever decision

1    Alexandria Detention Center makes.  And so if Alexandria

2    Detention Center is deciding to send him to the emergency

3    room, that is where he will go.

4              THE COURT:  All right.

5              MS. CHONG-SMITH:  But a court order could change

6    that.

7              THE COURT:  And I will do that.  Before that, let me

8    see if we need to do that.

9              Mr. Prabhu, do you have any suggestions?

10             Give me the number.  I will call that person.

11             MS. CHONG-SMITH:  Chief Williams' phone number is

12   703-746-5038.

13             THE COURT:  All right.  Go ahead, Mr. Prabhu.

14             MR. PRABHU:  Well, I don't know that ADC has been

15   made aware -- the final decider at ADC has been made aware of

16   the recommendation of this outside doctor.  If that was the

17   case and they still decided that it wouldn't fit their

18   protocols, I think there would have to be negotiations

19   between the treatment center --

20             THE COURT:  I will enter an order if it comes to

21   that.  Come on, this is not that difficult.

22             MS. CHONG-SMITH:  We provided a copy of this letter

23   from Integrated Neurology Services to Alexandria Detention

24   Center, including Dr. Graves, yesterday.

25             THE COURT:  All right.  Let me recess this matter.  I

1    will call the number.  What is her name?

2         MS. CHONG-SMITH:  It is Chief Shelbert Williams, and

3    it is a man.

4         DEPUTY MARSHAL:  Your Honor, I just want to let you

5    know Chief Williams' wife is having surgery today.  He is in

6    the middle of picking her up from that surgery.  If you're

7    trying to get in touch with him --

8         THE COURT:  What do you all suggest?  What do the

9    marshals suggest?

10        THE DEPUTY MARSHAL:  Sir, my supervisor, we were

11   discussing this downstairs, essentially what she stated was

12   that we have to abide by ADC's quarantine policies.  So

13   whatever they decide we have to do.  It is the same thing

14   when we bring prisoners over.  There are different stages of

15   quarantine.  We have to abide by their policies.

16        THE COURT:  Yes.  But that's not the issue.  The

17   issue is whether he should go to the emergency room or go to

18   this doctor's office to get this treatment.  If he goes to

19   the doctor's office, it is unlikely that quarantine will be

20   necessary.

21        THE DEPUTY MARSHAL:  Correct, sir.

22        THE COURT:  If he goes to the emergency room, it will

23   be necessary.

24        THE DEPUTY MARSHAL:  Yes, sir.

25        THE COURT:  That's what we're trying to avoid.

63

```
 1              THE DEPUTY MARSHAL:  I think what that discussion
 2      would have to be is most likely from our marshal to the
 3      sheriff at that point, because ADC tells us what they're
 4      going to do, we can't tell them --
 5              THE COURT:  No, I understand that.  So it's ADC I
 6      need to speak to.
 7              THE DEPUTY MARSHAL:  Yes.
 8              THE COURT:  And that's the number you're giving me,
 9      right?
10              MS. CHONG-SMITH:  Yes, that is right.
11              THE COURT:  What is the number again?
12              MS. CHONG-SMITH:  It is 703-746-5038.
13              THE COURT:  And that is who?
14              MS. CHONG-SMITH:  That is Chief Shelbert Williams,
15      the Chief of the Alexandria Detention Center.
16              THE COURT:  Now, that's not the Marshals Service,
17      that's the detention center.
18              THE DEPUTY MARSHAL:  Yes, sir.
19              THE COURT:  Let me speak to her and ask her what she
20      needs.  If she needs a court order, she'll get it.  Let me
21      recess for a few minutes.
22              (Recess taken)
23              THE COURT:  I was unable to reach anybody.
24              Now, let me understand this.  If I issue an order
25      that says that the defendant is to be transported to
```

64

1    Integrated Neurology Services for treatment, this treatment

2    will take most of the day, won't it?

3              MS. CHONG-SMITH:  Your Honor, they said it typically

4    takes only one to two hours for this treatment.

5              THE COURT:  So it would take a good half a day

6    because they have to transport him there, he has to have the

7    treatment, and they have to transport him back.  And if he

8    went to the emergency room, he would have to be taken by two

9    marshals, I think is the policy.  And if he receives

10   treatment there, if the treatment is in a facility that isn't

11   locked -- and it won't be -- it's an emergency room -- the

12   two marshals would have to stay there until he is done and

13   returning.  Am I correct?

14             THE DEPUTY MARSHAL:  Yes, sir, that's correct.

15             THE COURT:  Now, if it happens at the Integrated

16   Neurology Services office, then they would still have to stay

17   there until he's done and return him.  So two marshals is

18   going to be consumed no matter what they do.

19             MS. CHONG-SMITH:  Your Honor, we're not sure, if he

20   was taken to an emergency room, that he would be there for

21   five consecutive days without returning to the jail or not.

22   But given that Integrated Neurology Services --

23             THE COURT:  No, you're not admitted over five days to

24   an emergency room.  He would have to be admitted into the

25   hospital.

1        MS. CHONG-SMITH:  We're not sure that that is not

2    what would happen in the case of the emergency room --

3        THE COURT:  Say that again.

4        MS. CHONG-SMITH:  We haven't received confirmation

5    from Alexandria Detention Center that they don't intend to do

6    that with him.

7        THE COURT:  Don't intend to do what?

8        MS. CHONG-SMITH:  Admit him to the hospital for

9    five days.

10       THE COURT:  They can't.  Alexandria Detention Center

11   can't admit people to a hospital; only physicians can.  No

12   physician is going to admit him into the hospital for this

13   treatment.

14       MS. CHONG-SMITH:  We hope not, Your Honor.

15       THE COURT:  Of course not.  You should know more

16   about admissions into the hospital.

17       But the whole point is that I'm just thinking about

18   the burdens on the marshals.  It doesn't matter to the

19   marshals whether he goes to this Neurology Services and has

20   it done or whether he goes to an emergency room.  It is the

21   same burden for the marshals no matter which one he goes to.

22   We want him to go to the Integrated Neurology so that he

23   isn't quarantined when he returns.  Right?

24       MS. CHONG-SMITH:  That's right, Your Honor, but we

25   also think the burden would be less if he went to Integrative

66

1    Neurology Services because he would have a specifically

2    scheduled appointment; whereas, at the emergency room, we

3    don't know how long he would wait.

4            THE COURT:  That's possible.

5            Let's do this:  You get the appointment.  Get it for

6    as soon as you can.  And you're not going to get it for

7    Saturday or Sunday; right?

8            MS. CHONG-SMITH:  No, Your Honor.  It would be for

9    next Monday.  I think, however, that it is going to need to

10   be the Alexandria Detention Center that makes the

11   appointment.  When I was speaking to them on the phone, they

12   were saying, because he is in the custody of the detention

13   center -- the U.S. Marshals - that we wouldn't be able to

14   make appointments on his behalf, but they were able to say

15   that they would be able to make those times available and

16   that the treatment could occur starting Monday.  But as his

17   defense counsel, it doesn't seem like we're going to be able

18   to make that appointment.

19           THE COURT:  I'm not sure I understood it.  I thought

20   you said, you can't make the appointment, Alexandria has to.

21           MS. CHONG-SMITH:  Yes, that's right, Your Honor.

22           THE COURT:  Who at Alexandria?

23           MS. CHONG-SMITH:  It would be either the chief or the

24   medical department, and then the marshals would approve that

25   transport.

1          THE COURT:  Who is the chief?  The person who is not

2     there this afternoon?

3          MS. CHONG-SMITH:  Yes.

4          THE COURT:  Well, we're not going to solve it

5     entirely today.  But you can transmit to them that my goal is

6     to have Mr. Sanders treated promptly, to have it done at the

7     Integrated Neurology Services, which was approved by ADC

8     before, and that he doesn't then need to be quarantined

9     because it isn't the emergency room.  And if I need to enter

10     an order to make that happen on Monday, I will.  I don't

11     think you can get an appointment Monday.  You can't.  It will

12     have to be, as you've told me, Alexandria Detention Center

13     getting the appointment.  Right?

14          MS. CHONG-SMITH:  That is right, Your Honor.

15     Speaking to Chief Williams, he did say that they would do

16     what they're told.  So if there is a court order modifying

17     the existing plan, that is something --

18          THE COURT:  What existing plan?  I'm not going to

19     issue an order modifying something I don't know.  I will just

20     issue an order indicating that he should be treated for this

21     event at the Integrated Neurology Services as promptly as

22     possible and that he should be transported there and back

23     after each treatment so that he doesn't have to be

24     quarantined.  That's what my order will say.

25          Any problem with that order?

68

1              MS. CHONG-SMITH:  No, I think that would be very

2      helpful, Your Honor.  You could also reference this April 1st

3      letter that does set forth the full set of recommendations.

4              THE COURT:  All right.  I will do that.  And I will

5      issue this order today.  I'll give it to the marshals today,

6      and we need to have somebody take it to the Alexandria

7      Detention Center.  The marshals will do that and give it to

8      the appropriate person there.

9              All right.  Anything else to be done today in this

10     case?

11             MS. CHONG-SMITH:  No, thank you, Your Honor.

12             THE COURT:  Now, let's come back to one other issue.

13     You need to get together with Mr. Prabhu and tell him exactly

14     what you want to look at, all these documents.  We're going

15     to get his treatment done first.  I'm considering using one

16     of the interview rooms here, or one of the rooms here to do

17     it.  Now, it is possible to do it in the interview rooms that

18     the marshals have here, but there is a Plexiglas division

19     there.

20             Would that be a problem, Ms. Ginsberg?

21             MS. GINSBERG:  I think it will because we will have

22     to -- we will have to -- I would have expected that the

23     government would be making a computer available, and we'll

24     also need to have Mr. Sanders be able to look at documents,

25     make notes on them while we're looking at them.  It is very

69

1    difficult to do anything that involves sharing of paperwork

2    and certainly access to a computer in those interview rooms.

3    They do have -- they have holes in the Plexiglas.  But you

4    can't even transfer papers back and forth.  If you need

5    something signed, the marshal actually hand-carries it back.

6              THE COURT:  The only reason that I am attracted to

7    the marshals' interview rooms is that it would eliminate one

8    marshal.  You would only need one instead of two.  If we do

9    it in one of the rooms around here, we need two marshals by

10   their protocol, their policies.

11             MS. GINSBERG:  The only way he could look at a

12   computer screen -- he would have to -- I'm sure he could tell

13   us what to search for -- but we would have to be holding a

14   computer screen up to the Plexiglas.  It would be difficult,

15   and it certainly would take longer.  It would complicate

16   things.  And he wouldn't be able to use the computer at the

17   same time we would.  We'd be turning computer screens around.

18   We wouldn't be able to look at the screen, at the same screen

19   at the same time.

20             THE COURT:  Yes, well, I think I see all that.  But

21   the point that you need to have in mind, we don't have to

22   give you perfect conditions.

23             MS. GINSBERG:  I certainly understand.

24             THE COURT:  I'm trying to make it better for you.

25             MS. GINSBERG:  I know, and I'm trying to answer the

70

1    Court's questions as best I can.  I do understand.

2         THE COURT:  It isn't going to be perfect.  It's an

3    imperfect world.

4         In any event, I'm going to plan on having the

5    documents and the computer produced here, Mr. Prabhu, unless

6    you think it is better at the U.S. Attorney's Office.

7         MR. PRABHU:  We've had the experience of the U.S.

8    Attorney's Office.  It is very difficult.  I will talk to the

9    FBI about facilitating the Court's order.

10        THE COURT:  At their office?

11        MR. PRABHU:  No, here.

12        THE COURT:  Okay.

13        MR. PRABHU:  Here.  It is always available at their

14   office.  That's not a problem at all.  The issue is bringing

15   it to a third-party location.

16        THE COURT:  What about that?  What about doing it at

17   the FBI?

18        MS. GINSBERG:  Your Honor, we asked the government if

19   they would transport Mr. Sanders to the FBI facility, and the

20   answer was no, that that was not feasible or possible.

21        MR. PRABHU:  That is against policy, Your Honor.

22        THE COURT:  What's the policy that precludes that?

23        MR. PRABHU:  They don't allow defendants into their

24   evidentiary rooms.

25        THE COURT:  Well, so that really isn't available.

1          MR. PRABHU:  No, it's not.  The issue -- if the

2    defendant is going to participate, it has to be, if the Court

3    orders it, here or in the U.S. Attorney's Office.  We've

4    tried the U.S. Attorney's Office.  The key is that

5    Ms. Ginsberg needs to provide us with a more limited group of

6    materials that she wants to review with her client and not

7    ask for the complete amount, which overwhelms any computer

8    that is portable enough to bring over here to the courthouse

9    or to the U.S. Attorney's Office.

10          THE COURT:  Well, you might have to bring the

11   computer over on successive days to handle all the

12   information.

13          MR. PRABHU:  That is true.  But the problem is that

14   this is a massive database that we're talking about that a

15   laptop generally can't contain.  That's why we've had them do

16   these reviews at the FBI office with the appropriate

17   computers.  That is not an option with the defendant.

18          MS. GINSBERG:  I'm told that the computer that was

19   used at the FBI office or facility was a laptop computer.

20   I'm obviously not going to get involved in what they can and

21   can't do, but they did use a computer these four days with

22   our expert.

23          THE COURT:  With who?

24          MS. GINSBERG:  Our expert.  Your Honor, maybe we

25   should try and work this out --

72

1          THE COURT:  You all figure out how to do this.  That

2     really shouldn't detain me.

3          I am going to make sure that he gets his treatment.

4     And I will issue an order today setting that up.  And you

5     need to follow it up, make sure he gets his appointment and

6     make sure there aren't any hitches in the marshals taking him

7     to this place and returning him after his treatment.

8          MS. GINSBERG:  And we can spend this next week trying

9     to come up with concrete procedures.  We'll be back in front

10    of Your Honor next Friday if we need the Court's assistance.

11         MR. PRABHU:  Well, if he is being treated next week,

12    he may not be available --

13         MS. GINSBERG:  He won't be available next week

14    anyway, but counsel can confer next week.

15         THE COURT:  He can waive his appearance at the

16    argument on motions in limine, or I can postpone them.

17         MS. GINSBERG:  I think these are going to be

18    substantive motions that he really should be present for,

19    Your Honor.

20         THE COURT:  All right.  Well, then, I will postpone

21    that argument.  But let me tell you again, I'm going to hear

22    these motions in limine, and when we're done, we're done with

23    motions in limine.  I don't expect another flood of motions a

24    week before trial or anything else.  The schedule was set up

25    for this purpose.

73

1          MS. GINSBERG:  Understood.

2          THE COURT:  Am I clear?

3          MS. GINSBERG:  Yes, you are.

4          THE COURT:  Anything else, Mr. Prabhu?

5          Let me just recapitulate.  I'm going to do an order

6    that should facilitate his treatment next week.  I leave it

7    to you all to ensure that that happens; that is, that the

8    jail calls and gets appointments and that the marshals take

9    him to the appointments at the Integrated Neurology location,

10   which is -- I don't know where it is.  Let's see here --

11         MS. GINSBERG:  It's in Alexandria, Your Honor.

12         THE COURT:  Yes.  It's Walker Lane, Alexandria.

13   Right?  6355 Walker Lane.

14         MS. GINSBERG:  That's correct.

15         THE COURT:  All right.  So that he is taken there and

16   returned.  That's all I'm going to do today other than to

17   grant the motion to continue to July.  And we will move on.

18   You all are going to work on the redaction issue that I

19   mentioned earlier.  And next week, if it's necessary to

20   postpone the motions in limine, I will do so.

21         MS. GINSBERG:  Thank you, Your Honor.

22         THE COURT:  But the day has come and passed for

23   those.  And as far as the voir dire, I do that close to the

24   trial.  And when it's done, it's done.  If it requires

25   reversal, so be it.

74

```
1              MS. GINSBERG:  I understand.

2              THE COURT:  All right.  Anything further today,

3    Mr. Prabhu, for the government?

4              MR. PRABHU:  The only remark I would make is I don't

5    know how the Court resolved the mental health issues that you

6    heard ex parte.  If there are things that come up related to

7    that, we may want to --

8              THE COURT:  I have no reason at this time to send him

9    to Butner for a 4341 examination.  That's all you need to

10   know.

11             MR. PRABHU:  And the only related issue to that is,

12   if they want to introduce evidence of his mental --

13             THE COURT:  There is a federal rule that says they

14   have to tell you about experts, and you also have an

15   obligation under that.

16             MR. PRABHU:  Correct.

17             THE COURT:  And Ms. Ginsberg is aware of that, and

18   she will comply with it or suffer the consequences for

19   failing to do so.

20             MS. GINSBERG:  We will comply with it, Your Honor.

21             MR. PRABHU:  Thank you, Your Honor.  That's all, Your

22   Honor.

23             THE COURT:  The Court stands in recess.

24                  (Proceedings adjourned)

25
```

75

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3         I, Patricia A. Kaneshiro-Miller, certify that the

 4    foregoing is a correct transcript from the record of

 5    proceedings in the above-entitled matter.

 6

 7

 8    /s/ Patricia A. Kaneshiro-Miller          May 5, 2021
      ------------------------------------    --------------------
 9    PATRICIA A. KANESHIRO-MILLER                     DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```