IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20-cr-00143 |
| v. | Honorable T.S. Ellis, III |
| ZACKARY ELLIS SANDERS, | Trial: July 12, 2021 |
| Defendant. | |

**DEFENDANT'S MEMORANDUM ON ADMISSIBILITY OF RULE 12.2(B) EVIDENCE REGARDING MR. ZACKARY ELLIS SANDERS'S MENTAL HEALTH CONDITION**

The Court has reserved decision (Dkt. 402) on the government's motion to exclude evidence at trial or, in the alternative, to continue the trial (Dkt. 371) pending receipt of the final report from Dr. Tyler Whitney, memoranda from the parties, and further consideration by the Court.

**INTRODUCTION**

Evidence of evidence of Mr. Sanders's ▮▮▮ condition is evidence "bearing on . . . the issue of guilt," Rule 12.2(b), in this case in three respects.

First, it is essential for the jury to understand Mr. Sanders's ▮▮▮ in order to fairly evaluate his explanation of his specifically intended purpose in allegedly using a minor to engage in sexually explicit conduct, as alleged in Counts One through Five. Indictment (Dkt. 29). Without such evidence, his stated explanation would likely seem counterintuitive or, as the Court put it at the most recent hearing on June 11, 2021, "bizarre." If credited, Mr. Sanders's explanation would support the accepted theory of lack of a culpable purpose under § 2251(a): that his actual purpose of "producing a visual depiction" in these incidents was "merely incidental," *United States v. McCauley*, 983 F.3d 690 (4th Cir. 2020); *United States v. Palomino-Coronado*,

805 F.3d 127 (4th Cir. 2015), to his primary and more significant purpose of what he perceived as "mentoring" individuals seeking to experience (and capable of consenting to) the BDSM lifestyle.[1]

Second, "the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness." 18 USC § 3501(a). Mr. Sanders's ▇▇▇ in comparison to non-disabled individuals, made him significantly more susceptible to the threats and promises made to him by the FBI to induce him to incriminate himself, and rendered him significantly less able to appreciate his ability, or assert his will, not to be subjected to interrogation. Evidence about Mr. Sanders's ▇▇▇ is also necessary to dispel any "common sense" interpretations or inferences that his behavior in interacting with the FBI otherwise suggests that his statements were voluntary.

Finally, evidence of Mr. Sanders's ▇▇▇ condition is necessary in order to familiarize the jury with the nature of his condition, and how it affects him, so that his observable behavior in the courtroom, or manner of testifying in the event that he does testify, are not misinterpreted or the cause of unfair bias or discrimination by the jury on account of his developmental disability. Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.

Admission of expert evidence of Mr. Sanders's ▇▇▇ is therefore essential to each of the above evidentiary purposes, and is also compelled by his Sixth Amendment Right to Present a

---

[1] At the outset it should be clarified that, based on Dr. Whitney's final report, the intention of the defense with respect to its proposed Rule 12.2(b) notice is exclusively that "with respect to the production charges, that it was not [one of] Mr. Sanders's predominant purpose[s] to produce a visual depiction." Dkt. 305 at 1. It is not the defense's intention to assert that the defendant's "development deficits prevented him from forming the requisite *mens rea* for the charged offenses," which, as the Court's June 11 (Dkt. 402) observes, was stated in the defense's Memorandum in Support of the Motion for Leave to File a Rule 12.2(b) Notice, which was filed prior to receiving Dr. Whitney's final report. (Dkt. 305).

2

Defense and his right, under the Rehabilitation Act of 1973, to accommodation and to be free from discrimination.  The defense agrees wholeheartedly with the Court that there should be nothing in the presentation of evidence of the defendant's mental condition aimed at obtaining sympathy.

## DISCUSSION

**I.  Rule 12.2(b) authorizes admission of evidence of a mental condition bearing on a *mens rea* element.**

By its own terms, Fed. R. Crim. P. 12.2(b) ("Rule 12.2(b)") authorizes a defendant "to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on . . . the issue of guilt."  Thus the rule anticipates a defendant will introduce testimony on "mental disease or defect on the theory that such mental condition in inconsistent with the mental state required for the offense charged."  1974 Notes of Advisory Committee on Rules, Rule 12.2(b).  Many states have entirely abandoned this kind "diminished capacity" as a defense, in favor of the insanity defense being the only means by which to escape guilt based on mental defect evidence.  In contrast, Virginia recently reversed its position with the passage of several provisions specifically designed to ensure the consideration of ███████████████, especially ██████ in the criminal adjudication process, including allowing evidence of such a condition to negate *mens rea,* in amendments to §§ 19.2-120, 19.2-163.03, 19.2-299, and 37.2-808 of the Code of Virginia.  Furthermore, Congress's expectation that psychiatric evidence would remain admissible as to *mens rea* under the Insanity Defense Reform Act of 1984 can be discerned from its failure to amend Rule 12.2(b), despite many proposals to do so.  *United States v. Pohlot*, 827 F.2d 889, n. 8 (3rd Cir. 1987) ("Congress' failure to amend Rule 12.2(b), despite the fact that many bills did propose changes in the rule,

3

see e.g., S.1558, S.2669 (97th Cong.), indicates that Congress expected psychiatric evidence to remain relevant to *mens rea*.").

Accordingly, courts have observed generally, in accordance with the understanding of the Rules Advisory Committee, that evidence of a mental health condition is admissible to negate any mental state required for the offense. *Pohlet*, 827 F.2d at 897 ("[W]e therefore reject the government's contention that the Insanity Defense Reform Act either explicitly or implicitly bars a defendant from introducing evidence of mental abnormality on the issue of mens rea"); *United States v. Gold*, 661 F. Supp. 1127, 1131 (D.D.C 1987) ("Congress did not intend to restrict a defendant's right to "straightforwardly deny[ ] the prosecution's prima facie case by attempting to cast doubt on the prosecution's claim that a requisite mental element was present at the time of the offense."); *United States v. Bartlett*, 856 F.2d 1071, 1081, n. 9 (8th Cir. 1988) ("The Insanity Defense Reform Act, as clarified by its legislative history and statutory scheme, clearly allows Bartlett to raise the issue whether a mental disease or defect at the time of the alleged crime rendered him incapable of forming the requisite intent."); *United States. v. Westcott*, 83 F.3d 1354, 1358 (11th Cir. 1996) ("Psychiatric evidence is admissible to negate mens rea when the evidence focuses on the defendant's specific state of mind at the time the offense was committed."). As put by Judge Richard Gergel in the case of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

4

> **A. Cases discussing the admissibility of mental condition evidence on "specific intent" crimes do not exclude admission of such evidence with respect to other kinds of mens rea elements such as motive and purpose.**

There are cases referencing negating "specific intent." In this context, as can be seen in the Court's June 11 Order (Dkt. 402 at n. 3) 18 U.S.C. § 2251(a) has "intent" and "purpose" mens rea elements which are two separate elements to be proven, *McCauley*, 983 F.3d at 695-96. However they both fall under this "specific intent" rubric. The Fourth Circuit has interpreted the "purpose" element as also being in the category of "specific intent":

> As the text indicates, § 2251(a) **contains a specific intent element**: the government was required to prove that production of a visual depiction **was a purpose of engaging** in the sexually explicit conduct. *Id.*; see *United States v. Lebowitz*, 676 F.3d 1000, 1013 (11th Cir.2012). "It is simply not enough to say, 'the photo speaks for itself and for the defendant and that is the end of the matter.'" *United States v. Crandon*, 173 F.3d 122, 129 (3d Cir.1999) . . . That is, a defendant must engage in the sexual activity with the **specific intent to produce** a visual depiction; it is not sufficient simply to prove that the defendant purposefully took a picture.

*United States v. Palomino-Coronado*, 805 F.3d 127, 130–31 (4th Cir. 2015) (emphases added).

*See also United States v. Worrell*, 313 F.3d 867, 873 (4th Cir. 2002)

**II.     The defense has a legally accepted theory of lack of *mens* rea that is supported by evidence of his mental condition.**

The Fourth Circuit decisions in *McCauley* and *Palomino-Coronado*, and cases cited in these cases, establish a clear theory of lack of *mens rea* in relation to the "purpose" element in 18 U.S.C. § 2251(a) which encompasses the defense theory in relation to the "production" charges. That theory cannot be advanced without expert evidence of the defendant's ▮▮▮ condition.

> **A. Establishing that the "purpose" of creating a visual depiction was "incidental," or not a "dominant purpose" of the sexual activity is an accepted legal theory of defense.**

In *McCauley*, the Fourth Circuit held that the "purpose" element in 18 U.S.C. § 2251(a) "requires the government to prove that creating a visual depiction was 'the purpose' of an

5

accused for engaging in sexual conduct, not merely 'a purpose' that may happen to arise at the same instant as the conduct." 983 F.3d at 695. Thus, "[t]he differences" between "the purpose" and "a purpose" "is whether the accused's alleged purpose carries some predominant weight, as required by the plain statutory language," versus "whether [producing a visual depiction] was one among many, potentially much more significant purposes." *Id.* at 695.

The Fourth Circuit rejected the government's interpretation under which "'a purpose' to [produce a visual depiction] could be 'merely incidental' to other more significant purposes." *Id.* at 695 (citing *United States v. Torres*, 894 F.3d 305, 312-13 (D.C. Cir. 2018) (finding evidence sufficient that "obtaining the sexually explicit images was itself important to Torres-not merely incidental to the immediate gratification he derived from [the minor's] conduct")). Instead, producing a visual depiction of the sexually explicit conduct must be "at the very least a significant purpose in the sexual conduct itself, not merely incidental." *Id.* at 695 (citing *Mortensen v. United States*, 322 U.S. 369, 374 (1944) (interpreting "for the purpose of" under the Mann Act to be "the dominant motive"); *see also United States v. Sirois*, 87 F.3d 34, 39 (2d Cir. 1996); *United States v. Raplinger*, 555 F.3d 687, 693 (8th Cir. 2009).

The Court in *McCauley* also made a significant point about the importance of the mandatory minimum for the offense, obviously aimed at those who force children to submit to being photographed or filed for commercial purposes, rather than cases of self-produced images that had no such purpose. *See McCauley*, 983 F.3d at 696 ("Instructing a jury that it is sufficient to find filming was 'a purpose' that could 'arise at any time 'during the sexual conduct is for courts to improperly greenlight a fifteen-year minimum sentence for someone who engages in sexual conduct and takes a picture.") (citing *Palomino-Coronado*, 805 F.3d at 132); *see also id.* at 132 ("[t]he single photo [was] not evidence that Palomino-Coronado engaged in sexual

6

activity with [the minor] to take a picture, only that he engaged in sexual activity with [the minor] and took a picture.").

Clearly the Fourth Circuit has in mind here the vast difference between the commercial "production of child pornography" as originally understood, and the exchange of self-produced images over online social media that has prevalent today, even if *McCauley and Palomino-Coronado* were far more egregious than many "social media" exchanges.

Therefore, there is a legally accepted theory of lack of *mens rea* in a case charged under 18 U.S.C. § 2251(a), that there is a reasonable doubt about whether the purpose of the accused for the creation of visual depictions was a dominant purpose, rather than merely incidental to other reasons for alleged minors engaging in sexually explicit conduct.

### B. The defense will present evidence of the incidental nature of the purpose of creating visual depictions.

The defense will present factual support showing that Mr. Sanders ███████████ ███████████████████████████████████████ ███████████████████████████████████████ Dr. Whitney's Final Report (Dkt. 405-1) at 4. Dr. Whitney will explain why, as a result of his ██████ Mr. Sanders was pushed to ███████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████████████ *Id.* at 50.

In interacting with others online, including the alleged minor victims, Mr. Sanders ███████████████████████████████████████ ███████████████████████████ but his behavior was merely a form of █████ ███████████████████████████████████████



███ *Id.* at 50. This was Mr. Sanders's only way of having ███ ███. *Id.* at 51. Dr. Whitney will be able to explain, with specific reference to the charged chats, how



*Id.* at 52; *see also id.* at 52-56 (providing specific examples within charged chats).

Given Mr. Sanders's ███ and his history of intense bullying and social isolation, ███ ███ ███ *Id.* at 4. ███ ███ *Id.* at 56. More specifically, ███ ███ ███ *Id.* at 49. As a result, ███ ███ ███ *Id.* at 5. Consequently ███ ███ ███ *Id.* at 51.

8

### C. Evidence of the defendant's mental condition is essential for the jury to be able to understand and fairly evaluate the defense case.

As Dr. Whitney's report makes clear, Mr. Sanders's ▮▮▮ causes him to ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; thus, it is essential for the jury to understand that what a typically developing person might infer will not apply to Mr. Sanders. In previous hearing, this Court quoted the following proposition from *Cameron*:

> Because psychiatric evidence (1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract the jury from focusing on the actual presence or absence of mens rea, and (3) may easily slide into wider usage that opens up the jury to theories of defense more akin to justification, district courts must examine such psychiatric evidence carefully to ascertain whether it would, if believed, support a legally acceptable theory of lack of *mens rea*.

*Cameron*, 907 F.2d at 1067 (quotation and citation omitted). The suggestion by appellate courts that a psychiatric evidence "will only rarely negate specific intent," *id.* at 1067, is not applicable here.

This "rarity" concept derives from *Unites States v. Pohlot,* where that decision stated, "[o]nly in the rare case, however, will even a legally insane defendant actually lack the requisite *mens rea* **purely because of mental defect**." 827 F.2d at 900 (emphasis added). This is quoted in *Cameron*, 907 F. 2d at 1066, and is the antecedent to the above quotation. *Cameron* explains at this point why it would be rare that an accused could articulate a viable theory of defense in this situation because it would almost always be an insanity defense in disguise. But here, in this case, the defense is not asserting that the "purpose" element is "negated" "purely because of mental defect." *Pohlet*, 827 F.2d at 900. Here, the mental condition "sheds light on" Mr. Sanders's purpose in an essential, irreplaceable way.

Finally, while some defendants who have a pertinent mental health condition might conceivably be able to testify about how their condition affected them (the defendant in *Staggs,*

9

for example, for whom it was still error to have excluded the mental health evidence), but that is not going to be the case with most defendants, including the present defendant who ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Our assumptions about the capabilities of jurors to assess and properly credit the testimony of others, or their tales, by whomever told, assumes that the jurors have Theory of Mind and that they have an intuitive sense of how to assess the minds of others.  "Intent to commit a crime is almost always a question of fact for the jury to decide **based on the life experiences and common sense of its members**.  Most medical experts, including psychiatrists, are rarely able to make meaningful contributions that can properly guide jurors in this task." *United States v. Ricketts*, 146 F.3d 492, 498 (7th Cir. 1998).  But this appeal to "life experience and common sense" of jurors, which research tells us mostly boils down to bias and prejudice, is not applicable to the estimation of the behavior and point of view of one whose mind developed in a substantially different world.  The jurors need to know about that world too, and their life experience and common sense are no use in the case of judging a person with ▮▮▮▮.

### III. Evidence of the defendant's mental condition is essential for understanding the involuntariness of Zackary's statements to the FBI.

The defense has already documented the calculatedly coercive environment, the threats, promises, and psychological techniques used by the FBI in its efforts to elicit incriminating information from Mr. Sanders.  Memorandum In Support of Motion to Suppress Statements, Dkt. 150. The completely unnecessary mass of 26 armed agents, the display of weapons and shouting at the suspect and his parents is designed to rattle the accused and with no other purpose than to overcome the resistance of the accused to speak.  Every legitimate objective of the execution of the search warrant could have been accomplished without this over-the-top display of aggression.  This tactical display is common because it has proven very successful in getting

incriminating statements from typically developed subjects who are initially often put in fear of death as was Risa Sanders for her son's life.

 The interrogation was deliberatively coercive. The agents repeatedly threatened to take away the entire family's electronic devices—on which they all relied for work—unless Mr. Sanders provided them information and passwords. They isolated Mr. Sanders and rolled over his pleas for his mother, which clearly notified the agents of his weakness, which knowledge only fueled their pressure on him. They brushed aside his expressed concern about not having a lawyer and were even elusive about is right to cut off questioning, that he could stop at "some point" if he wanted. Multiple times that if he did not give them truthful information, they were going to take all of the devices in the home, knowing how much of a threat that was to him, and implicitly suggesting that they wound not take devices if he spoke. *Id*. at 6. They lied to him and threatened a § 1001 charge that would put him in jail.

 Mr. Sanders made statements explicitly indicating that he did not want to speak and that he felt he was being coerced. *Id*. at 8. All this implicate the question of how more severely this objective evidence of coercion, and the effects of coercion actually operate on somebody with ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████, while literally and concretely fastening on the promises and threats being made.

 A jury might look for clues as to voluntariness in things that happen, exchanges, and the ensuing interrogation, such as the fact that the defendant was able to speak with his mother at one point, or that he pedantically instructed the agents regarding techniques for searching the Internet. This might be taken to mean one thing when done by an individual who is affected by his ███ and needs explanation.

11

IV. **Evidence of the defendant's mental condition is necessary in order to familiarize the jury with the nature of his condition, and how it affects him as a participant in the proceedings.**

Being a defendant in a courtroom is an extremely complex social situation. Ordinarily it will be the most challenging, anxiety ridden and exhausting situation a person with ▌▌▌ will ever have ever experienced. Lawyers and judges tend to think of a trial simply as a very ordered linear process, with fixed and understood roles for the participants. We do not pay attention to the lighting, the carpet, the sound system, shiny handcuffs, recording devices or stenographers, or the sounds of ventilation systems. These things can be persistently upsetting or distracting for the ▌▌▌ defendant, ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌.

Even a typically developed accused is at the height of anxiety and challenged in effectively participating in the process—knowing when to speak up to the lawyer, the appropriate gestures and behavior. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌.

In some cases, this can go unnoticed, by the lawyers, the judge, and a jury. But so will the fact that the accused has gone through the entire moment, day, or multi-day proceeding without comprehending what we expect, or, more important, the entire import of the whole thing. But sometimes the stress can be so great and the need for escape be so profound that the ▌▌▌ ▌▌▌ will decompose or act out in an aggressive way—sometimes in a way that might be misinterpreted by security personnel in such a way that unnecessarily causes the situation to

escalate. For example, grabbing or touching or speaking loudly to the accused can provoke a wild physical "fight or flight" response.

The majority of children with ▓▓▓ are bullied in social setting, especially schools, often creating extreme anxiety about going to school, and engaging in social situations where there are strangers and imponderable group dynamics. A trial combines all these fears because there is not only a novel social situation with strangers, but the strangers are also actually "judging" them, prepared to reject and punish them, triggering all the emotional response from other social experiences of social rejection and abusive response.

This not only requires support, but being prepared for unpredictable and insuppressible outbursts if the pressure gets too great. While the ▓▓▓ accused is may chronologically be an "adult" or older adolescent, the social and emotional response skills are most likely at the level of a small child.

▓▓▓ defendants may need numerous breaks in the proceedings to have things explained to them, or to recover from stress of particular moments, or the exhaustion of trying to concentrate for just an hour of a proceeding.

Of course, we have a fascination with how a defendant appears in a courtroom, with very unrealistic and unfair assumptions about how an accused is "supposed" to respond to courtroom developments. These expectations are often very unfair enough in the case of the typically developed defendant who might not look remorseful, or Of course, contrite or caring at certain moments where a juror might expect this. But the ▓▓▓ defendant especially may exhibit no emotional response in facial expressions, or may exhibit "inappropriate affect" – smirking or giggling at extremely inappropriate times, or appear disinterested in a way that seems callous or "guilty."



Thus, it is important to let the jury know something about ▮ and prepare them to disregard incongruous or seemingly inappropriate reactions by the ▮ accused, and understand the need for appropriate accommodations to address the individual needs of an accused.

Hopefully problematic or potentially prejudicial things will not occur. But one should not be misled by the ability of an ▮ defendant to handle a simple colloquy with a judge about behaving in the courtroom. ▮ is a ▮ which ▮

---

2 ▮

14

If the jury is not informed of the defendant's diagnosis ▮ the impact of a negative demeanor may have a detrimental implication for defendants ▮. So, better to have the jury prepared, to the extent possible. Still developments might occur that will require more particular curative instructions and guidance for the jury, as a case proceeds.

V. **The Right to Present a Defense**

We have already given extensive discussion of the Right to Present a Defense. (Dkt. 381, p. 9 *et seq.*, is fully incorporated by reference here.

Some more discussion of the Right to Present a Defense is appropriate as focus is put on "relevance" as a criteria of admissibility. First, we have to acknowledge that many decisions pay lip service to this fundamental right, but brush it aside in effect by incanting, in effect, that "still we have to follow the rules of evidence." The hollowness of this is illustrated by many cases where convictions have been reversed where the rule of evidence were followed exactly, such as *Chambers v. Mississippi*, *Washington v. Texas*, and *Green v. Georgia*, 442 U.S. 95 (1979).

A. *The Right to Present a Defense circumscribes the determination of relevance.*

The framers of the sixth amendment did not intend to commit the "futile act" of guaranteeing the defendant the presence of witnesses, while leaving it to the courts to prohibit them from testifying by employing arbitrary standards of relevance.[4]
The defendant has a right under the compulsory process clause to present any evidence that may reasonably be deemed to establish the existence of facts in his favor. Cf. F.R. Evid. 401. The standard of admissibility cannot be greater than what the accused needs to prevail – showing a "reasonable doubt." Thus, "[s]o long as there is a significant chance of this added item,

---

[3] ▮

[4] Westen, The Compulsory Process Clause, *supra*, p. 206.

developed by skilled counsel . . . could [induce] a reasonable doubt in the minds of enough jurors to avoid a conviction the constitutional standard of materiality has been met." *United States v. Miller*, 411 F.2d 825, 832 (2d Cir., 1969). If the evidence "could . . . in any reasonable likelihood have affected the judgment of the jury" a sufficient showing of materiality has been made under our constitution. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (Burger, L.J., for a unanimous court); *Napue v. Illinois*, 360 U.S. 264, 271 (1959).

> As the Supreme Court said in *United States v. Agurs*:
>
> > The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.

*United States v. Agurs*, 427 U.S. 97, 112-113 (1976) (emphasis added).

In *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), affirming the compulsory process rights of the accused to favorable information in confidential child sex abuse reports for use at trial, the Supreme Court said, "our cases establish, at a minimum, that criminal defendants have . . . the right to put before a jury evidence that might influence the determination of guilt." *Id.* at 56.

Thus, in deciding issues such as relevance, a court cannot demand to be persuaded by the proposed evidence, and must rather consider whether it might give rise to a reasonable doubt in the mind of a rational juror.

### 1. *Risks of Prejudice, Reliability, Confusion must be addressed other than with preclusion.*

Having determined "relevance" of expert testimony, judges are pressed by prosecutors with claims that the evidence would be confusing to a jury and not "probative" enough, or "speculative," much as suggested by the statement that "[m]ost medical experts, including psychiatrists, are rarely able to make meaningful contributions that can properly guide jurors in

16

this task," in *United States v. Ricketts*, 146 F.3d at 498. However, these concerns can be addressed by careful presentation of the evidence and, if necessary, cautionary instructions:

> Allowing the judge discretion to balance the probative value of evidence against the danger that it will improperly influence the jury raises several problems. To begin with, it implies that, in counteracting the dangers of prejudice, the judge is free to exclude probative evidence rather than admit it under cautionary instructions. Yet *Washington* teaches that it is unconstitutional for a court to resort to exclusion when the less drastic alternative of sending the evidence to the jury under cautionary instructions is available. Furthermore, the jury is constitutionally presumed to be able to follow its instructions in all but the most extraordinary cases.(*footnote omitted*) Ordinarily, therefore, the compulsory process clause denies the judge any discretion to exclude relevant evidence.[5]

Such questions remind us of the directive in *Washington* that it is for the jury to "decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

> But the district court is not free to dismiss logically relevant evidence as speculative: [I]f the evidence [that someone else committed the crime] is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt.

*United States v. Stever*, 603 F.3d 747, 754 (9th Cir. 2009) (quotation and citation omitted). Here there is nothing missing in the relevance, or probative value of the evidence of the defendant's mental health condition. The expert will be offering opinions, but founded on accepted and validated clinical practices. And the government can have its experts too. While "confusion" in the case of conflicting is simply one of the inevitable challenges of adjudication. The ultimate question is whether the evidence is something a jury is capable of rationally evaluating. While the world of ▊ is unfamiliar, and often the facts are counterintuitive, it is not irrational, and for thousands of professionals it is all they deal with.

---

[5] Westen, The Compulsory Process Clause, *supra* p. 212

**VI.  In the case of a disabled accused, the right of the disabled to accommodations in communicating their case to the jury, and the right to be free from discrimination, compel doubt about admissibility to be resolved in factor of the accused.**

The Court observed that the defense had not cited precedent for the proposition that the defendant's status as a disabled person needs to be considered in determining these questions. This is true. In fact, no other federal district court has been asked this in a case that went to trial. While the rarity of actual trials of ▮▮▮▮ persons is one factor, the reality is that all actors in the criminal courts, state and federal, have been unprepared to meaningfully address the ▮▮▮▮ ▮▮▮▮. However, the lack of judicial rulings does not end the question. There is a national policy in a federal statute that creates a protected class of persons with disabilities. Here the need for accommodation is clear, and the prejudice to the accused of having the jury ignorant of empirical facts about his condition that pervasively affects his life, his beliefs, his understanding, and his culpability, as they sit in judgment of him, is of direct concern in the accommodation and antidiscrimination policies embedded in the Rehabilitation Act. Some federal judge will acknowledge this and set that precedent, and we submit it should be this Court.

## CONCLUSION

For the foregoing reasons, Mr. Sanders must be allowed to introduce expert testimony essential to the jury's accurate understanding of ▮▮▮▮ and how Mr. Sanders's developmental disability impacted both his ability to perceive and react to questioning by law enforcement, and to his intent and purpose in engaging in the online conduct charged in the indictment. The jury must not be allowed to decide Mr. Sanders's guilt or innocence based on mere intuition and erroneous preconceptions, or a ▮▮▮▮▮▮▮▮ condition that many experienced clinicians fail even to recognize. Encouraging the Court to preclude defense

18

available to the accused recklessly invites the Court to conduct a trial the outcome of which could never be sustained.

                                        Respectfully submitted,

                                        ZACKARY ELLIS SANDERS
                                        By Counsel

                                        Respectfully submitted,

                                              /s/
                                        Nina J. Ginsberg (#19472)
                                        Zachary Deubler (#90669)
                                        DiMuroGinsberg, P.C.
                                        1101 King Street, Suite 610
                                        Alexandria, VA  22314
                                        Telephone: (703) 684-4333
                                        Facsimile: (703) 548-3181
                                        Email: nginsberg@dimuro.com
                                        Email: zdeubler@dimuro.com
                                             /s/
                                        Jonathan Jeffress (#42884)
                                        Jade Chong-Smith (admitted *pro hac vice*)
                                        KaiserDillon PLLC
                                        1099 Fourteenth St., N.W.; 8th Floor—West
                                        Washington, D.C.  20005
                                        Telephone: (202) 683-6150
                                        Facsimile: (202) 280-1034
                                        Email: jjeffress@kaiserdillon.com
                                        Email: jchong-smith@kaiserdillon.com

                                             /s/
                                        Mark J. Mahoney (admitted *pro hac vice*)
                                        Harrington & Mahoney
                                        70 Niagara Street, 3rd Floor
                                        Buffalo, New York 14202-3407
                                        Tel.: 716-853-3700
                                        Facsimile: 716-853-3710
                                        Email: mjm@harringtonmahoney.com

                                        *Counsel for Defendant Zackary Ellis Sanders*

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and accurate copy of the foregoing was served this 21st day of June 2021, on all counsel of record.

*/s/ Jonathan Jeffress*
Jonathan Jeffress
