**\*\*\*PUBLIC VERSION\*\*\***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:20-cr-00143 |
| | The Honorable Judge Ellis |
| v. | |
| | Trial: October 19, 2021 |
| ZACKARY ELLIS SANDERS, | |
| | **PUBLIC VERSION** |
| Defendant. | |
| | **HEARING REQUESTED** |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO SUPPLEMENT THE RECORD AND RENEW HIS MOTION TO COMPEL EXCULPATORY MATERIAL OR, IN THE ALTERNATIVE, TO SUBMIT EXCULPATORY MATERIAL FOR *IN CAMERA* REVIEW**

Zackary Ellis Sanders, by and through counsel, respectfully submits this Memorandum in Support of his Motion to Supplement the Record and Renewed Motion to Compel or, in the Alternative, for *In Camera* Review.

**INTRODUCTION**

In bringing this motion, counsel are mindful of the Court's prior rulings, but also of their duty to Mr. Sanders of zealous advocacy and the severe penalties to which Mr. Sanders may be exposed if convicted. Due to the government's unrelenting pursuit of production charges that do not involve recordings of sexual contact between Mr. Sanders and the alleged minor victims, Mr. Sanders faces a mandatory minimum term of 15 years in prison. Because Mr. Sanders suffers from multiple sclerosis, a minimum 15-year sentence may well be a death sentence. Given his parents' ages, a 15-year sentence also means that Mr. Sanders may never see either his mother or father outside of prison again.

Notwithstanding the potentially life-altering stakes, the Court has issued several orders criticizing Mr. Sanders's counsel for overly long and untimely filings and for procedurally defaulting Mr. Sanders's right to present fundamental constitutional arguments. The blame for the "veritable mountain" of pleadings should not lie solely with the defense. *See* Order (Dkt. 402) at 8. From the outset of this case, the government has resisted producing discovery relevant to the Fourth Amendment issues, and only produced exculpatory screenshots of the target website and subpoenas for information relating to the Sanders family's IP address well *after* the time Mr. Sanders could have made timely use of them in litigating his motions to suppress.[1]

More fundamentally, however, Mr. Sanders has persisted in his motions to compel because the Court was forced by the government's delay in disclosing exculpatory screenshots, to decide his Fourth Amendment claims on an incomplete, if not factually inaccurate record—a deficiency that remains well within the Court's power to remedy. Specifically, the Court has twice found that the information the foreign law enforcement agency ("FLA") provided to the FBI could be read in two polar opposite ways.[2] As the Court has stated on several occasions:

---

[1] By contrast, the Court has not directed similar criticism at the government for its untimely disclosures.

[2] While the government has admitted it has no proof and does not know where on the website the Internet user purportedly went, it nonetheless claims that the FLA tip was accurate in asserting that the Internet user accessed child pornography. See, e.g., Transcript of September 11, 2020 Hearing (Dkt. 135-1) at 25 ("Mr. CLAYMAN: . . . Admittedly, we don't know precisely what the content is, but we have never claimed to know exactly what it is, or exactly the definition of child pornography under the United States Code. We also never claimed that the tip alleges that he downloaded that content. All the tip says is that he accessed content on this site and that we know that this site is dedicated to child pornography"). Nonetheless, the record is clear that, prior to the execution of the search warrant, there was no evidence that the Internet user had any interest in child pornography other than an uncorroborated allegation of a single visit to an unknown part of a target website, which is not enough to demonstrate an interest in such material. Id. at 25; FD-1057 (Dkt. 253-4) at 3 ("FBI database queries for IP address 98.169.118.39 revealed nothing pertinent."). Furthermore, the website's homepage, registration, and login pages were not even suggestive of child pornography, so a user could visit the website

> [O]n its face, the FLA Tip states that the user of the target IP address "accessed online child sexual and exploitation material," not that the user accessed only the Target Website's homepage. However, even if the FLA tip were read to mean that the target IP address user visited only the Target Website's homepage, "the information in the Affidavit noting the steps the Target IP address user was required to take to navigate to the [Target Website] warrants the inference that the Target IP Address user's arrival at the [Target Website] was purposeful, that is the Target IP User's purpose was to access the website and its illegal content."
> *United States v. Sanders*, Case No. 1:20-cr-143 (E.D. Va, October 26, 2020) (Memorandum Opinion) [(Dkt. 113)]. Furthermore, it is important to note that the mere fact that the website's homepage did not mention child pornography does not alter the conclusion, as indicated in the Affidavit and as evident from the screenshots of the website, that the website was dedicated to child pornography. *United States v. Sanders*, 1:20-cr-143, at *2 n.1 (E.D. Va, Jan. 26, 2021) (Order) [(Dkt. 237)].

Order (Dkt. 369) at 4, n.1.

As this passage makes clear, the Court's ruling is based on two starkly different interpretations of the FLA's tip, the first being that the FBI believed, as paragraph 23 of the Affidavit incorrectly suggested, that the tip meant that the user actually viewed child pornography via the website,[3] and the second, that the FBI knew that all the FLA tip was intended to convey was that the user merely visited a website, one time.

It is important that the Court clarify the bases for its ruling for at least two reasons. First, the two versions present different questions under the Fourth Amendment. There is a dispositive difference for Fourth Amendment purposes between actually viewing or downloading illegal content (or knowingly paying for, or subscribing to a service or website that is dedicated to child pornography), on the one hand, and merely visiting a website once, without more, on the other.

---

without knowing what content could be viewed by someone who went past the homepage, registered an account, and logged in, which there was no evidence this Internet user had done.

[3] To find and view child pornography on ▮▮▮▮▮▮ the user would have to navigate past the homepage, register an account, login, select a board, select a sub-forum, and then click on a post that contained child pornography. There is no evidence that anyone using the Sanders family's IP address ever took any of these steps.

3

Notice of Filing of Defense Exhibit (Dkt. 109) at 2-3.  Numerous courts have held that where the evidence demonstrates that the defendant knowingly subscribed to a child pornography service or actually viewed child pornography, the facts give rise to probable cause.[4]  With the exception of this case, however, no court has held that merely visiting a website one time, *without more*, gives rise to probable cause.[5]

Second, because the government failed to disclose exculpatory screen shots in a timely manner, there is no clear record of what the FLA's tip actually meant, or what the FBI or Special

---

[4] *See, e.g., United States v. Goodwin*, 854 F.2d 33 (4th Cir. 1988) (finding probable cause for anticipatory search warrant when defendant *ordered child pornography* and investigation verified that materials would be delivered to address where warrant was executed) (emphasis added);; *United States v. Shields*, No. 4:CR-01-0384, 2004 WL 832937, at *7 (M.D. Pa. Apr. 14, 2004), *aff'd*, 458 F.3d 269 (3d Cir. 2006) (finding probable cause where it was clear that the defendant *voluntarily subscribed to and joined two websites* whose purpose was to share child pornography); *United States v. Froman,* 355 F.3d 882, 890–91 (5th Cir. 2004) (finding probable cause where the defendant *paid to join a group* called Candyman where the sole purpose was to receive and distribute child pornography, the defendant *registered screennames that reflected an interest in child pornography*, and the defendant *did not cancel his paid subscription* to the group) (emphases added); *United States v. Hutto*, 84 F. App'x 6, 8 (10th Cir. 2003) (finding probable cause where the defendant *paid to join a group* where images of child pornography were available to all members and where subscribers could choose to receive regular emails containing child pornography) (emphasis added); *United States v. Bynum*, 604 F.3d 161 (4th Cir. 2010) (finding probable cause where suspect with particular screen name linked to specific physical address had uploaded child pornography to the Internet); *United States v. Bosyk*,  933 F.3d 319, 325-26 (4th Cir. 2019) (finding timing critical to probable cause where internet user clicked on a download link to four videos of child pornography *the same day* the link appeared in a bulletin board posting that contained text and images unequivocally identified as child pornography).

[5] *See, e.g., United States v. Falso*, 544 F.3d 110, 120-21 (2d Cir. 2008) (finding no probable cause when all that was alleged was that defendant "*appear[ed]*" to have "*gained access* or *attempted to gain access*" to a website with a name suggestive of child pornography, which contained 11 images of child pornography and which advertised additional child pornography at an internet address that was hidden until a membership was purchased *and there was no allegation that he subscribed* to the paying-membership site); *United States v. Bosyk,* 1:17-cr-00302, Gov't. Opp'n. to Mot. to Suppress, at 11-12, (Dkt. 29) (conceding that clicking on a suggestive invitation to join an e-group is not illegal, but that clicking on a download link that contained text and images of child pornography the same day the link appeared in a post on the e-group's bulletin board is).

Agent Ford believed when seeking the search warrant, or for that matter, what the Court found. To be sure, the government's untimely disclosure of four exculpatory screenshots undercut the factual basis for the Court's original ruling denying the motion to suppress.[6] *Compare* Memorandum Opinion at 11, (Dkt. 73) (finding "[t]here is no evidence . . . that Special Agent Ford thought defendant merely visited ▇▇▇▇▇ homepage and did not view child sexual abuse and exploitation material.") *with* Order at 2, n.1, (Dkt. 237), (finding "even if the FLA Tip were read to mean that the target IP address user visited only the Target Website's homepage, 'the information in the Affidavit noting the steps the Target IP Address user was required to take to navigate to the [Target Website] warrants the inference that the Target IP Address user's arrival at the [Target Website] was purposeful, that is the Target IP Address user's purpose was to access the website and its illegal content.'").[7]

---

[6] In rejecting Mr. Sanders's claim that an Internet user could easily access the target website once without intending to view child pornography, the Court relied heavily on its "thorough examination" of the initial four screenshots that the government had handpicked even though Mr. Sanders was not alleged to have accessed or seen any of that content, including the board index. Memorandum Opinion, at 10, (Dkt. 113). The ▇▇▇▇▇ homepage, the first and potentially only page a visitor would see, did not advertise child pornography, contrary to what Special Agent Ford suggested in the Affidavit. *See* Homepage Screenshot (Dkt. 176-1). To view the board index, a user would have to go past the homepage, register an account, and login, which the user in this case was *not* alleged to have done.

[7] Seth Schoen's declaration directly contradicts this Court's conclusion. Schoen Decl. (Dkt. 256-7 at ¶ 36) (stating, *inter alia*, that "the steps to download and use the Tor Browser are the same as those to download and use any other browser."); *id.* at ¶ 77 ("To the extent the affidavit suggests that an Internet user could only have visited a Tor onion service by typing in its exact "16-or-56-character web address" or using a directory site, that inference is incorrect, since search engines for onion sites do exist and are relatively easy to use, and onion site links can be easily shared in any forum or medium."). The Court did not acknowledge Mr. Schoen's declaration or Mr. Sanders's Motion to Suppress No. 3 (Dkt. 83-84) in its previous rulings, or the possibility that an internet user could purposefully access a website that contained a mix of legal and illegal content without intending to access child pornography.

Nevertheless, the Court has repeatedly denied Mr. Sanders's requests to compel the government to produce evidence referred to in Agent Ford's Affidavit that would establish the actual meaning of the tip and the presence or absence of good faith, instead characterizing the defense requests as a "fishing expedition."[8] Nor has the Court required the government to disclose whether the FBI believed that the user of the Sanders family's IP address had actually viewed child pornography on the ▮▮▮▮ website, or had merely visited the website a single time, without proof of taking the additional affirmative steps required to locate and view child pornography. While counsel is mindful of the Court's prior admonitions, it is respectfully submitted that Mr. Sanders is entitled to have his constitutional claims decided by this Court, and by the Fourth Circuit should this case proceed to an appeal, on a complete and accurate factual record. Counsel further submits that unless the factual record is supplemented and clarified, this case can only result in post-conviction proceedings. *See Brown v. Booker*, 622 F. Supp. 993, 995 (E.D. Va. 1985) ("it is important that an appellant's first level right to a ruling by the district judge not be forgotten or foreclosed") (quotations omitted).

Under these circumstances, the Court should resolve this fundamental factual issue and provide a clear record, both at this level and, if necessary, before the Fourth Circuit. Thus, Mr. Sanders respectfully requests this Court compel the production of evidence in the government's possession regarding whether, when seeking the search warrant, the FBI understood the FLA tip

---

[8] Special Agent Ford stated in his Affidavit that in August 2019, the FLA provided a tip to the FBI that stated that the Internet user had visited the Target Website and *named that website*, Affidavit at ¶ 23 ("In August 2019, a [FLA] . . . named and described . . . the TARGET WEBSITE"), but the government still has not produced a document from August 2019 that named the website or connected Mr. Sanders's IP address to ▮▮▮▮. *See infra*. The only document the government has produced mentioning ▮▮▮▮ was under a different operation name ("▮▮▮▮▮▮") that did not reference Mr. Sanders's IP address and was not produced by the FLA to the FBI until October 2019.

6

to state: (1) that Mr. Sanders merely visited a website once; or (2) that Mr. Sanders viewed child pornography on that website. Specifically, Mr. Sanders requests that the Court compel the government to produce (1) the complete tip communication (as opposed to the government's selective disclosure from its post-hoc characterization of the tip) that the FLA sent to the FBI, which identified the Sanders's IP address as one of many suspected of having visited the ▮▮▮ ▮▮▮ website (hereafter "the complete tip");[9] and (2) other case documents maintained in the FBI's main headquarters SENTINEL file that support Mr. Sanders's claims regarding the FBI's evidence of his online activity.

## REVIEW OF FACTUAL BACKGROUND AND SUPPLEMENT TO THE RECORD

In or around August 2019, the FLA provided the FBI with Intel Logs that included information about IP addresses whose users were alleged to have visited various target websites. These Intel Logs were provided as part of a larger group of documents (a.k.a., "the complete tip"). Indeed, during a call with defense counsel on March 10, 2021, the government acknowledged the existence of at least one additional document that accompanied the Intel Log in August 2019, which it nevertheless continues to withhold despite its clear obligation to produce that material under *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). *See* Ex. 1 (03/15/21 Discovery Letter) at 1-2.

---

[9] The complete tip includes, at minimum, the communication sent on or around August 19, 2019, that actually names the target website and explains what activity Internet users were alleged to have engaged in. Mr. Sanders has made repeated requests for this document. *See e.g.*, 03/15/21 Discovery Letter, attached as Ex. 1; 03/15/21 Email, attached as Ex. 2; 04/21/21 Discovery Letter, attached as Ex. 3; and 04/21/21 Email, attached as Ex. 4.

7

1. **The complete tip was part of a centralized FBI headquarters investigation.**

In September and November 2019, administrative subpoenas for information relating to Mr. Sanders's IP address were issued as part of a larger investigation run by FBI Headquarters ("HQ").[10] According to defense expert Anthony Ferrante, who before retiring from the FBI was detailed to the National Security Council, served as Chief of Staff for the FBI's Cyber Division, and originally joined the FBI as a Special Agent in the New York Field Office, the fact that FBI Headquarters issued the subpoenas signifies a much larger operation. As Mr. Ferrante explains, FBI HQ was conducting a larger investigation as part of case ID # 305A-HQ-3196371. FD-1057 (Dkt. 253-4) at 2; *see also* Ferrante Second Decl., attached as Ex. 5, at ¶¶ 12-15; *see also* "September Subpoena" (Dkt. 335-1).

According to Mr. Ferrante, "the administrative subpoena issued on September 10, 2019, was issued by Headquarters in reference to the larger [Headquarters] investigation." *Id.* at ¶ 14. As Mr. Ferrante states in his Declaration: "Headquarters would generally not run an investigation into a single individual potentially suspected of possessing or distributing child pornography;" instead, "Headquarters is typically responsible for providing programmatic, or leading and coordinating large-scale operations requiring national and//or international cooperation, including working with FBI Legal Attaches (LEGATs) and partner law enforcement agencies." *Id.* at ¶ 12. As Mr. Ferrante notes, "[t]he responsibility of FBI HQ is to provide strategic guidance and centralized coordination between the 56 Field Offices and 60 LEGAT offices." *Id.*

---

[10] The government delayed disclosing two of these subpoenas until March 2021, months after the Court's resolution of Mr. Sanders's motions to suppress.

2. **The Washington Field Office's investigation of the Sanders family's IP address was opened in response to the centralized FBI HQ investigation and therefore the HQ file would have information about the true meaning of the FLA's tip.**

The Washington Field Office "opened its case" into the Sanders family's IP address on January 17, 2020, when Agent Ford "submitted an electronic communication known as an 'EC' or 'FD-1057.'" (Dkt. 255-4). This occurred at least four months after FBI HQ initiated its investigation into the Sanders family's IP address and issued two administrative subpoenas to Cox, and after the FBI checked various FBI and public data bases with no pertinent results.[11] *See* FD-1057, at 2, (Dkt. 253-4). As Mr. Ferrante notes, "[t]his is significant because Special Agent Ford identified multiple databases in which he queried and stated there was nothing "pertinent," such as an FLA lead, or any documentation surrounding the alleged suspicious or illegal activity." Ferrante Second Decl. at ¶ 18.

The Washington Field Office case regarding IP address 98.169.118[.]39 was opened in reference to a pre-existing case file managed by FBI Headquarters, which had already been assigned Case ID# 305A-HQ-3196371 and was opened on or prior to September 10, 2019. Special Agent Ford's opening EC for IP address 98.169.118[.]39 lists "305A-HQ-3196371-▮▮▮ Serial 44" as a "Reference," and also refers to "305A-HQ-3196371-SBP Serial 257." The letters "HQ" in that case number signify that FBI HQ was responsible for managing the case file. The phrase "▮▮▮▮▮" in "305A-HQ-3196371-▮▮▮ Serial 44" refers to the specific "▮▮▮▮" sub-file of that case file managed by headquarters. Serial 44 refers to the 44th document in the "▮▮▮▮" subfile. The letters "SBP" in "305A-HQ-3196371-SBP" typically refer to the

---

[11] The FBI had issued a second administrative subpoena to Cox on November 21, 2019, seeking the subscriber information for 291 different IP addresses, including the IP address associated with the Sanders's family home. These IP addresses were provided as part of the complete tip the FLA sent the FBI.

"Subpoena" subfile of the case file.  Serial 257 refers to the 257th document added to the "Subpoena" subfile of the case file.  See Ferrante Second Decl. at ¶ 11.

The WF case focusing on IP address 98.169.118.39 was assigned case ID #s 305I-WF-322401 and 305G-WF-322401, FD-1057, at 1, (Dkt. 253-4).  The letters "WF" "indicate that a particular investigation is being run out of the FBI's Washington Field Office" ("WF"), not FBI HQ.  The WF case was opened in reference to and as a "spin-off" of the larger investigation run by FBI HQ (305A-HQ-3196371).  Ferrante Second Decl. at ¶ 12.  The relationship between the cases is reflected in "Special Agent Ford's FD-1057 [which]. . . lists '305A-HQ-31█████ Serial 44' as a 'Reference' . . . and also refers to '305A-HQ-3196371 – SBP Serial 257.'"  *Id.* at ¶¶ 11, 12.

FBI records management policy requires that records follow a specific "file classification system," in which "[i]nvestigative and intelligence documents relating to specific cases, as well as significant administrative documents appropriate for distribution to other divisions and offices, are serialized in relevant case files."  *See* FBI Records Management Policy Guide, attached as Ex. 6, at 14; *see also* Ferrante Second Decl. at ¶ 7.  The FBI's Records Management User Manual requires that "[e]ach document placed in an investigative case file must be numbered in sequence," and that Sentinel—the FBI's case management system— "automatically" assigns "sequential numbers" as documents are "imported or created within the central recordkeeping system."  *See* FBI Records Management User Manual, attached as Ex. 7, at 11, available from https://vault.fbi.gov/records-management-user-manual-may-2015/records_management_user_manual_may_2015_part_01_of_01.  Subfiles are created within a main case file to "aid in the organization and administration of a substantive case which has become voluminous or complex . . . Supervisory approval is necessary and should be obtained

10

before opening" a subfile. *Id.* at 11. Because Agent Ford's FD-1057 references "305A-HQ-3196371 – ▮▮▮▮ Serial 44" and "305A-HQ-3196371 – SBP Serial 257," it is clear that there were already, at minimum, Serials 1 through 44 in the '▮▮▮▮' subfile [within the HQ case file], for a total of at least 44 documents, and there were already, at minimum, Serials 1 through 257 in the 'SBP' (Subpoena) subfile, for a total of at least 257 documents. See Ferrante Second Decl. at ¶ 11. Thus, at that point, the FBI HQ case or investigation had already become "voluminous." Ex. 7 (FBI Records Management User Manual) at 11.

Importantly, none of the three "tip" documents the government produced is serialized or accompanied by an FBI 302 containing the document's source information or the date it was received by the FBI, as required by the FBI's SENTINEL record-keeping system. *See* Ferrante Decl. at ¶ 16.[12] This, and Agent Ford's reference to "Serial 44" in his Opening EC (FD-1057), strongly suggest that the three purported tip documents were NOT the basis for opening a case against Mr. Sanders. Furthermore, the "Reference" line in Agent Ford's Opening EC refers to a single serialized document (▮▮▮▮ Serial 44), not to the three purported "tip" documents the government produced. FD-1057, at 1, (Dkt. 253-4). Given the deviation from FBI standard record-keeping procedure, and Agent Ford's failure to reference the three "tip" documents in his Opening EC, the government should be ordered to disclose whether the three "tip" documents were uploaded into SENTINEL; whether the three "tip" documents were ever serialized and, if so, their serial numbers; departures from standard FBI record-keeping procedures; and whether Agent Ford relied on additional documents and information in drafting the Opening EC. Lastly,

---

[12] Notably, the third purported "tip" document was produced by the government in an editable format, *i.e.*, the date fields in the document automatically updated each time the document was re-opened. That is presumably why the version of the document the government produced was dated July 27, 2020 (the date it was sent to the defense) instead of October 25, 2019 (the date the government claims it was sent from the FLA to the FBI).

11

the Court should order the government to immediately produce, *inter alia*, "Serial 44," all 302s referencing the "tip" documents, and all documents purportedly connecting the Sanders's IP address to the ▇▇▇▇ website that have not been produced.

In light of the voluminous HQ file regarding this same operation, the defense has asked the prosecutors if they had reviewed that file for Rule 16 and *Brady* information pertaining to Mr. Sanders and, if not, whether they intended to do so. On March 10, 2021, the prosecution informed defense counsel that they had not reviewed the HQ case file and refused counsel's request to do so. As discussed below, the government's refusal to examine the FBI's files for exculpatory evidence directly violates its disclosure obligations under *Brady* and *Kyles*.

3. **The complete tip document and other HQ case file documents would show that Agent Ford knew or should have known that the FLA was *not* communicating that the user of the Sanders family's IP address viewed illegal content via the Tor website ▇▇▇▇.**

In his January 17, 2020, FD-1057 (the case opening report for the Sanders family's IP address), Agent Ford summarized the FLA's tip as follows: "*In August 2019*, the FBI received information . . . that the FLA identified a user who *accessed* ▇▇▇▇ using IP address 98.169.118.39, on May 23, 2019, at 02:06:48 UTC." FD-1057, at 2, (Dkt. 253-4) (emphasis added). However, according to the documents the government has produced, the FLA had not reported any connection between the IP address user and ▇▇▇▇ in August 2019. Indeed, the FLA had not even reported a connection between the IP address and TOR. *See, e.g.*, Intel Log (Dkt. 253-1) (no allegation that TOR or the TOR website ▇▇▇▇ was involved). Thus, unless there were other communications between the FLA and the FBI linking Mr. Sanders's IP address to the ▇▇▇▇ website, the FBI could not have known in August 2019 that the FLA was alleging that the user had visited any TOR website, let alone one called ▇▇▇▇.

On February 10, 2020, Agent Ford submitted the Affidavit in support of the search warrant for the Sanders family's home. In that Affidavit, Agent Ford stated that, "*[i]n August 2019*," the FLA provided the FBI with information that the user of Mr. Sanders's IP address had "accessed online child sexual abuse material" and "*that the FLA named* and described as the TARGET WEBSITE." Aff. ¶ 23. Agent Ford's Affidavit is proof that the FBI received additional information in August 2019 that both identified the Sanders's IP address, and named the ▮▮▮▮ website. And yet, the government has not produced any document from August 2019 naming ▮▮▮▮ as the target website or even mentioning the TOR network.

Furthermore, at least four times in the Affidavit, Agent Ford demonstrated his true understanding that the FLA's "tip" meant, at most, that a user of the IP address had merely "accessed" (*i.e.,* visited) the ▮▮▮▮ website and not any illegal content on the website. Aff. ¶¶ 6, 24, 29, and 30 (emphasis added). His sworn statements were clearly based on the complete tip document(s) that the government is still refusing to produce.

In addition, the government has since admitted that it does not know whether the user of the IP address ever viewed or attempted to view illegal material. *See* Transcript of Proceedings, September 11, 2020, attached as Ex. 9 at 25 (MR. CLAYMAN: "Admittedly, we don't know precisely what the content is, but we have never claimed to know exactly what it is, or exactly the definition of child pornography under the United States Code. We also never claimed that the tip alleges that he downloaded that content. All the tip says is that he accessed content on this site and that we know that this site is dedicated to child pornography.").

Thus, the complete tip will undoubtedly establish that when Agent Ford applied for the search warrant, the FBI had *no* evidence that the user of IP address 98.169.118.30 had ever visited, or attempted to visit, any of the ▮▮▮▮ pages that may have contained illegal content.

13

*Compare* Homepage Screenshot (Dkt. 176-1), Announcements Screenshot (Dkt. 176-4), Registration Screenshot (Dkt. 241-1), and Login Screenshot (Dkt. 241-2) *with* Aff. ¶¶ 6, 29, 30 *with* Aff. ¶ 23.[13] Those pages would have only been available to a registered user who logged-in and took several additional affirmative steps to view such content. Because that evidence is contrary to what Paragraph 23 of the Affidavit suggested and what this Court originally found, as well as Agent Ford's lack of good faith, it is *Brady* material that the government is duty-bound to produce.

4. **Agent Obie's affidavit in support of the criminal complaint and arrest warrant further supports the existence of an additional tip document that made clear that the user of the Sanders family's IP address was only suspected of having briefly accessed (i.e. visited) the ▮▮▮▮▮▮▮▮ website on a single occasion.**

On March 19, 2020, Agent Obie submitted an affidavit in support of the criminal complaint and arrest warrant that further supports the existence of an additional tip document. Dkt. 4. In describing how the Sanders family's IP address became a law enforcement target, Agent Obie explained that the "FBI, *in conjunction with other law enforcement entities*, is investigating *websites* on which visitors *can* access and view child sexual abuse material." *Id.* at ¶ 9 (emphases added). According to Agent Obie, "the FBI received information" through an "investigation" conducted "in conjunction with" "other law enforcement entities," "that on or about May 23, 2019, an individual connected to the Internet through a specific [IP] address and *accessed* [a specific] website." *Id.* at ¶ 9 (emphasis added). Agent Obie did not say that Mr. Sanders was suspected of actually viewing or attempting to view child pornography, only that he was suspected of having *accessed* a website. *Id.* at ¶ 9. The complete tip must therefore show

---

[13] The government's failure to timely disclose this information led this Court to incorrectly conclude that the Special Agent's addition of "'via a website' adds no information because it is obvious that the FLA's original tip describes an internet user's activity on a website." Memorandum Opinion at 10, (Dkt. 73).

14

that the FLA told the FBI that users were only alleged to have accessed a website called ▮▮▮▮, not viewed illegal content via ▮▮▮▮.

In opposing Mr. Sanders's motion for revocation of the detention order, the government similarly represented to the Court that Mr. Sanders had only accessed the ▮▮▮▮ website, not that he had viewed or attempted to view illegal content on ▮▮▮▮. Specifically, the government stated that Mr. Sanders "came to the government's attention after *an investigation conducted by the* [FBI] *and other law enforcement entities* revealed that an individual *accessed a website* that advertises child pornography." Gov't Opp'n, at 2 (Dkt. 15) (emphases added). *But see* the Homepage Screenshot which does not advertise child pornography. (Dkt. 176-1); *see also* Schoen Decl., attached as Ex. 8, at ¶¶ 44-77 (explaining numerous ways Internet users *can* visit TOR websites without intending to view a particular site or knowing what they will find on a particular site). Again, that representation could only have been based on the complete tip from the FLA that the government has still not produced. The Court should not permit a repeat performance of the government's untimely disclosure of the exculpatory screenshots.

5. **The recently filed criminal complaint in *United States v. David Corwin* further demonstrates that there are additional documents comprising the FLA's tip that the government has not produced.**

On March 23, 2021, the government filed a criminal complaint in *United States v. David Corwin*, Case No. 2:21-cr-00218-JS (E.D.N.Y., March 23, 2021). Paragraph 3 of the Complaint states:

> "In or around August 2019, the FBI received information from a foreign law enforcement agency regarding an internet user, who, on or about April 27, 2019, utilized the IP Address 69.124.30.198 to access a website on the dark web that was called "▮▮▮▮" This site is known by law enforcement to host child pornography."

*Id.*, 2:21-cr-00218, Dkt. 1.

15

The Complaint in *Corwin* clearly stemmed from the same FLA tip as this case and *accurately* reflects what the FLA told the FBI in August 2019—namely, that the FLA named ▇▇▇▇ as a TOR website in August 2019 and suspected that users had accessed the site, but nothing more. Dkt. 354-2 ¶ 3. The August 19, 2019 Intel Log the government produced to Mr. Sanders, by contrast, does not mention TOR or ▇▇▇▇ and therefore can only be a portion of the FLA's complete tip. Dkt. 253-1.

## DISCUSSION

**I. THE GOVERNMENT CONTINUES IMPROPERLY TO WITHHOLD EXCULPATORY EVIDENCE THE COURT SHOULD HAVE HAD WHEN DECIDING THE SUPPRESSION MOTION.**

**A. The government has possession of the complete tip document.**

The government has never produced any document from the FLA connecting Mr. Sanders's IP address to the TOR website ▇▇▇▇—period.[14] For the reasons previously stated, the complete tip document is material to Mr. Sanders's suppression motion and necessary to the Court's ruling. The Court should therefore compel the government to produce it. *See United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010) (evidence is material if it would "enable[] the defendant significantly to alter the quantum of proof in his favor," including by suppressing the evidence against him, or if it "will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.").

The government's possession of the complete tip document has been established for at least four reasons. First, Agent Ford's Affidavit states that this document exists. Specifically,

---

[14] The government's incomplete and post-hoc characterization of the "tip"—which combines three documents from different operations ("▇▇▇▇▇▇▇▇▇▇" vs. "▇▇▇▇▇▇▇▇▇▇")—is not the complete tip.

16

the Affidavit states, "*[i]n August 2019, . . . the FLA named and described [ ] the TARGET WEBSITE*." (emphasis added). Aff. ¶ 23.[15]

Second, the only document the government has produced from August 2019, is the Intel Log (Dkt. 253-1), that does not name the target website—or any website. Neither of the two additional FLA documents the government produced connected the Sanders's IP address to ▮▮▮ or states that a user of the IP address visited ▮▮▮.[16] Accordingly, the government must be withholding additional information from the FLA tip which reflected the FLA's belief that Mr. Sanders's IP address was used to "access" ▮▮▮.

Third, the criminal complaint recently unsealed in *United States v. David Corwin* further demonstrates that the FLA sent the FBI a communication that alleged a connection between the targeted IP addresses and ▮▮▮ in August 2019. Case No. 21-CR-00218-JS (E.D.N.Y., March 23, 2021).

And fourth, the government has itself admitted there was another document during a conference with the defense subsequent to Mr. Sanders's filing, and the Court's denial, of the third Motion to Compel.

---

[15] The Affidavit stated that "disclosure of the name of the website would potentially alert *active website users* to the investigation." Aff. at 9, n.1 (emphasis added). That could not have been true in February 2020 if the FLA actually seized the computer server hosting ▮▮▮ in June 2019, as the Affidavit stated, Aff. ¶ 15. If the foregoing were true, ▮▮▮ would not have had active users in February 2020. Thus, the Affidavit was either false and misleading in this respect, or referred to a different website.

[16] *See* August 19, 2019 Intel Log (Dkt. 253-1), September 16, 2019 FLA Letter (Dkt. 253-2), and October 25, 2019 FLA Report (Dkt. 253-3). The FLA Report names a different operation ("▮▮▮") than the Intel Log ("▮▮▮").

17

### B. The Court should compel the government to produce the complete tip document.

Throughout this case, the government has made inconsistent representations to this Court about the information the FLA provided to the FBI and withheld vital discovery until after the Court ruled on Mr. Sanders's motion to suppress. The government's tactics have led this Court to issue factually inconsistent and inaccurate rulings based on an incomplete record regarding what the tip meant and what Agent Ford believed. This Court should not permit the government to continue to conceal evidence that would undermine the bases for this Court's previous rulings. Importantly, the evidence that the government has withheld is evidence that the defense has no other way of obtaining and is necessary to create an accurate and complete record should this case proceed to an appeal, or should Mr. Sanders file a petition pursuant to 28 U.S.C. § 2255.

A finding that visiting a TOR website called ▮▮▮▮▮ one time is enough for probable cause, without evidence that the user had viewed (or attempted to view) illegal content, or even had a prior interest in child pornography, constitutes a significant contraction of the Fourth Amendment. The defense has found no other case that has gone so far. If that is indeed the Court's ruling, it should be made on an accurate and complete record. The government should either be ordered to produce the requested material, or, in the alternative, to provide it to the Court for *in camera* review.[17]

### C. The government must be compelled to comply with its most fundamental discovery obligations and review the FBI HQ case file for material and exculpatory information.

To date, the government has refused to review the FBI's HQ case file. The prosecution's willful failure to learn of and disclose exculpatory information that may exist in the FBI's

---

[17] See also Dkt. Nos. 38, 48, 58, 64, 88, 137, 140, 176, and 241, incorporated herein by reference.

possession violates its most fundamental discovery obligations.  *See Kyles*, 514 U.S. at 437*; see also Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 558 (4th Cir. 1999) (concluding that the duty to learn of exculpatory information is an "independent" one, separate and apart from "the adversarial part of the prosecutor's responsibilities.").  Accordingly, this Court should order the government to review the HQ file for information relevant to Mr. Sanders's Fourth Amendment claims and either produce such material or submit it to this Court for *in camera* review.

## CONCLUSION

For all of the reasons stated, this Court should enter an Order directing the government to produce the complete tip the FLA provided to the FBI as well as any other exculpatory or discoverable documents in the FBI Headquarters file.  In the alternative, this Court should order the government to produce the material for *in camera* review.  This is precisely the "atypical" *Brady* case where the government has not turned over the exculpatory material. Mr. Sanders has met the low bar of making "'some plausible showing' that exculpatory material exists," *United States v. King*, 628 F.3d 693, 702-03 (4th Cir. 2011), and has satisfied the requirement that the defendant "identify the requested confidential material with some degree of specificity," and is not based on "[m]ere speculation," *United States v.* Savage, 885 F.3d 212, 221 (4th Cir. 2018).

                                                           Respectfully submitted,

                                                               */s/*
                                       Jonathan Jeffress (#42884)
                                       Jade Chong-Smith (admitted *pro hac vice*)
                                       KaiserDillon PLLC
                                       1099 Fourteenth St., N.W.; 8th Floor—West
                                       Washington, D.C.  20005
                                       Telephone: (202) 683-6150
                                       Facsimile: (202) 280-1034
                                       Email: jjeffress@kaiserdillon.com
                                       Email: jchong-smith@kaiserdillon.com

                                        */s/*
                              Nina J. Ginsberg (#19472)
                              Zachary Deubler (#90669)
                              DiMuroGinsberg, P.C.
                              1101 King Street, Suite 610
                              Alexandria, VA  22314
                              Telephone: (703) 684-4333
                              Facsimile: (703) 548-3181
                              Email: nginsberg@dimuro.com
                              Email: zdeubler@dimuro.com

                              *Counsel for Defendant Zackary Ellis Sanders*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August 2021, the foregoing was served electronically on the counsel of record through the U.S. District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

                              */s/ Jonathan Jeffress*
                              Jonathan Jeffress