# Exhibit 1



1099 14TH ST. NW
8TH FLOOR WEST
WASHINGTON, DC 20005
(202) 640-2850
WWW.KAISERDILLON.COM

March 15, 2021

**VIA ELECTRONIC MAIL**
Mr. Jay Prabhu and Mr. William G. Cayman
Assistant United States Attorneys
United States Attorney's Office for the Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA  22314
Jay.Prabhu@usdoj.gov and William.G.Clayman@usdoj.gov

       Re: *United States v. Zackary Ellis Sanders*, 1:20-cr-00143

Dear Jay and Bill,

      We are writing to clarify and supplement our prior requests for discovery pursuant to Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963).

      The government has previously produced the following three documents from the Foreign Law Enforcement Agency ("FLA") whose "tip" allegedly formed the basis for the search warrant in this case:  1) the Intel Log (provided to the FBI on August 19, 2019), 2) the FLA Letter (provided to the FBI on September 16, 2019), and 3) the FLA Report (provided to the FBI on October 25, 2019).  You had previously represented that there are no other documents relevant to the FLA's tip with respect to the Sanders family's IP address (98.169.118.39).  In a phone call on March 10, 2021, however, the government conceded that there were additional documents sent from the FLA to the FBI, including a cover letter to the Intel Log, as well as additional packets of Intel Logs relating to other IP addresses.

      We have repeatedly conveyed our belief that additional documents exist that are relevant to the basis for the search warrant.  Consequently, we have retained experts with significant experience working for the FBI to opine on the kinds of information that FBI agents following FBI protocols and practice would be expected to have in their possession, custody or control in order to obtain a search warrant such as the one for the Sanders family's home.  Based on their representations, we write to reiterate and clarify certain of the previous requests we made regarding: (1) the "tip" from the FLA; (2) the reliability of the technique used by the FLA to de-anonymize/identify the Sanders family's IP address (along with the IP addresses of many other users); (3) the target website; (4) the FBI's failure to corroborate the FLA's "tip"; (4) the information Special Agent Ford knew or should have known about the state of the government's

1

evidence and the reliability of the technique used by the FLA to de-anonymize/identify the Sanders family's IP address; and (5) other documents required to prepare for trial.

As previously indicated, we are making these requests based on information that the defense has obtained with the assistance of defense expert Anthony Ferrante, Senior Managing Director and Global Head of Cybersecurity at FTI Consulting. *See* Declaration from Anthony Ferrante, attached as Ex. I.  As the attached declaration from Mr. Ferrante demonstrates, these are materials that have been in the government's possession from the inception of this case. There are also materials that should have been if standard FBI policies and practices were followed.

**Additional correspondence between the FLA and the FBI**

The government has never denied that additional correspondence took place between the FLA and the FBI regarding ▓▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓, or the target website.  Nor has the government ever denied that additional documents exist regarding the state of the government's evidence about the Internet user's activity or the technique that was used to identify the Internet user; it has only denied that the additional documents are material to Mr. Sanders's defense.  Indeed, in a phone call between Ms. Ginsberg and the government on March 10, 2021, the government finally conceded, for the first time, that the initial tip document the FBI received on August 19, 2019, the Intel Log, was accompanied by a cover sheet, as well as a larger packet of other Intel Logs pertaining to other IP addresses.  That is additional information that constitutes the FLA's tip that is required for the Court to understand the context in which information about the Sanders family's IP address was provided:  that this was a large-scale operation regarding ▓▓▓▓▓▓ and potentially other Tor sites and that the FLA was only attempting to generally describe the activities of a large number of IP addresses, rather than describe specific content that the user of IP address 98.169.118.39 viewed or downloaded.

**Information about a defined process for information-sharing between the FLA and the FBI**

FBI Legal Attaches ("LEGATs") are stationed overseas to "build[] relationships with law enforcement, intelligence, and security services" internationally, including in the FLA country. An FBI LEGAT office in the FLA country was "established through mutual agreement" with that country.  *Overseas Offices*, Federal Bureau of Investigation, https://www.fbi.gov/contact-us/legal-attache-offices.  The FBI LEGAT office in the FLA country conducts "[I]nternational liaison and information sharing" based on "FBI policies, and interagency agreements."  *Id*.

Based on our current knowledge of FBI information-sharing and record-keeping protocols, we now believe that there was a "defined process" that governed the terms of the information sharing between the FBI and FLA in this case.  Ex. I at ¶ 9.  This would likely have been memorialized in documentation, such as a Mutual Legal Assistance Treaty ("MLAT") and/or Memorandum of Understanding ("MOU").  *Id.* at ¶ 24(a).

2

**Additional case file documents**

We understand that FBI record-keeping protocols required the creation of additional documentation concerning IP address 98.169.118.39, the residents of the Sanders family's home, and the "tip" documents. *Id.* at ¶¶ 17-25. We also believe that the FBI would have been required to generate additional documentation bearing directly on probable cause (lack of probable cause) for the search warrant. *Id.* at ¶ 25.

Any information that could be seen as undermining the Court's probable cause finding is *Brady* and must therefore be produced. For example, if the FBI did not know what technique was used to identify the Sanders family's IP address, that is *Brady* information because the government cannot then vouch for the reliability of the identification or the lack of interference with a U.S. computer. If the FBI did know what technique was used, as Dr. Richard Clayton previously explained, it was either a Network Investigative Technique that required interfering with a U.S. computer, or it was a passive traffic analysis technique that does not produce a reliable identification based only on a single purported visit to a website. The FBI knows well that no law enforcement agency has ever used the global passive adversary technique and that it is a purely hypothetical method based on much less mature versions of the Tor Browser.

We now know that the investigation into the Sanders's family's IP address (98.169.118.39) was officially opened on January 17, 2020, when Special Agent Ford drafted and submitted the case opening electronic communication (also known as an "opening EC" or "FD 1057"). *See* Special Agent Ford's FD 1057 ("FD 1057") at 1; *see also* Ex. I at ¶ 10. The investigation of IP address 98.169.118.39 was assigned two case IDs, 305I-WF-4222401 and 305G-WF-4222401, which shows that it was run by the Washington Field Office ("WF"). *Id.* at ¶ 10. What happened between August 19, 2019, and up until January 17, 2020, was not done in reference to a specific investigation into IP address 98.169.118.39 by WF but was part of a much larger case or investigation run by FBI Headquarters ("HQ"). *Id.* at ¶¶ 11-12.

We also now understand that the investigation of IP address 98.169.118.39 was opened in reference to a larger case or investigation, case ID ████████████, run by HQ and that ████ was a specific sub-file of that larger HQ case or investigation. *Id.* at ¶ 11. The fact that HQ was running this larger case or investigation is significant because HQ will "provid[e] programmatic guidance" or "lead[] large-scale operations requiring national and/or international coordination, including working with FBI Legal Attaches (LEGATs) and partner law enforcement agencies." *Id.* at ¶ 12. HQ's responsibility is "to provide strategic guidance and centralized coordination between the 56 [FBI] Field Offices and 60 LEGAT offices." *Id.* at ¶ 12. That includes the FLA country.

Information in the documents the government did provide makes it clear that the larger HQ case/investigation already contained at least 44 documents (Serials) by the time the WF opened the case for IP address 98.169.118.39. Ex. I at ¶¶ 11, 17. The Reference and Serial Numbers in the WF FD 1057 prove that the WF case into IP address 98.169.118.39 was opened after Headquarters opened the larger case/investigation and that the WF case was opened in reference to that larger case/investigation. *Id.* at ¶ 12. That echoes what the FBI did in Playpen, where HQ ran the larger investigation and separate leads were disseminated to field offices to

3

limit the amount of information that would be disclosed in individual cases, including to conceal the international scope of the investigation from defense teams and from courts. You can find the reference to "▇▇▇▇▇▇ - ▇▇▇▇▇ Serial 44" in the FD 1057. FD 1057 at 1 (emphasis added); Ex. I at ¶ 11. ▇▇▇▇ Serial 44" is the 44th document in the ▇▇▇▇ sub-file of the HQ investigation).

"▇▇▇▇▇▇▇▇▇ - SBP" is a designation for another specific sub-file that contains all of the subpoenas issued as part of that larger HQ investigation, and other related documents. FD 1057 at 2 (emphasis added); Ex. I at ¶ 12. The reference to "▇▇▇▇▇▇▇ – SBP 257" proves that the HQ "SBP" sub-file already contained at least 257 documents (subpoenas and related returns or other documents) by January 17, 2020. FD 1057 at 2 (emphasis added); Ex. I at ¶¶ 12, 17. The administrative subpoena that FBI Headquarters issued to Cox Communications on September 10, 2019, was clearly issued as part of that larger HQ investigation, rather than part of the WF investigation into IP address 98.169.118.39 and was not particularized to Mr. Sanders. Ex. I at ¶¶ 15-16, 18.

**Subpoenas and returns**

We further understand that the subpoena return that the government filed as an exhibit (ECF No. 101-1), was not received by the FBI until after January 17, 2020, and is a return in reference to at least a second subpoena, but not the earlier subpoena that HQ issued on September 10, 2019. Because the earlier subpoena referenced in Special Agent Ford's FD 1057 was issued by HQ on September 10, 2019, we know that the information provided by Cox Communications in response to that subpoena was received earlier than the return that the Government filed as an exhibit (ECF No. 101-1).

The return that the Government filed as an exhibit (ECF No. 101-1) must have been provided to the FBI sometime between February 20 and February 26, 2020, given that the subpoena return references a January 29, 2020 bill, which was paid on February 19, 2020, but the balance due is listed as $0.00, and there is no reference to the subsequent bill that was issued on February 27, 2020. See Page 2 of subpoena returned filed as ECF No. 101-1, attached as Ex. II. That indicates that the January 29th balance had already been paid, which it was, through autopay, on February 19, 2020. See Cox Communications Billing Documents, attached as Ex. III. Given that the January 29, 2020 bill referenced in the subpoena return was paid on February 19, 2020, and the subpoena return did not yet reflect the new bill that was issued on February 27, 2020, Cox Communications must have provided these results between February 20, 2020 (after the January 29th bill was automatically paid), but before February 27, 2020 (when a new bill was issued). Ex. III. We previously requested both the administrative subpoena referenced in Special Agent Ford's FD 1057 and the return that was received before Special Agent Ford submitted the FD 1057. We have received neither despite the fact that copies of subpoenas are routinely produced as part of Rule 16 discovery. We therefore request the administrative subpoena that HQ issued to Cox Communications on September 10, 2019, and the subsequent return. We also request any administrative subpoena that resulted in the return received sometime after February 19, 2020, filed as Gov't Ex. 1 to ECF No. 101.

**Mr. Sander's requests**

For the reasons stated above and in Mr. Ferrante's declaration, we request that the following additional FBI documents be provided:

*Serials and Electronic Communications*

1. The cover sheet and additional (redacted) packets and/or other intelligence reports that accompanied the August 19, 2019 Intel Log, which the government conceded existed in a phone call on March 10, 2021.
2. ▇▇▇▇▇▇ Serial 1 (the opening EC for the larger investigation referenced in Special Agent Ford's FD 1057).
3. ▇▇▇▇▇▇ Serials in the main case file and subfiles mentioning "98.169.118.39" and/or information about Risa Sanders, the Sanders family home, Zackary Sanders, or Jay Sanders.
4. ▇▇▇▇▇▇ - ▇▇▇▇ Serial 44 (the 44th document in the ▇▇▇▇ subfile, which is referenced in Special Agent Ford's FD 1057).
5. ▇▇▇▇▇▇ – ▇▇▇▇ Serials containing IP address "98.169.118.39."
6. ▇▇▇▇▇▇ – ▇▇▇▇ Serials containing information about Risa Sanders, the Sanders family home, Zackary Sanders, and/or Jay Sanders.
7. ▇▇▇▇▇▇ – SBP Serials containing IP address "98.169.118.39."
8. ▇▇▇▇▇▇ – SBP Serials containing information about Risa Sanders, the Sanders family home, Zackary Sanders, and/or Jay Sanders.
9. ▇▇▇▇▇▇ – SBP Serial 257 (the 257th document in the "SBP" subfile, which is referenced in Special Agent Ford's FD 1057).

*305I-WF-322401*

10. All Serials from the main case file and any sub-files.

*305G-WF-322401*

11. All Serials from the main case file that have not been provided, including but not limited to Serials 4, 9, 14, 15, 20, 24, 25, 30, and 32.
12. All Serials from any sub-files that have not been provided, including but not limited to those in 305I-WF-3222401-SBP, including Serials 1, 2, 3, 4, and 5.

*Additional electronic communications and serials*

13. The serials and case file numbers to which the three "tip" documents were assigned. If the three "tip" documents were not assigned serials or case numbers, that is *Brady* information to which Mr. Sanders is entitled, because it would show there is "no documented chain of evidence" for the three "tip" documents to show that they "were in fact provided to the FBI from the [FLA] or that they are connected to the investigation into IP address 98.169.118[.]39." Ex. I at ¶ 20.
14. Additional electronic communications and serials within FBI databases and/or partner agencies that contain IP address "98.169.118.39."

5

15. Additional electronic communications and serials identifying device identification codes associated with IP address "98.169.118.39," including MAC address and device types.
16. Additional information provided by the FLA to the FBI identifying or referencing IP address 98.169.118.39, including the presence or absence of log data and device identifying information.
17. All information as to what databases the FBI searched/had access to that revealed that there was no evidence that the IP address 98.169.118.39 had engaged in suspicious or illegal activity at the time Special Agent Ford submitted the FD 1057. *See* FD 1057 at 3 ("FBI database queries for IP address 98.169.118.39 revealed nothing pertinent"); *see also* Ex. I at ¶ 21 ("In this case, there was nothing 'pertinent', such as a FLA lead, or any documentation surrounding the alleged suspicious or illegal activity").

*Information-sharing between the FBI and the FLA*

We also request the documentation (*e.g.* MLATs and/or MOUs) used as the basis for the receipt and sharing of information between the U.S. and the FLA country/FLA that led to IP address 98.169.118.39 becoming a target of law enforcement investigation.

\*\*\*

Please let us know no later than March 17, 2021 whether you intend to produce the requested materials. If you do intend to produce the materials, please do so no later than March 19, 2021. Otherwise, we intend to file a motion to compel. Thank you for your courtesy.

Sincerely,

Jonathan Jeffress

Nina Ginsberg

*Counsel for Zackary Ellis Sanders*

Exhibits to Letter Available Upon Request