***PUBLIC VERSION***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  v.<br><br>ZACKARY ELLIS SANDERS,<br><br>        Defendant. | Case No. 1:20-cr-00143<br><br>The Honorable Judge Ellis<br><br>Hearing: August 27, 2021<br><br>Trial: October 19, 2021 |

**REPLY TO THE GOVERNMENT'S OPPOSITION TO MR. SANDERS'S MOTION TO SUPPLEMENT THE RECORD AND RENEW HIS MOTION TO COMPEL EXCULPATORY MATERIAL OR, IN THE ALTERNATIVE, TO SUBMIT <u>EXCULPATORY MATERIAL FOR *IN CAMERA* REVIEW</u>**

Zackary Ellis Sanders, by and through counsel, respectfully submits this Reply to the Government's Opposition to his Motion to Supplement the Record and Renewed Motion to Compel or, in the Alternative, for *In Camera* Review ("Renewed Motion").

In its Opposition, the government again dodges the fundamental issues Mr. Sanders's Renewed Motion presents regarding the need for further discovery, including the new evidence from the criminal complaint in *United States v.* ▬▬▬▬▬ and from Anthony Ferrante's Second Declaration. In doing so the government misrepresents not just the plain meaning of the tip from the foreign law enforcement agency ("FLA"), *but the tip's very language*, so as to obscure the obvious fact that the FLA was not referring to accessing illegal content in its tip, but merely to visiting the website itself. The government states that Mr. Sanders "refuses to accept that [the FLA] identified the user of his IP address accessing child exploitation abuse material *on the Target Website*. To date, he has not explained why the statement in the tip that the user of his IP address *accessed online child sexual abuse material on the Target Website* can only be

interpreted to mean the exact opposite." Gov't Opp'n at 2 n.1 (emphases added); *see also id.* at 6 (noting "the tip's statement that [the Internet user] accessed child abuse and exploitation material *on the site...*") (emphasis added).

The problem for the government, however, is that the FLA's tip does not state that the Internet user *did anything* "on the Target Website" (or any other website). Gov't Opp'n at 2 n.1. As the government well knows, the FLA tip describes *the visiting* of a website, not any activity once there. It was only when Agent Ford misleadingly characterized the FLA tip in the Affidavit by adding the words "via a website" that the tip describes activity on a website. *Compare* Intel Log *with* Affidavit ¶¶ 23, 24. Mr. Sanders's position is further confirmed by the criminal complaint (Dkt. 1) from *United States v.* ▮▮▮▮▮ Case No. ▮▮▮▮▮ March 23, 2021)—which, having been sworn out on March 23, 2021, well after the November 20, 2020 filing of Mr. Sanders's last motion to compel on this issue, is indisputably new evidence justifying reconsideration of the Court's prior ruling.

## DISCUSSION

I.  **The Government's Opposition falsely characterizes the FLA tip, which did not refer to activity "on a website."**

The first purported tip document (which is undated, but the government represents as having been transmitted to the FBI on August 19, 2019) states as follows:

> On 2019-05-23 02:06:48 UTC 98.169.118.39 was used to access online child sexual abuse and exploitation material, with an explicit focus on the facilitation of sharing child abuse material (images, links and videos), ▮▮▮▮▮
> ▮▮▮▮▮ Users were
> required to create an account (username and password) in order to access the majority of the material.

Intel Log (Dkt. 253-1). While the government has declined to ever say what the FBI understood the above tip to mean, in its Opposition the government continues to urge the

2

Court to reject any view of the tip that does not involve the Internet user viewing illegal content, notwithstanding the insurmountable evidence to the contrary.

The interpretation of the tip that the government has urged upon the Court is wrong—and the government knows it. That the FLA tip is merely describing the accessing of a website—as opposed to any specific content on that website—is patently obvious for many reasons. Those reasons include (1) the third purported tip document (Dkt. 253-3), which makes it clear that "online child sexual abuse and exploitation material" is how the FLA describes *the target website* itself, as opposed to any particular content on the target website that the Internet user purportedly viewed; (2) the recently filed criminal complaint in *United States v.* ███ where the FBI accurately stated the import of the FLA tip, as opposed to both regurgitating a portion of the tip without qualification—while also significantly altering its meaning by adding "via a website"—so as to mislead the reviewing court; and (3) every other reference to the Internet user's alleged activity in Agent Ford's Affidavit, which uniformly describe accessing a website, and not any kind of content. Affidavit ¶¶ 6, 24, 29, 30.

### A. The third purported tip document compels the conclusion that the Intel Log is referring only to accessing a website.

First, the FLA's "Intelligence Report" (the third purported tip document), in describing *a website* in the same way that Agent Ford's Affidavit Paragraph 23 describes what the Internet user purportedly accessed, makes abundantly clear that when the Intel Log uses the term "online child abuse and sexual exploitation material," it is referring to an entire website. The Intelligence Report states as follows:

> *This site* had an explicit focus on the facilitation of sharing child abuse material (images, links and videos), ███████████████████ Users were required to create an account (username and password) in order to access the majority of the material.

3

Intelligence Report (Dkt. 253-3) (emphasis added); *see also* Affidavit ¶ 24 (using the same language from the Intel Log to describe the target website itself, not any specific content the Internet user was alleged to have viewed).

There is only one minor textual difference between the Intelligence Report's description of the target website and the initial tip from the Intel Log: the words "[t]his site had an explicit focus" at the beginning of the first sentence of the Intelligence Report are replaced in the Intel Log by a statement that a specified IP address "was used to access online child sexual abuse material, *with an* explicit focus. . . ." Intel Log (Dkt. 253-1) (emphasis added).

That the FLA was using the phrase "online child sexual abuse and exploitation material" synonymously with "[t]his site" is clear not just from the minor difference in wording (though not minor in meaning) between the first and third purported tip documents, but also by the remaining text of the Intel Log itself. It makes no sense to state that a user accessed material "with an explicit focus on the facilitation of sharing child abuse material (images, links and videos)" if the FLA intended to communicate that the user actually viewed illegal images or videos. *Id.* The words that follow "an explicit focus" do not describe what the Internet user actually saw on a website; they describe a website itself. Nor does it make sense for the next sentence of the Intel Log to state what "[u]sers were required to do" if the tip is describing the accessing of images or videos; websites have users, images and videos do not. The Intel Log's discussion of an "explicit focus" and "[u]sers" is plainly inconsistent with the reading of the tip the government continues to urge upon this Court.

The Intel Log is only comprehensible when one substitutes "the target website" or "██████" for "online child sexual abuse and exploitation material." That reverses the substitution

4

the FLA itself made, presumably in order to avoid revealing the name of the target website in that document. Moreover, it results in a coherent "tip" that—as the government well knows—was what the FLA intended to communicate in the first place:

> On 2019-05-23 02:06:48 UTC 98.169.118.39 was used to access [**the Target Website, a website**] with an explicit focus on the facilitation of sharing child abuse material (images, links and videos), ███████████████████████████████████████████████ Users were required to create an account (username and password) in order to access the majority of the material.

The above analysis, which is based on simple common sense and the few other documents the government has produced to the defense, *see, e.g.,* Criminal Complaint (Dkt. 4) at ¶ 9 (Agent Obie alleging only that the Internet user "accessed a website"), amply demonstrates that Mr. Sanders is *not* speculating in his argument that (1) the FBI understood that the tip described accessing a website only; and (2) there are further communications—including the FLA "cover memo" the government admits to possessing—demonstrating that Mr. Sanders's interpretation is the correct one.

Indeed, that the above analysis is not "speculative" is crystal clear from the fact that Agent Ford presented the *exact same* interpretation of the FLA tip in the Affidavit itself. Paragraph 24 of the Affidavit states:

> The FLA *described the website* as having 'an explicit focus on the facilitation of sharing child abuse material (images, links and videos), ███████████████████████ stated that '[u]sers were required to create an account (username and password) in order to access the majority of the material,' and provided further documentation naming the website as the TARGET WEBSITE.

Affidavit ¶ 24 (emphasis added). Thus, Agent Ford's own words reflect his understanding that the term "child sexual abuse and exploitation material" in the Intel Log referred to the website itself, and not to any specific illegal content on the website.

5

In addition, in language directly relevant to Mr. Sanders's instant motion to compel, Agent Ford wrote that the FLA "provided further documentation naming the website as the TARGET WEBSITE." *Id.*  Again, as noted, the government has never produced any document from the operation that contains Mr. Sanders's IP address and that also names the target website as ▮▮▮▮ (or any other website).[1] This is precisely the kind of material that is clearly in the government's possession but that it is refusing to produce to the defense.

### B. The criminal complaint from the recent case of *United States v.* ▮▮▮▮ further corroborates the defense's position.

In discussing the recently-filed criminal complaint from *United States v.* ▮▮▮▮ the government itself acknowledges—for the first time—the limited import of the information the FLA imparted to the FBI.  In the ▮▮▮▮ complaint, the FBI *accurately* conveyed the

---

[1] The government incorrectly asserts that Mr. Sanders "acknowledges that the FLA identified the user of his Internet Protocol ("IP") address accessing a child pornography hidden service." Gov't Opp'n at 2, n.1.  The defense has repeatedly explained that the only document that mentions Tor or names the target website, the FLA's October 25, 2019 Intelligence Report (Dkt. 253-3), relates to a different operation ("▮▮▮▮▮▮▮▮▮▮") and "does not state that [the IP address associated with Mr. Sanders's family home] created or accessed the five images or videos identified in the Report." Memorandum Opinion (Dkt. 73) at 4.  Nor does it mention the IP address at all.  The government initially described that Intelligence Report as merely providing "contextual information related to the FLA's tip," rather than constituting part of the tip. Gov't Opp'n (Dkt. 43) at 5.  Neither that Report nor any other document connects the IP address associated with the Sanders family's home to any website at all, much less ▮▮▮▮. *Cf.* Gov't Opp'n (Dkt. 43) at 1 (claiming that "an IP address was used to access [material] on May 23, 2019, *on a site hosted on The Onion Router*") (emphasis added); Gov't Brief (Dkt. 53) at 1 (claiming that the tip stated that "an IP address was used to access [material] *on a website hosted on The Onion Router*.") (emphasis added).

meaning of the exact same FLA tip,² averring that 

Dkt. 321-1 at ¶ 3 (emphasis added). Notably, the FBI in ▓▓ did not seek a search warrant based on the FLA's tip, as it is obvious that, when read correctly, the tip does not constitute probable cause. Instead, the agents visited the defendant's house and conducted a consensual

---

² The government rightly does not deny the obvious fact that the ▓▓ case emanates from the same operation as Mr. Sanders's case. *See* Gov't Opp'n at 4 (assuming that ▓▓ "stems from the same larger investigation as this one"). The government's representation that it could not confirm this fact, *id.* (stating that the prosecutors are "not privy to the details of that case"), however, is nonsense. As other parts of the government's pleading make clear, the government is actively monitoring and even intervening in other cases, including Mr. Sanders's lawsuits under FOIA, *id.* at 6, n.4, in order to prevent Mr. Sanders from obtaining further information that will undermine the government's representations to this Court about the FLA tip and other matters. The government's professed ignorance of the circumstances underlying ▓▓ is entirely consistent with the prosecutors' efforts throughout this case to maintain plausible deniability of any fact that might favor Mr. Sanders. As noted elsewhere, this persistent pattern of willful blindness does not comport with the government's obligations under *Brady*. *See, e.g., Long v. Hooks*, 972 F.3d 442, 469 (4th Cir. 2020), *as amended* (Aug. 26, 2020) ("Indeed, '[w]hen police or prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight.'" (quoting *Banks v. Dretke*, 540 U.S. 668, 675–76 (2004)); *see also Douglas v. Workman*, 560 F.3d 1156, 1181 (10th Cir. 2009) (per curiam) (petitioner satisfied due diligence requirement where "agents of the State prevented the facts underlying the claim from becoming known when they failed to turn over . . . undisclosed evidence"); *Jean v. Collins*, 221 F.3d 656, 661 (4th Cir. 2000) ("police knowledge is plainly imputed to the prosecution for purposes of the prosecutor's *Brady* duties").

³ Notably, the government in the unsealed ▓▓ complaint publicly listed the name of the target website as ▓▓ notwithstanding the prosecution's repeated representations to this Court about the potential repercussions of publicly disclosing the name of the website. Memorandum in Support of Motion for Order to Show Cause (Dkt. 171) at 5 (describing the name of the target website as "highly sensitive" and alleging that disclosure of the name of the target website "seriously jeopardizes other ongoing investigations and prosecutions involving crimes against children and the United States' cooperative relationship with the FLA and other foreign agencies.").

interview, during which Mr. ▬▬▬ admitted to possessing child pornography and granted the agents permission to search his electronics.

The government here denies that Agent Ford knew (or should have known) what the agents in ▬▬▬ clearly understood: that the FLA tip was only meant to communicate the FLA's belief that a number of Internet users had accessed *the website*. But Agent Ford did know, as his own Affidavit and internal report make clear. *See infra* at 9-10. Indeed, the government here—for the first time—has acknowledged its awareness that the tip *did not* mean that the FLA had evidence of the Internet user accessing (*i.e.,* viewing) illegal content. Instead, in discussing ▬▬▬ the government notes that the complaint "does not contradict *the tip's suggestion* that the user of his IP address accessed child sexual abuse and exploitation material on the Target Website[.]" Gov't Opp'n at 5 (emphasis added).

The government's admission that the tip *merely suggests* the Internet user *may have* accessed illegal content represents the first time the government has acknowledged the truth at the core of Mr. Sanders's Fourth Amendment claim: that the FLA tip did not mean that the Internet user had accessed child pornography, but merely that the Internet user went to the website, one time, so that there is *a possibility*, however remote, that he did so on that one occasion.[4] Having had countless opportunities to be candid with the Court about this issue prior to now, the government's concession is an important step. The problem, however, is that Agent Ford did not tell the Magistrate that possession of child pornography was merely "suggested" by the tip. To the contrary, Agent Ford represented that the FLA stated that Mr. Sanders "had

---

[4] However, "an Internet user could have gotten a link to the Target Website from a search engine or from another source and *clicked on it without knowing any or all of the content that they would find on a particular page*. . . . In this case, it appears that the Target Website contained many different pages, and a user visiting the home page wouldn't see those pages without navigating to them." Decl. of Seth Schoen (Dkt. 256-7) at ¶¶ 65, 67 (emphasis added).

8

accessed" such material "via a website," when he knew (or should have known) that the FLA meant something considerably less. Affidavit ¶ 23. Agent Ford's embellishment of the FLA tip was a material misrepresentation of the government's evidence regarding the only allegation in the Affidavit linking the Internet user to any criminal activity, and, when corrected, what remains is simply that the Internet user visited an unknown portion of the target website a single time at one particular second (2019-05-23 02:06:48 UTC). FD-1057 (Dkt. 253-4) at 2.

> C. **Agent Ford's own statements support the view that the FLA had evidence, at most, only of the Internet user visiting the website.**

To the extent any more was needed, Agent Ford's own Affidavit and his opening Electronic Communication (FD-1057) clearly support Mr. Sanders's position. As the Court is already aware, while Paragraph 23 of the Affidavit further distorts the FLA tip by adding the misleading language "via a website," Affidavit ¶ 23, other parts of the Affidavit accurately characterize the true meaning of the FLA's tip. Paragraphs 6, 29 and 30 of Agent Ford's Affidavit all characterize the Internet user's activity as merely "access[ing] the TARGET WEBSITE." Affidavit ¶¶ 6, 29, 30. Paragraphs 6, 29, and 30 similarly make clear that the Agent knew better than to repeat the FLA's tip from Paragraph 23 without stating, as he should have, that visiting the website was all the evidence the FLA believed it had. *Id.* Agent Ford averred in Paragraph 6, in relevant part, "that a user of the Internet account at the SUBJECT premises *accessed the TARGET WEBSITE*." Affidavit ¶ 6 (emphasis added). He averred in paragraph 29:

> Accordingly, based on my training and experience and the information articulated herein, *because accessing the TARGET WEBSITE required numerous affirmative steps by a user—including downloading Tor software, accessing the Tor network, finding the web address for the TARGET WEBSITE, and then connecting to the TARGET WEBSITE via Tor*—it is extremely unlikely that any user could simply stumble upon the TARGET WEBSITE without understanding its purpose and content.

9

Affidavit ¶ 29 (emphasis added).[5]  Agent Ford does not state in Paragraph 29 that the Internet user had "accessed online child sexual abuse and exploitation material" because he knew that—contrary to what Paragraph 23 said—neither the FLA nor the FBI had any such evidence.

In paragraph 30, similarly, Agent Ford averred, "[f]or all the reasons described herein, I submit that there is probable cause to believe that any user who *accessed the TARGET WEBSITE* has, at a minimum knowingly accessed the TARGET WEBSITE with intent to view child pornography, or attempted to do so."  Affidavit ¶ 30 (emphasis added); *but see* Decl. Seth Schoen (Dkt. 256-7) at ¶¶ 48-77 (Explaining how people can stumble across web sites, including on Tor, without knowing what they will contain).  Thus, here again, the Agent described the limits of the government's evidence as "access[ing] the TARGET WEBSITE with *intent* to view child pornography, or *attempt[ing] to do so,*" and not as viewing any illegal content.  Affidavit ¶ 30.

Finally, Agent Ford's own January 2019 internal report also stated that the extent of the activity was that the Internet user "accessed ▬▬▬▬ FD-1057 (Dkt. 253-4) at 2.  On January 17, 2020, less than a month before submitting his February 10, 2020 Affidavit, the Agent authored an internal report (FD-1057) describing his understanding of the Internet user's activities.  The

---

[5] Contrary to what this Court has incorrectly concluded, the steps required to download and use the Tor Browser are not complicated, suspicious, or uncommon.  Instead, they are perfectly legitimate.  *See, e.g.,* Department of Justice Office of the Inspector General, Audit Division, *Audit of the Federal Bureau of Investigation's Strategy and Efforts to Disrupt Illegal Dark Web Activities* i, 1, 2 (Dec. 17, 2020), available from https://oig.justice.gov/reports/audit-federal-bureau-investigations-strategy-and-efforts-disrupt-illegal-dark-web, attached as Ex. 1 ("[A]ccessing the dark web [(*i.e.,* Tor)] is not illegal. . . [M]any users access the dark web for legitimate purposes, including to discuss socially sensitive matters or counter censorship in oppressive areas of the world. . . For example, major press outlets, social media, and other mainstream organizations maintain sites on the dark web. . . Tor was originally developed by the U.S. Naval Research Laboratory in the mid-1990s to provide anonymity to U.S. military personnel.  Today, the non-profit Tor Project, Inc., maintains and develops the Tor software and is partially funded by the U.S. government."); *see also* Decl. of Seth Schoen (Dkt. 256-7) at ¶¶ 21-47 (explaining the many legitimate reasons people for using Tor and how easy it is to download and use).

Agent stated:  "In August 2019**,** the FBI received information from [the FLA]. . . that [the] *FLA identified a user who accessed* ▮▮▮▮ using IP address 98.169.118.39, on May 23, 2019, at 02:06:48 UTC."  *Id.* at 2 (emphasis added).  In other words, the Agent reported that the Internet used had "accessed ▮▮▮▮ only on a single date (May 23, 2019) for a single second (2:06:48 UTC).  *Id.* at 2.

The government argues that Agent Ford simply repeated what the tip said, which has led the Court to do the same.  *See* 2020/07/13 Hearing Tr. (Dkt. 253-13) at 23 ("MR. CLAYMAN: . . . . what we put in the search warrant affidavit is essentially a verbatim quote from the tip."); Memorandum Opinion (Dkt. 113) ("Paragraph 23 . . . simply repeats, essentially verbatim, the tip from [the FLA].").  While that is incorrect—the Agent misleadingly added the words "via a website"—it also confuses the inquiry:  *the issue is not what the tip literally said, it is what the FBI understood it to actually mean.*  Under no interpretation of the case law is law enforcement permitted to mislead the Magistrate with a third-party tip (even from a foreign law enforcement agency) that the government understands materially overstates the incriminating character of the evidence.  The government is well aware of this.  The FBI obviously understood the tip to represent far less than the meaning the government is seeking to foist on the Court in these proceedings, and the Court should accordingly resolve this factual dispute in accordance with its duty to do so.

The government correctly points out what the defense also noted in its Renewed Motion: that the Court has issued an alternative ruling based on the Internet user visiting the website alone, and not viewing any illegal content.  *See* Gov't Opp'n at 7.  But even the government does not deny that the government's alternative ruling presents a radically different issue under the Fourth Amendment.  Nor does the government deny that it is within the government's knowledge and ability simply to tell the Court what actually happened here, *i.e.*, what Agent Ford understood the

11

tip to mean. The only reason the government does not do so is because it benefits from confusion over this issue and, if this case proceeds to an appeal, will continue to do so. That is not a sufficient basis for the Court declining to resolve this critical factual dispute.

**II.     The fact that the Court has concluded that merely visiting the innocuous homepage of a target website just once is sufficient for probable cause does not relieve the government of its discovery obligations so long as it continues to argue that the FLA tip meant that there was evidence of the Internet user viewing illegal content via a target website.**

The government appears to be avoiding its obligation to produce relevant discovery based on the Court's previous ruling that there is no Fourth Amendment difference between merely visiting any portion of a website, including only a non-descript and innocuous homepage, on the one hand, and actually registering an account, logging in, and taking additional affirmative steps to view possible child pornography on that site, on the other. That is an upside-down approach to the government's most sacred discovery obligations and precisely why, to the extent the government has additional relevant evidence, it must at least provide that evidence to the Court for *in camera* review. *United States v. King*, 628 F.3d 693, 703 (4th Cir. 2011).

It should be undisputed that the government cannot both urge the Court to conclude that Mr. Sanders viewed illegal content on a website while simultaneously withholding evidence from the defense suggesting he merely visited some unknown page on that website. That would not only be improper, but would constitute prosecutorial misconduct. Va. Sup. Ct. R. PT 6 2 RPC 3.3 ("Candor Toward the Tribunal"). And yet, the government's Opposition reflects the disturbing possibility that the government is doing precisely that. *See, e.g.,* Gov't Opp'n at 7. If the Court does nothing else, it should ensure that the government is not using the Court's prior statements concerning probable cause as a basis for the government withholding discovery that would show

that the FBI well know that the FLA was not intending to communicate that it had evidence of Mr. Sanders actually viewing child pornography.

**III.     The Court should order the government to search for and produce the relevant evidence it and/or the FBI admittedly possess.**

Given the obvious credibility issues with the government's continued insistence that the FBI understood the FLA tip to mean that Mr. Sanders accessed illegal content, the remaining issue is what additional evidence within the government's possession, custody, or control is relevant to resolving this material dispute. There is no question that the government possesses further evidence on the FBI's contemporaneous understanding of the FLA tip; while the government disputes certain of Mr. Sanders's representations regarding a March 2021 discussion with defense counsel, for example, it does not deny telling defense counsel that there was a cover memo transmitted with the first tip document that remains in the government's possession. *See* Gov't Opp'n at 4-5. Furthermore, there is little other explanation why, for example, the FBI agents in ▇▇▇ knew that the tip meant only that Mr. ▇▇▇ IP address was used merely "to access a website on the dark web that was called ▇▇▇ Dkt. 321-1 at ¶ 3, instead of any illegal content, unless the agents were basing that conclusion on additional information from the FLA the government has not produced here. Agent Obie himself—the affiant underlying the criminal complaint in this case—has said that all the tip communicated was that a user of the Sanders family's IP address had "accessed a website that is known to law enforcement to advertise child pornography." Affidavit in Support of Criminal Complaint (Dkt. 4) at ¶ 9; *but see* Screenshots (Dkt. 174-1, 174-4, 241-1, 241-2) (screenshots of the homepage and three other pages do not advertise child pornography).

In addition, the government's critique of Anthony Ferrante's Second Declaration, which makes plain that the FBI must possess further material relevant to the violation of Mr. Sanders's

13

Fourth Amendment rights, is utterly unconvincing. First, the government's argument that Mr. Ferrante is somehow not qualified to opine on the content of the FBI's case files is frivolous. With respect to his qualifications on cyber issues, Mr. Ferrante formerly served as the Director for Cyber Incident Response at the U.S. National Security Council at the White House. Dkt. 427-5 at 8-9. Prior to that, Mr. Ferrante was Chief of Staff of the FBI's Cyber Division. He has deep and lengthy experience working on cyber operations. Given his extensive experience working with the FBI and on cyber operations in particular, the government's claim that the Court should reject his declaration because he has "no clear experience in online child sexual abuse investigations," Gov't Opp'n at 2, is meritless. Indeed, other than casting meritless aspersions on his credibility, the government does not dispute a single aspect of Mr. Ferrante's detailed declaration regarding what records are in the FBI's possession.[6]

    Mr. Ferrante's declaration makes abundantly clear that the FBI possesses additional evidence relevant to Mr. Sanders's Fourth Amendment claims, including but not limited to additional case file documents in both the larger, FBI Headquarters case file that pre-dated the FBI's investigation of Mr. Sanders's IP address, as well as in the case file specific to Mr. Sanders's IP address. Dkt. 427-5 at ¶¶ 19-20. Mr. Ferrante's declaration also raises concerns that the three purported "tip" documents are not referenced in the investigation of the Sanders family's IP address. *Id.* at ¶ 17. "At the time Agent Ford opened the investigation" into the Sanders family's IP address, he "identified multiple databases in which he queried and stated there was nothing 'pertinent,' such as an FLA lead, or any documentation surrounding the

---

[6] The government's approach to Mr. Ferrante's declaration stands in marked contrast to the way in which the government disputes the content of the March 10, 2021 phone call with defense counsel. This further demonstrates that the government knows that it cannot reasonably dispute the content of Mr. Ferrante's declaration.

14

alleged suspicious or illegal activity." *Id.* at ¶ 18.  Furthermore, the "absence of technical evidence (e.g., network traffic logs, named images or videos, et cetera.) to corroborate the tip suggests . . . that there was no . . . information . . . that a specific IP address viewed, downloaded, or uploaded specific illegal files." *Id.* at ¶ 21.

### IV.    The Court should hold the noticed hearing on this motion.

For all the above reasons, and other reasons previously stated in Dkt. 38, 48, 58, 64, 88, 137, 140, 176, 241, and 315, this Court should hold a hearing on this motion on the date noticed by the defense.  *See, e.g., United States v. Budziak*, 697 F.3d 1105, 1112-13 (9th Cir. 2012) (holding that it was "an abuse of discretion for the district court to deny [the defendant] discovery on the EP2P program," reasoning that "criminal defendants should not have to rely solely on the government's word that further discovery is unnecessary.").  Of particular concern is the government's apparent position that it can simultaneously argue that Mr. Sanders viewed content on the target website, while withholding (or refusing to review the FBI's files for) evidence undermining that assertion.  That erroneous aspect of the government's position is itself more than sufficient to require a hearing on Mr. Sanders's motion.

Respectfully submitted,

_____/s/_____
Jonathan Jeffress (#42884)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C. 20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com

_____/s/_____
Nina J. Ginsberg (#19472)
Zachary Deubler (#90669)
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
Telephone: (703) 684-4333
Facsimile: (703) 548-3181
Email: nginsberg@dimuro.com
Email: zdeubler@dimuro.com

_____/s/_____
Mark J. Mahoney (admitted *pro hac vice*)
Harrington & Mahoney
70 Niagara Street, 3rd Floor
Buffalo, New York 14202-3407
Telephone: 716-853-3700
Facsimile: 716-853-3710
Email: mjm@harringtonmahoney.com

_____/s/_____
H. Louis Sirkin (*pro hac vice* pending)
600 Vine Street, Suite 2700
Cincinnati, OH 45202
Telephone: (513) 721-4450
Facsimile: (513) 721-0109
Email: hls@santenhughes.com

*Counsel for Defendant Zackary Ellis Sanders*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August 2021, the foregoing was served electronically on the counsel of record through the U.S. District Court for the Eastern District of Virginia Electronic Document Filing System (ECF) and the document is available on the ECF system.

*/s/ Jonathan Jeffress*
Jonathan Jeffress