1

```
                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
                           Alexandria Division

UNITED STATES OF AMERICA,        :
                                 :       Criminal Case
                Plaintiff        :       No. 20-CR-00143-TSE
                                 :
        v.                       :
                                 :
ZACKARY ELLIS SANDERS,           :       October 15, 2021
                                 :       11:25 a.m.
                Defendant        :
.............................    :       ......................

                  TRANSCRIPT OF PRETRIAL CONFERENCE
                 BEFORE THE HONORABLE T.S. ELLIS, III
                    UNITED STATES DISTRICT JUDGE


 APPEARANCES:

  FOR THE PLAINTIFF:          SETH SCHLESSINGER
                              JAY V. PRABHU
                              WILLIAM CLAYMAN
                              U.S. ATTORNEY'S OFFICE
                              2100 Jamieson Avenue
                              Alexandria, VA  22314
                              (703) 299-3700

  FOR THE DEFENDANT:          NINA J. GINSBERG
                              DiMURO GINSBERG, P.C.
                              1101 King Street
                              Suite 610
                              Alexandria, VA  22314
                              (703) 684-4333

                              JONATHAN STUART JEFFRESS
                              JADE CHONG-SMITH
                              KAISER DLLON, PLLC
                              1099 14th Street, NW
                              8th Floor West
                              Washington, DC  20005
                              (202) 640-2850

                              (APPEARANCES CONTINUED ON NEXT
                              PAGE.)
```

```
 1    FOR THE DEFENDANT:          HENRY LOUIS SIRKIN
                                  SANTEN & HUGHES
 2                                600 Vine Street
                                  Suite 2700
 3                                Cincinnati, OH  45202
                                  513-721-4450
 4

 5    OFFICIAL COURT REPORTER:    REBECCA STONESTREET, RPR, CRR
                                  U.S. District Court, 9th Floor
 6                                401 Courthouse Square
                                  Alexandria, Virginia  22314
 7                                (240) 426-7767

 8
                             ( Pages 1 - 65)
 9

10
            COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1
     COURTROOM CLERK:  Court calls criminal case United

2
States of America versus Zackary Ellis Sanders, Case Number

3
2020-CR-143.  May I have appearances, please, first for the

4
Government.

5
     MR. SCHLESSINGER:  Good morning, Your Honor.

6
Seth Schlessinger, Bill Clayman, and Jay Prabhu for the

7
United States.

8
     THE COURT:  Good morning to you all.  And who is here

9
for the defendant?

10
     MS. GINSBERG:  Good morning, Your Honor.

11
Nina Ginsberg, Jonathan Jeffress, and Jade Chong-Smith for

12
Mr. Sanders.  And also present is Louis Sirkin, whose motion for

13
*pro hac vice* is still pending before this court.

14
     THE COURT:  Yes.  I will of course sign that *pro hac*.

15
And there is no limit, in my view, on the number of lawyers who

16
can represent a defendant.  However, there are limits on who can

17
appear and where.

18
     First, only one lawyer will be able to address the

19
Court on any particular argument, only one lawyer will examine a

20
witness or object to questions asked of that witness.  One

21
lawyer, not several.  But I don't care if you want to switch it

22
around.  But you're going to have to have social distancing at

23
the seats as well, so you can't all sit there during the trial.

24
     MS. GINSBERG:  Judge, maybe I can be a little helpful.

4

1    Mr. Mahoney, who has previously been admitted, will not be

2    present at trial.  He was admitted for the purpose of the autism

3    evidence.  The Court has excluded that evidence, so it's not

4    necessary for him to be here.

5         THE COURT:  But my point is, Ms. Ginsberg, it's fine

6    for you to have as many lawyers all over the country if you

7    want.  I don't care about that.  But you can't all participate.

8    In other words, I'm not going to have more than one lawyer for

9    each witness and more than one lawyer for each argument.

10        MS. GINSBERG:  I understand that.  We were hoping to

11   get some assistance from the Court.  The Government has

12   identified three agents or forensic experts to -- what appears

13   to be, to introduce evidence regarding the six victims.  They

14   have not indicated which agent is going to introduce evidence

15   with respect to -- it's got to be at least four of the victims.

16   Two are on the Government's witness list and will be present.

17        The volume of material is so large, we have divided

18   amongst the lawyers primary responsibility for each individual

19   victim.  We don't know - and the Government has not answered any

20   of my emails requesting this information - which agent is going

21   to testify about which victim.  So we are essentially unable to

22   prepare for one lawyer to examine or cross-examine one witness

23   because we don't know which --

24        THE COURT:  They're not bound to do that, though.

25        MS. GINSBERG:  Judge, what we're saying is, the volume

5

1    of material with regard to the victims is so voluminous that no

2    one lawyer representing Mr. Sanders is able to prepare to

3    cross-examine with respect to each victim.  It would be

4    different if the victims were coming to court.  We have divided

5    the two that are coming to court.  We've divided those up.  But

6    if the Government --

7                THE COURT:  And you've listed four.

8                MS. GINSBERG:  No, the Government has.

9                THE COURT:  Did you list any victims?

10               MS. GINSBERG:  We are not calling any victims,

11   Your Honor.

12               THE COURT:  All right.  They were listed.

13               MS. GINSBERG:  They were previously listed, but they've

14   been removed.

15               THE COURT:  All right.  So you're not calling any.  The

16   Government has listed two.

17               MS. GINSBERG:  They've listed two, but there are six

18   victims.  And they are going to introduce evidence -- as it

19   appears from their exhibit list and their witness list, they are

20   going to introduce evidence about the remaining four, who will

21   not be present in the courtroom, through three different agents.

22               THE COURT:  I understand your request.  I'm not

23   inclined to get into the business of requiring one party or

24   another to tell me exactly what their scope of their examination

25   is going to be.  But let me think about that.

6

1          Let me go on.  I have an agenda that I want to get

2    done.

3          MS. GINSBERG:  I understand, Your Honor.

4          THE COURT:  And at the end, Ms. Ginsberg, I will say,

5    is there anything else you want to raise, and renew that request

6    at that time and I'll think about it.

7          MS. GINSBERG:  Thank you, Your Honor.

8          THE COURT:  All right.  I have covered the fact that

9    I've made clear that I have no problem or objection to however

10   many lawyers want to appear *pro hac* for the defendant.

11   However -- and that gives them access to the docket.  However,

12   if the clerk is directed by me to contact the defendant about

13   something, it's going to be you, Ms. Ginsberg.  And I do that

14   because you're the person with the most experience in this

15   courthouse, and you're the person who lives closest.  You're not

16   in Buffalo, Chicago, or wherever.  And if we need something, to

17   communicate something, then I don't want Ms. Randall to have to

18   go doing things.

19         MS. GINSBERG:  I'm very happy to do that, Your Honor.

20         THE COURT:  Yes, I'm glad.  Because I am going to do it

21   that way.

22         MS. GINSBERG:  I'm sure you are.

23         THE COURT:  All right.  Now, I'm going to review with

24   you the voir dire process.  I know Ms. Ginsberg may be familiar

25   with it from recent times.  Have you had a case in this

1    courtroom recently?

2          MS. GINSBERG:  I had a case in front of Judge Alston in

3    the courtroom, but not in front of Your Honor.

4          THE COURT:  Was what the MS-13 matter?

5          MS. GINSBERG:  No, Your Honor, that was another

6    child pornography case several weeks ago.

7          THE COURT:  Oh, all right.  I do recall he asked to use

8    this courtroom.

9          All right.  So let me review the process with you.  For

10   the time being, although the pandemic is winding down, we still

11   adhere to the rules of social distancing and masking.  When

12   you're otherwise than behind these partitions, then it's not

13   required.  Otherwise, it is required.

14         Now, we will do the voir dire -- I'm going to go

15   through the whole process with you.  We will do the voir dire

16   beginning Tuesday at 9 o'clock.  Not beginning Tuesday at 9:30,

17   but at 9:00.  And at that time we're going to have the voir dire

18   proceed in two phases, a morning phase and an afternoon phase.

19   And we do that because we can't fit all of the prospective

20   jurors in this courtroom with social distancing.  It's the

21   largest courtroom, and I have been trying cases for 34 years

22   here.  Not in this courthouse.  This courthouse hasn't been here

23   34 years, or this courtroom.  For many years I've been in this

24   courtroom and we're able to accommodate large numbers of people

25   for voir dire in this courtroom.  But we can't do it during the

1    pandemic because of social distancing requirements.

2            So we'll proceed at 9 o'clock and again at 1 o'clock.

3    I think I can complete the voir dire in that period of time.  At

4    least cases I've had in the last two weeks demonstrate that I

5    can do that.

6            Now, next, I will conduct the voir dire.  I will ask

7    all the questions.  And I think, Mr. Schlessinger, you were here

8    for the last pornography case that I tried here to a jury.

9            MR. SCHLESSINGER:  Yes, Your Honor, I was here as

10   recently as Tuesday.

11           THE COURT:  All right.  Now, I will conduct all the

12   voir dire.  I have reviewed your submissions and I will take

13   that into account.  However, I will do all the voir dire, and

14   I'm going to go into some detail now about how that will be done

15   mechanically.  But let me say that at the end of the voir dire,

16   I will ask you whether you have any further voir dire you want

17   me to conduct, and you can then look at what you've submitted

18   and tell me what you think you want to know.

19           I will tell you now that unlike other courts in other

20   jurisdictions -- and I have tried cases in North Carolina, the

21   Eastern District of New York, and other places, where they do

22   things very differently.  Indeed, I remember one matter in the

23   Eastern District of New York where the judge did not even want

24   to be present during voir dire, and another one where the judge,

25   who has now passed away - he's a famous person - he never did

1    come in in a robe.  Shirt sleeves and a jacket was the most.

2          Well, it's a big country and there's a wide variety of

3    people who inhabit this earth, and Ms. Ginsberg will tell you

4    what variety of people inhabit this courtroom.  I will do all

5    the voir dire.

6          Now, at the end of my voir dire I'll ask you if you

7    have any more, and at that point I will rule on anything that

8    you want to persist in asking for.

9          Now, there will be about 45 people in the courtroom

10   seated at social distances.  And, of course, you'll be here,

11   won't you, Ms. Ginsberg?

12         MS. GINSBERG:  Oh, absolutely.

13         THE COURT:  There was speculation whether you would be

14   here this morning.

15         MS. GINSBERG:  There was?

16         THE COURT:  There was.

17         MS. GINSBERG:  I maybe shouldn't ask why.

18         THE COURT:  No, you shouldn't.

19         MS. GINSBERG:  I won't.

20         THE COURT:  Anyway, the deputy clerk will call the

21   roll, so you'll have an opportunity to match a name with a face

22   when that person rises to indicate they're present.  They'll be

23   administered an oath and I will begin asking questions.

24         Now, for most of the questions, at the beginning they

25   will indicate they have an affirmative answer.  For example,

1    I'll ask them, have you previously served on a jury, a grand

2    jury or trial jury, on any state, federal, or local court, and

3    hands will go up.  The deputy clerk -- I'm sorry, not deputy

4    clerk.  The court security officer will take a microphone to

5    them, they will stand and they will answer the question with the

6    microphone.  And there will be a number of questions like that

7    that I'll ask.

8            For example, I'll point out -- who's going to be the

9    main person here?  You, Mr. Schlessinger?

10           MR. SCHLESSINGER:  Your Honor, I think it will be

11   either me or Mr. Clayman.

12           THE COURT:  All right.  I'll ask whether they or any

13   member of their family, so far as they know, know these people

14   or know this person, or any attorneys or employees of the

15   U.S. Attorney's Office.  And I'll do the same for each of the

16   firms involved.  And if hands are raised, the court security

17   officer will take the microphone to them, they'll answer, and

18   I'll do any follow-up.  That will cover a number of questions.

19           Then the second phase of the voir dire will be that

20   phase in which I ask questions that they will be permitted -- in

21   the usual case, before the pandemic, I would do it all at the

22   bench and they would give their answer in the relative privacy

23   of the bench and counsel to provide any personal information

24   they have to provide, and also to avoid having any knowledge or

25   information that might infect one juror from infecting them all.

1          And the way we'll do that is a little different.  The

2    questions -- I will ask the questions in a series of three, so

3    it won't be evident to anybody which question they have an

4    affirmative answer to.  If they do have an affirmative answer,

5    they'll be asked to come up, they'll take a seat in the witness

6    box - you can't see it clearly, there is a screen there - and

7    they will give their answers there wearing earphones and a

8    microphone.  And that will be heard only by counsel, the

9    defendant, and me, and the bench.  It won't be heard.  We also

10   have a noise machine here that we will activate so they won't

11   hear it.  And I'll also be reminding lawyers and the prospective

12   jurors to speak quietly into the microphone.

13          Now, then we will go through all of that voir dire.  At

14   the end of what voir dire, as I've told you, I will then ask you

15   if you have any further voir dire and I'll rule.  And I think

16   you can reasonably -- Ms. Ginsberg can reasonably anticipate

17   what those rulings will be.  I don't know whether you've read

18   some of the voir dire submitted by your colleagues,

19   Ms. Ginsberg, but you've had experience and know, I'm interested

20   in picking jurors who can render a fair and impartial verdict.

21   I'm not interested, as you would be -- and I understand your

22   interest.  You want to pick jurors who would be more favorable

23   to your clients.  That's your goal.  It isn't the Court's goal.

24   I want impartial jurors, that's all.

25          So you don't get to know who voted for Trump, who voted

 1    for Clinton, anything like that, what magazines do you subscribe

 2    to.  And I say this jokingly, because there are places where

 3    that's done.  I even have a dear friend who is no longer in this

 4    veil of tears who was a federal judge in Arizona, and he always

 5    let jurors ask questions, and he tried to persuade me to do the

 6    same thing.  He was a very persuasive man, he was a delightful

 7    person.  I liked him very much, although we had views very, very

 8    different.  So anyway, I did what he suggested, and I only did

 9    it once.  The result was horrendous.

10          Anyway, that's how we will do the voir dire.  At the

11    end I'll ask you if you have any further voir dire; I'll rule on

12    it then.  Then I'll ask you if you have any motions to strike

13    for cause, and I'll rule on those.  That will be the morning.

14          Then these 45 people will go to lunch and be told to

15    come back at 2 o'clock or thereabouts, or 3 o'clock we told them

16    last time.  They'll come back at 3:00 because that will give me

17    a chance to do the second 45 and get them on down the road.  And

18    after that's done, we hope, in the first day, to have picked a

19    jury.

20          Now, I will seat -- how long do you think your

21    case-in-chief will take, Mr. Schlessinger?

22          MR. SCHLESSINGER:  Your Honor, I estimate probably the

23    balance of next week.  That is, until Friday, I would estimate.

24          THE COURT:  Really?  All right.  That surprises me.

25    But then I was surprised at how long this last case you were in

1    took.

2         MR. SCHLESSINGER:  Yes, Your Honor.  I think it's

3    similar, maybe a little shorter, maybe only two full days of

4    evidence, which would have us rest on Thursday.  But I would

5    estimate, best estimate, resting sometime on Friday.

6         THE COURT:  All right.  Usually I hear other matters on

7    Friday, but next week I will hear this case.

8         All right.  So I will seat, then, 14 jurors, two

9    alternates.  That means the Government will have seven strikes

10   and the defendant will have 11.  You get one extra strike for

11   every two jurors.  And, of course, unlike a civil case, the

12   alternates will be identified and the order in which they were

13   named or called will be identified.

14        Now, Ms. Ginsberg, in the event that you are not here

15   or not the person who is doing this, here's what happens after

16   the motions to strike are ruled on and we are left with a panel

17   of eligible jurors.  We have a board, and the deputy clerk,

18   Ms. Randall, will call names at random.  She'll call 12 names

19   and they'll come up.  And you can't see it, but there are social

20   distancing places here in the jury box where they may sit.  And

21   you'll know because we'll do it out loud, "Mr. Smith,

22   Ms. Jones," and they'll come up and sit and you'll know the

23   order.

24        Then they'll be listed here.  There will be a little

25   piece of paper that's attached to this.  This will be taken

1    first to the Government; the Government will exercise its

2    strikes.  Now, you may exercise as many strikes as you wish on a

3    round, but you may not back-strike.  In other words, a juror who

4    survives a round cannot be stricken later on.

5         So if the Government strikes two people and the

6    defendant strikes three people, then those people will be told

7    to return to their seat in the courtroom, and then the deputy

8    clerk will call out five new persons to come and sit in

9    the...and when you exercise strikes, be sure to number them as

10   you do.  This will ensure that you don't think you have more

11   strikes than you have, and it will also enable the deputy clerk

12   and me to keep track of that.

13        So after 12 people are chosen, then Ms. Randall will

14   call two more names and those will be alternates.  If you have

15   strikes left, you can exercise against those too.  And

16   ultimately the two people who are chosen in addition to the 14

17   are the alternates, and they will serve, if necessary, in the

18   order in which they are selected.  And we will know that because

19   of the way we do it.

20        So that is how the jury selection will go.  Following

21   the jury selection, I will have preliminary instructions to the

22   jury.  No substantive instructions, only procedural

23   instructions.  Following that, there will be opening statements.

24        Who will make the opening statement?

25        MR. SCHLESSINGER:  I will, Your Honor.

15

```
1              THE COURT:  How long do you think you need for opening
2    statement?
3              MR. SCHLESSINGER:  I request 10 or 15 minutes.
4              THE COURT:  Ms. Ginsberg, who will do your opening
5    statement?
6              MS. GINSBERG:  That has not yet been decided.
7              THE COURT:  How long do you think whoever it is is
8    going to need?
9              MS. GINSBERG:  Certainly not in excess of 15 minutes.
10             THE COURT:  Good.  Those are both reasonable.  Okay.
11   And then we'll go to the witnesses.  And as I said, it doesn't
12   matter to me how many lawyers want to divide up witnesses.
13   That's fine with me.  That includes the Government.  You don't
14   have to do all of them, Mr. Schlessinger and Mr. Clayman,
15   although -- is that Mr. Prabhu over there?
16             MR. PRABHU:  It is, Your Honor.
17             THE COURT:  Well, he's not going to take any witnesses,
18   I'm sure.
19             Then we will hear the evidence.  I want to tell you
20   that we use a questionnaire for COVID.  Every prospective juror
21   has filled out a questionnaire for COVID.  And, Ms. Ginsberg,
22   you know about that, don't you?
23             MS. GINSBERG:  Yes, sir.
24             THE COURT:  And you know that jurors who answer "yes"
25   to questions 2 through 5 can't even come into the courthouse.
```

1    Either because they have it or they've been quarantined, or for

2    whatever reason, they can't come into the courthouse.  I don't

3    think we preclude people from coming into the courthouse if they

4    haven't been vaccinated, but we do preclude people from coming

5    into the courthouse if they have been exposed to COVID or they

6    have the symptoms.

7         I've forgotten what the five questions are.  I don't

8    think I have them here in front of me.  Here they are.  "Have

9    you been diagnosed with COVID-19?"  If they answer "yes," they

10   can't come in the courthouse.  "Have you been directed to

11   quarantine or isolate?"  If they say "yes," they can't come in.

12   "Have you experienced a fever or chills, persistent cough,

13   shortness of breath or difficulty breathing, a new loss of taste

14   or smell, or other flu-like symptoms?"  If the answer is "yes,"

15   they can't come in the courthouse.  "Have you resided with or

16   been in close contact with any person in the above-mentioned

17   categories?"  If they say "yes," they can't come in the

18   courthouse.

19        Now, I can tell you that 12 people answered "yes" to

20   that.  So they can't in the courthouse, and I've excused them.

21   Any objection to that on behalf of the Government?

22        MR. SCHLESSINGER:  No, Your Honor.

23        THE COURT:  Any objection on behalf of the defendant?

24        MS. GINSBERG:  No.  Your Honor, I would reserve an

25   objection in the event that we end up having a jury that is not

1    a fair cross section of the community.  But if that is not the

2    case --

3              THE COURT:  The ones we've excused for this are all

4    white.

5              MS. GINSBERG:  Oh, okay.  I didn't know that.

6              THE COURT:  Yes.  And there is a fair cross section.

7    That's reviewed.  A fair cross section of this area.

8              MS. GINSBERG:  Yes, sir.

9              THE COURT:  All right.  Now, for objections, in this

10   courtroom, the way in which you assert an objection to a

11   question is you stand, say "objection," but no speeches then.

12   If I need to hear from you on argument, we will go to the

13   earphones and the microphone and the noise machine.  In other

14   words, there will be no arguments by the Government or by the

15   defendant to the jury on objections.

16             In the years that I tried cases as a lawyer, I had

17   experiences where judges did not follow that, and the result was

18   what you might expect.  That's another reason why I don't allow

19   lawyers to conduct voir dire.  I too was subjected to that as a

20   lawyer, and -- at my age, I reminisce a lot.  I remember going

21   into a court in the western part of Virginia to try a case in

22   which my client was a large automobile manufacturer - I won't

23   identify it - but the problem was that they had been in a pickup

24   in the mountains in West Virginia, turned over, and a gear shift

25   lever went through the brain of the driver.  And I thought I had

1    a decent case.  I was wrong.  Because there had been five guys

2    in the front seat of this pickup truck; they had taken the gear

3    shift knob off the lever - wise - and they had had a lot of

4    beer.

5        So I thought, you know, this doesn't look that bad.

6    State case, state court.  And then we began the voir dire, which

7    was lawyer-conducted voir dire.  The plaintiff went first, and

8    the plaintiff, who was a very good plaintiff's lawyer from

9    Tennessee somewhere, he said, well, now, Ms. Ericson, you

10   wouldn't be prejudice against my client if he had had a few

11   beers before this, would you?  Whoa, wait a minute, I said.  The

12   judge said, never mind, son - I was young then - he says, you

13   can ask the question the other way around.  Well, I got home

14   cooked pretty badly that morning.

15       And later on, to finish this story quickly -

16   Ms. Ginsberg will tell you that's one of the disadvantages of

17   appearing before me, is sharing my reminisces - I was on a

18   judicial conference committee for the canopy committee, the big

19   committee for the rules of practice and procedure which

20   considers the various advisory committee rules, and I sat on

21   that committee for about six years toward the end of the 1980's.

22   And there was a fellow who was appointed to this committee who

23   had been Bill Clinton's lawyer, and he was a big advocate for

24   lawyer-conducted voir dire, as any trial lawyer would be.  You

25   want to do it because you want to persuade the jury in advance

1    that you are right.  And he and I squared off for about a year

2    and a half, and the result is what you see today in the rules of

3    civil procedure.  It's up to the judge, and I don't allow it.

4              MS. GINSBERG:  Judge, before you go on beyond

5    objections, I would like just some instruction.  If one of us

6    just stands up and objects and Your Honor makes a ruling, say,

7    denying my objection, how would you like us to be able to

8    preserve the basis for our objection for the record?  Because it

9    will be deemed waived if we --

10             THE COURT:  Remind me at the recess and I'll let you do

11   it in the absence of the jury.

12             MS. GINSBERG:  Thank you.

13             THE COURT:  But, you know...

14             MS. GINSBERG:  That's why I asked.  I understand the

15   Court's ruling, but I think we have to be able to preserve the

16   record.  And I have had objections waived because I didn't make

17   them clear on the record.

18             THE COURT:  Unless it's obvious.  If it's obvious,

19   don't take my time.

20             MS. GINSBERG:  Yes, Your Honor.

21             THE COURT:  For example, if you got up and objected in

22   this case and I ruled on it because I've already ruled on

23   autism, don't get up and tell me what this doctor or that doctor

24   would have said about the Autism Spectrum Disorder.

25             MS. GINSBERG:  That's not what I had in mind,

1    Your Honor.

2         THE COURT:  Well, I want to be clear that I don't want

3    frivolous objections.

4         All right.  And, of course, I'm not going to ask the

5    defendant at this time - that's not appropriate - whether they

6    intend to offer witnesses or evidence and what that will be.

7    I'll do that at the end of the Government's case.  You have the

8    right not to have to disclose that until then.

9         You have given me a list of witnesses, but I want that

10   updated.  Because I'm not requiring it, you're not required to

11   do it, but I want to safeguard against having a witness that you

12   call that all of a sudden Ms. Jones on the jury says, hey, I

13   know that person.  So that has happened.  Virtually everything

14   happens in 34 years.

15        So I ask that you give me a list of witnesses, but I

16   don't require it.  You don't have to do that if you don't want

17   to.  You have already submitted one, but I don't think it's

18   adequate anymore.  Is that right, Ms. Ginsberg?

19        MS. GINSBERG:  I think that's correct, Your Honor.

20        THE COURT:  All right.  So if you want to give me one -

21   and I hope you do, because I want to avoid the circumstance I

22   described to you - then I will get it from you on Tuesday

23   morning.

24        MS. GINSBERG:  Yes, sir.

25        THE COURT:  Now let me go to another matter.  And I

1     will issue the *pro hac* form for the -- I don't recall what

2     law firm it was, whether it was New York or Chicago.

3              MS. GINSBERG:  It's Cincinnati, Ohio.  That is

4     Mr. Sirkin, seated next to me.

5              THE COURT:  That's fine.  That's fine.  I will enter

6     that.  I'm not a computer person, as you know, Ms. Ginsberg, so

7     I don't know what that entitles that person to.  But they should

8     have it, and I will sign that.

9              MS. GINSBERG:  Thank you.

10             THE COURT:  Now, very recently the defendant has filed

11    a notice of a new expert, this one a BDSM so-called expert.  And

12    the Government has filed a motion to exclude that testimony, and

13    something was filed today.  I'll hear focused argument on that

14    now.

15             Who will argue that for your group?

16             MS. GINSBERG:  Mr. Jeffress, Your Honor.

17             THE COURT:  All right.  I'll hear first from him.  And

18    I understand what you've submitted, Mr. Jeffress, that you're

19    not going to elicit from him any questions relating to

20    mental health or autism or whatever.  But I do know that you

21    want to elicit questions from him about BDSM.

22             MR. JEFFRESS:  Yes, Your Honor.  That's correct.  In

23    response to Your Honor's ruling that we received the other day

24    on the autism evidence, we are not going to have Dr. Berlin

25    testify about Mr. Sanders' mental health condition with respect

1    to the autism or with respect to any other aspect of

2    Mr. Sanders' mental health.  So I think many of the concerns

3    that the Government raised with respect to the 12.2 notice and

4    with respect to the law that, you know, limits our ability to

5    present a mental health defense are no longer relevant to

6    Dr. Berlin's testimony.

7              There were four opinions from Dr. Berlin's notice.  I

8    think the one that we seek to present, Your Honor, after

9    Your Honor's ruling, and that is consistent with it, is just the

10   subject matter expertise on the BDSM issue.  BDSM -- and it's

11   not really about opinion so much as it is providing the jury

12   with the context and with expert facts so that they will

13   understand --

14             THE COURT:  What makes him an expert on that?

15             MR. JEFFRESS:  Your Honor, Dr. Berlin, I don't think

16   the Government has seriously contested that he's one of the

17   foremost experts --

18             THE COURT:  Well, I don't think anything in what you've

19   submitted that suggests he knows anything about BDSM.

20             MR. JEFFRESS:  He runs the Johns Hopkins clinic on

21   sexual disorders.  He's one of the most foremost experts on

22   sexual disorders and basically --

23             THE COURT:  And BDSM is a sexual disorder?

24             MR. JEFFRESS:  No, it's actually not, Your Honor.

25             THE COURT:  Then what does that tell me?

23

1          MR. JEFFRESS:  I think, Your Honor, we can certainly --

2          THE COURT:  You tell me that Johns Hopkins has this

3    great thing for sexual disorders, and now you tell me that BDSM

4    is not even part of that.

5          MR. JEFFRESS:  I would say that his knowledge on this

6    range is beyond just the disorders.  He is one of the -- or he

7    used to be, at least, one of the people, the professionals who

8    decides what goes into the DSM.  So we're on that level of

9    expertise.

10         But I don't think there's a serious objection to

11   Dr. Berlin not having a background and experience on many

12   different aspects of sexual behavior, including this one.

13         THE COURT:  I, as you know, under 702, am the

14   gatekeeper.

15         MR. JEFFRESS:  Yes, Your Honor.

16         THE COURT:  So you've got to persuade me that he knows

17   what he's talking about.  And what you've submitted doesn't.

18         MR. JEFFRESS:  Well, Your Honor, we are happy to -- and

19   again, this isn't going to come up until the defense case, but

20   we are --

21         THE COURT:  What opinion do you want to elicit from

22   him?

23         MR. JEFFRESS:  Again, Your Honor, on this subject, on

24   the first category of his expert notice, I don't think we're

25   providing an opinion.  I think it's more providing the jury with

1    expert facts so that they understand the evidence and they

2    understand the chat communications between Mr. Sanders and --

3            THE COURT:  Well, that's expert testimony.

4            MR. JEFFRESS:  It's expert testimony, but it's not

5    really an opinion.  He's going to explain this area, explain how

6    the terminology works, explain what the dynamic is.

7            THE COURT:  Why is that relevant?

8            MR. JEFFRESS:  Well, I don't think there's any

9    question, and I think the Government would concede, that

10   Mr. Sanders met the alleged minor victims on BDSM websites, for

11   the most part.

12           THE COURT:  Tell me again what BDSM is.

13           MR. JEFFRESS:  Your Honor, I think the best way to

14   think about --

15           THE COURT:  No, tell me what the letters stand for.  I

16   know it's sadomasochism at the end, but what's the BD?

17           MR. JEFFRESS:  I'm just trying to make sure I say this

18   right.  I know the first one is bondage, discipline, and

19   sadomasochism are those letters.

20           THE COURT:  Bondage, discipline, sadomasochism.  All

21   right.

22           THE DEFENDANT:  That is not correct.  Bondage,

23   discipline, dominance, submission, sadomasochism.

24           MR. JEFFRESS:  This is why we need Dr. Berlin, Judge.

25   He would know the answer.

1          THE COURT:  I don't know of any discussion between the

2   defendant and the victims that use BDSM.

3          MR. JEFFRESS:  Your Honor, the entire dynamic between

4   Mr. Sanders -- and I think the Government is not going to

5   seriously resist this --

6          THE COURT:  Tell me what you want this person to

7   testify to.

8          MR. JEFFRESS:  I want him to explain what this is to

9   the jury, explain what this dynamic is.  There is no question --

10          THE COURT:  And why is that relevant?

11          MR. JEFFRESS:  Well, it is what they're doing in these

12   chats.

13          THE COURT:  All right.  But why is that relevant to the

14   offense charged?

15          MR. JEFFRESS:  Well, Your Honor, in a couple of ways.

16   First of all, the best way to look at this is that when you come

17   into this --

18          THE COURT:  Look, let me get to the heart of this

19   matter.  You don't seem to see it -- the Government has to prove

20   that the defendant uses, persuades, induces, entices, or coerces

21   any minor to engage in, and so forth.  So is what you're

22   offering this person for relevant to uses, induces, entices, or

23   coerces any minor?

24          MR. JEFFRESS:  It's beyond that, Your Honor.  First --

25   I think there are a couple of different aspects.  First, he has

1    to explain what's going on here.  The jury is not going to be

2    familiar with this subject area.  This is classic expert

3    testimony in this respect.

4              THE COURT:  A moment ago you were saying it wasn't

5    expert.

6              MR. JEFFRESS:  No, he --

7              THE COURT:  But anyway, what is the relevance of what

8    they have to say?

9              MR. JEFFRESS:  The relevance of what Dr. Berlin has to

10   say?

11             THE COURT:  Yes.

12             MR. JEFFRESS:  Because he's explaining the dynamic that

13   these --

14             THE COURT:  Never mind dynamic.  What is it that he

15   wants to say?  In other words, let's say you have the defendant

16   saying, look, take your clothes off and slap yourself around.

17   What is he going to testify about as to that?

18             MR. JEFFRESS:  He's going to say that that is -- what

19   they are doing, they're engaged in a power-sharing relationship

20   where basically people like -- and this is a widespread sexual

21   practice and it's also a nonsexual practice.

22             THE COURT:  It's not widespread.

23             MR. JEFFRESS:  Well, Your Honor, it's much more

24   commonplace than people think, and that's why Doctor --

25             THE COURT:  That may be.  But it certainly isn't

```
1    widespread.  I've lived nine centuries on this planet and I've
2    never run across it.  Nine decades, not centuries.
3           MR. JEFFRESS:  Well, Your Honor, among other people,
4    this is something that goes on.  I don't even think the
5    Government is opposing it on this basis.
6           THE COURT:  I am still the gatekeeper, and I will have
7    to decide this.
8           MR. JEFFRESS:  So basically, Your Honor, he has to
9    explain the whole context so the jury understands these chats.
10   We're entitled to do that.  That's classic expert testimony, for
11   him to explain the context --
12          THE COURT:  You're not entitled to do it until it's
13   relevant.  Look, I'm going to do this.  I'm going to take a
14   brief recess.  Ms. Ginsberg will give you a little prep on me.
15   But you better address what I'm asking.  I want to know the
16   relevance of it.  All right.
17          I'll take a brief recess, 15 minutes.
18          (Recess taken at 12:08 p.m.)
19          THE COURT:  Before we continue, Mr. Jeffress, let me
20   correct myself.  I misspoke.  I said there were no
21   African-Americans in, what was it, the 10 or 12 who had
22   responded "yes."  Two of the 12, one of them is Asian and the
23   other one is a person who identified herself as of mixed race.
24   So the extent I said they're all white, I was wrong.
25          MR. JEFFRESS:  Thank you, Your Honor.
```

28

1          THE COURT:  All right.  Now, you-all submitted a

2     Rule 12 -- or a 16(b)(1) notice, and you've already, I think

3     appropriately, conceded that you're not going to ask this person

4     for opinions about his mental health, autism, or anything else.

5          MR. JEFFRESS:  Correct, Your Honor.

6          THE COURT:  And I think I understand what you say is

7     you want to -- well, let me hear what you say.  I need to focus

8     sharply on what it is and why you think it's relevant.  Because,

9     as you know, consent by these juveniles is not relevant and will

10     not be permitted.

11          MR. JEFFRESS:  Yes, Your Honor.  I think there are

12     really two things I would say, Your Honor.  The first is, is

13     that there's a lot of terminology and so forth that's used

14     during these chat communications that is particular to the BDSM

15     practice.  There are words that are used -- I mean, it would be

16     like when the Government calls a drug expert to come explain how

17     drug dealers talk to each other, which is usually admitted and

18     the Government often does.

19          Here, it's sort of the converse because it's the

20     defense that wants to put it on.  But basically there are words

21     that are being used that are used typically in BDSM practice

22     that the jury needs to have it explained what they mean.

23          THE COURT:  Like what?

24          MR. JEFFRESS:  Well, I mean, the big one for us is the

25     term "boy" used in this context - and I think it's very clear -

1    does not connote age.  It connotes the submissive part, a

2    submissive component of the dominant/submissive relationship,

3    but it's not being used for age.

4         So, for instance, the Government is going to put on an

5    ad that Mr. Sanders put out that this is how he met these

6    people, where the term "boy" is used, but boy is used in this

7    community not to say this is under age, in that sense of the

8    term "boy," but in the sense of, this is going to be the

9    submissive part of this.  So I think that kind of terminology

10   needs to be explained.

11        THE COURT:  All right.  And are you also telling me

12   that you contest -- because the Government has to prove to the

13   jury that these are juveniles, that these are under age people.

14   And I take it you-all contest that?

15        MR. JEFFRESS:  We don't contest.  We've seen the birth

16   certificates.  I think there are various issues that I'm still

17   unclear about, about how the Government is going to prove that.

18   But the point is, is the issue is Mr. Sanders' knowledge and

19   Mr. Sanders' intent, and when he is using the term "boy," he is

20   not asking for --

21        THE COURT:  Well, yes, but it doesn't matter

22   what Mr. Sanders -- he might have thought they were 25-year-old

23   people.  It doesn't matter.  If they're juveniles, the defendant

24   is charged with knowing.

25        MR. JEFFRESS:  Yeah.  Well, we've submitted our

1    argument that we believe age is an element of the -- knowledge

2    of age by Mr. Sanders is an element of the offense.

3              THE COURT:  Well, tell me a little bit more about that.

4              MR. JEFFRESS:  Yeah, Your Honor, we think the

5    Government has to prove that Mr. Sanders knew that the minors

6    were in fact minors, and that he intentionally sought to produce

7    a visual depiction or to have sexual activity for the purpose of

8    producing a visual depiction by a minor.  Now, if he thought he

9    was talking to another consenting adult, we do not believe that

10   that is illegal conduct, and that is not within the statute's

11   ambit.

12             THE COURT:  All right.  Go on.

13             MR. JEFFRESS:  So here, I think it's important for the

14   jury to understand, when Mr. Sanders is using the term "boy" in

15   his advertisements or in anything else, he is not seeking an

16   underage person, he is just seeking the submissive partner.  So

17   that's one explanation for how the terminology that Dr. Berlin

18   will explain from this area will be relevant and very helpful to

19   the defense for the jury to understand.

20             Now, the second thing -- and, Your Honor, there are

21   other examples.  That was --

22             THE COURT:  Do you expect he will say anything about

23   consent?

24             MR. JEFFRESS:  No.  Now, Your Honor, I think --

25   Dr. Berlin will not say that.  Now, what he will say, though, I

1    think, is -- his testimony will be relevant in explaining the

2    sort of dynamic of basically:  I'm ordering you to do something,

3    you're doing it.  It looks from the outside like coercion, which

4    is one of the words that is included in the statute; but in

5    fact, in the context of this dynamic, there's already sort of

6    buy-in to these rules.  I mean, it's like they're playing a

7    game, right, and that they already know that they're not being

8    coerced to do anything, they're being -- you know, this is part

9    of the agreed-upon conduct that they're engaging in.

10            And the statute says that Mr. Sanders has to have

11   coerced, used, persuaded, enticed them to create this visual

12   depiction of sexual conduct.  We're going to oppose many aspects

13   of those elements, including that this is even sexually explicit

14   conduct.  That's something that we will say it's not, and it

15   will be up to the jury to decide.  But, more importantly, I

16   think, is that Mr. Sanders was not acting with the intent to

17   persuade, entice, coerce.  They're having a conversation over

18   this BDSM platform, if you will, where they're already agreed

19   upon about this is how we're going to talk to each other.  So

20   what maybe looks like coercion from the outside is not.

21            And I think we're entitled to show that it's less

22   likely that Mr. Sanders actually violated the statute once one

23   understands this BDSM dynamic.  The BDSM dynamic, Your Honor, is

24   going to be a subject of, I think, a lot of testimony during the

25   Government's case.

1          THE COURT:  Why?

2          MR. JEFFRESS:  Because there's no question, and even

3    they agree, that that is what's going on in these chats --

4          THE COURT:  Do you have to keep -- you know, you say,

5    "even they agree."  One of the reasons I took a recess is

6    because it didn't seem to me that you had read their brief.

7    They don't agree with a lot that you're saying.

8          MR. JEFFRESS:  I think they will agree that the

9    responses that he received to his ad were over a BDSM platform

10   and this was a BDSM practice.  Now they say it's still illegal

11   because these are minors we're talking about.

12         THE COURT:  And they can't consent.

13         MR. JEFFRESS:  Right.  That's what the Government's

14   position certainly will be.

15         THE COURT:  And that's the law.

16         MR. JEFFRESS:  Well, I mean, the statute still says

17   that Mr. Sanders has to have the intent to entice, coerce, use,

18   or persuade.  That's for the production statute.  Those are the

19   operative verbs.

20         THE COURT:  That's correct.

21         MR. JEFFRESS:  And they have to prove that about him.

22   And if he thinks in his mind, oh, this is already what we've

23   already agreed to, this is the rules of this game that we're

24   playing, that everyone plays for fun, then it makes it less

25   likely that he was acting with the intent to coerce, Your Honor.

1    And that's what the gist of our defense will be.

2           THE COURT:  You keep using the word "coerce," and that

3    isn't something that the Government has to prove.

4           MR. JEFFRESS:  Well, it is in the statute, Your Honor.

5           THE COURT:  No.

6           MR. JEFFRESS:  Yes.

7           THE COURT:  It's entice or coerce.  Or.  It's in the

8    disjunctive.  They don't have to prove coercion.

9           MR. JEFFRESS:  That's right.  There are four different

10   verbs, and they --

11          THE COURT:  I'm glad you agree.

12          MR. JEFFRESS:  I do agree with that, Your Honor.  But

13   coerce is one of the things -- they've charged Mr. Sanders under

14   coercion.

15          THE COURT:  Well, they charged him under the statute --

16          MR. JEFFRESS:  Correct.

17          THE COURT:  -- and it's typical to do it all.  But

18   they're not required to prove coercion.

19          MR. JEFFRESS:  They can prove one of the other ones.

20   They have to prove one of the verbs.

21          THE COURT:  They aren't required to prove coercion, are

22   they?

23          MR. JEFFRESS:  They could prove -- well, one of four --

24          THE COURT:  I'm sorry, are they required to prove

25   coercion?

1          MR. JEFFRESS:  No, not necessarily.

2          THE COURT:  All right.  What do you mean by "not

3    necessarily"?

4          MR. JEFFRESS:  They could prove one of the other verbs.

5          THE COURT:  All right.  So they're not required to

6    prove coercion.  They can prove one of the other ones.

7          MR. JEFFRESS:  Right.  They have to prove one of the

8    verbs.

9          THE COURT:  Yes.  All right.  I think I understand now

10   what you mean.  Do you want to tell me anything else about what

11   you want to use Dr. Berlin for, other than to define or explain

12   the significance of these terms in the chats?

13         MR. JEFFRESS:  I think, Your Honor, in light of

14   Your Honor's rulings and everything like that, that would be the

15   subject area, which is the first one that we noticed that we

16   would be presenting him on.

17         THE COURT:  Mr. Schlessinger, are you responding?

18         MR. SCHLESSINGER:  Yes, Your Honor.  Your Honor, I

19   think in the Court's colloquy with defense counsel, it's evident

20   the Court has already seized on the most significant fundamental

21   flaws with Dr. Berlin's proposed expert testimony.  And there

22   are numerous flaws, but I think most fundamental is the utter

23   irrelevance of the entirety of his proposed testimony.

24         The defense proposes that Dr. Berlin will testify about

25   BDSM practices, what that means, and whether Mr. Sanders'

1    conduct, as will be shown to the jury through the evidence,

2    falls within this understanding of BDSM.  It does not matter

3    whether Mr. Sanders was acting consistently or inconsistently

4    with the precepts of BDSM, as Dr. Berlin proposes to explain

5    them.

6              Supposing that --

7              THE COURT:  Well, the statute says, "uses, persuades,

8    induces, entices, or coerces."  I take it you would say, if

9    these juveniles -- well, it says, "employs, uses, persuades,

10   induces."  So he could use or employ a minor to engage in lewd

11   and lascivious conduct, and that would be covered by the

12   statute.

13             MR. SCHLESSINGER:  That's absolutely right.  And

14   there's nothing that Dr. Berlin purports -- or that defense

15   purports to have Dr. Berlin testify about that has anything to

16   do with that one way or another.

17             When the defendant sent to a minor child, "You are to

18   record a video, you will show me your entire body, state your

19   full name," that is or is not production of child pornography -

20   it is, in fact - but there's no relevance whether this could be

21   considered, as defense suggests, part of BDSM or consistent with

22   BDSM.  It makes no difference whatsoever.

23             Supposing further that it's not consistent with BDSM,

24   but the purported testimony is that Mr. Sanders believed it was

25   consistent with BDSM, it's equally irrelevant.  It makes no

1    difference when or whether, when Mr. Sanders was producing child

2    pornography, that he thought that it was consistent with BDSM or

3    some other sexual attitude or subculture.  It's totally --

4          THE COURT:  Does Mr. Sanders have to know that they

5    were juveniles, under age?

6          MR. SCHLESSINGER:  No, he does not.  And for that

7    reason, the specific proposed relevant purpose of Dr. Berlin, to

8    explain terminology, including the meaning of the term "boy," is

9    irrelevant.  It is not required.  And, in fact, this court has

10   already ruled in this case, in granting the Government's motion

11   in limine, to preclude any mistake of age defense, that it's not

12   relevant.  It doesn't matter, for purposes of the production

13   statute --

14         THE COURT:  I think the law is fairly clear on that.

15   But in the argument that I just heard, the defendant wants to

16   argue that the Government must prove beyond a reasonable doubt

17   that Mr. Sanders knew they were under age.  What's your view

18   again on that?

19         MR. SCHLESSINGER:  This court has already recognized

20   and rejected that argument in granting the Government's motion

21   in limine to preclude any mistake of age defense.  This court --

22         THE COURT:  But you would agree, wouldn't you, that the

23   Government has the burden to prove that they were in fact

24   juveniles?

25         MR. SCHLESSINGER:  Yes, Your Honor.  Yes, we do.

1    Absolutely.  And we do have that burden.  We do not have any

2    burden -- there's no requirement to show that Mr. Sanders knew

3    they were juveniles.  And in this court's order of May 20th of

4    this year, on docket entry 364 at page 6, the Court recognized

5    as much, citing the Fourth Circuit's precedential decision in

6    *United States vs. Malloy*, 568 F.3d 166, a 2009 decision.

7           Equally irrelevant is the defense suggestion that

8    Dr. Berlin will testify about the buy-in or the dynamic, to use

9    two words that defense counsel chose.  It is irrelevant what the

10   dynamic was, or whether there was, quote, buy-in by the minors.

11   Because as this court has already aptly noted, minors cannot

12   consent to this conduct.  And indeed, the Court has already, in

13   the very same order, granted the Government's motion in limine

14   to preclude any defense evidence suggesting that the minors

15   could have possibly consented in some way, noting that there is

16   no consent defense.  For that reason, any purported testimony of

17   Dr. Berlin that the minors bought into it or there was a dynamic

18   where they were agreeable to it in some way is just totally

19   legally irrelevant, and can serve no function for the jury.

20          Finally, Your Honor, defense counsel suggested that --

21   near the end of his argument that Dr. Berlin is going to testify

22   that Mr. Sanders was not acting with any particular -- with the

23   requisite intent.  He was not acting with the intent to produce

24   a visual depiction when he communicated with the minors and said

25   things like "you're going to record a video and send it to me."

1          The problem with that is that it runs directly afoul of

2     Rule 704(b).  Rule 704(b) expressly precludes an expert witness

3     from offering an opinion about whether a defendant did or did

4     not have a mental state that's an element of the crime.  And

5     when defense counsel proposes that Dr. Berlin will testify that

6     Mr. Sanders did not have the requisite purpose, that is exactly

7     what he's proposing to have Dr. Berlin testify to, and it's

8     flatly contrary to Rule 704(b).

9          Just as the Court ruled that Dr. Whitney's proposed

10    testimony was inadmissible and would have violated Rule 704(b),

11    to the extent that Dr. Whitney would have testified about a

12    mental state that's an element of the offense, so too

13    Dr. Berlin's testimony, to that extent, is inadmissible pursuant

14    to Rule 704(b).

15         For that reason, because Dr. Berlin's testimony is

16    entirely irrelevant, and it should be excluded.

17         THE COURT:  All right.  Mr. Jeffress -- by the way,

18    what does your mask say on it?

19         MR. JEFFRESS:  It says "D.C. Health Link, Get Covered,

20    Stay Covered."

21         THE COURT:  Well, that's fine.  But for the trial, see

22    if you can wear something that has nothing on it.

23         MR. JEFFRESS:  Absolutely, Your Honor.

24         THE COURT:  One never knows what something like that

25    might evoke from a juror.  Go ahead, Mr. Jeffress.

1        MR. JEFFRESS:  Your Honor, first of all, the last thing

2   that Mr. Schlessinger said, we do not intend on having

3   Dr. Berlin opine specifically on Mr. Sanders' intent.  We

4   recognize that's not proper expert testimony, and that's not

5   what he's going to do.  He's just going to give background facts

6   on BDSM from which we can argue about to the jury, and will need

7   in order to make our arguments to the jury that Mr. Sanders did

8   not have the requisite intent, and that also he wasn't acting

9   for the purpose of producing a visual depiction of sexual

10  conduct.

11       Now, I know the Court has already written about

12  *McCauley* and *Palomino Coronado*, but we think, Your Honor, that

13  one issue that we can argue here is, Mr. Sanders' purpose, if

14  you look at some of these chats, at least, he's not asking for

15  sexually explicit conduct.  He's asking for a naked photo or

16  he's asking for a photo that has them doing something that's in

17  the nature of BDSM, but he's really not asking for sexually

18  explicit conduct.  And he wasn't acting for the purpose of

19  producing a video.  There's no evidence that he ever distributed

20  the videos to anybody else, there's no evidence that he ever

21  watched the videos again.

22       THE COURT:  The evidence is that he demanded the

23  videos.

24       MR. JEFFRESS:  Demanded the video to confirm that they

25  were doing what they were supposed to be doing in the context of

```
 1    this BDSM game.  So we just need those rules explained.

 2    Dr. Berlin is not going to say that.  But that is part of our

 3    defense, is that the purpose of what he's asking this for is

 4    he's just trying to see that they did what he said, which is

 5    sort of the power dynamic here, like I order you to do

 6    something --

 7          THE COURT:  Are you also saying that what he asked them

 8    to do was not sexually explicit?

 9          MR. JEFFRESS:  Some of it is not.

10          THE COURT:  But some of it is.

11          MR. JEFFRESS:  I don't know, Your Honor.  I have my

12    witnesses.  What I have seen, when he asked for a full live body

13    pic, I don't regard that as sexually explicit conduct, and I

14    don't think it is under Dost --

15          THE COURT:  Do you have children?

16          MR. JEFFRESS:  I do, actually, yes.

17          THE COURT:  Never mind that.

18          MR. JEFFRESS:  But just a naked photo of a child, a lot

19    of parents have that, and I think Congress very specifically --

20          THE COURT:  Really?

21          MR. JEFFRESS:  Yeah, like in the bathtub or something

22    like that.  Yeah, I think a lot of parents have that.  I think

23    Congress very specifically and the courts very specifically have

24    endeavored not to criminalize that.  And that's why it has to be

25    lascivious.
```

1           THE COURT:  All right.  Well, I think your point that

2      it's a jury issue is somewhat well taken.  I'll think about

3      that.

4           MR. JEFFRESS:  Thank you, Your Honor.  I think after

5      the Government's case, it will be even more clear why this needs

6      to be part of the defense.

7           THE COURT:  All right.  I think that last point that

8      you've just made is the one that I find most moving at this

9      time.  I'm going to do this.  I'm going to issue an order that

10     grants the Government's motion to exclude the testimony

11     because -- of his, on everything but what you've talked about.

12     I'll make it explicit in the order.  And I'll defer that until

13     the conclusion of the Government's case.  Maybe I will know more

14     at that time.

15          But it's very clear that there can be no evidence from

16     this purported expert about autism, about his mental health

17     condition, about his purpose under 704 as to why, in his

18     opinion, he did things.  This doctor says he's a nice person; I

19     don't have any doubt about his being a nice person.  But there

20     won't be any testimony about that.  And there won't be any

21     testimony about consent, that they did it all consensually.

22     Because that is legally irrelevant, and any evidence offered in

23     that regard would be unfairly prejudicial and confusing to the

24     jury.

25          The law says -- and I think, Mr. Jeffress, and I'll ask

1    you, but I think the law is fairly clear that he doesn't have to

2    know that they are juveniles.  Indeed, a mistake of age defense

3    does not apply.  So the Government doesn't have to prove that

4    Mr. Sanders knew they were under age.  They do -- the Government

5    does have to prove beyond a reasonable doubt that they were in

6    fact -- these so-called victims were in fact under age.  And

7    they can do that just by a picture.

8            Indeed, in this last case Mr. Schlessinger tried, they

9    relied very heavily on that, because there were literally

10   hundreds of them and there was no way to identify who they were,

11   nor any way to identify when the pictures were taken.  But it

12   was clear to anybody that these were small children; in some

13   cases babies and in some cases teenagers.  But they were all

14   under age, and the jury had no trouble concluding what.

15           As far as your issue about the standard, of course, as

16   you know, I have written some about the standard.  In the

17   *McCauley* case I used the wrong standard, and I was reversed for

18   that.  And I accept and understand that.  I was wrong, and I

19   should have anticipated that.  It wasn't that difficult.  I

20   don't remember now my exact feeling, but I should have seen that

21   one.

22           However, as you know, I have had a subsequent case in

23   which I have construed the statute in accordance with existing

24   Fourth Circuit precedent to be a motivating factor; that is, a

25   motivating, not the predominant, not the principal one, as you

1    argue.  You'll have a chance to argue that anew.  Maybe there

2    will be some new law between now and then.  But at the moment

3    I'm not persuaded that it has to be more than a motivating

4    factor.

5            But anyway, I'll deal with that in this order.

6            MR. JEFFRESS:  Thank you, Your Honor.

7            THE COURT:  And again, of course, maybe I'm wrong

8    again.  But this is the wrong court to persuade me.

9            MR. JEFFRESS:  Your Honor, on mistake of age, I know

10   that's not exactly sort of what we were dealing with, but I

11   think it's very different now.  *Excitement Video* actually said

12   for possession and receipt counts, they do have to prove

13   defendant's knowledge of age.

14           THE COURT:  Oh, tell me that again.  I didn't follow

15   you.

16           MR. JEFFRESS:  The Supreme Court in *Excitement Video*

17   said that they do have to prove --

18           THE COURT:  In which case?

19           MR. JEFFRESS:  *Excitement Video*.

20           THE COURT:  What's the cite on that?  And was that a

21   2252 conviction?

22           MR. JEFFRESS:  I think that case is included in both

23   their jury instructions and in ours, Your Honor, referred to and

24   cited.  But I don't have the cite right in front of me.

25           THE COURT:  And what do you contend that case holds?

```
1          MR. JEFFRESS:  For possession or for receipt charges,
2     which Mr. Sanders is charged with, the Government -- the jury
3     does have to find that Mr. Sanders understood that material to
4     be -- yeah, here it is, Your Honor.  513 U.S. 64, and it's from
5     1994.  But the Government does have to prove that knowingly
6     meant knowingly that it was -- that the minors were under age.
7          THE COURT:  All right.
8          MR. JEFFRESS:  Okay.  Now, production, they argue
9     there's a different rule for production.  But there should not
10    be a different rule for production.  The reason why there's a
11    different --
12         THE COURT:  That you should address up the road here at
13    that building --
14         MR. JEFFRESS:  Yes, I just want to make sure our
15    objection is noted, Your Honor.  We've already litigated this
16    issue and already said that.
17         THE COURT:  All right.  But I'm glad to have your
18    reminding me of that, because we had that in your case as well,
19    Mr. Schlessinger.  They had to know, in the receipt and the
20    possession case, that they were minors.  It was a little easier
21    for you to show because of the obviousness of the pictures.  But
22    I think Mr. Jeffress is right, that for possession, it has to be
23    knowing.  Is that right, Mr. Schlessinger?
24         MR. SCHLESSINGER:  That is right, Your Honor.  And
25    perhaps it will be helpful to note for the Court that the
```

1    possession count in this case pertains to child pornography that

2    is not the same child pornography that was produced with these

3    minor victims, but other child pornography, much of which

4    involves victims of similar age to those in the last case; that

5    is to say, very young victims.

6              THE COURT:  All right.

7              MR. JEFFRESS:  The receipt count, though, Your Honor,

8    does include material from older -- you know, the same victims

9    that are discussed in the production counts.

10             THE COURT:  Does that also include others?

11             MR. JEFFRESS:  I believe it does.

12             THE COURT:  Well, I'll have to make all that clear in

13   instructions to the jury.

14             All right.  This is helpful.

15             MR. JEFFRESS:  Thank you, Your Honor.

16             THE COURT:  Now, Mr. Schlessinger, you have a lot of

17   evidence that you wish to admit from computers or telephones.

18   Right?

19             MR. SCHLESSINGER:  Yes, we do, Your Honor.

20             THE COURT:  All right.  Well, you need to be sure --

21   are there any stipulations about admissibility?

22             MR. SCHLESSINGER:  We've proposed a stipulation.  I

23   don't believe we've received a response from defense.

24             THE COURT:  They're not required to stipulate anything.

25   So you need to be prepared to dot every "I" and cross every "T,"

1    because I don't want to have to take time, in the course of the

2    trial, to hear objections that could have been obviated.  So I

3    think you can assume that every objection that can be made will

4    be made.

5            MR. SCHLESSINGER:  Yes, Your Honor.

6            THE COURT:  All right.  Anything else at this time?

7    Just a moment.

8            Mr. Schlessinger, I understand that you have requested

9    that these monitors be turned off.  Is that to preserve the

10   privacy of the minor victims?

11           MR. SCHLESSINGER:  Yes, Your Honor.  Because unlike in

12   the last case, we're not only going to have child pornography

13   exhibits in the case, but we're also going to have exhibits that

14   contain information identifying minor victims.  And for that

15   reason --

16           THE COURT:  Like birth certificates?

17           MR. SCHLESSINGER:  Yes.

18           THE COURT:  How do the birth certificates come in?

19           MR. SCHLESSINGER:  They're self-authenticating and

20   there's a special hearsay exception for records of births and

21   deaths, I believe.

22           THE COURT:  And have you made that information known to

23   Ms. Ginsberg?

24           MR. SCHLESSINGER:  Yes.

25           MS. GINSBERG:  Judge, I think that was a subject of a

1    prior motion.  And the Government has -- as I reread the

2    transcript, the Government, um, acknowledges that it is going to

3    have to produce a witness who can connect the name in the birth

4    certificate with the person who is the victim in this case.  A

5    birth certificate that's self-authenticating is not relevant for

6    any purpose unless it's connected -- unless it can be connected

7    to the victims.

8              THE COURT:  All right.

9              MS. GINSBERG:  So whether they do it through parents or

10   someone else who has seen and met with the victim, um, we don't

11   know how they're going to do that.  But we don't agree that --

12   we think that has to happen.  That's part of what would make it

13   admissible.

14             THE COURT:  All right.  Mr. Schlessinger, what's your

15   response to that?  Are you prepared to cover that?

16             MR. SCHLESSINGER:  Yes, Your Honor.  There will be --

17   that will be covered in the fashion envisioned by defense

18   counsel for four out of the five charged minor victims, and

19   there is a fifth charged minor victim as to which we anticipate

20   resting on the evidence that's going to be presented as to the

21   devices; that it is a real minor and it is a person under the

22   age of 18.  And we think it will be evident from that.

23             THE COURT:  So for the birth certificates, what are you

24   going to present?

25             MR. SCHLESSINGER:  For the birth certificates, we

1    intend to introduce the birth certificates --

2         THE COURT:  Right.  But she says it's not relevant

3    unless it's tied to a particular victim.  The name won't be

4    enough, apparently.

5         MR. SCHLESSINGER:  Right.  And I think for four of the

6    five victims, the testimony of the type that Ms. Ginsberg

7    anticipated will be presented during the trial.

8         THE COURT:  All right.  Anything else on behalf of the

9    Government that I need to cover in this matter, Mr. Prabhu?

10        MR. PRABHU:  Yes, Your Honor.  An issue related to one

11   of our witnesses has been raised with us, and we felt that we

12   needed to present it to the Court.

13        The mother of one of the minor victims has been

14   receiving contact from the defense, which obviously they're

15   entitled to do, but she has informed the Government that she

16   told them that she did not want to expose her child to any

17   questioning by the defense, and that they should stop calling.

18   She has complained to us that the calls keep coming, that they

19   come from different numbers, different people.  She's had to

20   block numbers because of continued, what she views as

21   harassment.

22        We don't have any independent knowledge of that, but

23   this is what our minor victim's mother has told us.

24        THE COURT:  Is she going to be a witness?

25        MR. PRABHU:  She is not.  Her son is.  And the

1   additional issue there is that she is feeling harassed, and

2   she's not the witness, she's the mother of the witness.

3          But she had two conversations, apparently, with a

4   member of the defense, and in one of them she was told that it

5   was in the child's interest to meet with the defense because

6   they were going to come very hard at him when he is testifying.

7   I just refer the Court to the previous discussion about consent

8   and circumstances and the age of the minor.  Those are the

9   things that they would likely be asking him about, and that's

10  inappropriate.

11         But the fundamental point is, she, independently of

12  us -- we certainly did not encourage her not to meet with the

13  defense, but she has made that decision, and would like it on

14  the record that she's refused that contact, and she believes

15  what she terms as harassment should stop.

16         MS. GINSBERG:  Judge, I would like to address that.

17  Because I was on both of those calls, among other people.  We

18  spoke with this witness' mother, we explained who we were, that

19  we were asking her permission to speak with her son.  We had a

20  conversation that was very short; she said that she didn't think

21  it was in his interest, she would think about it, and we asked

22  her if we could call her back and ask her again.  And she said

23  that we could, that she would speak with her son's therapist,

24  see if it was advisable.

25         We did call her back a second time; she told us at the

1   very beginning of that call that she has been told that she does

2   not and her son do not have to speak with us.

3           THE COURT:  That's true.

4           MS. GINSBERG:  Of course it's true.  I assume that she

5   meant - and I may be wrong - but that she was told by the

6   Government or someone on the Government's behalf that they did

7   not have to speak with us.  And we said that's right.

8           We asked her if she would reconsider; she said no.  The

9   call was very short.  She almost hung up on us.  But there was

10  never --

11          THE COURT:  I don't see anything for the Court to do,

12  Mr. Prabhu or Ms. Ginsberg.

13          MS. GINSBERG:  I don't either.  But if she felt

14  harassed, she may have because she is very protective of her

15  son.  But I want to assure the Court that we were extremely

16  careful, we had a witness who is not a lawyer --

17          THE COURT:  All right.  I don't doubt that,

18  Ms. Ginsberg.

19          MS. GINSBERG:  Thank you.

20          THE COURT:  But I also -- you can understand how she

21  might see things differently.

22          MS. GINSBERG:  Of course.

23          THE COURT:  But I'm glad to have your statement about

24  what happened.  I'm sure you would never harass a person like

25  that, so I don't feel that there's any need for the Court to do

1    anything.

2            Do you, Mr. Prabhu?

3            MR. PRABHU:  No, Your Honor.  I brought it to the

4    Court's attention at the request of the victim's mother.  And I

5    felt we had a duty to do that.

6            THE COURT:  All right.  Right.  And the most you ought

7    to tell her is that it was brought to my attention.  That's the

8    end of it.  I don't plan to do anything further.

9            Anything else on behalf of the Government today?

10           MR. SCHLESSINGER:  No, Your Honor.

11           THE COURT:  Anything else on behalf of the defendant

12   today?

13           MS. GINSBERG:  One thing.  Your Honor asked me to

14   remind you about the problem that we have of anticipating who

15   can be prepared to cross-examine a given agent who is going to

16   offer testimony about these victims' chats.  The chats for some

17   of these victims are as long as a thousand pages.  The

18   Government is not intending to offer a thousand pages, but there

19   are portions of those chats that we believe are relevant and

20   admissible --

21           THE COURT:  In fact, the Government has already filed

22   their exhibits, have they not?

23           MS. GINSBERG:  They have.

24           THE COURT:  So you know.

25           MS. GINSBERG:  But, Your Honor, we are not bound by the

1    Government's exhibits.  And I think the cases -- um, the

2    defendant has the right to put context around these statements,

3    and *Palomino* is very clear that just the fact of taking a

4    picture of a minor, or in this case, because the minor took the

5    picture himself, basically asking them to do that is not enough

6    to convict.  That there is context that the defendant's intent,

7    in requesting the taking of the picture --

8            THE COURT:  What does that have to do with what you're

9    asking me -- are you asking the Court to tell the Government

10   that they have to tell you now which witness is going to do

11   which --

12           MS. GINSBERG:  Judge, I wish I was asking that, because

13   I'm going to ask something that's probably going to irritate the

14   Court more.  But I am asking the Court to allow -- if the

15   Government elects to have one witness testify about victims that

16   have been -- that different lawyers have prepared for, to allow

17   different lawyers to cross-examine on those particular victims.

18           THE COURT:  It doesn't irritate me, but I'm not going

19   to do it.

20           MS. GINSBERG:  Judge, I will say, and respectfully,

21   that I don't think under those circumstances I can be effective,

22   because I cannot personally prepare to cross-examine --

23           THE COURT:  Well, that's your problem.

24           MS. GINSBERG:  -- all of -- well, it will be

25   Mr. Sanders' problem.

```
 1            THE COURT:  Yes.  I'm not going to do it any other way.
 2    It's just not necessary.  Your client wants to talk to you.
 3            MS. GINSBERG:  Your Honor, what we're essentially
 4    asking is to allow one attorney per victim, to cross-examine per
 5    victim.
 6            THE COURT:  All right.  That might be a better way to
 7    do it.  You should listen to your client more often.
 8            MS. GINSBERG:  I should.  I think he thinks I should
 9    listen to him more often than I do.
10            THE COURT:  Well, he may be right.
11            MS. GINSBERG:  He may be.  But that is what I was
12    trying to say.  Because the Government may introduce its
13    evidence about more than one victim through the same witness, we
14    would like to be able to have a lawyer -- one lawyer
15    cross-examine per victim.  And if that means that the Government
16    is having an agent who is testifying about two victims, that it
17    could be that one lawyer, one victim --
18            THE COURT:  What is it that's cross-examining an FBI
19    agent about a victim?
20            MS. GINSBERG:  Maybe I...Your Honor, there are five
21    victims for the production charges.
22            THE COURT:  Yes.
23            MS. GINSBERG:  Only two of them are going to be in
24    court.
25            THE COURT:  All right.
```

1          MS. GINSBERG:  It is our assumption --

2          THE COURT:  But with respect to the others who are not

3     going to be in court, what does an FBI agent know that isn't on

4     the -- isn't in the exchanges and the chats?

5          MS. GINSBERG:  Well, it's through the FBI agent that

6     the Government will put on those chats.  And these agents have

7     reviewed the entire body of the chats.  I mean, they've taken

8     out certain portions, but these agents extracted these chats,

9     they are familiar with the content of these chats, some of which

10    are longer than a thousand pages --

11         THE COURT:  They're not going to introduce a thousand

12    pages.  You keep arguing, well, we have the right to add other

13    material to show context.  And you do.  And I'll consider that.

14    I haven't heard anything that requires the Government to put on

15    a single -- I told you you should listen to him --

16         MS. GINSBERG:  I know.  But he's pointing to the entire

17    hard drive.

18         THE COURT:  I won't castigate you for interrupting me

19    and doing it.  Go ahead.  What do you want to say?

20         MS. GINSBERG:  What I want to say is that the

21    Government is introducing the entire chats.  They may elicit

22    testimony about a smaller volume of those chats.

23         Out of the greater volume, we are entitled to question

24    the agent who has knowledge of these chats about other portions

25    of the chats as they relate to Mister --

1        THE COURT:  All he knows or all she knows is what the

2   chat says.

3        MS. GINSBERG:  That's right.  But we need to be able to

4   pick from among those chats the relevant portions that we would

5   use to cross-examine them, to put the chats the Government has

6   selected into context and to --

7        THE COURT:  What can an FBI say about context?

8        MS. GINSBERG:  He can say yes -- judge, we have to have

9   a witness from whom we can elicit these other chats.  The other

10  chats put the Government's chats into context.

11       THE COURT:  All you have to do is designate those other

12  chats, and then you can argue that they're necessary for

13  context.  The Government will then be heard and I'll make a

14  ruling.  And if they come in, they come in.  But I don't see

15  what an agent has to do with it.

16       MS. GINSBERG:  Well, judge, wouldn't they come in

17  through the agent?  Otherwise, if we did what Your Honor is

18  suggesting, the Government could just give the jury a transcript

19  of the chats they want, we could give the jury transcripts.  I

20  mean, that's not how I envision the trial occurring.

21       I think the Government is going to ask the agents

22  whether they extracted these chats, whether they're familiar

23  with them, whether they're accurate, and then have them, through

24  the agent, put up on the monitors, and either have the agent

25  read them out loud or have the jury read them while the agent is

1    on the stand.

2         And we ought to be able to do that with respect to

3    other portions of the chats so that the jury -- I did not

4    envision just designating portions of chats and giving it to the

5    jury in the jury room.  We have to have a witness --

6         THE COURT:  Mr. Schlessinger, what's your view on how

7    to deal with this?  She says she can't prepare for all of this.

8         MR. SCHLESSINGER:  Your Honor, the chats that defense

9    counsel has alluded to were provided to defense counsel in

10   discovery over one year ago.

11        If Your Honor recalls, the last case that Your Honor

12   tried last week, there were multiple chats in that case, and

13   there was a single defense counsel who was able to cross-examine

14   a testifying FBI agent --

15        THE COURT:  It wasn't even a law firm.  It was one

16   lawyer.

17        MR. SCHLESSINGER:  That's correct, Your Honor.

18        THE COURT:  He did a pretty good job.  In fact, he won

19   an acquittal on one of the three counts.

20        MR. SCHLESSINGER:  He did an outstanding job,

21   Your Honor.

22        THE COURT:  How long are these chats that you intend to

23   offer?

24        MR. SCHLESSINGER:  They vary widely.  Some of them are

25   quite short, in the tens of pages; some of them are hundreds of

1      pages.

2              THE COURT:  Why would you need a chat that's hundreds

3      of pages long?

4              MR. SCHLESSINGER:  We do not.  And we didn't intend to

5      read to the jury, publish, or otherwise dwell on hundreds of

6      pages.  It was our idea, our thought to at least admit the

7      entire chats, quite honestly, simply to inoculate ourselves

8      against any charge of hiding the ball or providing less than

9      full context.

10             So it was our thought to admit them, certainly without

11     publishing all of them or even the majority of the very long

12     ones, but only the certain portions that are relevant to the

13     charges.  And I think defense counsel will be fully able to

14     cross-examine the witness about any chats that are --

15             THE COURT:  The defense counsel can't do anything other

16     than elicit from the agent what the other portions of the chats

17     say that are admitted for context or for completeness.  Right?

18     I mean, the agent can't do anything but read -- how is it that

19     you're going to put on what you want?  The agent would read it?

20             MR. SCHLESSINGER:  That's your intention, Your Honor,

21     yes.  Again, only small portions.

22             THE COURT:  I think I have a solution to this, but it

23     isn't going to be multiple lawyers, Ms. Ginsberg.  But let me

24     see if I can deal with this.

25             (OFF THE RECORD.)

```
 1                THE COURT:  I'll tell you in a moment how I intend to

 2      deal with this problem.

 3                Yes?

 4                MR. SIRKIN:  Your Honor, there is one thing I would

 5      like to point out to the Court.  The indication that merely the

 6      person may have been under the age of 18 and they could not have

 7      consented, there are other statutory provisions in the U.S. Code

 8      that say the age of consent is 16.  And there are very many

 9      variations throughout the country of the age of consent for

10      engaging in voluntary --

11                THE COURT:  I'm only interested in federal statutes.

12                MR. SIRKIN:  Well, the federal statutes, the

13      transporting across state lines for the purpose of sexual

14      activity and so forth, is 16.  And there are perhaps other

15      provisions in the federal code that provide that the age of

16      consent is 16.

17                THE COURT:  Now, I'm fine with your telling me the

18      this.  And you're Mr. Sirkin.  I'm glad that you have told me

19      this.  It's useful.  But it violates my rule that only one

20      lawyer can stand up.

21                MR. SIRKIN:  I understand that.  I understand that.

22                THE COURT:  I'm not going to chastise you for that

23      because we're beginning this.

24                Anything else you want to tell me, Mr. Sirkin?

25                MR. SIRKIN:  No, Your Honor.
```

1          THE COURT:  Is there anything -- let me go back to you,

2     Mr. Schlessinger.  You haven't addressed in any pleading that

3     I've read, because I don't think you're on notice, that they

4     intend to rely on statutes other than what might be -- well, let

5     me ask you this.  What do you intend to rely on in order for me

6     to instruct the jury that what does minor mean?

7          MR. SCHLESSINGER:  Section 2256.  I don't recall the

8     precise subsection, but it defines all the terms for Chapter 110

9     of the U.S. Code, and defines minor as being a person under the

10    age of 18 years.  It does not matter that other statutes

11    prohibit conduct solely with respect to people under 16.

12         THE COURT:  All right.  I don't have before me,

13    Mr. Sirkin, right now any issue that makes me choose between

14    what you've said and what Mr. Schlessinger has said.  But at

15    least you both know what positions you may take.  I think it's

16    pretty significant that the specific chapter in the code has its

17    own decision about what's a minor.

18         Did you want to offer anything else, Mr. Sirkin?  I

19    take it you need to confer.  In this court, when you need to

20    confer, you ask for permission to do so.

21         MR. SIRKIN:  I was just indicated, I think in

22    *Ashcroft vs. Free Speech*, the Court talked about the age of

23    consent in the New York statute was 16.  I know the Court had

24    indicated you're only interested in federal law, but I think

25    there's another case in which the U.S. Code, in a recent case

1   of -- it appears at 137 Supreme Court 1562, where they mention

2   that the act of sexual abuse of a minor is 16.

3           THE COURT:  All right.  But you understand that this

4   statute of the code has its own definition of a minor.  What's

5   your response to that?

6           MR. SIRKIN:  It's what the statute says.  I can't

7   disagree with that.

8           THE COURT:  Am I not bound by what that statute says?

9           MR. SIRKIN:  Well, we think that there's some dispute

10  with that, but that's for another day.

11          THE COURT:  Well, I wouldn't be optimistic about that

12  other day, in view of the fact that this particular statute has

13  its own definition.

14          MR. SIRKIN:  Consistent -- as I say, I think it's

15  something that we will in the future argue.  Perhaps not in this

16  case, but on appeal or in other cases.

17          THE COURT:  All right.  Well, you can bring it to my

18  attention and the reasons for it; otherwise, an appellate court

19  will say you didn't raise it.

20          MR. SIRKIN:  Specifically, the age of consent is

21  different than the age of a minor.

22          THE COURT:  All right.  I understand that.

23          Mr. Schlessinger, do you want to respond to that?

24          MR. SCHLESSINGER:  The only definition we're concerned

25  with is the definition of minor as defined -- for purposes of

 1     Chapter 110 of the U.S. Code, all of the crimes with which

 2     defendant is charged are violations of Chapter 110 of the

 3     United States Code; and Section 2256, which is in Chapter 110,

 4     specifically Subparagraph 1, says:  "For the purposes of this

 5     chapter, the term 'minor' means any person under the age of

 6     18 years."

 7              THE COURT:  All right.  But then we go to the law on

 8     when consent is relevant or irrelevant.  And he's saying that,

 9     okay, so a minor is a person under the age of 18, and Mr. Sirkin

10     knows he doesn't have any traction to argue against that.  But

11     he says that the age of consent is different from the definition

12     of a minor.

13              MR. SCHLESSINGER:  The crimes with which Mr. Sanders

14     are charged do not reference any age of consent.  There's no --

15     it does not matter what the age of consent is in any federal --

16              THE COURT:  If they're minors, they can't consent.

17     That's your view?

18              MR. SCHLESSINGER:  Our view is that minor is

19     statutorily defined as a person under the age of 18 years for

20     all of the crimes with which Mr. Sanders is charged.

21              THE COURT:  Yes, but you didn't listened to what I

22     said.  I threw you a softball and you muddled it.

23              So consent, in your view, is defined by the statute --

24     or not defined by the statute.  But consent, in your view, does

25     not apply to a person under the age of 18?

1          MR. SCHLESSINGER:  Yes, that is right.

2          THE COURT:  All right.  I understand that.

3          Last, Mr. Sirkin?

4          MR. SIRKIN:  It is our position that if the child is of

5   the age of consent, then there's been no underlying crime

6   committed that was filmed because they were able to consent to

7   the sexual activity that was engaged in.  And therefore, to film

8   or record a lawful act, just a lawful act being transmitted,

9   cannot constitute a crime under the Fifth Amendment.

10          THE COURT:  All right.  Thank you, I understand that

11   argument.

12          All right.  Court will stand in recess.  We'll take up

13   the --

14          MS. GINSBERG:  Judge, were you going to give us

15   whatever decision you had about how we cross-examine that I

16   wasn't going to be happy with?

17          THE COURT:  Yes.  I'm not going to allow different

18   lawyers to do it.  I'm going to consider - I may put something

19   in an order - how you may resolve it, but I don't see it as a

20   problem, Ms. Ginsberg.  You've told me that you consider it a

21   very significant problem.  I don't.

22          MS. GINSBERG:  I understand.

23          THE COURT:  And I may not see it fully, but it seems to

24   me you've had these materials for years; you ought to be able to

25   tell me -- maybe I'll consider, Mr. Schlessinger, you don't

1    really intend to offer all of these chats or all portions of it,

2    just smaller portions of it.  Right?

3              MR. SCHLESSINGER:  We did intend to offer the entirety

4    of them, but simply to show the jury a small portion of them.

5              THE COURT:  So Ms. Ginsberg already knows what chats

6    you want to offer?

7              MR. SCHLESSINGER:  Yes.

8              THE COURT:  So she already knows or has the ability to

9    decide how much in addition to that she thinks should be

10   admitted for purposes of completeness.  Right?

11             MR. SCHLESSINGER:  Yes.

12             THE COURT:  Ms. Ginsberg, you already know that.

13             MS. GINSBERG:  I do know that.  Well, again, until we

14   hear which portions the Government is going to present to the

15   jury, it's very difficult to anticipate exactly which other

16   portions we want to use.

17             This would never be a problem if the individual victims

18   were all testifying, because we could divide up victim by

19   victim.  That's the situation we're in, Your Honor.

20             THE COURT:  Okay.  I'm not going to rule on that today.

21   I don't see any need to require the Government to parcel it out

22   or for you to have separate lawyers do it.  But I'll think about

23   it some more, and if I can conceive of how to do it.

24             But it seems clear that the Government has already told

25   you what statements it wants to argue -- or admit.  I take it,

1        though, Mr. Schlessinger, you haven't told them precisely what

2        parts you want to elicit from the witness?

3                MR. SCHLESSINGER:  We have.  Because they're separated

4        out as separate exhibits, access to which defense has already

5        been granted.

6                THE COURT:  And does the defense know which agent is

7        going to testify to which victim?

8                MR. SCHLESSINGER:  That I do not -- no, I do not think

9        they do.

10               THE COURT:  All right.  Nor do I think it would make

11       any difference to the defendant.  Because all he's going to do

12       is be able to read it.  Right?

13               MR. SCHLESSINGER:  That's right.

14               THE COURT:  Last chance, Ms. Ginsberg.

15               MS. GINSBERG:  It would make a difference if we knew.

16       And --

17               THE COURT:  I'm not going to require that.

18               MS. GINSBERG:  Well, Your Honor, what we may have to do

19       is call these agents as our own witnesses.  And I was just

20       trying to avoid having to do that.

21               THE COURT:  That's something you have the ability to

22       do.

23               MS. GINSBERG:  Thank you.

24               THE COURT:  Anything further from the Government?

25               MR. SCHLESSINGER:  No, Your Honor.

65

1          THE COURT:  Anything further from you, Ms. Ginsberg?

2          MS. GINSBERG:  No.

3          THE COURT:  All right.  I'm going to take a 30-minute

4   recess.  I'll reconvene at 10 minutes to 2:00 and take up first

5   the Gant matter.

6          (Off the record at1:20 p.m.).

7

8

9

10

11

12

13

14

15

16

17              **CERTIFICATE OF OFFICIAL COURT REPORTER**

18

19          **I, Rebecca Stonestreet, certify that the foregoing is a**

20   **correct transcript from the record of proceedings in the**

21   **above-entitled matter.**

22

23

24   **_____//Rebecca Stonestreet_____              __12/14/21___**

25   **SIGNATURE OF COURT REPORTER                      DATE**