# Exhibit 1

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2


 3


 4   UNITED STATES OF AMERICA,        )
                                      )
 5   vs.                              )  Criminal Action
                                      )
 6   VINCENT KIEJZO,                  )  No. 20-40036-TSH
                      Defendant       )
 7                                    )
                                      )
 8                                    )


 9


10   BEFORE:  MAGISTRATE JUDGE DAVID H. HENNESSY


11                        MOTION HEARING

12


13


14
                     Donohue Federal Building
15                        595 Main Street
                   Worcester, Massachusetts 01608
16


17                      September 17, 2021


18


19


20


21


22


23               Transcribed by Valerie A. O'Hara
                      Official Court Reporter
24        John Joseph Moakley United States Courthouse
                        1 Courthouse Way
25                      Boston, MA 02210
                    E-mail: vaohara@gmail.com
```

APPEARANCES:

For The United States:

    United States Attorney's Office, by KRISTEN NOTO,
ASSISTANT UNITED STATES ATTORNEY, 595 Main Street, Worcester,
Massachusetts 01608;


For the Defendant:

    Federal Defender's Office, by SANDRA GANT, ATTORNEY,
51 Sleeper Street, 5th Floor, Boston, Massachusetts 02210.

1          PROCEEDINGS

2          THE CLERK:  United States District Court is now in

3   session, the Honorable David Hennessy presiding.  You may be

4   seated.

5          Today is September 17th, 2021.  We're on the record

6   in the matter of United States vs. Vincent Kiejzo, Docket

7   Number 20-CR-40036.

8          Will counsel please identify themselves for the

9   record.

10         MS. NOTO:  Good morning, your Honor, Kristen Noto

11   for the United States.

12         THE COURT:  Good morning, Ms. Noto.

13         MS. GANT:  Good morning, your Honor, Sandra Gant,

14   for the federal defender's on behalf of Mr. Kiejzo, who is

15   seated to my left.

16         THE COURT:  Good morning, Ms. Gant.  Okay.  This is

17   a hearing on a discovery motion.  Hang on one second.  This

18   is a hearing on a discovery motion that the defense filed in

19   this case.  We tried to do this hearing a couple of times

20   and ran into some logistical or other issues, and so here we

21   are.

22         I mention that only because I went through the

23   filings back in August, when we were originally on, and I

24   guess owing to a memory that's not getting any better, I had

25   to go through it again to refresh my recollection, so I've

1    been through the papers a few times.

2         I think it's worthwhile to mention a couple of

3    principles upfront.  The first is the government obviously

4    has an obligation to produce exculpatory evidence.  We

5    haven't moved away from that.  If anything, it's been

6    reinforced by the Due Process Protections Act warning that

7    the Court is now required to give at every initial

8    appearance, which basically reminds the government of its

9    duty and of the potential consequences that can be imposed

10   if it's not imposed.

11        The second is if there is a motion filed to

12   suppress the search warrant, it's limited to the four

13   corners of the affidavit.  The government cannot bring in

14   additional evidence to establish probable cause.  It really

15   stands on the basis of that document, so the right of the

16   defendant to move to suppress is preserved.  It exists

17   independently of any ruling the Court may make in this case.

18        Just two other things.  I think the discovery law

19   that's perhaps most relevant here is the controlling

20   First Circuit decision in United States vs. *Goris* about the

21   threshold showing that a defendant must make to obtain

22   discovery.

23        If it's grounded in speculative theory, it's

24   insufficient.  And it seems to me that that is reflected in

25   the standard for a *Franks* Hearing, which in order to get a

1    hearing or discovery regarding it, there has to be a

2    preliminary showing, and it has to be substantial that

3    statements made in an affidavit reflect reckless disregard

4    for a truth or an outright falsehood and that such material

5    is or such statements are material to a finding of probable

6    cause.

7            The last thing is -- sorry, two more things.  The

8    United States has been working with foreign agencies for a

9    very long time.  The United States is in all kinds of

10   treaties with foreign governments maybe for extradition,

11   maybe for mutual legal assistance.

12           I'm not aware of any law that says the existence of

13   such a treaty means that the cooperation between two

14   governments is a joint venture, and certainly the defendant

15   has cited no law in his memo to support that.

16           The last thing I'll mention is I don't want to lose

17   sight of the fact that as required by the Fourth Amendment,

18   probable cause in this case is supported by a sworn

19   statement from an agent.  I'm not so naive to suggest that

20   that means that every single sworn statement is absolutely

21   true.  People make mistakes, people make intentionally false

22   statements, and I recognize that, and I think the law does,

23   too, by allowing for discovery when there is a substantial

24   preliminary showing that that is the case.

25           But in my humble estimate, that is a -- that's a

1    profound piece of paper.  It's a crime to lie on a sworn

2    statement.  It's perjury.  It opens up people to all kinds

3    of adverse consequences, and I would note that our entire

4    system in many ways depends on people taking that oath

5    seriously, whether it's at a hearing, whether it's at a

6    trial, whether it is in an affidavit.

7         So I'm not particularly sympathetic to the view

8    that you can't believe anything in an affidavit, and I'm not

9    saying that Mr. Kiejzo is making that argument here, but I

10   do think it's tied in with a number of arguments that are

11   made, so with that as a preface, Ms. Gant, I really

12   struggled with this motion.  I struggled candidly to see the

13   merits of it almost at all.  I couldn't get away from the

14   idea that everything or nearly everything struck me as just

15   base speculation.

16        You know, if this turns out to be true, this is

17   going to be helpful to the defendant.  I'm fine with that.

18   I'm fine with the link that's made as to how something could

19   be helpful to the defendant.  You know, if it turns out, for

20   instance, the U.S. Government was very involved in this

21   investigation, this is a joint venture, it would be very

22   helpful to the defendant, but in a manner of speaking, if

23   you don't mind the analogy, that's kind of the distance

24   between second base and third or first base and second.  The

25   problem that I have here is the distance between home plate

1    and first base that takes it out of the equation, and I'm

2    struggling to understand what false statement or what

3    evidence you have that suggests that any of this, any of the

4    suppositions, or to use what I characterize as speculation,

5    has any basis, so that's where I am, and that's what I need

6    you to address.  If it's helpful, we can go through some of

7    these.  I really don't want to go through all of them.

8          MS. GANT:  And I don't intend to go through all of

9    them, but I have a couple of I think points that might speak

10   both directly to the principles that the Court laid out at

11   the beginning of this hearing and also the Court's concerns

12   and the defendants' disagreement with the characterization

13   that this is resting on kind of base speculation.

14          It's the defendant's position that -- first I want

15   to thank the Court for continuing the matter from

16   previously.

17          THE COURT:  No problem.

18          MS. GANT:  I do apologize for that.

19          THE COURT:  That's okay.

20          MS. GANT:  It's the defendant's position that the

21   request of the discovery goes to the heart of whether or not

22   the search warrant was based on reliable information

23   provided by the foreign law enforcement tip and that

24   ultimately relayed from an as yet unnamed foreign law

25   enforcement agency and whether the representations made by

1   the affiant for the search warrant were mischaracterizations

2   based on that information.

3           One thing that the Court doesn't have in the

4   pleadings is a representation made by the government to

5   counsel in the interim of these rescheduled hearings, and

6   that is that the foreign law enforcement agency who seized

7   the server back in June, 2019 was not the foreign law

8   enforcement agency that provided the tip and did not even

9   originate from the same country that the government has

10  assured us is bound by the rule of law, the same rule of law

11  that it relies upon to justify the warrant as --

12          THE COURT:  Okay, so let's take that.  What shows

13  that that statement is false?

14          MS. GANT:  Well, it's not an issue of being false,

15  it's completely omitted from the affidavit.  The affidavit

16  doesn't even disclose that it was a foreign law enforcement

17  agency distinct from the one that provided the tip that

18  seized the server.  There's no information --

19          THE COURT:  Well, it doesn't say that it was one in

20  the same that seized the server and that provided the tip.

21          MS. GANT:  It implies that it was.  The

22  affidavit --

23          THE COURT:  That's your reading on it, but it does

24  not say that, Ms. Gant.

25          MS. GANT:  So I think that the Court ultimately has

1    a different factual record here, at least based on the

2    identity of the server being seized by a different foreign

3    law enforcement agency than, for example, the Court did in

4    *Bateman* or in the Eastern District of Virginia case, but

5    teasing out the import of the --

6              THE COURT:  Okay.  Well, just -- you're now talking

7    about something that's out of the four corners of the

8    affidavit.

9              MS. GANT:  So I think it goes to first the

10   sufficiency of the tip, the reliability of the tip, and then

11   I think it goes to a question of a *Franks* issue, and I can

12   address them kind of in turn.

13             Is it possible for me to go this podium?

14             THE COURT:  Yes, that's fine.

15             MS. GANT:  My glasses are fogging as I look down.

16             THE COURT:  I have the same issue.  I don't know if

17   we can take our masks off.

18             MS. GANT:  I'm okay with keeping it on if that's

19   okay.

20             THE COURT:  Okay, that's good.

21             MS. GANT:  So I think the question of the identity

22   of the foreign law enforcement agency that seized the

23   server, and the government will correct me if I'm wrong,

24   that not even this U.S. Attorney's Office knows what the

25   foreign law enforcement agency or country was who seized the

 1 | server.

 2 |        I don't know whether or not Agent Moynihan knows, I

 3 | don't know whether FBI knows, but my understanding from

 4 | Ms. Noto is that the government does not know who the

 5 | foreign law enforcement agency who seized the server was.

 6 |        Now, the representations made in the search warrant

 7 | affidavit are premised on the foreign law enforcement agency

 8 | who provided the tip.

 9 |        THE COURT:  Right.

10 |        MS. GANT:  Their assurance, which the government

11 | asks us to take at face value that it did not interfere with

12 | any computer in the United States, that only applies

13 | specifically to that foreign law enforcement agency's

14 | collection and obtaining of the data, specifically the IP

15 | address, but the source of that IP address and ultimately

16 | how it was maintained, how it was collected, how it was

17 | turned over is critical to the issue of the reliability of

18 | the tip, and no assurances have been made that there was no

19 | U.S. involvement in the foreign law enforcement agency who

20 | seized the server.

21 |        THE COURT:  In other words, what you're saying is

22 | if it turns out, if it turns out that the foreign law

23 | enforcement agency does not observe a rule of law that they

24 | did tap into servers in the United States or computers in

25 | the United States to get this information, if all that

1     happens, that would show that the tip is not reliable?

2           MS. GANT:  So I think two things.

3           THE COURT:  Could you just answer my question?

4           MS. GANT:  Well, two things in response to that.  I

5     don't know that it's predicated on that because the truth is

6     the Court has a complete dearth of information and can't

7     conclude one way or the other about the reliability of the

8     tip.

9           THE COURT:  Great, so there's your argument when

10    you go to the suppression hearing, Judge, you don't have

11    enough information to evaluate the reliability of the tip,

12    you don't know what country seized the computer, you're

13    relying on an intermediate, if I understand your argument,

14    intermediate law enforcement agency, i.e., the ▮▮▮▮▮▮

15    ▮▮▮▮▮▮▮'s representation that that country follows a

16    rule of law, that that country did not access computers, and

17    that's an insufficient basis to credit the tip that you got

18    from the a ▮▮▮▮▮▮▮▮.

19         MS. GANT:  So that that country being the country

20    of the ▮▮▮▮▮▮▮ not the country that

21    ultimately -- I think the circumstances at least the way it

22    could be presented in a motion to suppress --

23         THE COURT:  We got seizure, we got the party that

24    passed the tip, i.e. --

25         MS. GANT:  Right.

1          THE COURT:  -- the ███, and then we have the

2    United States that receives the tip.

3          MS. GANT:  Right.  If we analogize the tip from the

4    ███ to the United States, essentially let's just use kind of

5    plain analogy of a confidential informant, we don't have a

6    confidential informant providing information to the FBI or

7    the HCA or the U.S. Government about information that it

8    collected.  It ultimately is we got this information from

9    somebody else, no information as to how they got it and what

10   circumstances, what methodology was used or anything like

11   that.

12         THE COURT:  Well, hang on.  We don't know that.  We

13   don't know what information the ███ has.  We only know what

14   they gave us, but that brings me back to my point, so you

15   have what you need to go before Judge Hillman and say the

16   magistrate judge assigned this was not paying attention, the

17   tip is not reliable because all of this information

18   is -- was not in the hands of the government, they just took

19   an at face representation, if you will, that this IP address

20   on this particular date in May of 2019 accessed these child

21   porn websites.

22         MS. GANT:  So I think in terms of being able to

23   argue that the Court just didn't have the information to

24   assess the reliability of the tip, perhaps we can argue that

25   in the absence of that provided by the government, but the

1     other issue that's raised here, especially in the context of

2     *Valdivia* and in the context of not knowing who this foreign

3     law enforcement is who conducted the seizure, we don't know

4     whether or not there was an intermediary between the █████ and

5     the law enforcement agency who seized the server such that

6     that's even a broader kind of international chain, but the

7     issue is --

8           THE COURT:  Well, so what?

9           MS. GANT:  Well, I think the issue is that we don't

10    know, especially under *Valdivia* under circumstances that

11    would shock the conscious first whether or not the U.S. was

12    involved with this other foreign law enforcement agency in

13    the seizure and what was done in that respect.

14          THE COURT:  Right.  See, that's speculation though,

15    Ms. Gant, that's the problem that I've had.  I understand

16    your argument, but you're saying, Judge, if it turns out

17    that the law enforcement agency that seized this computer

18    does not follow rule of law, they ignore everything, they

19    have no search and seizure rules or anything like that, if

20    all that turns out to be -- if it turns out to be true, then

21    I have an argument to make, and my argument is that that tip

22    is unreliable.

23          First of all, I'm not sure that that logic works,

24    but putting that aside, that's a great big if.  What is -- I

25    mean, if you can get discovery on the basis of it's possible

1     that the law enforcement agency does not follow the rule of

2     law, therefore I'm entitled to discovery, we don't need

3     discovery rules, we don't even need *Valdivia* or any other

4     exception to the extraterritorial scope of the Fourth

5     Amendment because the government would have to turn over

6     absolutely every single piece of information that's out

7     there because of the possibility that you are raising.

8              MS. GANT:  Well, I don't think that this is an

9     abject speculative inquiry, as the Court would suggest.  I

10    think, ultimately, and maybe this is a problem that the

11    defense has generally with what we are cabined into in terms

12    of laying out the argument here.

13             I do think that *Goris* is controlling on this, but

14    *Goris* says that the defendant has to show some indication,

15    not a substantial threshold, like the Court laid out in its

16    principles at the beginning of this hearing, and the

17    government's opposition, I think, principally rests on what

18    appears to be the Court's position here, which is this

19    characterization of the defendant's request for discovery is

20    speculative.

21             THE COURT:  Well, I'm just looking at the words of

22    *Goris* that the showing has to significantly alter the

23    quantum of proof in the defendant's favor.

24             MS. GANT:  Right.  And preceding that, it says it

25    requires some indication that pretrial disclosure of the

1  information sought, and so I think that --

2       THE COURT:  Sorry, pretrial disclosure of the

3  information?  I missed the last word.

4       MS. GANT:  Then it goes into the quote that your

5  Honor just said, that would have altered the quantum of

6  proof in the defendant's favor.

7       THE COURT:  Okay.  So you want to argue some

8  indication?

9       MS. GANT:  Correct.

10      THE COURT:  What's the some indication?  Let's talk

11  about the unknown law enforcement agency that seized the

12  server.  What's the indication that they don't follow the

13  rule of law?

14      MS. GANT:  Well, I don't know that that is the

15  required showing here.  I think that the required showing is

16  that disclosure of the information about the identity of the

17  tip because this is now really just a question of where the

18  tip originated from.  Even preceding the issue of, you know,

19  getting into the circumstances of the seizure and the

20  collection of the data.

21      THE COURT:  Please don't because you're going to

22  confuse me.  Stay with your point if you want to make it.

23      MS. GANT:  Okay.  So I think that this goes

24  directly to the origin of the tip.  If the origin of the tip

25  is this as yet unnamed foreign law enforcement agency and

1  not actually -- I mean, I think -- I don't even know if I

2  need to say if.  The origin, the source of the information

3  that is ultimately channeled through at least one party to

4  the United States is this as yet unnamed foreign law

5  enforcement agency, that goes to not just *Valdivia*, but it

6  goes to the reliability I think for the reasons laid out in

7  the motion, specifically critical to determine not just the

8  circumstances.

9          THE COURT:  I'm not sure that you're right about

10  that.  I mean, it strikes me that the source of the tip is

11  the ███████████████████████████.  They're the

12  ones that sent the tip over to the United States to say this

13  IP address has accessed this computer.  The seizure was made

14  by a foreign law enforcement agency that follows the rule of

15  law.

16          MS. GANT:  So the information the Court has is that

17  the ███ bulk warrants for the collection of this data, but

18  the actual data and the --

19          THE COURT:  Sorry, say that again.  The ███ issued

20  both warrants?

21          MS. GANT:  Bulk, B-u-l-k, your Honor.

22          THE COURT:  Oh, okay.

23          MS. GANT:  For the collection of this data and then

24  based on that data relayed these intelligence reports that

25  were provided in discovery and were attached, the single

1    page intelligence reports that were attached to the

2    defendant's motion.

3         The problem with that is that in issuing the bulk

4    data for the collection of the data, we don't know where the

5    data came from, so it's one thing for the foreign law

6    enforcement agency to say we obtained this data, we're not

7    going to tell you who from, we're not going to tell you how

8    it was obtained, we're not going to tell you anything about

9    the circumstances of how it was obtained, that's a problem

10   because it goes directly to the origin of the tip.

11        I don't think the ███ can be characterized as the

12   origin of the tip because they are merely passing on

13   information that was retained by somebody that the

14   government refuses to disclose or at this point maybe

15   doesn't know.

16        THE COURT:  But they're representing that it's a

17   foreign law enforcement agency that follows the rule of law.

18        MS. GANT:  That's the ███.  That characterization

19   of the foreign government that follows the rule of law is

20   only applicable to the ███ who collected the data.

21        THE COURT:  Okay.

22        MS. GANT:  But omitted in the -- you know, I

23   completely agree with your Honor's characterization that our

24   system depends on, you know, the truthfulness of the

25   affidavits, but courts function as frankly the only check on

 1    that, and I think that the key omission here in the
 2    affidavit is the identity, not just of the foreign law
 3    enforcement agency but the fact that it was distinct from
 4    that provided by the tip.
 5         The affidavit essentially lays out a timeline and a
 6    chain as if it was the foreign law enforcement agency that
 7    provided the tip as being the same as who obtained the
 8    information.
 9         THE COURT:  Okay.  But how does that make the
10    affidavit then untruthful?  Where is the false?
11         MS. GANT:  It is a key omission that relates to the
12    reliability of the tip because the reliability of the tip,
13    as laid out in the affidavit, is premised on the belief,
14    representation and understanding --
15         THE COURT:  Okay.  Well, you're going to make that
16    argument to Judge Hillman.  You're on your way.  Nobody is
17    stopping you from making that, but --
18         MS. GANT:  I think the identity.
19         THE COURT:  I don't mean to cut you off.
20         MS. GANT:  No, no, that's okay.
21         THE COURT:  But I want to stay focused on what is
22    it in the affidavit?  I got Agent --
23         MS. GANT:  Moynihan, I believe.
24         THE COURT:  Moynihan, thank you.  I have her
25    affidavit.  What is it in her affidavit that is a false

1    statement with respect to what we're talking about right now

2    or a reckless disregard of the truth?  She has a tip from a

3    law enforcement agency that the United States works with

4    regularly.

5         MS. GANT:  That tip as laid out represented in the

6    search warrant affidavit is one that the affiant represents

7    as having come from information essentially solely from the

8    █████ and the assurances that the affidavit makes about this

9    country being predicated on the rule of law and this country

10   interfering with the U.S., that is only we now know cabined

11   to the ████ and the ████., it is not applicable to the agency

12   or the country, whoever intermediaries there were who seized

13   the server, obtained the data and then related it to the

14   ████

15        THE COURT:  So is the answer to my question then

16   the false statement in the affidavit is that Agent Moynihan

17   painted this as coming from the ████ when, in fact,

18   information was coming from another law enforcement agency?

19        MS. GANT:  I think partially, yes.  The other issue

20   is that --

21        THE COURT:  Well, I want to hear the government on

22   that.

23        MS. GANT:  Okay.

24        THE COURT:  Ms. Noto.

25        MS. NOTO:  Your Honor, first, if I could just

1    answer the question that came up a little bit earlier to the

2    extent that this is important to the Court, the

3    United States does know the name of this foreign law

4    enforcement agency that was seizing.

5             THE COURT:  I don't think that matters.

6             MS. NOTO:  I don't agree with the characterization

7    that the affidavit of Special Agent Moynihan either implies

8    or states that the tip FLA was the only law enforcement

9    agency involved.

10            I don't think that there is an omission there that

11   makes the tip unreliable.  What it says is that the foreign

12   law enforcement agency that provided the tip affirmed that

13   they had not interfered with a computer in the United States

14   in order to conduct their investigation leading to the tip

15   coming to the United States.

16            THE COURT:  Can I get the first part of that just

17   one more time?  If you want to just read it out of there,

18   that's helpful.  I can try pulling it up.  What is it,

19   Exhibit F to your motion?

20            MS. NOTO:  Yes, the Exhibit F is the affidavit.

21            THE COURT:  Right.  Isn't that what we're talking

22   about?

23            MS. NOTO:  Yes.

24            THE COURT:  Okay, good.  Okay.  Go ahead.

25            MS. GANT:  It's paragraph 33.

```
 1              THE COURT:  Okay.  Do you want read it?

 2              MS. GANT:  U.S. law enforcement personal did not

 3      participate in the investigative work through which in this

 4      case referring to the ███ identified the IP address

 5      information provided by the ███.

 6              There's no representation that they didn't

 7      participate in -- it's cabined into the investigative work

 8      that produces the information that, collected the

 9      information as opposed to the U.S. did not participate in

10      the seizure of the server, the collection of that

11      information, the --

12              THE COURT:  All right.

13              MS. GANT:  The deployment of the investigative

14      technique to identify the IP addresses.

15              THE COURT:  All right.

16              MS. GANT:  And that goes I think to the joint

17      investigation of this as yet unnamed.

18              THE COURT:  I'll give you say chance to argue that.

19              MS. GANT:  Right.

20              THE COURT:  I guess, Ms. Gant, just in the interest

21      of doing what is my job and not Judge Hillman's, since

22      that's what's in the affidavit, why do you need discovery?

23              MS. GANT:  I think it goes to the question of

24      whether or not there was a Fourth Amendment search by the

25      United States, and I shouldn't say I think.  This is the
```

1    argument on this point.  I think there are several points,

2    but on this point, the as yet unnamed foreign law

3    enforcement agency, which the government --

4            THE COURT:  -- knows but they haven't disclosed to

5    you?

6            MS. GANT:  Right, and I apologize but the last time

7    I spoke with Ms. Noto, I thought the government didn't know.

8            THE COURT:  That's all right.

9            MS. GANT:  But the way that it's characterized in

10   the affidavit, all the representations about what the U.S.

11   did or did not do preceding the tip only applies to the █,

12   it does not apply, and the affidavit does not disclose or

13   even indicate to the Judge that issued the warrant that it

14   was a different FLA who seized the server.

15           THE COURT:  Yeah, but it does, at paragraph 33, if

16   I remember correctly, and if I do, it's going to surprise

17   me, at paragraph 33, does it not say that the U.S. had no

18   involvement, I'm paraphrasing, didn't participate in the

19   investigation that led to the -- no, it doesn't say that?

20           MS. GANT:  No, it says that didn't participate in

21   the investigative work through which the █, referring to

22   the one who collected the data, identified the IP address.

23   It doesn't say broadly didn't participate in the --

24           THE COURT:  I think that's the same thing.  Read

25   that one more time.

```
 1              MS. GANT:  Again, just for the record, this is page
 2      33 of the affidavit.
 3              THE COURT:  Thank you.
 4              MS. GANT:  U.S. law enforcement personnel did not
 5      participate in the investigative work through which ███
 6      referring to the ███ identified the IP address, information
 7      provided by ███
 8              THE COURT:  I don't know, that sounds pretty good
 9      to me.
10              MS. GANT:  Well, that makes sense your Honor
11      because -- not the sounding pretty good part but the
12      characterization here because it's clear from the tip
13      documents that the ███ issued bulk warrants, and the U.S.
14      played no part in that, that the U.S. issued bulk
15      warrants -- I'm sorry, that the ███ through the ███ issued
16      bulk warrants, we don't know to whom, but that the U.S.
17      didn't participate or request the issuance of those warrants
18      or whatever.
19              That's the investigative work that they're talking
20      about, we issued a warrant and we got this information, but
21      that sentence that is directly quoted from paragraph 33
22      doesn't say that the U.S. did not have involvement preceding
23      that warrant through which the ███ ultimately --
24              THE COURT:  Can I just ask though if the
25      United States -- I don't know that that's a logical reading
```

1   of that.  If the U.S. participated in the investigation that

2   led to the seizure of the server and the obtaining of the IP

3   addresses, why would we be getting, we, the United States,

4   why would we be getting a tip from the ███ about our own

5   investigation?  It would be like the ███ telling us, you

6   know, there's drug dealing going on in Maine South, it's

7   like, great.

8          MS. GANT:  Well, I think, first of all, that is

9   also predicated on an if, right, which demonstrates the true

10  dearth of information that we have here, but also I think

11  the issue is that this is and has functioned, that this tip

12  has functioned here and in many other cases in which the

13  cases have been prosecuted arising out of this tip as

14  effectively an end run around the not just Fourth Amendment

15  questions and everything like that.

16         THE COURT:  I get that argument, but I don't buy

17  it, but I still want you to answer my question, and I don't

18  think you have.

19         MS. GANT:  Can I clarify?  Is your Honor's question

20  why would it make sense for the U.S. to have participated in

21  the seizure and then gotten the information from the ███?

22         I think, first, the ███ issues bulk warrants, and

23  the United States does not.  The ███ Investigatory Powers

24  Act --

25         THE COURT:  No, my question -- it is my question,

1    but for that reason, I just did not think it was a logical

2    or a fair reading of what's there, but --

3         MS. GANT:  Your Honor, respectfully, I think it's

4    the only reading that can be made from that because it's so

5    cabined and restricted specifically to the investigative

6    work that the ▮▮▮ did in issuing the bulk warrant to get

7    this information.

8         Now, the ▮▮▮▮▮▮▮ --

9         THE COURT:  All right.  But under your scenario

10   then the ▮▮▮ is giving a tip to the United States about

11   information that the United States helped develop?

12        MS. GANT:  Possibly.  I mean, I think that is a

13   likely scenario, and the problem with that is that let's say

14   it was a situation, and I don't want to engage in a

15   hypothetical here because I think that may just support your

16   Honor's opinion that this is speculation, but I think the

17   problem here is that we're limited by the information that

18   the government has provided to us that they say they know

19   but they have not provided to us.

20        THE COURT:  But, Ms. Gant, just to interrupt you

21   there though, that's not a small point.  In other words, and

22   I don't mean, I really appreciate the effort that you're

23   making here on this, but so I don't say this in a demeaning

24   way, but the argument strikes me very much as if there's

25   helpful information out there, that's going to be helpful to

1    us, and, therefore, we should get another discovery and,

2    again, the problem I have is going back to this analogy, I

3    don't see you getting from home plate to first base, in

4    other words, if it's out there, if these are false

5    statements, it's like, okay, but I have a sworn statement

6    that they're not, that this is true.

7            MS. GANT:  So I understand, and that's probably the

8    easiest baseball analogy for somebody who doesn't understand

9    the rules of baseball to get.

10           THE COURT:  Thank you.

11           MS. GANT:  But I would say it is a totally and

12    reasonable and logical explanation and scenario for the U.S.

13    to have participated in the seizure of this server, and the

14    only way that the U.S. then would not be subject to Fourth

15    Amendment seizure and search was is if somebody like the

16    ███ with a broad power to issue bulk warrants under the

17    investigatory powers act that is thoroughly explored in the

18    motion gets the information from the server, that's the way

19    potentially that the U.S. avoids deploying the NIT that

20    became fatal and at issue in some of the playpen cases, and

21    I think that that is a problem when the government isn't

22    disclosing who the foreign law enforcement agency is, and

23    that I think is a broader point.

24           I think that there are missing pieces of discovery

25    that are cross-referenced in terms of, for example, on

1    page 19 of the defendant's motion, it outlines specific

2    missing documentation where the tip, I'm sorry, where the

3    affidavit characterizes the, if I could go to the 19th page

4    of this, where the affidavit characterizes the tip

5    documents.

6               THE COURT:  So where are we on page 19?  I see a

7    big paragraph in the middle.

8               MS. GANT:  A big paragraph in the middle with the

9    underlined.

10              THE COURT:  Yeah, right.  I'm just going to read,

11   specifically the affidavit at paragraphs 31, 32 indicates

12   that the FLA notified U.S. law enforcement that a specific

13   IP address was used to access online child substance abuse

14   and exploitation material via a website that the foreign law

15   enforcement agency named and described as website 2 and 3

16   respectively and that the FLA provide further documentation

17   naming the website as website 2 and 3 respectively, which

18   the FLA referred to by its actual name.

19              Okay.  So I'm there.

20              MS. GANT:  Okay.  So that deals specifically with

21   Exhibits G and I to the defendant's motion, specifically the

22   ██ reports that appear to be kind of copy and paste of IP

23   address was used to access a website.

24              THE COURT:  This?

25              MS. GANT:  That's I think Exhibit I.

 1          THE COURT:  Okay.  So this, the letter?

 2          MS. GANT:  That's the letter that identified the

 3     use of the bulk warrants.  Your Honor just had it.  It's a

 4     small single paragraph.

 5          THE COURT:  Small single paragraph.

 6          MS. GANT:  That says that on such-and-such date, a

 7     bolded IP address was used to access a website.

 8          THE COURT:  Oh, okay.  Got it.

 9          MS. GANT:  So comparing that with the affidavit,

10     the affidavit he references tip documents that says that the

11     FLA named the website --

12          THE COURT:  Yes.

13          MS. GANT:  -- in that document.  There's no name of

14     the website in that document.

15          THE COURT:  Does it say it named it in this

16     document?

17          MS. GANT:  So it says that, "was used to access

18     online child sexual abuse and exploitation material via a

19     website that the FLA named and described as websites 2 and

20     3," and then that they further provided documentation naming

21     the websites as websites 2 and 3, which is Exhibit I, the

22     one that your Honor had first pointed out.

23          So, that in and of itself demonstrates that there's

24     missing documentation.  There is a question as to whether or

25     not the tip documents that have been provided by the

1    government are what was referred to in the affidavit, and

2    that's critical to determine whether or not the

3    characterization in the affidavit is correct because so far,

4    it's not, and I'm not accusing Agent Moynihan of willfully

5    misleading the Court or lying to the Court, but ultimately

6    the tip documents don't reflect in the affidavit at

7    paragraphs 31 to 32.

8              THE COURT:  Okay.  Hang on a second.  Let me digest

9    that.

10             MS. GANT:  Maybe this is an easier way to say it.

11   How do you get from that single page, single paragraph

12   identification of an IP address to the documents that name

13   the websites?  There's no cross-reference to either of them

14   to suggest to --

15             THE COURT:  Well, I don't know that's true.  Mine

16   has come in blacked out.

17             MS. GANT:  That's the item that I was provided, so

18   that's all I can say, the discovery that the government has

19   provided.

20             THE COURT:  Okay, that's a little bit of

21   speculation.  That's where we're running into a problem.

22   Ms. Noto, is it possible to -- I realize -- well, is it

23   possible to take out some of these deletions so that the

24   reference -- so I'm looking at -- I don't know what to call

25   it, this document?

1              MS. NOTO:  Yes.

2              MS. GANT:  That's Exhibit I, your Honor.

3              THE COURT:  Thank you.  I.  Is I this two-pager or

4      is one I and one -- is it H and I?

5              MS. NOTO:  I believe there's a two-page document.

6      There's almost nothing on the second page.  Document H.

7              THE COURT:  Oh, okay.  Then there's the one -- so

8      one site, one of them names the ████████ and the other one

9      references ████████?

10             MS. NOTO:  That's right.

11             THE COURT:  So is there a way to take the

12     redactions out to satisfy the defense about the link?  So,

13     as I understand it, I have the communication from the

14     ██████████████████.

15             MS. NOTO:  That which has been, if you look up in

16     the top right-hand corner, the Bates number is 93.  Is that

17     what you're looking at?

18             THE COURT:  No, I don't have the Bates numbers.

19             MS. GANT:  I think for ease of labeling the

20     exhibits, I put Bates numbers on the bottom.

21             THE COURT:  Oh, sorry.  Well, I have one that

22     doesn't have a Bates number on it.  I have one that has

23     0092, and then there's a --

24             MS. GANT:  I think that's Exhibit G or H.

25             THE COURT:  Okay.

1          MS. NOTO:  Either way, there are two nearly

2     identical tip documents that are in that form, the single

3     paragraph identification of an IP address, they're just like

4     minutes apart, it's the same days, just minutes apart.

5          THE COURT:  In other words, I have a letter that

6     says that on this date at this time this IP address was used

7     to access the website.

8          MS. NOTO:  That's correct, and if you see the

9     description of that website there --

10          THE COURT:  In that letter, okay.

11          MS. NOTO:  Yes, with an explicit focus on

12     facilitation of sharing child abuse materials, emphasis on

13     indecent materials of boys, if you then look at the document

14     in Exhibit I that has a Bates number of 100, that lists some

15     of the named videos.

16          THE COURT:  Yes.

17          MS. NOTO:  It's the identical description, which I

18     think it's almost practically copy and pasted into the

19     paragraphs 32 and 33.

20          THE COURT:  Right, I see that, I see that identical

21     language.

22          MS. NOTO:  So while it is true that paragraph I

23     think it was 31 does not say I looked at more than one piece

24     of paper in order to compile this paragraph.

25          THE COURT:  I understand that.

1          MS. NOTO:  The points -- the language is lifted

2     virtually identically.  There's nowhere that says, which is

3     what I think the defendant is speculating that, therefore,

4     there must be another piece of paper that has the entirety

5     of paragraph 31 laid out on the same tip document, but even

6     if there were yet another piece of paper that restates this

7     tip in a different way, I don't see how that advances the

8     defendant's argument at all.  It's primarily speculation

9     that this document exists.

10          THE COURT:  Ms. Gant doesn't need me to be her

11     advocate, but I think what I understand her to be saying is

12     the affidavit says that the tip expressly identified the

13     website by name, okay, what we're calling website 2 and 3.

14          MS. NOTO:  Yes.

15          THE COURT:  In connection with the tip that on this

16     day at this time this IP address accessed it.  I completely

17     understand your argument, Ms. Noto, that you can look at two

18     pieces of paper, and I assume, I don't know, I assume when

19     the agent is looking at it, not everything that is blacked

20     out here was blacked out.

21          My question to you is does the government object to

22     unblacking out something either on the letter from the

23     ███████████████ or from the report Bates Number 100

24     that links these two, I guess, for instance, would show

25     maybe it's the same ███ project?  On the letter, it says,

1    "███ project blank."  Maybe that project number appears on

2    100.  I'm just asking if it can be done.

3            MS. NOTO:  In all candor, your Honor, I don't

4    remember what everything is that is redacted here to the

5    extent that I even saw it myself, so I would have to look to

6    see what that is in order to know what to remove the

7    redaction from.

8            MS. GANT:  And I do want to say --

9            MS. NOTO:  I don't think that that's a problem, but

10   without remembering what it says there, I can't tell, for

11   example, that I would unredact the operation name or the

12   project name.  I can't remember.

13           THE COURT:  Right.

14           MS. NOTO:  Exactly what it is that might line it

15   up, except in my conversations with Special Agent Moynihan,

16   she explained that she read the description on Bates 100,

17   where it has the name of the website --

18           THE COURT:  Right.

19           MS. NOTO:  -- and she read the tip that's on Bates

20   92, which gives the same description and understood that to

21   mean this IP address access that website.

22           Now, I don't think even Ms. Gant is suggesting

23   this, but I think it should be clear that websites 1, 2, 3,

24   those are all names that HSI has used in their affidavits in

25   the United States.

1          THE COURT:  Right, I get that.

2          MS. NOTO:  The tip document never calls them

3     website 2 or 3.

4          MS. GANT:  I agree with that.  I have no quibble

5     with that.  I think my issue is, first, we're subject to a

6     very strict protective order, and so I don't think redaction

7     would harm -- I don't think unredacting those specific

8     documents to demonstrate a link, if there exists one, would

9     create any harm.

10          But, second, to the extent the government hangs

11    their hat on this quote, unquote, "identical language," that

12    language describes nearly every hidden service site on Tor.

13          There's virtually no child abuse and sexual

14    exploitation material that doesn't fit those specific

15    parameters.  Granted, the two intelligence documents are

16    attached different, but the government says that there's no

17    evidence in the affidavit that suggests that there was more

18    than one piece of paper, but there is in paragraphs 32, it

19    says that the FLA provided further documentation naming the

20    website, and earlier it says that the original tip document

21    named and described the website, but to me, aside from that

22    definition, which could apply to every single hidden service

23    site, there's no link between the two to suggest that it

24    was --

25          THE COURT:  You know, I'm not sure about that

1    because doesn't the affidavit, you know, it includes a few

2    paragraphs, I don't remember exactly where it is that an

3    agent went to the site, they looked at it, and these were

4    some of the videos that were on it.

5        MS. GANT:  Correct.

6        THE COURT:  If I could just finish, and those

7    videos have names, and aren't those names names that are

8    like under the "███████"?

9        MS. GANT:  I think some might be, your Honor, but

10   the problem is --

11       THE COURT:  Right, so doesn't that link it up?

12       MS. GANT:  No, your Honor, because the tip is

13   coming from the FLA, and the ████ is the one that says

14   that -- I mean, the affidavit says that the ████ named and

15   described the website in connection with used to access

16   online child sexual abuse and exploitation material via a

17   website that the FLA named and described.  That larger tip

18   document naming "██████" doesn't have Mr. Kiejzo's IP

19   address, it doesn't have anything connected to the date and

20   time, and the videos that were allegedly corrupt --

21       THE COURT:  I think you can make that argument to

22   Judge Hillman and say therefore there's a break in the

23   probable cause.  I mean, who cares if you're right or wrong,

24   wouldn't you rather not know?  I mean, if they've turned the

25   information over to you, you'll lose the argument.

1           MS. GANT:  Well, if it exists, that's the problem.

2           THE COURT:  Well, then see we're back to the -- I

3  get that, but I'm not comfortable with the discovery motion

4  that is kind of if it whatever because if that standard

5  applies, then we don't need discovery rules.

6           MS. GANT:  So I think that this is maybe a problem

7  that I, maybe many defense attorneys have with the standard

8  that is put forth on defendants for the burden of discovery,

9  and ultimately I think it's a frankly wholly unfair one

10  because ultimately the government is able to withhold

11  evidence that is relative and material to the filing of a

12  *Franks* motion and say, well --

13           THE COURT:  Ms. Gant, you recognize that you are

14  arguing to the lowest federal court in -- I mean, lowest

15  level of the federal court that there exists.

16           MS. GANT:  I know, I know.

17           THE COURT:  It's a great argument, and it should be

18  taken up with Congress or --

19           MS. GANT:  Well, there's one way to start it here,

20  your Honor, but I don't think the Court needs to have that

21  starting position in order to hear the defendant out on

22  several different requests, but to the extent that the Court

23  can be assured that even just unredacting some of the

24  documents that have been provided, whether it wants to do

25  that subject already to the extremely restrictive protective

1   order or to view the documents in camera that are requested

2   by the defendant and then take it from there.

3        I don't need to belabor kind of all of the points

4   and specific requests.  They are fully briefed and

5   enumerated and explained in the motion, but I think there

6   was just one thing that I wanted to address.  The same kind

7   of missing link exists with Request Number 15, the

8   defendant's motion, page 23 for the Verizon records.

9        THE COURT:  Yes.

10       MS. GANT:  I don't necessarily need the Court to go

11  there, I just wanted to point out that it flows from the

12  same kind of missing link and documentation that we were

13  just talking about.

14       I really think that that is -- I think everything

15  is fully briefed.  I think the Court has the defendant's

16  arguments, and I think that ultimately the specific cases

17  that the government cites to in trying to argue that the

18  defendant's motion with respect to the *Franks* Hearing is

19  speculative are distinguishable.

20       I mean, I think the *Marcellus* case, which is the

21  Eastern District of New York case, the sole basis in that

22  case was to garner support for a *Franks* motion, and there

23  was, I think, a much greater level of speculation in that

24  case that dealt with kind of omissions and these subsequent

25  reauthorization requests that were included in the original

1    materials, and the defendant just raised some like

2    speculation that there was some lack of detail about the

3    confidential source, and that's not what we have here.

4         To the extent that I was able based on limited

5    information that the government gave me, I attempted to do

6    significant research on the ██, on the Investigatory Powers

7    Act, how the tip was relayed to the U.S., and ultimately

8    identified areas which the defendant would need to file not

9    just a *Franks* motion but to make an assessment about the

10   credibility of the tip and to make an assessment about the

11   reliability of the tip, and that goes to the heart of the

12   methodology question that is fully briefed in the motion.

13        So unless the Court has additional specific

14   questions, I'm happy to -- oh, the only other thing I wanted

15   to say, there is mention in the -- and this goes to the

16   missing documentation piece which may rest under those

17   redacted materials from the tip documents.

18        In the government's discovery responses, which are

19   attached to the motion, the government for the first time

20   essentially claimed that the defendant had logged on to one

21   of the websites, one or both of the websites, which would

22   suggest the creation of an account, the creation of a

23   password and the purposeful and intentional visit to a

24   website that is depicted in the tip documents.

25        But that logged-on language, which suggests the

1   creation of an account is nowhere in any of the other

2   discovery, it just seems to be a representation made by the

3   government.

4           THE COURT:  Exactly.  In other words, is Exhibit D

5   an answer to your original discovery?

6           MS. GANT:  That's right, and in an answer, they

7   imputed this new action on the part of Mr. Kiejzo, which is

8   not borne out in any of the materials provided thus far.

9           THE COURT:  But, I mean, the affidavit, I had

10  checked it, the affidavit says the tip is that this IP

11  address accessed these accounts.  It doesn't say logged in,

12  in fact, it says elsewhere that you can visit or access

13  these sites, if you will, without creating an account or

14  logging in.

15          MS. GANT:  So the materials that were provided by

16  the government that is cited in the enumerated requests and

17  partially at page 19 indicates that the IP address to which

18  they attribute Mr. Kiejzo had accessed or logged into

19  website 2 and 3, and in order to access much of the

20  material, at least with respect to one of the websites,

21  there would have had to have been the creation of an

22  account, so I've asked for that account information, which

23  the government has declined to provide, and to access the

24  website vs. access the material I think is an important --

25          THE COURT:  But that doesn't mean that the IP

1   address did not access it.

2            MS. GANT:  Well, there's a different point here,

3   and I think this is actually a critical point, so I'm glad

4   to end on this.  The government's representations in the

5   affidavit and in the tip documents about what your Honor

6   just said, which is you can get some of the material outside

7   of the creation of the account, for one of the websites, and

8   I'm happy to have the Court correct me if I'm wrong, you

9   need to be logged into the account, so if the government has

10  evidence that Mr. Kiejzo did not log onto the account and

11  then was not able to access the material that is laid out in

12  the tip document, that's exculpatory.

13           THE COURT:  I agree with you, and that would have

14  to be turned over.

15           MS. GANT:  And that goes to a misstatement in not

16  just the tip documents but the affidavit that he accessed

17  material.

18           THE COURT:  Okay.

19           MS. GANT:  So I'm happy to end on that unless the

20  Court has additional questions.

21           THE COURT:  No.

22           Ms. Noto, let me hear you on why is the

23  government's response had access to or logged into website 2

24  and 3?

25           MS. NOTO:  Your Honor, I think that that may be

1     just poor phrasing on my part. I did not intend to imply

2     that access and logged in were equivalent, given how these

3     websites were accessed. One way of accessing is to create

4     these identities. The question that the defendant posed was

5     do we have the evidence that Mr. Kiejzo in particular

6     created an account on all the other dates? The

7     United States is not in possession of that information.

8           The only information that we were provided was that

9     the IP address that was linked to his house accessed these

10     websites. We were not provided with specific information

11     about Mr. Kiejzo at all. It was the IP address.

12           This was a residence that was used by both the

13     defendant and his father. The United States is not in

14     possession of the answer to that question. I don't know if

15     the foreign law enforcement agency has more specifics about

16     the person who logged in from that IP address. We do not

17     know that information. It was simply a response to the

18     question do we have information about Mr. Kiejzo logging in.

19           THE COURT: Okay. And am I correct that at least

20     this is what the affidavit says, you can access each website

21     without an account? And I understand that to mean you don't

22     need to log in. In other words, I understand there to be a

23     distinction between accessed or log in. Log in to me means

24     you have an account, you put your name, your credential or

25     whatever, your password and you're in. You can access

 1   website 2 and website 3 without logging in?

 2          MS. NOTO:  Yes, there's what some people would

 3   call --

 4          THE COURT:  That's what the affidavit says?

 5          MS. NOTO:  That's what the affidavit says.  If you

 6   look at paragraph 16, for example, it says a review of the

 7   initial website two-page revealed a message board with a

 8   search bar with two hyperlinks, announcements and important

 9   information, and then below that is a link to log in or

10   register.

11          So an individual could access that much of the page

12   without logging in?

13          THE COURT:  Right.

14          MS. NOTO:  And I think there's very similar

15   language with respect to website 3, that in order to get to

16   the initial page, a person only needs to navigate to that

17   website.  Once they arrive there, they have the option to

18   log in, and I'm paraphrasing here, but there are in order to

19   see all of the videos create an account or register are

20   options that are on that initial page.

21          But I don't think the affidavit anywhere says, and

22   I don't have this -- the United States does not have the

23   information that Mr. Kiejzo created an account and accessed

24   on any certain number of days or what was looked at exactly.

25   We don't have that information.

1       THE COURT:  By virtue of using log in information

2   to get there?

3       MS. NOTO:  That's right.  The tip was based on IP

4   address, not based on individual.

5       THE COURT:  Right, otherwise you would just say

6   so-and-so logged in?  Yes?  I mean, now I'm speculating,

7   talk about the kettle calling the pot black.

8       MS. NOTO:  But that is my phrasing, access or

9   logged in as an alternative.  It is not meant to imply that

10  there is any record out there that shows Vincent Kiejzo

11  logging in.  I don't -- that is not something we were

12  provided.

13      THE COURT:  Ms. Gant, anything else?

14      MS. GANT:  Nothing that hasn't already been fully

15  kind of briefed, your Honor.  I appreciate the Court's

16  consideration of this.

17      THE COURT:  Yes, sure.  I'll think about it a

18  little bit more.  I will tell you I'm inclined to deny this

19  in toto.

20      MS. GANT:  Does that relate even to the redaction

21  that the government?

22      THE COURT:  I was going to come back to that.  I am

23  not ordering it, but invite the government just to address

24  an issue, I mean, if you want to go ahead and brief it, go

25  ahead, but I understand the argument is going to be made

1    that the tip that ties the IP address date and time does

2    not -- at least as it's produced to satisfy the defendant,

3    assuming that Agent Moynihan had access to this information,

4    that more closely ties.  I understand your argument, and I

5    also think that the names of these individuals --

6            MS. GANT:  One housekeeping question, your Honor,

7    just as we close.

8            THE COURT:  They could go to Japan, they could go

9    to Ireland, they could go to Massachusetts.  I really

10    struggle with the idea that there's some end run going on

11    here to get this information because nobody knows where this

12    goes to.  Moreover, IP addresses are not necessarily static,

13    I could have an IP address for six months and then it could

14    change.

15            MS. GANT:  So I think the missing critical piece in

16    your Honor's description of events with respect to this as

17    yet unnamed FLA is the how.  How ultimately were any IP

18    addresses discovered and usually consistent with *Playpen* and

19    consistent with the cases cited in the defendant's

20    memorandum, it's through the deployment of a network

21    investigative technique that would interfere with computers

22    in the United States.

23            We have no information as to how the IP addresses

24    were identified.  We know how they were collected, and

25    that's through the issuance of a bulk warrant in the ███

1   but we have no idea how they were identified, whether --

2   (audiotape cut was cut off).

3           THE COURT:  Anyway.  All right.  So go back to the

4   housekeeping.  So yesterday I granted the motion to give you

5   45 days.

6           MS. GANT:  I appreciate that, your Honor.

7           THE COURT:  It goes out to October 29th.

8           MS. GANT:  Yes.

9           THE COURT:  I'll mull it over the weekend.  I think

10  I'm going to deny this motion for discovery.  I'm not trying

11  to put more pressure on you, but do you really want to wait

12  until the end of October to file a suppression motion?

13          MS. GANT:  So I have been working on it.  The

14  problem is that seems to be converging at the same time.

15  I'm preparing a co-defendant-in-custody trial before Chief

16  Judge Saylor that has taken on kind of a mountain of

17  pretrial work including a late stage --

18          THE COURT:  All right.  So you want October 29th?

19          MS. GANT:  Please, your Honor.  The only thing I

20  was going to ask in terms of the housekeeping question,

21  that's the date that was set for the initial pretrial, and

22  to --

23          THE COURT:  No, so that's been canceled.

24          MS. GANT:  Oh, okay.

25          THE COURT:  At least, as I understand it,

 1     Judge Hillman basically kicked the case back to me, it was

 2     creating too much paperwork, so my order from yesterday, and

 3     if you don't ride them, that's okay.  I didn't read them

 4     when I was an AUSA.  The September 23rd pretrial conference

 5     is canceled.  The date for filing is October 29.

 6              MS. GANT:  Okay.

 7              THE COURT:  I put a final status conference on that

 8     date.  You know, if you send me a short joint memo that says

 9     it's being filed or it's been filed and the government needs

10     two weeks or three weeks to respond, and we'll look to

11     exclude the time, you can send it back to Judge Hillman,

12     I'll just cancel the status conference.  I think I put it on

13     for 9:30 or 10.

14              MS. GANT:  Okay.  I thought that it had been

15     continued for the initial pretrial on the 29th, and I was

16     just going to ask for a certain date to file.

17              THE COURT:  No, it's before me.

18              MS. GANT:  Thank you, your Honor.

19              THE COURT:  All right.  Is there a motion to amend

20     conditions?  I'm sorry, did you want to be heard, Ms. Noto,

21     on that, on the housekeeping issue?

22              MS. NOTO:  A slightly different housekeeping issue.

23     Once Ms. Gant files the motion, I do believe I'll be on

24     trial at that time.  I may ask for a little time to respond,

25     but I can deal with that.

 1           MS. GANT:  No objection.

 2           THE COURT:  I'm sure you'll work it out.

 3           MS. NOTO:  What I was going to ask is that given

 4    that some of the materials, some of the details that are

 5    covered by the protective order were discussed at this

 6    hearing, the recording of today's hearing under seal.

 7           THE COURT:  I can do that, but do you think you

 8    need it?  I thought we referred to things fairly, and I made

 9    an effort to do this fairly, what's the word kind of

10    categorically?  I tried not to -- yes, we did talk about

11    another foreign law enforcement agency.

12           MS. NOTO:  And the identity of the foreign law

13    enforcement agency that provided the tip is something we've

14    been asked to keep private as well as the names of one of

15    these websites was mentioned on a couple of occasions.

16           THE COURT:  You're right, I did.  Well, can we

17    redact the websites?

18           MS. NOTO:  If a transcript is made, I'd be happy to

19    suggest.

20           THE COURT:  Show it to Ms. Gant.  Get the

21    transcript, go through it, agree on what you want to redact,

22    and I'll look at it and grant in a motion.

23           MS. GANT:  That makes sense.

24           MS. NOTO:  I'm sorry, is that a practical question?

25    Is the transcript automatically created or do we need to

1    order it and pay for it?

2           THE COURT:  I think you do need to order it.

3           MS. GANT:  I'll order it.

4           MS. NOTO:  We'll work that out amongst ourselves.

5           THE COURT:  Well, look, take *Goris*, the discovery

6    motions ended up getting appealed.  Of course, I have no

7    idea what's going to happen in this case, but if there were

8    a conviction and an appeal, that may be one of the matters

9    taken up on appeal, so I do think it's a good idea to have

10   that record.  I guess that's where I'm going with that.

11   It's probably now that I think of it, why I should write a

12   short memo, memorandum on it, whatever decision I do make.

13   Okay.  All right.  That's housekeeping.

14          So then there was an issue, there was a motion to

15   amend conditions.  Has that been dealt with?

16          MS. GANT:  Yes, your Honor, I did file an assented

17   to motion.  Your Honor allowed it.

18          THE COURT:  Okay, great.

19          MS. GANT:  All right.  Mr. Kiejzo has had zero

20   problems with compliance on conditions of release for over

21   the last year.

22          THE COURT:  Okay.  All right.  Thank you, everyone.

23   We're in recess.

24          MS. GANT:  Thank you, your Honor.

25          THE CLERK:  The Court stands in recess.

1          (Whereupon, the hearing was adjourned at 3:38 p.m.)

2

3                        C E R T I F I C A T E

4

5

6     UNITED STATES DISTRICT COURT )

7     DISTRICT OF MASSACHUSETTS ) ss.

8     CITY OF BOSTON )

9

10          I do hereby certify that the foregoing transcript,

11    Pages 1 through 49 inclusive, was transcribed by me

12    stenographically at the time and place aforesaid in Criminal

13    Action No. 20-40036-TSH, UNITED STATES of AMERICA vs.

14    VINCENT KIEJZO and thereafter by me reduced to typewriting

15    and is a true and accurate record of the proceedings.

16          Dated September 28, 2021.

17

18                        s/s Valerie A. O'Hara

19                        _____

20                        VALERIE A. O'HARA

21                        OFFICIAL COURT REPORTER

22

23

24

25