# Exhibit 16

```
 1                    IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE EASTERN DISTRICT OF VIRGINIA
                              Norfolk Division
 3

 4    - - - - - - - - - - - - - - - - - -
 5                                          )
          UNITED STATES OF AMERICA,         )
 6                                          )
                      Plaintiff,            )    CRIMINAL ACTION
 7                                          )    NO. 2:18cr101
          v.                                )
 8                                          )
          DASHAWN WEBSTER,                  )
 9                                          )
                      Defendant.            )
10    - - - - - - - - - - - - - - - - - -

11

12                       TRANSCRIPT OF PROCEEDINGS
                                (SENTENCING)
13                          Norfolk, Virginia

14                          December 13, 2018

15

16    BEFORE:    THE HONORABLE RAYMOND A. JACKSON
                 United States District Judge
17

18
      APPEARANCES:
19
                 OFFICE OF THE UNITED STATES ATTORNEY
20               By:  Elizabeth M. Yusi, AUSA
                 Counsel for the Plaintiff
21

22               OFFICE OF THE FEDERAL PUBLIC DEFENDER
                      Keith Loren Kimball, AFPD
23               By:  Wilfredo Bonilla, Jr., AFPD
                 Counsel for the Defendant
24

25
```

```
 1                        P-R-O-C-E-E-D-I-N-G-S

 2              (Whereupon, the proceedings commence, 9:59 a.m.)

 3              THE CLERK:  United States of America versus Dashawn

 4    Webster, in Criminal Action 2:18cr101.

 5              Ms. Yusi, is the government ready to proceed?

 6              MS. YUSI:  The government's ready.

 7              Good morning, Your Honor.

 8              THE COURT:  Good morning, Ms. Yusi.

 9              THE CLERK:  Mr. Bonilla, is the defendant ready to

10    proceed?

11              MR. BONILLA:  Good morning.

12              Good morning, Your Honor, the defense is ready to

13    proceed.

14              THE COURT:  Good morning, Mr. Bonilla.

15              Mr. Webster, morning.

16              THE DEFENDANT:  Morning.

17              THE COURT:  Have you had an opportunity to speak to

18    your lawyer to prepare for the hearing this morning?

19              THE DEFENDANT:  Yes, Your Honor.

20              THE COURT:  Are you satisfied with the advice and

21    counsel they are giving you?

22              THE DEFENDANT:  Yes, Your Honor.

23              THE COURT:  All right, you may have a seat.

24              The Court has reviewed the presentations, the

25    position papers filed by each counsel in this case.
```

```
 1           The Court found no outstanding objections from the
 2   United States.
 3           Ms. Yusi, is that still the case?
 4           MS. YUSI:  Yes, sir, Your Honor.
 5           THE COURT:  You made a motion for the defendant to
 6   receive an additional one point for responsibility?
 7           MS. YUSI:  I did file one.
 8           THE COURT:  That motion is granted.
 9           Mr. Bonilla, the Court, likewise, found no
10   outstanding objection from Mr. Webster.
11           Is that still the case?
12           MR. BONILLA:  Yes, Your Honor.
13           THE COURT:  All right, then, we will get right to
14   the indication of what the Advisory Guideline Range is.
15           Mr. Webster, if you will stand again.
16           Mr. Webster, the Court finds that you have a
17   Criminal History Category of I, an Offense Level of 48.  The
18   advisory guideline is life, but that's restricted to a
19   mandatory minimum of 15 or a cap of 30 years.
20           You may produce witnesses, documents, exhibits this
21   morning to assist the Court in determining what sentence is
22   sufficient but not greater than necessary.
23           If you wish to testify under oath, you may do so.
24   But, if you do, you will be subject to being questioned or
25   cross-examined by Assistant United States Attorney Yusi on
```

1    this case.

2            If you choose to make an unsworn statement just

3    before the Court sentences you, you will not be

4    cross-examined.  You also have a third option; just remain

5    silent and have Mr. Bonilla or Mr. Kimball to handle the

6    closing and argument for you.

7            Do you understand this?

8            THE DEFENDANT:  Yes, sir.

9            THE COURT:  Now, Mr. Bonilla, are there any

10   witnesses you will be calling?

11           MR. BONILLA:  No, Your Honor.

12           THE COURT:  Does Mr. Webster wish to make any

13   statement before being sentenced?

14           MR. BONILLA:  Yes, Your Honor, he just asked to make

15   an unsworn statement.

16           THE COURT:  All right, then, thank you very much.

17           MR. BONILLA:  Thank you, Your Honor.

18           THE COURT:  Okay, the Court will note a couple of

19   things for the record.

20           The Court has received and read the forensic

21   neuropsychological evaluation on the defendant.

22           By the way, do you wish to -- you have it filed

23   under seal, but do you wish for this to go to the Bureau of

24   Prisons with the defendant?

25           MR. BONILLA:  Yes, Your Honor.

 1              THE COURT:  Okay, we will work that out so that will
 2   happen.
 3              The Court has also received a substantial submission
 4   here with respect to the victims.
 5              Ms. Yusi, it's kind of repetitive reading, but the
 6   Court understands the need for it.
 7              Are there any other exhibits or documents or
 8   witnesses you will be presenting?
 9              MS. YUSI:  I have one brief witness, Your Honor.
10              THE COURT:  Okay.  Then let's call your brief
11   witness.
12              MS. YUSI:  Your Honor, we call Special Agent Paul
13   Wolpert.
14              PAUL WOLPERT, called by the Government, having been
15   first duly sworn, was examined and testified as follows:
16                        DIRECT EXAMINATION
17   BY MS. YUSI:
18   Q.  Could you introduce yourself to the Court?
19   A.  I'm Paul Wolpert.
20   Q.  How do you spell your last name?
21   A.  W-O-L-P-E-R-T.
22   Q.  Where do you work?
23   A.  I'm a Special Agent with Homeland Security Investigations
24   here in Norfolk.
25   Q.  What do you do there?

1    A.  I primarily investigate crimes involving child

2    exploitation, as well as I'm a computer forensic examiner.

3    Q.  And how long have you been involved with those types of

4    crimes?

5    A.  The investigations, since April or February of 2004, and

6    then March of 2006, I became a forensic examiner.

7    Q.  Are you the case agent on the investigation and

8    prosecution of Dashawn Webster, the Defendant?

9    A.  I am.

10   Q.  And you're familiar with the images and the charges that

11   we are here today about?

12   A.  Yes.

13   Q.  I just want to give some context to the Court, or a

14   little bit more information.

15          Are you familiar with the 2012 FBI investigation that

16   led to Mr. Webster's residence?

17   A.  I am.

18   Q.  And how did that come about?

19   A.  I didn't learn about this until we executed the search

20   warrant this time, but it was apparently a peer-to-peer

21   investigation, where a download was made of a file.  I

22   believe it was one file, it wasn't a whole lot.

23          So they decided to conduct what we consider a

24   knock-and-talk interview at the residence to determine if

25   somebody was responsible for the activity on the peer-to-peer

```
 1  networks.
 2  Q.  And this was Mr. Webster's residence in Portsmouth?
 3  A.  Yes.
 4  Q.  And at that point was there enough for a search warrant?
 5  A.  No.
 6  Q.  Who was at the residence when law enforcement went there?
 7  A.  I don't know everyone.  I only know by the interview that
 8  was conducted with Mr. Webster's mother during our search
 9  that she was at least there.
10  Q.  Okay, and did law enforcement check the computers that
11  were located at that time?
12  A.  They did.
13  Q.  Was any indication of child pornography or peer-to-peer
14  technology found at that time?
15  A.  No.
16  Q.  Where was the defendant at that time?
17  A.  He was in New Jersey.
18  Q.  Was he a minor at that point?
19  A.  I believe he may have been 17.
20  Q.  Okay.  And did the FBI in New Jersey follow up?
21  A.  I believe they did what they could in terms of checking
22  if there was any activity associated with the address where
23  Mr. Webster was in New Jersey.
24       Other than that, I'm not aware of what else they had
25  done.
```

```
 1    Q.  And they were unable to charge him at that time?

 2    A.  Correct.

 3    Q.  Now, let's talk about the current investigation.

 4         This involves the Dark Web, correct?

 5    A.  Correct.

 6    Q.  Could you tell the Court a little bit about what the Dark

 7    Web is?

 8    A.  The Dark Web is -- it's not like your typical internet,

 9    even though when you access it, it runs the same way but it's

10    an encrypted network, it's layered.  There's no traditional

11    methods of tracking origination of activity and who is

12    actually on there.

13    Q.  And so it's more difficult for law enforcement to

14    identify users on that?

15    A.  Correct.  There is no known -- yeah, there's no way to

16    pinpoint where somebody is.

17    Q.  In this particular case, several agencies, international,

18    national, had to work together to try to identify

19    Mr. Webster; is that right?

20    A.  Correct.

21    Q.  Do you know how many websites that Mr. Webster was

22    involved on on the Dark Web that were dedicated to child

23    exploitation?

24    A.  Not exactly the number.  It was at least five or six.

25    Q.  What were these websites?
```

1   A.  They were all dedicated to the trading and discussion

2   about child exploitation.

3   Q.  Were they private or could anyone join?

4   A.  Yes, anybody can join, but they have different levels of

5   access.  So depending on the amount of activity that you

6   conduct, you may get access to other parts that just

7   somebody -- like, if I logged into the site right now, I

8   would get a lower level access.  I would have to conduct

9   activity to gain access to upper levels.

10  Q.  What do you mean, "activity"?

11  A.  Either posting images, or some of the websites it's just

12  basically commenting; the more comments you make and likes on

13  the site can elevate you because they know you're active on

14  the site.

15  Q.  Now, during the search warrant involving the immediate

16  case, did you interview Mr. Webster?

17  A.  I did.

18  Q.  And did he say anything about trying to get VIP status?

19  A.  When I was asking him about some images that we believed

20  were produced by his particular screen name, he admitted that

21  he made these images and it was for the purpose of getting

22  VIP status to a particular site.

23  Q.  And "VIP status", does that get you more access to

24  different, I guess, rooms and things like that?

25  A.  It gets you more access to others that are not publicly

```
 1   putting out their produced material, or bigger collections.
 2   Q.  Were the images that Mr. Webster produced found anywhere
 3   outside of his home?
 4   A.  Yes.
 5   Q.  Where -- or how did law enforcement know that?
 6   A.  Other individuals that were arrested that were connected
 7   to the site, it was located in their collection, as well as
 8   undercover agents had also downloaded it from the website.
 9           MS. YUSI:  I believe those are all my questions at
10   this time, Your Honor.  Thank you.
11           THE COURT:  Thank you.  Any cross?
12           MR. BONILLA:  Yes, Your Honor.  Thank you.
13                      CROSS-EXAMINATION
14   BY MR. BONILLA:
15   Q.  Good morning, Mr. Wolpert.
16   A.  Good morning.
17   Q.  When you conducted the 2012, or have knowledge of the
18   2012 FBI investigation, there was not enough information for
19   a search warrant?
20   A.  Correct, that's what I was told, yes.  I did not conduct
21   that.  I wasn't aware of it until we had done the search
22   warrant this time.
23   Q.  Okay.  And as far as you know, there was no child
24   pornography found on the computers at that time?
25   A.  Not at that time, yes.
```

P. WOLPERT - REDIRECT                                          11

```
 1   Q.  Okay.  And Mr. Webster was not charged with any offense
 2   during that time, correct?
 3   A.  Correct.
 4         I mean, he wasn't there when they conducted their
 5   knock-and-talk, but he had not been charged, ultimately, from
 6   that part of their investigation.
 7   Q.  And then, with regard to the investigation that leads us
 8   to what he pled guilty to, the production, you interviewed
 9   Mr. Webster?
10   A.  I did.
11   Q.  And he waived his Miranda rights?
12   A.  He did.
13   Q.  And he admitted and accepted responsibility for the
14   production of the child pornography?
15   A.  He did.
16   Q.  And he admitted to the use of all the screen names that
17   were referenced with regard to the various websites, correct?
18   A.  Yes.
19   Q.  He also admitted producing sexually explicit images;
20   isn't that correct?
21   A.  Correct.
22         MR. BONILLA:  No further questions.
23         MS. YUSI:  Can I ask one -- two follow-ups?
24                    REDIRECT EXAMINATION
25   BY MS. YUSI:
```

```
 1   Q.  For the forensic analysis of the computers that were
 2   seized during your search warrant, was there activity, child
 3   pornography activity all the way back to 2012 on those?
 4   A.  If it's in my report.  Yeah, it was -- it went back
 5   several years.
 6   Q.  Okay.
 7        And then, in addition to admitting to producing
 8   images and things, did he also talk about warning others on
 9   the site?
10   A.  Yes.  A review of his posts indicated that he had posted
11   news articles about others that were arrested for being
12   involved in child exploitation, so he found those articles or
13   those court documents online and posted them on the Dark Web
14   site.
15        MS. YUSI:  Thank you.
16        Your Honor, that's it.
17        THE COURT:  Thank you.  You may step down.
18        MR. BONILLA:  Just a brief cross, Your Honor.
19        THE COURT:  Wait a minute, hold on a second.
20        MR. BONILLA:  Oh, I'm sorry.
21        THE COURT:  I didn't know you were about to do a
22   recross.  I will give you one question.
23        MR. BONILLA:  Yes, Your Honor.
24        THE COURT:  Go on.
25                           RECROSS-EXAMINATION
```

```
 1   BY MR. BONILLA:
 2   Q.  Mr. Webster also gave you permission to use his online
 3   presence as well as with his password, correct?
 4   A.  He did.
 5           MR. BONILLA:  Nothing further.  Thank you, Your
 6   Honor.
 7           THE COURT:  Now you may step down.
 8           MS. YUSI:  I have no further evidence, Your Honor,
 9   just argument.
10           THE COURT:  Okay, let's move to your argument.
11           MS. YUSI:  Thank you, Your Honor.
12           As we asked for in our position paper, we are
13   requesting 360 months, which is the statutory maximum, but we
14   believe that Mr. Webster is completely deserving and it's not
15   greater than necessary under the 3553 factors and the
16   purposes of sentencing.
17           THE COURT:  Let me ask you a question.
18           MS. YUSI:  Yes, sir.
19           THE COURT:  Did you read the forensic
20   neuropsychological evaluation?
21           MS. YUSI:  I did, Your Honor.
22           THE COURT:  And do you put any -- give that
23   particular document any weight or credit in your assessment
24   of what --
25           MS. YUSI:  Your Honor, I have several comments that
```

1   I was going to --

2          THE COURT:  Whether the statutory maximum should be

3   imposed?

4          MS. YUSI:  Your Honor, I found this very -- I don't

5   find it to be given much weight at all.  I find it more of a

6   social history of Mr. Webster, and it does not talk about the

7   risk that he poses to the community.

8          Or what I would like to see and what I think should

9   be in every single one of these cases is a psychosexual

10  evaluation by someone who is an AXA, or Association for the

11  Treatment of Sex Abusers Member who qualifies to give a

12  psychosexual evaluation to talk about relevant factors that

13  this Court should know about in terms of what risk that they

14  pose to the community in the future after release.

15         In this particular one, this is not -- he calls it a

16  forensic neuropsychological evaluation of Mr. Webster.  And

17  it talks about he, I guess, talked to his mother to try to

18  corroborate the veracity of some of the statements that

19  Mr. Webster said.

20         I know he was allowed to see the PSR, I believe, and

21  I know some of the discovery was given to him.

22         He did not ask to look at any of the images, that I

23  recall, nor did he contact the government to try to clarify

24  some of this.  But I found that some -- a lot of the things

25  that were said were self-serving and not necessarily

1   accurate.

2          He's talking about in 2012 he was collecting as much

3   adult pornography as possible.  If you see in the PSR, his

4   earliest -- the earliest, I guess, relevant conduct was 2012,

5   and that was based on -- I believe it was 2012.  I'm just

6   looking for the date.  But that's based on the forensic

7   analysis and that there were child pornography activities.

8          If you see the forfeiture order before you, Your

9   Honor, there's three computers, I think four or five SD

10  cards, an external drive, two cellular devices.

11         He has been involved with this for a very long time

12  and some of it went back all the way to 2012.

13         I'm sorry, it says "Relevant Conduct 2014" in the

14  PSR, but the forensic information goes back to 2012.

15         And then on Page 5 of the Social History Report, he

16  talks about faking the images that he produced, that this

17  wasn't semen on the child's anus and buttocks, but that it

18  was coconut oil.  However, he's not talking about the videos

19  where he's inserting his finger into the child's anus.

20  That's not fake, nothing about this is fake.

21         And if he can tell himself that, that's fine, but

22  it's not truthful, especially with the report that is

23  supposed to help him during sentencing.

24         We also found on Page 7, when it's talking about

25  mood and personality and that the clinical scales are

1    uninterruptible because due likely to overreporting.

2            So, of course, someone is going to make themselves

3    in the best light, or talk about, perhaps exaggerate their

4    issues, whether it's socially or mental health wise in order

5    to do this.

6            I have nothing to say that he doesn't qualify to be

7    on the Autism Spectrum Disorder, Your Honor, but he also

8    notes that it's without accompanying intellectual impairment.

9            There's no intellectual impairment here to try to

10   mitigate his role in this offense.

11           I also find that in the conclusion, which just talks

12   about, you know, perhaps how he ended up here, or mitigating

13   factors how he ended up here.

14           I think that, in terms of risk factors, it talks

15   about him being vulnerable, likely to be coerced into

16   escalating his behaviors related to the instant offense.

17           I mean, we have to look at all of the different

18   decisions that Mr. Webster chose to do in order to be here

19   today, Your Honor.

20           And while he is a very young man, it is very

21   disturbing that he is this far escalated on the Child

22   Exploitation Spectrum in terms starting with peer-to-peer and

23   then moving on to the Dark Web, which is a pretty

24   sophisticated technology that he was able to pretty much

25   master and find all of these different sites, become members

1    of these sites to figure out how to move up on the echelon of

2    these sites.

3            And so I really find this, while, you know, a lot of

4    this information, at least socially, is in the PSR, I don't

5    find it very helpful for the Court or for the government to

6    try to evaluate what would be appropriate.

7            As we heard from Agent Wolpert about the Dark Web,

8    and this is more sophisticated, Your Honor, and we are

9    talking about a young man who has already been there.

10           His mother knew about the issue and presumably he

11   knew that the FBI came in 2012 and he moved to the Dark Web,

12   which gives some level of an anonymity and makes it very hard

13   for law enforcement to get a control on these websites and

14   these communities that are sitting there baiting each other.

15           I mean, Mr. Webster and others on there find other

16   like-minded individuals who basically can rationalize what

17   they are interested in, the sexual abuse of children, and

18   encourage each other to make these things in order to get new

19   and different images on there.

20           And what this left was Mr. Webster choosing to

21   sexually abuse a 2-year-old, to putting his watermark, his, I

22   guess, handle, or stage name or his -- his nom des in order

23   so everyone knew that these were his images in order to get

24   more recognition in this community online.

25           And beyond that, he had over 110,000 images on all

1    of those different items that are on the forfeiture, Your

2    Honor, that I briefly listed.  And, as this Court pointed

3    out, there were 39 Victim Impact Statements of known victims.

4    Obviously there were many, many, many other victims.

5           But that's honestly one of almost every single

6    Victim Impact Statement that is available to courts that was

7    provided.

8           He was just massively involved with this and we

9    obviously agree with the report by the doctor that he does

10   need treatment and he does need help.  He obviously has

11   several issues to deal with, whether it be physical, or

12   mental and socially.  But we're here because he chose to go

13   onto these sites.

14          And, granted, he could have been just charged with

15   trading and receiving those, but he took it a step further in

16   order to get VIP access, with what he called "fake images."

17   And, Your Honor, there is nothing fake about these and it

18   happened not just once, but on several different occasions.

19          You can look at the videos and the images and the

20   boy is not just sleeping, the boy is awake at some point

21   during -- the 2-year-old, and who knows what's going on.

22          He had no jobs, but he obviously had means to

23   collect the electronic media and means to know how to get on

24   the Dark Web and how to find the websites, how to get

25   membership into these groups, and he did it for years.

1        And, as this report does suggest, he was willing to

2  do anything to be a part of this community, even molesting a

3  2-year-old.  They weren't fake, he was touching them.

4        And given the gift, I believe, that he got from the

5  government allowing him to just plead to a 30-year cap and

6  having that cap, he will still have time, after he gets out,

7  to be a productive member of society.

8        But, because of the extent of his criminal activity,

9  his use of the sophisticated technology, his use of a

10  2-year-old to help him in this sick community that he was

11  involved with, and the number of victims that are in the

12  related conduct and the risk he poses, we are asking for

13  30 years, Your Honor, and we believe that is appropriate

14  under the 3553 factors.

15        THE COURT:  Thank you very much.

16        MS. YUSI:  Thank you.

17        THE COURT:  Mr. Bonilla.

18        MR. BONILLA:  Thank you, Your Honor.

19        Your Honor, we believe that the Court should give

20  significant weight to the neuropsychological report that was

21  prepared by Jonathan DeRight.

22        It really takes the Court to an understanding as to

23  Dashawn Webster, a young man who is only 21 years old at the

24  time that this offense originated.  And that report is

25  significant because it provides information about his

1    background, his mental health, which is a significant factor

2    in this particular case, Your Honor.  And I'll go more into

3    that as I discuss and argue for the appropriate sentence.

4           Your Honor, before I begin, though, I would like to

5    introduce that I do have at counsel table Mr. Kimball,

6    Supervisory Attorney for the Federal Public Defender's

7    Office, as well as Dashawn Webster, our client, and, of

8    course, Ms. Wanda Rivera, our investigator.

9           And also in the courtroom, Your Honor, we do have

10    Ms. Ruth Bell, my client's mother, Your Honor, and she is

11    here also in support of Dashawn, as well as Ms. Amy Hurd, one

12    of our investigators in our office, Your Honor.

13           Your Honor, I ask the Court for some indulgence as I

14    go through this argument as to the importance of what is at

15    stake for Dashawn.

16           As indicated, he's a young man that faces a lengthy

17    prison sentence, Your Honor, and I want to carefully address

18    his personal history and characteristics in light of the

19    reason why we think that a sentence of 30 years, the maximum,

20    Your Honor, is overly punitive, and a sentence of 15 years is

21    sufficient but not greater than necessary.

22           The fact that Ms. Bell is here and that she's been

23    in communication with her son I think is profound, because it

24    speaks volumes of forgiveness of her son, which is difficult

25    for her, I'm sure, and difficult for her son Dashawn, Your

1    Honor.

2          The government seeks a sentence of 30 years.  Your

3    Honor, we argue that a sentence of 30 years is overly

4    punitive, it's excessive.  It provides no incentive for

5    acceptance of responsibility and pleading guilty to only get

6    the maximum sentence in the end.  It ignores the personal

7    history and characteristics of Dashawn.

8          And as the Court is aware from reading the

9    pleadings, he was conceived by a mother who was raped when

10   she was only 14 years old.  He was sexually molested and

11   sexually abused himself.

12          He was mentally, emotionally, and physically abused

13   and tormented.  He was badly bullied in school, such that he

14   had dropped out.  He attempted suicide when he was only

15   13 years old.

16          He suffers from a number of mental health issues

17   such as depression, Autism Spectrum Disorder, a learning

18   disability, and very serious physical health issues.  He's

19   even resorted to self-degradation, isolation, drugs and

20   activities on the internet as a way of trying to escape his

21   world of pain.

22          It ignores a sentence of 30 years, it ignores the

23   neuropsychological report that the defense filed with regard

24   to his history of sexual trauma and the issues that I've

25   listed.

1          It ignores that Dashawn, when he was approached by

2     law enforcement, instead of doing what some do, and there's

3     nothing wrong with invoking your Fifth Amendment right not to

4     incriminate yourself with requesting to speak to an attorney.

5     Dashawn didn't do that.

6          He immediately yielded to the authority of law

7     enforcement, he admitted to his wrongful conduct, he provided

8     them his presence -- online presence name and password so

9     that way they could -- he was trying to help in trying to get

10    other people found and arrested with regard to this stuff

11    because he felt badly about it.

12         Mr. Dashawn, he convicted himself when he admitted

13    to his wrongdoing with law enforcement before he even pled

14    guilty.

15         So we ask the Court to take that into consideration,

16    because that should count for something, when someone owns up

17    to it immediately and accepts responsibility.

18         Your Honor, if there was any particular case where

19    the mandate to impose a sentence that is sufficient but not

20    greater than necessary hits home and reaches our

21    sensitivities, it's in Dashawn's case; it's in this case,

22    Your Honor.

23         He's going to be put on a term of supervision.  He's

24    not going to be a danger to the community, he's a Criminal

25    History Category I.  He's never spent one day incarcerated.

1    He has no juvenile or adult convictions, his total
2    criminal history score is zero.
3        With regard to factors that the Court must consider,
4    a term of 15 years is sufficient to promote respect for the
5    law, provide for just punishment for someone like Dashawn.
6        In terms of deterrence, Your Honor, a large prison
7    sentence -- longer prison sentences were associated with a
8    three percent increase in recidivism compared to shorter
9    sentences.
10       A longer sentence doesn't necessarily connote with
11   recidivism that is going to happen, and we don't believe that
12   that is the case in this case with Dashawn.  A 15-year
13   sentence adequately addresses deterrence in this case.
14   Dashawn is already specifically deterred, he's convicted
15   himself.
16       Your Honor, before you sentence a young man who is
17   23 years old, who is broken, who's contrite, while others
18   have forgiven him, even his mother being here in court today,
19   Dashawn is having a difficult time forgiving himself, Your
20   Honor, and I think that counts for something as well.
21       Dashawn is not a danger to the public, Your Honor.
22   A 15-year sentence will adequately give him time to get the
23   mental health treatment, the medication management, the
24   counseling that he needs, so that way he can be a productive
25   member when he comes out and he's released from the BOP.

1          But when he's released, he will be on a term of

2     supervision.

3          The Sentencing Project notes, Your Honor, that more

4     severe sentences fail to enhance public safety.

5          Dashawn is unlikely to pose any future danger to the

6     public once released.  15 years is enough time; he will get

7     the help that he needs while he's incarcerated.  He will get

8     needed educational/vocational training in addition to the

9     medical care and correctional treatment that he needs.

10          With regard to specifically, Your Honor, the

11     personal history and characteristics.

12          Dashawn is 23 years old because he was born 23 years

13     from today, but mentally he's not a 23-year-old young man.

14     He was 21 when this offense occurred, but mentally he was

15     younger than that.

16          His mother described him, as noted in the PSR at

17     Paragraph 50, that Dashawn has the mind of a child.  The

18     physical, emotional, sexual, and mental abuse that Dashawn

19     faced and suffered during his short life on this Earth has

20     been overwhelming, and it's appropriately documented in the

21     PSR, as well as in the neurological report of Dr. DeRight.

22          His mother, she was raped, he was conceived from

23     rape, she was only 14 at the time.  That was Dashawn's

24     introduction into the world, that was his start at life.

25          She was unable to take care of him, so he was raised

 1   by his mother's adoptive parents, and he grew up to know and

 2   loves his grandparents, Elizabeth Bell, who passed away, and

 3   Ernesto Santiago.  He came to know them as his grandparents.

 4          He was primarily raised by them in New Jersey from

 5   the age of 5 to 13, and only had sporadic contact with his

 6   mother while growing up.

 7          Mr. Webster loved his grandparents, Your Honor, he

 8   craved the nurturing of his mother, though, because she

 9   wasn't there.  And that's not a ping on his mother; she had

10   her own struggles that she was dealing with.  But while she

11   was dealing with those struggles, Dashawn was severely

12   struggling himself.

13          When he was only nine years old, he was sexually

14   molested.  In an attempt to make himself be less attractive

15   to the abuser, he drowned himself in food and he binge ate.

16          He grieved in silence, he struggled and never got

17   the help that he needed by counseling and treatment and

18   medication management, and the sexual molestation led to

19   binge eating.

20          The binge eating led him to being bullied.  The

21   bullying led him to wanting to kill himself and take himself

22   from this world of struggle.

23          Dashawn was cleaving to the one thing that he had in

24   life, was his grandparents.  That's something that was

25   consistent, honest, and loving.

```
 1              He struggled with the rapid deterioration of his
 2    grandmother due to dementia.  He was only 13.  So things even
 3    get worse for him progressively.  He feels overwhelmed,
 4    helpless, hopeless, and he tried to overdose using his
 5    grandmother's prescription medication and was hospitalized as
 6    a result.
 7              It continued with the incessant bullying at school,
 8    which led him to drop out.  And then what did he do?  He
 9    isolated himself from the world.  He was screaming for help,
10    saying take me out of this world, help me to deal with this.
11    And where did he find that?
12              And it's not that it's not an innocent excuse or
13    justification, but he found that in a virtual world, a world
14    where he didn't have to have that permanent human
15    interaction.  And that's discussed in detail in Dr. DeRight's
16    report.
17              And that goes along with his Autism Spectrum
18    Disorder, where he has the mindset where he's ostracized,
19    he's trying to get rid of or stay away from the reality that
20    is plaguing him and, at the same time, he's got this mental
21    disorder where he has to have things of a repetitive nature;
22    going back on the internet, finding that refuge in the
23    internet, in that virtual world.
24              Again, the issues and the hurdles that
25    Mr. Webster -- that Dashawn has had to experience is
```

1  overwhelming.

2      As the Court is aware that the United States Supreme

3  Court has given legal weight to neurobiological and

4  sociological studies that confirm that a lack of maturity and

5  an underdeveloped sense of responsibility are found in youth

6  more often than in adults.

7      In the case *R.A.M. v. Florida*[sic], Your Honor,

8  neurobiological evidence is convincing, specifically that

9  young adults lack full development of the areas of the brain

10 that support self-monitoring and the evaluation of self-risk.

11     And that is further detailed in the report by

12 Dr. DeRight, that age matters, right?

13     That, in this particular case, it is a mitigating

14 factor.  That although Dashawn was 21 at the time, he wasn't

15 21 mentally because of his Autism Spectrum Disorder.

16     So we ask the Court to consider that and the

17 arguments that we raised in our pleadings.

18     The heart of retribution rationale is that a

19 criminal sentence must be directly related to the personal

20 culpability of the criminal offender.  That's in *Tison v.*

21 *Arizona*, Your Honor, 481USC137 (1987).

22     We ask the Court to consider that because, again,

23 Dashawn is a young man, and younger than his age.  He has

24 lesser culpability than some who don't have the type of

25 disorders that he has.

```
 1              Physical health, Your Honor.  Dashawn is 6-foot-1
 2    and he weighs more than 400 pounds.  He suffers from high
 3    blood pressure, asthma, he uses an inhaler, he's seen a
 4    cardiologist in 2013, Dr. Patel, for chest pains and
 5    shortness of breath.  Suffers from severe nose bleeds and
 6    arthritis in his knees, and he has indicated that he has had
 7    issues seeing, made partially blind in his left eye.
 8              Mental and emotional state, Your Honor -- and I've
 9    gone through the mental aspects of it but, again, we ask the
10    Court to strongly consider his mental health and emotional
11    state.  He has blamed himself for this, he's remorseful, he's
12    broken.
13              In January and February of 2015, Dashawn reached out
14    to a suicide prevention hotline because he was significantly
15    impacted by the death of his grandmother, who raised him.
16              Since he's been placed at the Western Tidewater
17    Regional Jail, he's been prescribed medication for
18    depression.  So this is ongoing.
19              Dashawn's biological mother is noted in the PSR
20    stating that she was in the process of setting up mental
21    health evaluation for Dashawn at the time that he was
22    arrested, but he just didn't get that help.
23              Dashawn has been visibly depressed, unable to sleep,
24    and it's just been a difficult process for him, Your Honor.
25    And he feels bad for the victims in this case, Your Honor.
```

1  Not just for himself, but for all of those, the victims and
2  all of those who are struggling, his family, his mother and
3  his stepfather, Mr. Skinner, who couldn't be here today but
4  wanted to be here.
5          In terms of substance abuse -- and I'll wrap it up,
6  Your Honor, with just a few more points.
7          In terms of substance abuse, he experienced
8  marijuana when he was 17, tried heroin when he was 18.  He
9  abused prescription medication when he was only 11 years old.
10 Again, he used his grandmother's prescription medication to
11 try to take his life.
12         He was harboring the abuse that he was suffering,
13 Your Honor, and he was trying to mask it and self-medicate.
14         In terms of educational and vocational skills, he
15 does have a learning disability, Your Honor.
16         He was in elementary classes in New Jersey for
17 children with a learning disability.  He attended IC Norcom
18 High School up to the 10th grade, but withdrew at that time
19 as a result of bullying and all the other issues he was
20 suffering from.
21         He does desire to obtain his GED, Your Honor.
22         In terms of employment, he was unemployed at the
23 time of the arrest.  He couldn't go anywhere, didn't want to
24 go anywhere.  He didn't want to leave his home and go in to
25 and have to deal with the realities of the world that he was

1  facing outside of the virtual world.

2          So, again, Your Honor, just in closing, we do ask

3  the Court to consider these factors, all of these factors:

4  The fact that he accepted responsibility from the onset, that

5  he waived his Miranda rights, that he cooperated

6  significantly with the prosecution of this case against him,

7  which is very serious.  He had no idea, at the time that he

8  had cooperated, the severity of the penalties that were at

9  stake.

10         And we ask the Court to consider the cases that we

11  cited in our pleading, and I will just highlight one.  *The*

12  *United States v. Ortiz-Graulau*, 526 Fed.3d. 16, 17 to 18, 1st

13  Circuit 2018, where a 38-year-old defendant had sexual

14  relations with a 14-year-old, photographs of the child were

15  taken, over 50 photos, and he was sentenced to 180 months.

16         THE COURT:  The Court read it.

17         MR. BONILLA:  Thank you, Your Honor.

18         Dashawn is a low risk for recidivism, Your Honor.

19  After he does -- if Your Honor imposes a term of 15 years, he

20  will be on supervised release for a period of time.  That

21  will protect the public.  He will be required, as a must, to

22  register as a sex offender.  That will protect the public.

23         So in closing, Your Honor, we do ask the Court to

24  impose a sentence of 15 years followed by a term of

25  Supervised Release.

 1              We ask that he get the mental health counseling and
 2     vocational training that he needs while in the BOP, as well
 3     as residential drug abuse treatment, Your Honor.
 4              We do ask that Dashawn be placed at a BOP facility
 5     as close to the Tidewater area as possible, because seeing
 6     his family is part of the healing process.
 7              He is a young man and he needs them to move forward
 8     in his life and to be able to bounce back.  When he's
 9     released from the BOP, if he's given a 15-year term, Your
10     Honor, he will be in his late 30s.  And so he will be a young
11     man still with an opportunity to further change his life
12     around and be a productive member.
13              Thank you, Your Honor.
14              THE COURT:  Thank you.
15              MS. YUSI:  Your Honor, may I briefly say something?
16              THE COURT:  Briefly.
17              MS. YUSI:  Your Honor, the history and
18     characteristics of the defendant is just one aspect that this
19     Court considers, and we are not here because the defendant is
20     the victim here, that the defendant has had hardship, and
21     he's not the victim in this case.
22              And if the Court wanted to consider the doctor's
23     report with great weight, I wish that the doctor was here and
24     that we could cross-examine him on some of the incongruities,
25     and maybe we could ask the doctor how this is going to affect

 1  a 2-year-old who is going to be living with this all of his

 2  life, and knowing that his images are all over the internet

 3  at this point because of the victim.

 4          The 2-year-old is the victim, the victims of the

 5  other guys' who were producing these to get in there to

 6  impress their friends, warn their friends about police

 7  involvement in this to try to make sure that they are hiding

 8  better from this.

 9          The defendant is not the victim in this case, Your

10  Honor.

11          Thank you.

12          THE COURT:  All right, step to the podium,

13  Mr. Webster, with your counsel.

14          If you wish to make a comment, you may do so.

15          MR. BONILLA:  Your Honor, I'm sorry, he's just

16  trying to catch his breath, he's having a hard time breathing

17  right now.

18          (Pause.)

19          THE COURT:  Was Mr. Webster going to read something?

20          MR. BONILLA:  Yes, Your Honor.

21          THE COURT:  I will permit counsel to read it for him

22  if you cannot read it.

23          MR. BONILLA:  He wants me to read it, Your Honor.

24          THE COURT:  Fine.  Please read it, Mr. Bonilla.

25          MR. BONILLA:  To Judge Jackson.  I would like to

1    formally apologize, not just to the Court but to the State of

2    Virginia for my actions to conspiring with the wrong people

3    and getting the victim involved in the situations that led me

4    in your presence today.

5            I would also like to apologize to my mother for the

6    crimes that I committed.  My mother accepted and given

7    forgiveness.  And towards the victim, I know it is hard

8    seeing me here in this situation.  Even with the victims,

9    knows it will be difficult without my presence and forgives

10   me.

11           My family has never left my side and has been

12   supportive since being incarcerated, but knowing also what I

13   done took me away from their grasp, even though nothing can

14   break the everlasting love they still have for me.

15           I hope and pray that you have mercy on me today,

16   knowing the things I've done will never happen again, and ask

17   to get me the help that I need to be a better person, because

18   I'm not a violent man and want to live a life not being

19   looked down on as one.

20           I also hope that I can continue to help in any way

21   possible to find other people who deserve judgment, too.

22           THE COURT:  Thank you.

23           Mr. Webster, you are here for a rather heinous

24   offense.  You didn't rob or kill anybody, but you committed a

25   truly objectionable offense.  You pled guilty to Production

1    of Child Pornography.

2         This record reflects, of course, that you engaged in

3    sexual exploitation of a 2-year-old, your 2-year-old

4    half-brother that you were supposed to be babysitting.

5         This conduct was part and parcel of sustained

6    involvement in child pornography, and what the Court's been

7    able to understand here, not just that incident, but for

8    years you had been viewing child pornography and in this case

9    it's indicated you had over 110,000 images, some 75 videos.

10        You were deeply into child pornography and the

11   record reflects that you were involved in a way that made

12   your detection of your conduct very difficult.

13        You were on the Dark Web, on the Dark Web engaging

14   in -- these videos range from a couple of seconds to a few

15   hours, maybe about four hours sustained exploitation.

16        Now, the Court is required to consider your personal

17   history and background and to set your criminal conduct in

18   the context of your personal history.

19        You've been engaged in this conduct for a few years.

20   You are now 22 or 23?

21        THE DEFENDANT:  23.

22        THE COURT:  23.  So you've been engaged in this

23   conduct since you were a teenager.  So you've gotten to be

24   very good at hiding your conduct and engaging in it.

25        The record reflects that you have no relationship

1   with your biological father, and the Court has already heard

2   the circumstances under which you were born, but you were

3   raised primarily by your grandparents.

4          The record also reflects that you have some

5   siblings, but the record reflects that you had a truly

6   troubled childhood being emotionally, physically, sexually

7   abused as a child yourself, so you were introduced to child

8   molestation.

9          And it is often the case that those who are molested

10  become molesters in your own way here.

11         In addition, the record reflects that you had a very

12  tough time in school.  You withdrew from school in the tenth

13  grade, never did get a GED largely because of, you say, of

14  the bullying and the weight that you carried, and the weight

15  caused you to have other problems.

16         You became -- you withdrew and engaged in activity

17  that was truly damaging to you and to others.  Because of

18  your lack of education and your emotional circumstances, you

19  have no record of employment, just no record.

20         Physically you have serious medical problems.  Over

21  400 pounds, asthma, high blood pressure, hypertension, any

22  number of ailments that would go with your weight.

23         Now, there's been a big debate about how the Court

24  should consider the forensic neuropsychological evaluation

25  that was done on you.

1        The Court read that report with interest, with keen

2    interest, to see exactly who you were.

3        There's no question about it, your childhood had a

4    severe impact on who you are and what you've been doing.

5    This was not a psychosexual evaluation that the Court has

6    sometimes seen in these cases.  It clearly provides to the

7    Court insight on who you are and your thinking and what, in

8    effect, compelled you.

9        But the Court finds it interesting that it said that

10   you had a learning disability.  The Court had some question

11   about this learning disability, because obviously you

12   function at a very high level here.  You have extraordinary

13   technological and computer skills.

14       So just because you didn't do well in school, and

15   the Court has seen it too many times, doesn't mean you have a

16   learning disability.  Unfortunately, for society, for people

17   that cannot cope, students they cannot cope with, often

18   African-Americans, they declare "learning disabled" and move

19   on.

20       Meanwhile, you are as smart as you want to be but

21   you are left behind, and I think that's you.  This record

22   reflects an awareness here of your criminality because you

23   get on the Dark Web and you start warning others about the

24   criminal activity.  So the Court doesn't really believe that

25   you are severely learning disabled.  No, you are learning

ignored in school, but you are exceptional in your own way, and you simply withdrew into your own world of criminality to get away from people who abuse you, laughed at you, made you feel bad.

You have no record the Court can find here, no juvenile record, no criminal record.

You have a history of abusing certain medications, started back in 2006. The Court doesn't know that you are going to qualify for the 500-hour Residential Drug Abuse Program.

The Court will recommend it, but then they read this Presentence Report, they may very well decide that you may need drug education, but you do not need to be in that 500-hour Residential Drug Abuse Program. You need some other things, but not that.

Now, the statutory maximum is 30 years, the minimum is 15 years, the government asked for 30 years. The advisory guideline was life.

The Court read with interest the reference to sentences imposed on other individuals who committed these offenses. It's no simple offense. The Court has to give you a sentence that deters you, but also provides general deterrence.

Now, the Dark Web is very interesting. I bet the Dark Web knows that you are being prosecuted for production

```
 1    of child pornography, they know that.

 2           But they also need to know what sentence you

 3    received as a result of doing it.  And the Court understands,

 4    as it sentences you, it has to weigh all these factors, and

 5    the Court cannot entirely disregard your personal history and

 6    background, it's too much here to disregard it, so the Court

 7    has to put it in context.

 8           The Court doesn't believe putting it in context that

 9    the minimum sentence the Court can impose is appropriate.  So

10    the Court cannot, or will not do that, but the Court will

11    certainly consider it.  It has some impact on the reason that

12    you are who you are and why you are standing here right now.

13    No question about it.

14           You need mental health treatment, the Court will

15    provide for that.  You need educational treatment, you need a

16    vocation, you need a whole bunch of things to straighten you

17    out, hopefully help you, Mr. Webster.

18           But the Court believes that you have the ability to

19    do more than is apparent, because the Court believes that you

20    are very, very smart, not very learning disabled.

21           It's kind of difficult to make restitution to

22    victims in these cases.  The Court doesn't have anything

23    providing for restitution to victims here, and so we are not

24    going to be addressing that right now, but, believe the

25    Court, if we could find a way to make restitution to victims,
```

 1  then you would be required to make restitution to certainly
 2  specific victims in this case.
 3          Now, having said all of that, the Court's been
 4  listening at the argument of counsel.  This is not a
 5  situation where the Court simply decides to divide up things,
 6  equal split; that's not where the Court's going.
 7          The Court is trying to determine and has determined
 8  whether it's appropriate to give you 30 years, the maximum
 9  the statute allows, or to give some weight to the other
10  factors in this case, and I think the Court has to give
11  weight to other factors in the case, as well as the other
12  needs identified by Section 3553.
13          Having said all of that, the Court will sentence you
14  as follows:
15          Pursuant to the Sentencing Reform Act of 1984, it's
16  the judgment of the Court that the Defendant, Dashawn
17  Webster, is hereby committed to custody of the United States
18  Bureau of Prisons for a term of 290 months.  Upon release
19  from imprisonment, you shall be placed on Supervised Release
20  for a term of 20 years.
21          You shall refrain from any unlawful use of a
22  controlled substance, submit to one drug test within 15 days
23  commencement on Supervised Release, and at least two periodic
24  drug tests thereafter, as directed by the Probation Office.
25          You shall also comply with the following additional

1    conditions:

2           You shall participate in a program approved by the

3    United States Probation Office for mental health treatment

4    that includes psychosexual evaluation and sexual offender

5    treatment.

6           Cost of these programs are to be paid by you as

7    directed by the probation officer.

8           You shall waive all rights of confidentiality

9    regarding sex offender and mental health treatment to allow

10   the release of information to the United States Probation

11   Office and authorize communication between the probation

12   officer and the treatment provider.

13          Mr. Webster, you shall submit to a polygraph testing

14   as directed by the United States probation officer as part of

15   your sex offender therapeutic program.  Cost of this testing

16   is to be paid by you, as directed by the probation officer.

17          You shall submit to an able assessment for sexual

18   interest or similar tests as directed by the United States

19   Probation Office.

20          As part of your sexual offender therapeutic

21   treatment, cost of this testing is to be paid by you as

22   directed by the probation officer.

23          You shall not possess or use a computer to access

24   any online computer services at any location, including

25   employment, without the prior approval of the probation

1    office.  This includes any internet, service provider,

2    bulletin board systems, or any other public or private

3    network.

4            You shall not utilize any sex-related adult

5    services, websites or electronic bulletin boards.

6            You shall submit any records requested by the

7    probation office to verify compliance with this condition,

8    including but not limited to credit card bills, telephone

9    bills, and cable, satellite telephone bills.

10            You shall not have any access to or possess any

11    pornographic material or pictures displaying nudity or any

12    magazines using juvenile models or pictures of juveniles.

13            You shall have no contact with minors unless

14    supervised by a competent, informed adult approved in advance

15    by the probation officer.

16            You shall not engage in any employment or volunteer

17    services that allow you access to computers or minors.

18            Pursuant to the Adam Walsh Child Protection & Safety

19    Act of 2006, you shall register with State Offender

20    Registration agencies in any state where you reside, work,

21    and attend school, according to the federal and state law and

22    as directed by the probation officer.

23            Pursuant to the Adam Walsh Child Protection & Safety

24    Act of 2006, you shall submit to a search of your person,

25    property, house, residence, vehicle, papers, computer, other

```
 1   electronic communication or data storage devices, or media
 2   and effects at any time by any law enforcement or probation
 3   officer with reasonable suspicion concerning unlawful conduct
 4   or a violation of a condition of supervision, upon prior
 5   notification to and approval by the Court, or with a warrant.
 6           You shall also comply with the Computer Monitoring
 7   Program as administered by the Probation Office.  You shall
 8   consent to the installation of computer monitoring software
 9   on any computer to which you have access.  Installation shall
10   be performed by the probation officer.
11           Software may restrict and/or record any and all
12   activity on the computer, including the capture of
13   keystrokes, application information, internet use history,
14   email correspondence, and chat conversations.
15           A notice will be placed on the computer at the time
16   of installation to warn others of the existence of the
17   monitoring software.  You shall also notify others of the
18   existence of the monitoring software.
19           You shall not remove, tamper with, reverse engineer
20   or in any way circumvent the software.  Cost of this
21   monitoring shall be paid by you.
22           Let me say this.  Of course, if you're not able to
23   pay all of these costs, the Court will take a look at it and
24   make the appropriate adjustments.
25           You shall consent to the use of WiFi detection
```

 1   devices to allow the probation officer to detect the presence
 2   of wireless signals inside or outside of your residence.
 3           And the Court has looked at your financial
 4   background, your lack of net worth, your liquid assets, your
 5   lifestyle and your earning potential, and the lack of
 6   dependents relying on you for support.  The Court finds that
 7   you are not capable of making payments for a full restitution
 8   as mandated by statute.
 9           The Court also finds that you are not capable of
10   paying a fine.
11           However, with respect to Count Three, you must pay a
12   Special Assessment of $100.  It's due today.  Any balance
13   remaining unpaid on the Special Assessment at the inception
14   of your supervision shall be paid by you in installments of
15   not less than $50 per month until paid in full, and such
16   payments shall commence 60 days after your supervision
17   begins.
18           The Court recommends to the Bureau of Prisons that
19   you be enrolled in an educational program.  The Court
20   recommends to the Bureau of Prisons that you be enrolled in a
21   vocational education program.
22           The Court recommends to the Bureau of Prisons that
23   you receive mental health treatment.
24           The Court recommends to the Bureau of Prisons that
25   you be enrolled in the 500-hour Residential Drug Abuse

```
 1   Program.
 2           The Court recommends to the Bureau of Prisons, if
 3   possible, to house you on or in or near the Commonwealth of
 4   Virginia.
 5           At the time you entered your plea, did he waive his
 6   right to appeal, Mr. Bonilla?
 7           MR. BONILLA:  Yes, Your Honor.
 8           THE COURT:  All right.  The Court will not advise
 9   you of any right to appeal.
10           Ms. Yusi, are there other charges?
11           MS. YUSI:  There are, Your Honor.
12           We move to dismiss those, and there is a Forfeiture
13   Order that is now before the Court.
14           THE COURT:  On motion of the United States, the
15   remaining charges against the defendant are hereby dismissed.
16           The Court has a Forfeiture Order.
17           Now, Mr. Webster, did you sign that Forfeiture
18   Order?
19           THE DEFENDANT:  Yes, Your Honor.
20           THE COURT:  Did you discuss it with your counsel
21   before you signed it?
22           THE DEFENDANT:  Yes, sir.
23           THE COURT:  All right, it's in the record.
24           The Court will have the neuropsychological report
25   forwarded to the Bureau of Prisons.
```

1    Is there anything else, Mr. Bonilla?

2    MR. BONILLA:  Nothing further, Your Honor.  Thank

3 you.

4    THE COURT:  Okay, if there's nothing else, the Court

5 will be in recess until further notice.

6    (Whereupon, the proceedings conclude, 11:04 a.m.)

7    *****    *****    *****

8 I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.

9

10

11    /S/                                    1/29/2019
   -------------------------------         ------------
12    Janet A. Collins, RMR, CRR, CRI          DATE

13

14

15

16

17

18

19

20

21

22

23

24

25