IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:20-CR-143 |
| v. | ) | |
| | ) | Honorable T.S. Ellis, III |
| ZACKARY ELLIS SANDERS, | ) | |
| | ) | Sentencing: April 1, 2022 |
| *Defendant*. | ) | |
| | ) | **FILED UNDER SEAL** |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The defendant is a sexual predator with a demonstrated interest in bondage, torture, and rape. For years, he sought out vulnerable minors online and induced them to record and send him videos of themselves engaging in sexualized, self-inflicted violence and other sexual acts. His predation followed a similar pattern: he would find a minor on an online forum or mobile application, chat with the minor, and then introduce "punishments" that required the minor to send him sadomasochistic and pornographic content. At the same time, he was amassing a collection of child pornography from the dark web and other sources depicting shocking acts of sexual violence, including videos depicting the rape of bound-and-gagged children.

Notwithstanding the severity of his crimes, the defendant has shown no contrition. Instead, he has attempted to shirk responsibility at every turn—claiming, variously, that he did not seek out child pornography (despite having it on nearly every device in his bedroom); that he is a victim who was taken advantage of (that is, by the very minors he exploited); that he was mentoring and "push[ing these minors] to be the best person they can be" (by subjecting them to his abuse); and even that he was protecting them (by exploiting them before some hypothetical offender could). While his excuses are muddled, the through-line is clear: he lacks a scintilla of remorse.

A federal jury saw through these self-serving rationalizations and found him guilty of five counts of production, six counts of receipt, and one count of possession of child pornography. The defendant's sentencing is set for April 1, 2022. The U.S. Probation Office has correctly calculated the applicable sentencing range for his offenses under the U.S. Sentencing Guidelines ("Guidelines"). For the reasons below, the United States submits that a Guidelines-compliant sentence appropriately reflects the severity of the defendant's conduct. The United States also requests that the Court impose a lifetime of supervised release and special assessments under 18 U.S.C. §§ 3014 and 2259A, and order the defendant to pay restitution to the victims of his crimes.

## BACKGROUND

In February 2020, law enforcement executed a warrant to search the defendant's home, during which he admitted to special agents from the Federal Bureau of Investigation ("FBI") that he downloaded child pornography through The Onion Router network ("Tor" also known as the "dark web"). ECF No. 602 ("PSR") at ¶ 12. When presented with a thumb drive containing child pornography, he further admitted that he knew the drive contained "younger" content. GX 105A. And when asked about his interactions with minors, he claimed that it was legal for him to "do something" with minors but insisted he would stop them from sending him nude images of themselves when he chatted with them online. *See id.*; GX. 106A.

The defendant was lying about the nature and extent of his relationships with minors. In fact, after the execution of the warrant, he contacted a minor from whom he had recently received sexually explicit videos—MINOR VICTIM 6 in the indictment—told him that he was under investigation, and instructed him to "delete everything." PSR at ¶ 55. Law enforcement fortunately recovered portions of his conversations with this minor through an examination of his digital devices, several of which were hidden under his mattress. GX 217. Additional investigation

revealed that he routinely sought out minors on online forums and mobile applications, describing himself as a "Dominant Sir looking for boys who are in Virginia, Washington DC, Maryland, or New York City to meet," a "Master currently seeking new slaves," and the administrator of a group chat "for sub and slave boys." PSR at ¶ 15. The defendant instructed those interested in being his slave to send him a "full body nude photo," and their age and location. *Id.*

Ultimately, law enforcement found sexually explicit communications with at least six different minors on the defendant's iPads and iPhone dating back several years and continuing up until the execution of the warrant, as well as images and videos depicting the sadomasochistic abuse of other minors on electronic devices scattered throughout his bedroom. The defendant was charged by indictment with five counts of production, six counts of receipt, and one count of possession of child pornography. ECF No. 29. The evidence of his guilt is summarized below.

## I.    The Defendant's Sexual Exploitation of MINOR VICTIMS 1 through 6

### A.    MINOR VICTIM 1

Between November 20 and 25, 2019, the defendant produced and received visual depictions of a fourteen-year-old boy, MINOR VICTIM 1 ("MV1"), engaging in sexually explicit conduct using an encrypted mobile messaging application. PSR at ¶ 43. In his first message to MV1, the defendant ordered him to record and send a video of himself stripping, displaying his "entire body," and stating his full name. *Id.* at ¶ 44. MV1 told the defendant in response that he was a minor, which the defendant acknowledged and accused him of using as an "excuse" to not send the requested video. GX at 505A. As MV1 explained at trial, he then sent the defendant a "self-destruct[ing]" video—that is, a video that disappeared after a certain amount of time. Trial Transcript ("Tr."), 10/20/21 at 59. Frustrated that the video self-destructed, the defendant told MV1 to "[s]top sending it like that" and to record it again. GX 505A. The defendant later told

MV1 that he will begin "training" MV1 to "serve him," and ordered MV1 not to tell anyone about the video or their communications until he turns eighteen. PSR at ¶¶ 44-45.

The next day, the defendant ordered MV1 to provide personally identifying information. *Id.* at ¶ 47. When MV1 resisted, the defendant threatened to send "that video" to everyone at MV1's high school, which he identified by name. *Id.* On November 24, 2019, the defendant told MV1 to provide his parents' names and phone numbers. GX 505A. When MV1 resisted again, the defendant said he would "figure it out" and sent MV1 undisclosed information about his family. *Id.* As MV1 explained, he did not know how the defendant knew this information and felt uncomfortable. Tr., 10/21/21 at 107. And as the defendant conceded, he researched MV1 online to find real-life information with which to confront him. Tr., 10/26/21 at 49. The defendant then imposed a "punishment" for MV1's refusal to provide his parents' numbers, instructing: "You will send me a video of this. You will apologize for disobeying, strip, and then slap your balls as hard as you can 30 times. Then send me the video. If you don't do it hard enough I'll make you start over." PSR at ¶ 48. After repeated protestations, MV1 relented and sent the requested video. *Id.*

At trial, the defendant did not dispute the above, but claimed that he was only communicating with MV1 to "protect him" from other unknown offenders, that it was for MV1's "own good," and that he was helping MV1 "live his best life." Tr., 10/26/21 at 38-40.

### B.    MINOR VICTIM 2

Shortly before his exploitation of MV1, in November 2019, the defendant produced and received visual depictions of another fourteen-year-old, MINOR VICTIM 2 ("MV2"), engaging in sexually explicit conduct. PSR at ¶ 36. In his first message, MV2 introduced himself as a fourteen-year-old. *Id.* at ¶ 37. In response, the defendant ordered MV2 to send a "live full body pic," and confirmed that MV2 found his contact information on a "[s]ex chat forum." *Id.* The

defendant then ordered him to "record a video" showing his "entire body," and stating his full name and why he wants to be the defendant's slave. *Id.* MV2 sent the defendant a video the next day, which prompted the defendant to demand another video depicting MV2's full body, including his "face, ass, everything." *Id.* at ¶ 38. MV2 complied with the demand. *Id.*

The defendant then told MV2 that he was a "cute little faggot" and that he was going to "train" him to be a "perfect slave." *Id.* When MV2 stated that he recently celebrated his birthday, the defendant asked, "So you just turned 14 then?" and remarked, "Oh you are young. Okay. I want you to shave your entire body, except for your head." *Id.* at ¶ 39. MV2 initially resisted but eventually complied with the instructions, sending multiple nude images of his expose penis and pubic area at the defendant's request. *Id.* at ¶ 40. The defendant then imposed a "punishment" for MV2's initial resistance, writing: "Good boy. Now for your punishment. You're going to slap yourself on your balls as hard as you can 40 times. You will record yourself doing this and then send me the video." *Id.* at ¶ 41. Like MV1, MV2 protested the "punishment" but ultimately relented, sending a video of the requested conduct and stating that it "hurt." *Id.* The defendant replied, "Good. Now if you every disobey me again the punishment will be worse next time." *Id.*

Law enforcement interviewed MV2, who explained that he was struggling with his sexuality at the time and sought out individuals online with whom he could communicate. *Id.* at ¶ 42. At trial, the defendant did not dispute that he instructed MV2 to create the above content but speculated that MV2 might have been roleplaying or somehow "altered" the images to make himself appear younger and smaller. Tr., 10/26/21 at 44-45; Tr., 10/26/21 at 202.

### C.    MINOR VICTIM 3

From September 2017 to April 2018, the defendant produced and received sexually explicit videos of a third minor, MINOR VICTIM 3 ("MV3"). PSR at ¶ 25. MV3 made clear to the

defendant that he was underage and even sent a copy of his high-school class schedule at the defendant's request. *Id.* at ¶ 27. The defendant then instructed MV3 to "strip and send a full body pic," which MV3 did. *Id.* at ¶ 28. Later, as "punishment" for a perceived transgression, the defendant instructed MV3 to: "Slap your balls as hard as you can 15 times. Record it. Send me the video." *Id.* at ¶ 28. After MV3 sent the requested video and confirmed that it hurt, the defendant commented, "You could have done it harder," and ordered him to do it five more times "as hard as [he] can." *Id.* MV3 then sent the defendant another video of the requested conduct. *Id.*

Over the course of their conversation, the defendant gathered information about MV3's family and personal life. GX 503A. At the same time, he ordered MV3 to engage in sexually explicit and risky activity, including stripping in public and inserting an object into his anus. GX 503I. In February 2018, he told MV3 to "[w]rite the most degrading and humiliating things" he can think of on his body, take a picture of it that includes his face, and post it online. GX 503M. When MV3 expressed concern that this might have repercussions in his future, the defendant told him that he was not going to have the kind of job for which it would matter. *Id.* MV3 then complied with the order. *Id.* The defendant later instructed MV3 to "[r]ecord a video and jerk off but do not cum," and "[t]hen get on [his] knees and verbally ask [the defendant] in the most respectful, submissive, obedient way [he] can for permission to cum." *Id.* When MV3 said his little sister was nearby, the defendant dismissed his concern. MV3 eventually complied but expressed fear that the defendant might "blackmail" him with the material. The defendant said he could do what he wanted with the video and that MV3 would perform oral sex on him when they met. *Id.*

Law enforcement interviewed MV3, who reported that he met the defendant online when he was sixteen and later met him in person. PSR at ¶ 30-31. At trial, the defendant did not deny that he instructed MV3 to do these things. Tr., 10/25/21 at 182. He described his punishments as

6

"cock and ball torture," and claimed that he ordered MV3 to engage in this sexual activity as a mixture of punishment and "stress relie[f]." *Id.* at 183, Tr., 10/26/21 at 60-61. The purpose of these "power exchange relationships," as the defendant called them, was to "push [the minors] to be the best person they can be." Tr., at 10/25/21 at 140.

### D.    MINOR VICTIM 4

While exploiting MV3, the defendant also produced and received sexually explicit videos of a fourth minor, MINOR VICTIM 4 ("MV4"). PSR at ¶ 33. MV4 was thirteen years old at the time and told the defendant so in his very first message. *Id.* at ¶¶ 33-34. After establishing that MV4 had seen his post—presumably referring to one of his online advertisements seeking "boys" or "slaves"—the defendant demanded "a live full body pic." GX 509. MV4 responded with a picture in a bathtub. GX 509A. The defendant then asked MV4 for his full name, address, and parents' names, which MV4 provided. GX 509. The defendant next told MV4 to record a video, advising him that he "should be nude," and provide ten reasons why he "feel[s he] would be a good slave." *Id.* MV4 told the defendant he did not want to talk in the video because his parents were home, but the defendant dismissed his concern. *Id.* MV4 then sent multiple videos in which he appears to be nude and whispering in a bathtub. *Id.* Finally, the defendant told MV4 to "record a video showing [his] entire face, [his] full body, and say 'I [MV4] am a worthless faggot and am the property of Master Zack for the rest of my life[.]'" *Id.* In response, MV4 sent multiple versions of the requested video. *Id.* Afterwards, the defendant asked MV4 if he had a dildo and repeatedly followed up with MV4, but MV4 stopped responding. *Id.*

MV4 confirmed for law enforcement that he sent those images and videos, and disclosed that he was exploring his sexuality at the time and felt "young" and "dumb" in retrospect. PSR at ¶ 35. The defendant, for his part, admitted that these chats came from his account but claimed to

have no memory of ordering this thirteen-year-old victim to engage in this conduct. Tr., 10/26/21 at 66.

### E.      MINOR VICTIM 5

In 2017, the defendant was communicating with another minor, MINOR VICTIM 5 ("MV5"), and inducing him to record sexually explicit images and videos. PSR at ¶ 17. MV5 was seventeen years old at the time. *Id.* In his conversations, the defendant sought out personal information about MV5's sexuality, school and family life, and medical history. *See* GX 501A. The defendant never provided similar information about himself; his goal instead was to learn about the minor's vulnerabilities and insecurities so he could exploit them later. The defendant also offered to employ MV5 so they could meet without MV5's parents becoming suspicious, asking him how "little clothing" he was willing to wear while working. *Id.*; *see also* GX 501D.

As he did with the other minors, the defendant instructed MV5 to take and send sexually explicit images of himself. In September 2017, for example, he instructed MV5 to "[s]trip" and send a "full body pic." GX 501F. He then told MV5 to write the words "liar," "disobedient," "disrespectful," "faggot," and "slave" on his chest and take a picture displaying his face and "dick" with those words visible. PSR at ¶ 19. Later, after acknowledging that he had met MV5 in person, the defendant ordered MV5 to "strip" and "send a photo once that is done." GX 501P. He then asked MV5 whether he was ready for his "punishment," and sent the following instructions: "You're going to slap yourself on the balls as hard as you can 30 times. You will record this and send me the video. I strongly suggest you actually dop it hard, because if I feel you're being too gentle you'll have to start over." *Id.* MV5 sent the requested video and said he was "crying," to which the defendant responded "Good." *Id.* At various points, MV5 sought to end his relationship

with the defendant, who responded with ultimatums, blackmail, and emotional manipulation to keep the relationship going. *See, e.g.*, GX 501D at 9; GX 501E at 1-6; 501P at 1.

MV5 later told law enforcement that he met the defendant online and that the defendant had him shave his body, wear a "chastity cage" that confined his genitals, and sign a contract allowing the defendant to "have him." PSR at ¶ 22-24. MV5 reported that the defendant repeatedly showed up at his high school and work and once duct taped his hands to the passenger seat of the defendant's car in his school's parking lot and forcibly locked a "chastity cage" around his genitals, which MV5 later had to remove with power tools. *Id.* At trial, MV5 explained that he created and sent the videos described above specifically because the defendant requested them. Tr., 10/22/21 at 164-71. The defendant, on the other hand, claimed that his instructions to MV5 were simply "part of the dynamic between [them]." Tr., 10/26/21 at 78.

### F.      MINOR VICTIM 6

In addition to the minors who he used to produce child sexual abuse material, the defendant communicated in 2019 and 2020 with a sixth minor, MINOR VICTIM 6 ("MV6"), who was sixteen years old at the time and from whom the defendant received sexually explicit videos. PSR at ¶ 52. Specifically, law enforcement recovered chats in which the defendant engaged in sexually charged conversations with MV6, discussed MV6's high school classes and self-esteem issues, and offered MV6 employment. *See* GX 507A; GX 507B. The defendant also discussed meeting MV6 in person, and the fact that he engaged in oral sex with MV6. GX 507A; GX 507B; GX 507E at 7. In January 2020, shortly before the defendant denied having sexual relationships with minors to the FBI, MV6 sent the defendant two videos of himself engaged in sexually explicit conduct, prompting the defendant to say: "You're going to be sucking my dick every day," and "Just seeing you suck dick reminded me that you were good at it when I saw you." PSR at ¶ 53. Later in the

chat, MV6 told the defendant that the defendant never sent him the "videos" of MV6 "sucking" the defendant. *Id.* at ¶ 54. After law enforcement searched the defendant's home, the defendant told MV6 that he was under investigation and instructed him to "delete everything." *Id.* at 55.

At trial, the defendant did not deny having the above conversations with MV6 but suggested that the reference to "sucking" in the chat might have been referring to MV6 "lick[ing] and slobber[ring] and bit[ing] people and slobber[ing] all over them and suck[ing] their toes and fingers like a dog," as opposed to oral sex. Tr., 10/26/21 at 73.

## II.   The Defendant's Additional Child-Exploitation Conduct

The FBI found additional child sexual abuse material on various devices in the defendant's bedroom. GX 601, 701, 801, 901. At trial, the defendant acknowledged that these devices were his and that he downloaded "disturbing" videos and images. Tr., 10/26/21 at 12-15. He insisted, however, that he did not want this content and only kept it to sort through later to find what he actually "wanted." *Id.* at 18. He never specified which files he actually wanted, of course. In fact, despite his claim that he did not seek out child pornography, images and videos depicting the sexual abuse of prepubescent boys with creation dates ranging from 2014 to 2020 were found on devices scattered throughout his bedroom. GX 705, 904.

On a thumb drive in the defendant's bedside table, *see* GX 225, 601, for example, law enforcement found a two-minute video depicting a nude minor being repeatedly whipped with a rod and a thirty-minute video of two prepubescent boys engaged in oral and anal sex, GX 602, 603. On a laptop hidden under his mattress, *see* GX 218, 701, law enforcement found dozens of images and videos of child pornography, including a nineteen-minute video depicting multiple men orally and anally raping and whipping a crying, bound-and-gagged minor, and a seven-minute video depicting an adult male engaged in oral and anal sex with a prepubescent boy, *see* GX 702,

704, 705. On another thumb drive, this one from his laptop bag, *see* GX 228, 801, law enforcement found dozens more images and videos depicting the sexual abuse of minor boys, including a nine-minute video depicting a male anally penetrating a crying infant and a twenty-four-minute video depicting a boy who is bound and gagged and then forced to perform oral sex on an adult male, *see* GX 803, 804, 806. And on another laptop, this one from his closet, *see* GX 234, 901, law enforcement found even more depictions of minors engaged in sexually explicit conduct, including a four-minute video of an adult engaged in oral sex with a minor, *see* GX 902, 904.

## SENTENCING ANALYSIS

To determine the appropriate sentence, a court must consult both the Guidelines and the factors set forth in 18 U.S.C. § 3553(a). Based on these factors, the United States submits that a Guidelines-compliant sentence is appropriate here.

### I.      Guidelines Calculations

Although the Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005). Here, the PSR correctly calculated the defendant's total offense level under the Guidelines as 43, his criminal history as category I, and his Guidelines sentencing range as 3,480 months. PSR at ¶¶ 66-111, 139-40. The United States has no objections to this calculation or the PSR.

### II.      The Defendant's Objections to the PSR

The defendant submitted a fifty-page letter raising dozens of objections to the PSR, including objections to: (1) the description of his offense conduct; (2) the requests for restitution; (3) the application of the four-point enhancement under U.S.S.G. § 2G2.1(b)(4)(A); (4) the application of the two-point enhancement under U.S.S.G. § 2G2.1(b)(6)(B) with respect to MV1

through 5; (5) the application of the five-point enhancement under U.S.S.G. § 4B1.5(b)(1); and (6) the description of history and characteristics.

### A.    Defendant's Objections to the Offense Conduct

The defendant has submitted numerous and lengthy objections to the PSR's description of the offense conduct.[1] The sheer volume of his objections ignores the fact that the PSR's offense conduct section customarily includes only a summary of the defendant's criminal conduct for which he is to be sentenced and does not purport to comprehensively catalogue the defendant's behavior with a recitation of every minute factual detail. The defendant's objections are particularly puzzling in this case, since the matter proceeded to trial and the Court thus heard and saw all the evidence that proved the defendant guilty beyond a reasonable doubt as it was introduced and presented to the jury. Moreover, none of these objections affect the calculation of the Guidelines imprisonment range applicable to the defendant.

Some of the objections split utterly irrelevant hairs. *See, e.g.*, Def. Obj. ¶ 9 (insisting on usage of the term "onion service websites" instead of "hidden service websites"). Many of the objections insist on the inclusion of additional irrelevant information not directly pertinent to the conduct underlying the offenses of conviction. *See, e.g.*, Def. Objs. ¶¶ 10, 11 (proposing inclusion of details regarding his access of particular Tor website); ¶ 15 (suggesting addition of details regarding a website dedicated to sex-related conversations and terms said to be common in BDSM culture); ¶ 16 (indicating PSR is incomplete because it does not include details regarding prevailing expectations of those assuming dominant and submissive roles in BDSM culture, and statistics from a 2015 survey of American adults that asked how many had "tried some elements of BDSM,"

---

[1] The defendant's objections to the summary of the offense conduct span forty-two pages, while the summary itself occupies only around twelve pages in the PSR.

such as spanking or flogging). Some of the objections are flatly inaccurate, in addition to being irrelevant. *See, e.g.*, Def. Obj. ¶ 12 (describing defendant's interview with the FBI as involuntary).

The majority of the defendant's objections pertain to extended additional portions of conversations between the defendant and his several minor victims, which he suggests must be recounted at great length. *See, e.g.*, Def. Objs. ¶¶ 19-22, 26-29, 36-41, 44-49. The only conceivable purpose for requesting inclusion in the PSR of these additional conversation portions is an apparent attempt by the defendant to suggest that the minor victims somehow consented to the defendant's production of child pornography. *See, e.g.*, Def. Obj. ¶¶ 26-29 (arguing that "the types of things that Mr. Sanders asked MV3 to do were tasks that he enjoyed and had been discussed previously"), Def. Obj. ¶¶ 44-49 (positing as relevant that MV1 "understood that there are sort of rules of the way people talk to each other when they're having these kinds of BDSM relationships"). However, as the Court correctly observed during trial, the purported "consent" of a minor victim forms no defense to the crime of production of child pornography. There is thus no relevance to the many pages of additional conversations between the defendant and the victims that he proposes to add to the PSR. In any case, large portions of these chats were already admitted at trial, including portions that he moved to admit himself because he claimed they were necessary to show the minors' purported consent, and the Court may consider this evidence as appropriate at sentencing regardless of whether it is included in the PSR. Amendment of the PSR is therefore unnecessary.

### B.     Defendant's Objections to the Requests for Restitution

The defendant next objects to the PSR's inclusion of requests for restitution from victims of his possession-of-child-pornography offense who have been identified by the National Center for Missing and Exploited Children ("NCMEC"), claiming that he "is unaware of evidence that the individuals seeking restitution were in fact identified as being in images/videos that [he]

possessed." Def. Obj. p. 44-46. The government produced the restitution requests from these victims and has repeatedly offered to make available at a government facility the visual depictions from his devices of these victims so that the defense can confirm that they are entitled to restitution. The defense has not responded to any of the government's offers. The U.S. Probation Office, however, has reviewed this material to confirm the accuracy of the information in the PSR. The defendant bears the burden to show that this information is inaccurate and the Court is permitted to adopt the PSR without a specific inquiry if he fails to make that showing. *United States v. Smith*, 827 F. App'x 262, 266 (4th Cir. 2020) (citing *United States v. Powell*, 650 F.3d 388, 393–94 (4th Cir. 2011)); *United States v. Mobley*, 153 F.3d 724, 724 (4th Cir. 1998) (per curiam) ("A 'mere objection' to the PSR's contents 'is not sufficient' to challenge the accuracy of a PSR." (citing *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990)). Here, there is sufficient indicia of reliability in the information in the PSR and the Court should overrule the defendant's barebones objection to the inclusion of this information.

## C.    Defendant's Objection to the § 2G2.1(b)(4)(A) Enhancement

The defendant next objects to the application of the four-point enhancement under § 2G2.1(b)(4)(A) with respect to Counts One, Two, Three, and Five, arguing that the material does not portray "sadistic or masochistic conduct or other depictions of violence" because he believes MV1, MV2, MV3, and MV5 voluntarily engaged in the depicted conduct. Def. Obj. p. 46. As other courts have explained, however, the assessment of whether to apply this enhancement "should focus on an observer's view of the image—what is portrayed and depicted—rather than the viewpoint of either the defendant or the victim." *United States v. Nesmith*, 866 F.3d 677, 679-80 (5th Cir. 2017); *see also United States v. Raplinger*, 555 F.3d 687, 594 (8th Cir. 2009) ("The enhancement, however, applies to material *depicting* sadistic, masochistic, or violent conduct even

if those pictured were not truly engaging in painful activities."); *United States v. Johnson*, 680 F. App'x 194, 199 (4th Cir. 2017) ("Whether a particular image portrays sadistic conduct under the Sentencing Guidelines is, indeed, an objective determination." (internal quotation marks omitted)). Here, the videos of MV1, MV2, MV3, and MV5—in which the minors' genitals are being slapped and the victims are visibly pained—plainly depict sadistic, masochistic, and violent acts. Indeed, the defendant explained at trial that his "cock and ball torture" punishments were intended to be "painful" and testified at length about how his relationships with minors were fueled by his devotion to "BDSM" culture—which includes, in his own words, "sadomasochism." Tr., 10/25/21 at 183, 10/26/21 at 35. The defendant's frivolous objection should therefore be overruled.

**D.      Defendant's Objection to the § 2G2.1(b)(6)(B) Enhancement**

The defendant also objects to the two-level enhancement assessed by the PSR pursuant to U.S.S.G. § 2G2.1(b)(6)(B) as to each of the production counts for the use of a computer or interactive computer service to persuade, induce, entice, coerce or facilitate the travel of a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct. *See* Def. Objs. ¶¶ 67, 75, 82, 89, 96. The defendant argues that because the offense of production of child pornography, as defined by 18 U.S.C. § 2251(a), can be accomplished through certain actions not specifically included in § 2G2.1(b)(6)(B) (such as "employing" or "using" a minor), and because no special jury verdict form was returned at trial, the evidence is insufficient to justify the enhancement.

The argument is plainly meritless. It is irrelevant whether the jury's guilty verdict itself compels application of the enhancement. What matters instead is whether the evidence (including the evidence admitted at trial) proves by a preponderance of the evidence that the enhancement is applicable. *See United States v. Hill*, 322 F.3d 301, 307 (4th Cir. 2003) ("For a sentencing

enhancement to apply, the government must prove the facts underlying the enhancement by a preponderance of the evidence."). The evidence admitted at trial overwhelmingly proved that the defendant, at a minimum, solicited participation of each of the minor victims in various forms of "sexually explicit conduct," including masochistic abuse, masturbation, and the lascivious exhibition of their genitals. The enhancement is applicable.

### E.   Defendant's Objections to the § 4B1.5(b)(1) Enhancement

The defendant also objects to the application of the five-level enhancement under U.S.S.G. § 4B1.5(b)(1) for repeat and dangerous sex offenders against minors, arguing that it covers the same conduct as the five-level enhancement under § 2G2.2(b)(5). The defendant is again mistaken. As the Fourth Circuit has explained, the enhancements under § 2G2.2(b)(5) and § 4B1.5(b)(1) can be applied simultaneously because they "serve distinctly different goals." *United States v. Dowell*, 771 F.3d 162, 171 (4th Cir. 2014) (explaining that § 2G2.2(b)(5) "provides an enhancement for offense-specific conduct" while § 4B1.5(b)(1) provides an enhancement when a defendant's pattern of activity presents a continuing public danger). Based on this clear precedent, the defendant's objection should be overruled.

### F.   Defendant's Objections to the Offender Characteristics Section

The defendant finally objects to various offender characteristics recounted by the PSR. *See* Def. Objs. ¶¶ 125, 126, 133, 134, 136, 138, 139, 140. The government does not have the ability to independently verify the accuracy of many of the objections submitted in this section. Nevertheless, to the extent they are factually accurate, and without conceding the relevance of any of them to determination of the appropriate sentence to be imposed, the government does not oppose corresponding revisions to the PSR.

III.   **Section 3553(a) Factors**

After calculating the Guidelines range, a sentencing court must consider that range and the sentencing factors set forth in § 3553(a) to determine an appropriate sentence. *Nelson v. United States*, 555 U.S. 350, 351 (2009). These factors include the nature and circumstances of the offenses, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offenses and afford adequate deterrence. 18 U.S.C. § 3553(a). Based on a careful consideration of these factors, the United States respectfully requests that the Court impose a Guidelines-compliant term of imprisonment and a lifetime of supervised release.

A.   **Nature and Circumstances of the Offenses**

The production and trafficking of child pornography are vile crimes whose horror cannot be fully captured in words. As the Victim Impact Statements submitted in this case show, and as "[l]ong-term studies" confirm, "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc) (collecting authority). "When child pornography is produced in conjunction with the sexual abuse of children, … the harm to the child victims is magnified and perpetuated." *Id.* at 1208. "Such images are 'a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.'" *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *United States v. Ferber*, 458 U.S. 747, 759 & n.10 (1982)); *accord United States v. Accardi*, 669 F.3d 340, 345 (D.C. Cir. 2012).

Indeed, "[e]very instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006)

(codified at 18 U.S.C. § 2251 note); *accord United States v. Sherman*, 268 F.3d 539, 547-48 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children, "who must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," "suffer a direct and primary emotional harm when another person possesses, receives or distributes the material." *Sherman*, 268 F.3d at 547.

It is therefore unsurprising that when one "[m]ention[s] the term [child pornography] to your average American[,] … he responds with immediate disgust and a sense of unease." *United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), *aff'd*, 669 F.3d 723 (6th Cir. 2012). But as the *Cunningham* court warned, "once it enters the legal system, child pornography undergoes sterilization … far beyond properly removing emotion from sentencing decisions." *Id.* "Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement." *Id.* Thus, while the written excerpts below cannot fully capture the suffering the defendant's crimes have inflicted on his victims, it is important to highlight the pain the defendant has caused in the victims' (or their parents') own words.

As the mother of MV1 explained, for example, the defendant's actions made her son "feel like he was worthless." "Even though your contact was only with my son," she continued,

> you hurt our family deeply. Because of you, and others like you, we moved, we did not feel safe in our home, because you knew what school he went to and where we lived. I lived in fear for months, I had a hard time sleeping, still do some nights. I am not as trusting or as social as I used to be.
>
> My son is now in therapy and is working on himself. We are not hearing him call himself trash as much. He still puts himself down, but not as much. Monsters like you feed off fear. … My son and all the other victims and survivors of you will have to live with what you have done to all of them for the rest of their lives.

PSR at p. 38. The victims depicted in the child pornography the defendant possessed expressed equal amounts of trauma and pain in response to the defendant's collecting of material depicting their horrific abuse. *See* PSR at pp. 50-53, 56-65, 87. And those were just the victims who were identified. Many more victims depicted in the contraband he possessed were subjected to extreme and unimaginable sexual violence—including, as described above, prepubescent boys who were bound and gagged and then raped on camera—but were never identified, and their pain will never be voiced. In light of extremely serious nature of the defendant's offenses, the government submits that a Guidelines-compliant sentence is appropriate here.

## B.     The History and Characteristics of the Defendant

Although the defendant has no prior convictions, his history and characteristics nevertheless counsel in favor of a Guidelines sentence. For years, he targeted the most vulnerable members of society—children—and exploited their insecurities and naivete to induce them to record themselves performing his desired sexual acts. This exploitation was not, as he later claimed, the product of his social deficits and isolation, or his attempts at "sexting." In fact, several of the victims reported that he met them in person, and one reported that the defendant forcibly locked a cage-like device around his genitals in his high school's parking lot. A review of his chats, on other hand, makes his true motivations clear: he sought out minors who felt confused or isolated, or ideally both, because he could more easily groom them into engaging in the kind of sadomasochistic relationships he found sexually appealing. When the minors resisted his degrading "punishments"—some of which he described as "cock and ball torture"—the defendant would respond with threats, dismissal, or self-pitying manipulation, suggesting that they failed to appreciate how difficult he had it as their "dom" or "master". And at the same time, he was seeking out videos of minors being whipped, bound, and raped. These videos serve as a startling precursor

of the kind of conduct the defendant would have—and with some of the minor victims, already had—progressed towards if law enforcement had not intervened.

This criminal conduct is consistent with the observations of mental health professionals who evaluated him. As the government's expert, Dr. Paul Montalbano, noted after his examination,

██████████████████████████████████████████████████████████

████, ECF No. 447 at 22, which is reflected in the child-pornography material he possessed and the degrading sexual acts he had the minor victims record themselves performing. Equally alarming is Dr. Montalbano's observation that █████████████████████████████

██████████████, *id.* at 41, but still engaged in it for years. Moreover, since being caught, the defendant has refused to accept any responsibility for his actions, blaming at various times law enforcement, his family, and even the minor victims for his circumstances. ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████ *Id.* at 15 (████████████████████████████

████████████████████████████); *id.* at 31 (████████████

████████████████████████); *id.* at 34-35 (████████████████████

████████████████████████████████████████).

The government anticipates that the defendant will submit multiple lengthy reports from purported experts that minimize the danger he poses.[2] As he made clear before, however, the defendant is more than willing to craft a false narrative to downplay or even acquit him of his criminal actions. ████████████████████████████████████████████

████████████████████████████████ ECF No. 314-1. ████████████

---

[2] The defendant has provided no information regarding any evaluations as of this filing.



*See* ECF Nos. 282-1, 344-1, 356-1, and 414.

ECF No. 492. The defendant's lengthy and detailed testimony at trial only further undermined the reliability of the opinions the defendant previously sought to introduce, and any similar opinions he relies on at sentencing should be met with significant skepticism.

### C.   The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment

"There can be no keener revelation of a society's soul than the way in which it treats its children." *Cunningham*, 680 F. Supp. 2d at 847. Sadly, "[t]he exploitation of children is pandemic. The most vulnerable members of our society have been exploited and discarded." *Id.* at 848. To reflect the seriousness of this crime, those who participate in this conduct must be punished severely. *See United States v. Morace*, 594 F.3d 340, 350 (4th Cir. 2010) (citing a 2003 legislative enactment as "ample evidence of Congress's intent that offenses involving child pornography be treated severely"). Indeed, as detailed above, the victims in this case have already been subjected to a lifelong scar worse than any punishment the defendant could now receive. The Government requests that the Court impose a sentence that captures the significant impact of his crimes.

### D.   The Need for Sentence to Afford Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant

The sentence in this case must constitute a loud message to potential child sex offenders that severe consequences will result from such heinous acts. Although it is not entirely clear why

the defendant thought he could carry out these crimes without detection or punishment, it is likely that his vast resources and privileged upbringing coupled with the feelings of shame and confusion that these minors communicated to him led the defendant to assume that he could exploit them with impunity. He has shown no indication that he understands his conduct to be criminal, let alone wrong. Had the FBI not executed a warrant to search his home, he would likely still be engaging in the very same conduct. Whatever the reason for his actions—and given the difficulty in detecting these sort of crimes—it is imperative that the defendant and offenders like him understand that there are significant consequences associated with the sexual abuse of children.

Indeed, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'" *Irey*, 612 F.3d at 1211 (citation omitted). "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'" *Id.* (citation omitted); *accord United States v. Garthus*, 652 F.3d 715, 721-22 (7th Cir. 2011); *see also Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand.").

Distressingly, the market for child pornography has continued to grow, and to become more depraved, in recent years. *See, e.g.*, *U.S. Sent'g Comm'n Hr'g on the Child Pornography Guidelines* 1-2 (Feb. 15, 2012) (statement of James M. Fottrell, Steve DeBrota & Francey Hakes, Dep't of Justice), *available at* http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215/Testimony_15_Hakes_DeBrota_Fottrell.pdf. That depravity is evident here. The need for effective deterrence through a significant sentence is therefore essential. As the Supreme Court has reasoned, "[t]he most expeditious if not the only

practical method of law enforcement [to halt the exploitation of children] may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product." *New York v. Ferber*, 458 U.S. 747, 760 (1982).

A Guidelines sentence is additionally appropriate given the "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Smith v. Doe*, 538 U.S. 84, 103 (2003); *see also Cunningham*, 680 F. Supp. 2d at 855-56, 859-60 (discussing recidivism studies). There is little reason to think that the defendant is a "low risk" to recidivate. All his perverse activities were carried out in relative secret, and it is clear based on the recovered chats that he received sadistic pleasure from his exploitation of minors. He also minimized the gravity and extent of his offenses, both in his interview with the FBI and to the jury at trial, indicating that he has little concern for the harm inflicted upon his victims or the potential harm he might cause to future victims. And even if the defendant could be described as a "low risk" to recidivate, "[a] low risk is not the same as no risk." *Irey*, 612 F.3d at 1216-17. "Adequate protection is a function of two variables: the level of risk that conduct will occur and the level of harm that will be inflicted if that conduct does occur." *Id.* at 1217; *see also Garthus*, 652 F.3d at 720 ("The sadistic nature of much of the child pornography consumed by the defendant is another reason to worry about his being on the loose."). The sentence imposed must therefore be designed to ensure the defendant's crimes do not happen again.

"Nor does the fact that [the defendant] will be subject to restrictions and supervised release [if] he gets out of prison offer any guarantee that he will not commit any crimes." *See Irey*, 612 F.3d at 1215 (discussing studies and other data showing that "supervised release . . . often fails to prevent sex offender recidivism"). In short, "[s]upervised release is better than unsupervised

release, but it does not offer society the level of protection from a convicted criminal that incarceration does." *Id.* at 1216.

### E.      The Need to Avoid Unwarranted Sentencing Disparities

A Guidelines sentence would also avoid unwarranted sentencing disparities consistent with the goals of 18 U.S.C. § 3553(a). Child sex offenders around the country routinely receive significant sentences for similar crimes.[3] So, too, do offenders in this district. *See United States v. Harris*, 653 F. App'x 203 (4th Cir. 2016) (affirming 50-year sentence following jury trial for 31-year-old defendant who posed as a minor online and had multiple girls send him sexually explicit images of themselves); *United States v. Battle*, 695 F. App'x 677, 681 (4th Cir. 2017) (affirming 300-month sentence following jury trial for 24-year-old defendant who posed as a minor online and had four minors create and send sexually explicit images of themselves); *United States v. Thomas*, 2:18-cr-58-AWA, ECF No. 281, Judgment (E.D. Va. July 19, 2021) (imposing 40-year sentence following jury trial for defendant who, in his late twenties, and groomed multiple teenagers to record themselves engaging in sexually explicit conduct). Of course, what this Court must decide is not what sentence was appropriate in other cases, but what sentence is appropriate

---

[3] *See, e.g., United States v. Belanger*, 683 F. App'x 38 (2d Cir. 2017) (affirming 40-year sentence for 21-year-old defendant who met a minor through an online video game and enticed him to create sexually explicit videos of himself); *United States v. Whitt*, 644 F. App'x 97 (2d Cir. 2016) (affirming 60-year sentence for defendant who used online video chat websites to meet and entice minors to engage in sexually explicit conduct); *United States v. Bogomol*, 2021 WL 3620444, at *1-2 (5th Cir. 2021) (noting 60-year sentence for defendant who used online persona of minor female to entice minors to produce child pornography); *United States v. Ables*, 728 F. App'x 394 (5th Cir. 2018) (affirming 80-year sentence for defendant who used mobile messaging application to coerce minors into creating and sending sexually explicit images of themselves); *United States v. Killen*, 773 F. App'x 567, 569 (11th Cir. 2019) (affirming 50-year sentence for defendant who used online persona when he was 19-years-old to coerce minor boys to send him nude images); *United States v. Brandt*, 585 F. App'x 754 (11th Cir. 2014) (affirming 90-year sentence for defendant who used the internet to coerce minors to photograph themselves engaging in sexually explicit conduct and send him the photographs).

for this defendant. The cited cases simply stand for the proposition that a Guidelines sentence of imprisonment is appropriate and well-deserved here.

**IV.**    **Supervised Release**

The Court must also impose a term of supervised release.  "Supervised release … is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994).  Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Under 18 U.S.C. § 3583(k), the authorized term of supervised release here is at least five years and up to life. This five-year mandatory minimum reflects a heightened concern for recidivism among sex offenders and the need for supervision over time. *See* H.R. Rep. No. 107–527 at 2 (2002) ("[S]tudies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes [and that] … the recidivism rates do not appreciably decline as offenders age"). Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, U.S.S.G. § 5D1.2(b) (Policy Statement), and the Fourth Circuit has observed that § 3583(k) and § 5D1.2(b) jointly "reflect[] the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citations omitted). For all the reasons above, the United States respectfully recommends that the Court impose a lifetime of supervised release.

**V.**    **Restitution**

Pursuant to 18 U.S.C. §§ 2259 and 3663, the defendant must pay restitution in the "full amount of the victims' losses." The United States has received restitution requests from two victims depicted in the child pornography that he possessed. PSR at ¶¶ 60-62. Under 18 U.S.C. § 2259(b)(2)(B), these two victims are entitled to at least $3,000 in restitution each, and the United

States believes that such an award is reasonable under the circumstances. Accordingly, the United States requests that the Court order a judgment of restitution to the two minor victims identified in the PSR in the amount of at least $3,000 per victim.

## VI.     Mandatory Special Assessment Under the Justice for Victims of Trafficking Act

The Justice for Victims of Trafficking Act imposes a mandatory assessment of $5,000 per count of conviction on any non-indigent defendant convicted of, among other offenses, production, receipt, and possession of child pornography.[4] 18 U.S.C. § 3014(a)(3). While the statute is silent as to how to determine indigence, courts have treated the imposition of this assessment like the imposition of other post-conviction assessments, where "[t]he defendant bears the burden of proving both his inability to pay at the time of sentencing and that he is not likely to become able to pay a fine upon his release from his term of imprisonment." *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017).   Relevant factors to consider include a defendant's future earning potential, assets, education, employment history, and age.  *See United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020); *see also United States v. Mann*, 770 F. App'x 649, 650 (4th Cir. 2019). Based on those factors, and considering the many attorneys and consultants he has privately retained throughout this case, the government respectfully requests that the Court find the defendant non-indigent and impose a special assessment of $5,000 for each of the qualifying twelve counts of conviction under 18 U.S.C. § 3014.

## VII.     Mandatory Special Assessment Under 18 U.S.C. § 2259A(a)(1)

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act. The Act instructs that, in addition to any restitution or other special

---

[4] This assessment goes to the Domestic Trafficking Victims' Fund, which is used to enhance programming for victims of child pornography, and is payable after the defendant has satisfied all outstanding court-ordered fines and orders of restitution. *See* 18 U.S.C. § 3014(b) & (e).

assessment, courts "*shall* assess . . . not more than $17,000 on any person convicted" of the offense of possession of child pornography, "not more than $35,000 on any person convicted" of the offense of receipt of child pornography, and "not more than $50,000 on any person convicted" of the offense of production of child pornography. 18 U.S.C. § 2259A(a). Assessments collected under this statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* 18 U.S.C. §§ 2259(d) & 2259B, and shall be paid in full after any special assessment under § 3013 and any restitution to victims of the defendant's offense, *see* 18 U.S.C. § 2259A(d)(2).  In determining the amount to be assessed under § 2259A, courts should consider the sentencing factors set forth in § 3553(a) and the guidance in § 3572 for the imposition of fines. *Id.* at § 2259A(c). Given the gravity and extensiveness of the defendant's offense conduct, the government respectfully requests that the Court impose a reasonable special assessment under this statute.

## CONCLUSION

The defendant is a serial sexual predator who has shown no remorse for his exploitative conduct. Accordingly, the United States respectfully requests that the Court impose a Guidelines-compliant sentence, a lifetime of supervised release, restitution in the amount of at least $3,000 each to the two requesting victims, and special assessments under 18 U.S.C. §§ 2259A and 3014.

Respectfully Submitted,

Jessica D. Aber
United States Attorney

By: /s/_____
William G. Clayman
Special Assistant United States Attorney (LT)
Jay V. Prabhu
Seth M. Schlessinger
Assistant United States Attorneys

United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3980

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to counsel of record in this case.

By:     /s/
William G. Clayman
Special Assistant U.S. Attorney (LT)