**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

ZACKARY ELLIS SANDERS,

       Petitioner,

  v.

UNITED STATES,

       Respondent.

Case No. 1:20-CR-00143 (AJT)

Honorable Anthony J. Trenga

Motion Pursuant to 28 U.S.C. § 2255

**REPLY MEMORANDUM OF LAW IN SUPPORT**
**OF ZACKARY SANDERS' MOTION TO VACATE**
**HIS CONVICTIONS PURSUANT TO 28 U.S.C. § 2255**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

    I.     THE RECORD IN THE DISTRICT COURT AND ON DIRECT APPEAL ........ 2

    II.    THE NEW EVIDENCE ................................................................................. 3

          A.     The U.S. and the U.K. Worked as a Joint Venture. .................................. 3

          B.     The Santos Sites Shared a Single IP Address. ........................................... 5

ARGUMENT .............................................................................................................. 6

    I.     THE NEW EVIDENCE ESTABLISHES A JOINT VENTURE THAT
          VIOLATED MR. SANDERS' FOURTH AMENDMENT RIGHTS .................... 6

          A.     The U.S. and U.K. Were in a Joint Venture, a Fact Not Previously
                 Disclosed. ................................................................................................ 6

          B.     The Search by a Joint Venture Partner Identifying Mr. Sanders'
                 IP Address and the Content It Accessed Violated His Reasonable
                 Expectation of Privacy. ........................................................................... 7

               1.     Mr. Sanders Had a Reasonable Expectation of Privacy in
                       His Tor-Anonymized IP Address. .................................................... 8

                2.     The Joint Venture Violated Mr. Sanders' Fourth Amendment
                         Rights by Intruding on His Computer to Determine His IP
                         Accessed Hurt Meh. ........................................................................ 9

           C.     At a Minimum, Mr. Sanders Is Entitled to an Evidentiary Hearing. ........ 10

          D.     The Good-Faith Exception Does Not Excuse the Fourth Amendment
                 Violation. ................................................................................................ 11

          E.     Mr. Sanders' Fourth Amendment Claim Is Not Barred Under
                 Section 2255. .......................................................................................... 12

                1.     *Stone* Does Not Bar Mr. Sanders' Claim. ..................................... 12

                      a.     *Stone* Does Not Apply to Section 2255 Petitions. ............ 12

                      b.     Even if *Stone* Applied, Mr. Sanders' Claim Would Be
                           Cognizable Under the "Full and Fair Opportunity"
                             Exception. ...................................................................... 13

i

        2.     Mr. Sanders Has Not Waived His Fourth Amendment
Argument. ...................................................................... 14

        3.     Mr. Sanders' Fourth Amendment Claim Is Not Procedurally
Barred.............................................................................. 15

II.    TRIAL COUNSEL'S FAILURE TO FILE A TIMELY MOTION TO
SUPPRESS INVOLUNTARY STATEMENTS CONSTITUTES
INEFFECTIVE ASSISTANCE ................................................................. 16

    A.    Mr. Sanders Has Satisfied *Strickland*'s "Performance" Prong. ................ 16

        1.     Missing a Deadline Was Not a Reasonable Strategic Decision.... 16

        2.     The Motion to Suppress Plainly Had "Some Substance." ............ 20

    B.    Mr. Sanders Has Satisfied *Strickland*'s "Prejudice" Prong. ..................... 21

        1.     If Trial Counsel Had Made a Timely Motion, There Is a
Reasonable Probability Mr. Sanders' Statements Would
Have Been Suppressed.................................................... 21

        2.     There Is a Reasonable Probability the Outcome Would Have
Been Different If Mr. Sanders' Involuntary Statements Were
Suppressed. .................................................................. 24

CONCLUSION................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baranski v. United States*,
515 F.3d 857 (8th Cir. 2008) ................................................................................. 13

*Carpenter v. United States*,
585 U.S. 296 (2018) ............................................................................................... 8

*Chatrie v. United States*,
146 S. Ct. 2193 (2026) ...................................................................................... 7, 8

*Grayson O Co. v. Agadir Int'l LLC*,
856 F.3d 307 (4th Cir. 2017) ............................................................................... 15

*Griffin v. Clarke*,
No. 1:15cv658 (LMB/TCB), 2015 WL 11117147 (E.D. Va. June 1, 2015) ........................... 15

*Grueninger v. Dir., Va. Dep't of Corr.*,
813 F.3d 517 (4th Cir. 2016) ................................................................... 16, 19, 24

*J.D.B. v. North Carolina*,
564 U.S. 261 (2011) ............................................................................................. 23

*Jones v. Barnes*,
463 U.S. 745 (1983) ............................................................................................. 16

*Katz v. United States*,
389 U.S. 347 (1967) ........................................................................................... 7, 8

*Kaufman v. United States*,
394 U.S. 217 (1969) ............................................................................................. 12

*Ray v. United States*,
721 F.3d 758 (6th Cir. 2013) ............................................................................... 13

*Rummel v. Estelle*,
498 F. Supp. 793 (W.D. Tex. 1980) ..................................................................... 17

*Stone v. Powell*,
428 U.S. 465 (1976) ............................................................................................. 12

*Strickland v. Washington*,
466 U.S. 668 (1984) ............................................................................................. 25

*Tisnado v. United States*,
547 F.2d 452 (9th Cir. 1976) ............................................................................. 13

*United States v. Abdallah*,
911 F.3d 201 (4th Cir. 2018) ............................................................................. 24

*United States v. Abu Ali*,
528 F.3d 210 (4th Cir. 2008) ............................................................................... 6

*United States v. Basham*,
789 F.3d 358 (4th Cir. 2015) ............................................................................. 22

*United States v. Benoit*,
730 F.3d 280 (3d Cir. 2013) ............................................................................... 11

*United States v. Braxton*,
112 F.3d 777 (4th Cir. 1997) ....................................................................... 22, 23

*United States v. Caro*,
733 F. App'x 651 (4th Cir. 2018) ...................................................................... 15

*United States v. Colonna*,
511 F.3d 431 (4th Cir. 2007) ............................................................................. 23

*United States v. Cook*,
997 F.2d 1312 (10th Cir. 1993) ......................................................................... 13

*United States v. Dodier*,
630 F.2d 232 (4th Cir. 1980) ............................................................................. 20

*United States v. Doyle*,
650 F.3d 460 (4th Cir. 2011) ............................................................................. 11

*United States v. Draven*,
77 F.4th 307 (4th Cir. 2023) ............................................................................. 15

*United States v. Dugan*,
136 F.4th 162 (4th Cir. 2025) ............................................................................. 6

*United States v. Ferguson*,
508 F. Supp. 2d 1 (D.D.C. 2007) ...................................................................... 12

*United States v. Giddins*,
858 F.3d 870 (4th Cir. 2017) ....................................................................... 23, 24

*United States v. Hashime*,
734 F.3d 278 (4th Cir. 2013) ................................................................... 22, 23, 24

*United States v. Henderson,*
  906 F.3d 1109 (9th Cir. 2018) ................................................................................................ 9

*United States v. Holmes,*
  670 F.3d 586 (4th Cir. 2012) ............................................................................................... 22

*United States v. Horton,*
  863 F.3d 1041 (8th Cir. 2017) ............................................................................................... 9

*United States v. McNeil,*
  126 F.4th 935 (4th Cir. 2025) ............................................................................. 16, 17, 18, 21

*United States v. Mitrovich,*
  95 F.4th 1064 (7th Cir. 2024) ............................................................................................ 8, 9

*United States v. Pelton,*
  835 F.2d 1067 (4th Cir. 1987) ............................................................................................. 23

*United States v. Pressley,*
  990 F.3d 383 ................................................................................................... 16, 21, 24, 25

*United States v. Sanders,*
  107 F.4th 234 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1434 (2025) ......................... 2, 3, 15, 20

*United States v. Schulte,*
  230 F.3d 1356 (4th Cir. 2000) ............................................................................................. 12

*United States v. Spearman,*
  178 F.4th 1295 (11th Cir. 2026) ........................................................................................... 6

*United States v. Sutherland,*
  103 F.4th 200 (4th Cir. 2024) ............................................................................................. 14

*United States v. Taylor,*
  935 F.3d 1279 (11th Cir. 2019) ............................................................................................ 8

*United States v. Walden,*
  625 F.3d 961 (6th Cir. 2010) .............................................................................................. 17

*United States v. Wellbeloved-Stone,*
  777 F. App'x 605 (4th Cir. 2019) .......................................................................................... 8

*United States v. Werdene,*
  883 F.3d 204 (3d Cir. 2018) ................................................................................................. 9

*United States v. Zelaya-Veliz,*
  94 F.4th 321 (4th Cir. 2024), *cert. denied* 145 S. Ct. 571 (2024) ........................................... 7

**Statutes**

18 U.S.C. § 3501 .......................................................................................................... 20

28 U.S.C. § 2255 .......................................................................................................... 10

## PRELIMINARY STATEMENT

Based on the government's false representations that United States law enforcement was the passive recipient of a tip from a Foreign Law Enforcement Agency ("FLA") that an IP address determined to be affiliated with Mr. Sanders accessed child pornography on a website called Hurt Meh, the government obtained a warrant to search Mr. Sanders' residence. Because the FLA purportedly acted independently, it was of no moment how the FLA obtained the information it shared with U.S. law enforcement. New evidence discovered after Mr. Sanders' conviction, evidence the government had concealed, demonstrates both that the U.S. was acting as a joint venture partner with the United Kingdom law enforcement agency that provided the tip and that the information provided was the fruit of a search that deanonymized Mr. Sanders' IP address and then intruded on Mr. Sanders' computer to determine what his IP address had accessed. Mr. Sanders never received a full and fair hearing on this violation of his Fourth Amendment rights before the trial court and is entitled to post-conviction relief, or at a minimum, an evidentiary hearing to determine whether he is entitled to relief.

In addition, the government concedes that Mr. Sanders' trial counsel, Jonathan S. Jeffress, failed to file a timely motion to suppress as involuntary statements Mr. Sanders made during an FBI interrogation during the search of his residence. When trial counsel belatedly moved to suppress, the court rejected the motion as untimely, without holding an evidentiary hearing. The government claims Mr. Jeffress chose to forgo the motion for strategic reasons, but his proffered reasons—that he hoped to obtain a conditional plea agreement that would allow Mr. Sanders to pursue the Fourth Amendment violation on appeal and that he did not think the case would go to trial—are not reasonable strategic justifications for his failure to meet the motions deadline. In any

1

event, his proffered reasons are factually disputed. Further, the government's claims that the motion lacked substance and the admission of the statements was harmless are unpersuasive.

## I.    THE RECORD IN THE DISTRICT COURT AND ON DIRECT APPEAL

Mr. Sanders allegedly first came to the attention of domestic authorities after an FLA, the U.K.'s National Crime Agency ("NCA"), provided them information related to an IP address that was later linked to him. The trial record contained sparse facts about the investigation and search(es) that generated this information: in August 2019, U.K. law enforcement reported to U.S. counterparts that on May 23, 2019, a specific IP address "[w]as used to access online child sexual abuse and exploitation material…." *See United States v. Sanders*, 107 F.4th 234, 241 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1434 (2025) (quoting the FLA's report). The U.K. later identified the website containing the accessed material as "Hurt Meh," accessible via Tor. *See id.*; *see also* ECF 691 ("Mot.") at 17–18 (describing the purpose and function of Tor, a service that anonymizes IP addresses). The U.K. did not disclose how it obtained this information but stated it neither interfered with a device in the U.S. nor accessed, searched, or seized data from a computer in the U.S. *Sanders*, 107 F.4th at 241. The U.S. used this information to obtain a search warrant for Mr. Sanders' residence. *Id.* at 242–43.[1]

Mr. Sanders moved for a *Franks* hearing and to suppress, in part because the warrant application omitted the fact that the U.S. and the U.K. had acted as part of a "joint venture." *See id.* at 244–45, 254 n.16. Finding, on the record before it, the existence of a joint venture was "hopeful speculation," the trial court did not conduct an evidentiary hearing and denied the

---

[1] It is undisputed that the U.K. had not obtained a warrant issued by a neutral, detached judicial officer, as U.S. law requires. *See* ECF 691-2 ¶ 15. Further, "English law permits…equipment interference under [non-judicially issued warrants]…of computers based in the U.S." *Id.* ¶ 17.

motions; the Fourth Circuit affirmed. *See id.* at 245, 254 n.16. The trial record thus reflected that the U.K. *independently* ascertained the information and gave it to the U.S. as an unsolicited tip.

## II.    THE NEW EVIDENCE

### A.    The U.S. and the U.K. Worked as a Joint Venture.

Evidence obtained only after Mr. Sanders' conviction demonstrates that the government had concealed from the trial court that it had, in fact, been acting in a joint venture with the U.K. *See, e.g.*, Ex. 1 (press release from Brazil's National Association of Public Prosecutors ("ANPR")); Darkest Web, https://www.youtube.com/watch?v=mNUku0jd4FA (BBC World Service 2026).[2]

Law enforcement from the U.S., the U.K., Brazil, Portugal, and elsewhere participated together in a years-long investigation into a network of child-exploitation websites and the people who administered and used them. *See, e.g.*, Ex. 1 at 1; ECFs 691-4 to-6; Darkest Web. Darkest Web features interviews with U.S. and Brazilian agents who participated in and coordinated this investigation, discussing how their joint efforts resulted in the arrest of Lucas Batista Santos a/k/a Lubasa in Brazil and the seizure of the server he used to host and operate Hurt Meh. Santos' arrest occurred two months before the U.K.'s "tip" about Mr. Sanders. *See generally* Darkest Web; *id.* at 27:00–34:00, 44:00–50:30.

For years, the U.S. and its international "partners" investigated "Twinkle," the administrator of the child pornography website "Babyheart." 28:55–30:30. After information from Brazilian partners helped confirm Twinkle's identity, the U.S. put together a team to participate in

---

[2] Ex. 1 is a certified translated copy of a report from the ANPR, the official representative body for Brazilian federal prosecutors, originally available at https://www.anpr.org.br/media/com submissoes/files//Resurno-Lobos2021-12-14-16•5 l-49.pdf. The link is no longer active. In at least one other case from the same investigation, the government "largely confirme[d]" the contents of what appears to be the same "undated translated press release from the National Association of Public Prosecutors," filed under seal. *See United States v. Stuart*, No. 21-cr-0007, ECF 99 at 6 (W.D.N.Y. July 10, 2023); *id.*, ECF 89-4.

3

Twinkle's arrest and interrogation in Portugal. *See* Darkest Web at 31:28–37:45; ECF 691-5; *see also* Ex. 1 at 2. In a joint media event with U.S. law enforcement, Portuguese officials said the U.S. played "an important" role and provided significant intelligence analysis. *See* ECF 691-5. Twinkle told agents someone with the alias Lubasa could shut down Babyheart. *See* Darkest Web at 44:17–38. After another agency reported "to the working group" that it believed it identified Lubasa (Santos) in Brazil, a team of U.S. and U.K. agents flew there together. *See id.* at 45:03–46:31.

The U.S. provided investigative and technical assistance in identifying, locating, and monitoring the server hosting Hurt Meh. *See* Ex. 1 at 2–4. Footage from The Darkest Web shows a U.S. agent conducting analysis for the investigation in front of a whiteboard listing Hurt Meh ("H Meh"). ECF 691-3. Along with the U.K., the U.S. also assisted Brazil in piercing Tor anonymity and intercepting network communications in connection with the investigation. Ex. 1 at 3 ("with the support of the English NCA" and "with assistance by the FBI"). Brazil installed equipment to capture administrative passwords and copy the server's hard drive. *Id.* at 2–4. The U.S. then assisted with additional network interception that corroborated that Santos maintained a server at his residence. *Id.* The joint investigation led to Santos' arrest on June 6, 2019 and the seizure of a server that hosted Hurt Meh (and, we now know, shared an IP address with other sites, *see* ECF 691-12). U.S. law enforcement thus participated as a full partner in leading the investigation resulting in Santos' arrest, the search, and the seizure of the server. *See* Darkest Web at 44:00–48:30; *see also* ECF 691-6; Ex. 1 at 3–5. Both the U.S. and the U.K. obtained copies of Santos' seized hard drives to provide "necessary assistance for the identification of abusers." *See* ECF 691-6 at 3.

### B.       The Santos Sites Shared a Single IP Address.

The ANPR press release indicates that Hurt Meh was only one of several websites hosted by Santos that shared the same IP address. *See* Ex. 1 at 2–3. Expert analysis confirms that all the "services subject to surveillance in this operation [including Hurt Meh] were sharing the same IP address." *See* ECF 691-12 at 2–3. In its Opposition (ECF 707, "Opp."), the government does not contest that the Santos server hosting Hurt Meh also hosted multiple websites or that this information was known to the government and not disclosed to Mr. Sanders prior to his conviction.[3]

That multiple sites used Santos' IP address is a material fact. If Hurt Meh was the only site hosted using that IP address, after determining that a user with a particular IP address accessed Santos' IP address, the U.K. could conclude the user accessed Hurt Meh as it represented in its "tip." Since there were multiple sites hosted at the same IP address, however, merely deanonymizing the user's IP address would not have revealed that the user went to Hurt Meh, as opposed to any of the other sites the server hosted.

As established by an expert declaration attached to Mr. Sanders' motion, and not contested by the government, "[a]n actual connection log to [Hurt Meh] with a true user IP address could only be created by interfering with the user's Tor Browser software or the computer it is running on causing it to malfunction." ECF 691-12 at 3. Causing "the Tor Browser on the user's computer

---

[3] In two other cases that stem from the same investigation, the government has admitted that a server seized in June 2019 (when Santos' equipment was seized) hosted multiple websites. *See Stuart*, No. 21-cr-0007, ECF 99 at 6; *United States v. Kiejzo*, No. 20-cr-40036, ECF 193 at 1 (D. Mass. Feb. 10, 2023). In *Kiejzo*, the government did not challenge the defendant's assertion that his case "ar[ose] out of the same set of tips" that led to Mr. Sanders. No. 20-cr-40036, ECF 193 at 4 n.1, 6 n.2. Although neither decision found the defendant had established a joint venture or equivalent coordination, neither court had the benefit of the new evidence presented here, including Darkest Web, not released until 2026, which details the coordination between the U.S., the U.K., and Brazil.

to malfunction and reveal information that it was designed not to…interferes with the user's computer." ECF 467-1 ¶ 30. The expert further explained that traffic analysis—a technique based on the timing of computer connections and the volume of packets transmitted, a method that does not intrude on the user's computer—would "not indicate which onion [hidden] service was visited." ECF 691-12 at 2. This limitation "is well known, apparent, and understood by anyone familiar with this technique." *Id.* Finally, logs indicating that a user's IP address connected to Hurt Meh "would not be created by software running on the" site. *See id.* at 3. Thus, the government knew that the U.K.'s representation that it had not interfered with a U.S. computer was false.[4]

ARGUMENT

I.  **THE NEW EVIDENCE ESTABLISHES A JOINT VENTURE THAT VIOLATED MR. SANDERS' FOURTH AMENDMENT RIGHTS**

A.  **The U.S. and U.K. Were in a Joint Venture, a Fact Not Previously Disclosed.**

The purpose of the joint venture doctrine is to deter U.S. law enforcement from circumventing the Constitution "by using [foreign] agents to do what American law enforcement could not." *See, e.g.*, *United States v. Spearman*, 178 F.4th 1295, 1308 (11th Cir. 2026). U.S. agents may not launder unreasonable searches through foreign partners and then benefit from the fruits of those searches. *See United States v. Abu Ali*, 528 F.3d 210, 227–28 (4th Cir. 2008) (discussing parallel *Miranda* concerns). The joint venture doctrine applies where the U.S. has

---

[4] Based on the new evidence and the expert analysis, the U.K., in addition to determining that his IP address connected with Santos' server, had to have taken additional steps to determine the specific website accessed. Expert analysis indicates that the U.K. would have needed to interfere with Mr. Sanders' computer. *See* ECF 691-12 at 3; ECF 467-1 ¶ 30. Any intrusion into his computer or interception of the content of Mr. Sanders' communications would constitute a Fourth Amendment violation. *See* Mot. 15–17.

6

active or substantial participation with a foreign law enforcement agency, meaning "coordination and direction" between the law enforcement agencies. *See id.* at 229.

The government relies on *Spearman*, which holds that sharing technology and relevant usernames between the U.S. and foreign law enforcement does not alone give rise to a joint venture, *see* Opp. at 18, and *United States v. Dugan*, 136 F.4th 162, 170–71 (4th Cir. 2025), in which no joint venture existed because U.S. law enforcement had "no additional information regarding how [the defendant's] IP address had been obtained," *see* Opp. at 16. Neither case is helpful to the government on the facts here. As detailed above, there was a joint venture in which U.S. law enforcement helped the FLA carry out the search and seizure of the server that led to the FLA "tip" that Mr. Sanders' IP address and the government knew, based on the information it had, that the content of the "tip" could only have been obtained through computer intrusion.

**B.    The Search by a Joint Venture Partner Identifying Mr. Sanders' IP Address and the Content It Accessed Violated His Reasonable Expectation of Privacy.**

The purpose of the Fourth Amendment is to protect privacy, and "[t]hat purpose is central to decisions about whether a Fourth Amendment 'search' has occurred." *Chatrie v. United States*, 146 S. Ct. 2193, 2204 (2026). The touchstone of the analysis is not whether there has been some physical intrusion on property, but whether there has been an intrusion on a reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 351 (1967) ("[T]he Fourth Amendment protects people, not places."). This principle also applies to internet usage. *See United States v. Zelaya-Veliz*, 94 F.4th 321, 334 (4th Cir. 2024), *cert. denied* 145 S. Ct. 571 (2024) (the content of private electronic communications is generally protected by the Fourth Amendment, even when transmitted over third-party platforms).

Mr. Sanders' privacy interest is twofold: he had a reasonable expectation of privacy in his IP address on the Tor network, which was violated when the U.K. unmasked his anonymized

identity, and he also had a reasonable expectation of privacy in his internet communications, which was violated when the U.K. intruded on his computer to determine he connected to Hurt Meh and accessed child pornography via that site. While the government contests that a Tor user has a reasonable expectation of privacy in his IP address, the government ignores altogether the second, independent violation. *See* Opp. at 20 n.8.

### 1.    Mr. Sanders Had a Reasonable Expectation of Privacy in His Tor-Anonymized IP Address.

The Supreme Court recently reaffirmed that sharing information with a third party does not automatically waive a reasonable expectation of privacy. *See Chatrie*, 146 S. Ct. at 2215. Even a limited intrusion into data in which someone has a legitimate privacy interest constitutes a Fourth Amendment search. *See id.* at 2209–11. In *Chatrie*, although the user could have opted not to enable a feature that generated detailed location history available to a third-party, the Court nonetheless held the user had a reasonable expectation of privacy in the data. *See id.* at 2213–15.

Because "Tor users purposefully shroud their browsing," the third-party doctrine (*i.e.*, the principle that sharing information with a third-party waives the user's privacy interest, a doctrine that is questionable following *Chatrie*) does not apply, and Tor users "have a reasonable expectation of privacy in their online 'movements.'" *United States v. Taylor*, 935 F.3d 1279, 1284 n.4 (11th Cir. 2019). Indeed, even prior to *Chatrie*, the Supreme Court had explained that "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Carpenter v. United States*, 585 U.S. 296, 310 (2018) (alteration in original) (quoting *Katz*, 389 U.S. at 351–52). Mr. Sanders used Tor to anonymize his IP address and shield his digital communications from third parties. Accordingly, the act of deanonymizing Mr. Sanders' IP

8

address, the privacy of which he had sought to protect by using Tor, by an FLA acting in concert with U.S. law enforcement, standing alone, violated Mr. Sanders' Fourth Amendment rights.[5]

> **2. The Joint Venture Violated Mr. Sanders' Fourth Amendment Rights by Intruding on His Computer to Determine His IP Accessed Hurt Meh.**

New evidence shows the U.K. conducted a search by intruding on Mr. Sanders' computer to determine he visited Hurt Meh and navigated to child pornography there. This search constitutes an independent violation in addition to the warrantless unmasking of his IP address. The government makes no argument to the contrary. Instead, it argues only that "the FBI is aware of ways to de-anonymize a user's IP address on the Tor network without searching his computer." Opp. at 20 n.8. While it may be true that the FBI can unmask a Tor-protected IP address without intruding on the user's computer (although as set forth above this would constitute an unreasonable search), the government does *not* claim it can determine which of multiple websites sharing the same IP address a user accessed without interfering with the user's computer.

---

[5] The Fourth Circuit has not addressed whether an individual who uses Tor to protect his IP address has a reasonable expectation of privacy in that address. *Cf. United States v. Wellbeloved-Stone*, 777 F. App'x 605, 607 (4th Cir. 2019) (unpublished, pre-*Chatrie* opinion addressing IP addresses not using of Tor). The government, citing *United States v. Mitrovich*, 95 F.4th 1064, 1068 (7th Cir. 2024), contends a Tor user has no expectation of privacy in his IP address. *See* Opp. at 20 n.8. But *Mitrovich*, which pre-dates *Chatrie*, made only a passing observation that prior precedent under the third-party doctrine—that did not consider the use of Tor—"established that a person has no reasonable expectation of privacy in their IP address." 95 F.4th at 1068. Prior to *Chatrie*, courts have held that whether a Tor user's Fourth Amendment rights were violated depended on what the government did. *See, e.g.*, *United States v. Werdene*, 883 F.3d 204, 213 n.7 (3d Cir. 2018) (Tor user had reasonable expectation of privacy in his IP address where government "obtained the IP address and other identifying information from [the defendant]'s home computer"); *United States v. Horton*, 863 F.3d 1041, 1047 (8th Cir. 2017) (Tor user "has a reasonable expectation of privacy in the contents of his personal computer"); *accord United States v. Henderson*, 906 F.3d 1109, 1113 n.4 (9th Cir. 2018).

9

In the trial court, there was no basis to contest the representation that the U.K., having de-anonymized Mr. Sanders' IP address, determined it connected to Hurt Meh without interfering with a computer. If the server hosted only Hurt Meh, a determination that the IP address connected to the server would demonstrate it went to Hurt Meh. New evidence, however, shows that Hurt Meh had no IP address of its own; it shared a single server, and thus a single IP address, with several other hidden sites. *See* ECF 691-12 at 1–2;  pp. 3–4, *supra*. An IP address connecting to the server could have connected to any of the sites hosted on the same server.

The trial court denied Mr. Sanders' motion for a *Franks* hearing and his motion to suppress because the assertion that the U.K. "must have used a technique that interferes with a computer in the [U.S.] in order to obtain defendant's IP address," was speculative. ECF 122 at 14. It was speculative because no expert "establish[ed] that the FLA could not have obtained [Mr. Sanders'] IP address without interfering with a computer in the [U.S.]," only that it was the "most likely" way it happened. *Id.* Based on new, previously concealed, evidence and expert analysis of that evidence, however, we now know that there were multiple websites hosted on the same server and that determining which of those sites was accessed could only occur through computer intrusion. *See* ECF 691-12 at 4 ("An actual connection log to the forum with a true user IP address could only be created by interfering with the user's Tor Browser software or the computer it is running on causing it to malfunction."). In other words, based on the new evidence Mr. Sanders can now demonstrate, rather than speculate, what the government knew all along and concealed—the U.K.'s "tip" information was the product of an intrusion into Mr. Sanders' computer and the U.K.'s representation to the contrary could not have been true.

### C.    At a Minimum, Mr. Sanders Is Entitled to an Evidentiary Hearing.

At a minimum, Mr. Sanders is entitled to an evidentiary hearing concerning the U.S.'s participation and the methods used to ascertain that he visited Hurt Meh and accessed child

pornography there. "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall…grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). If, as the new evidence indicates, the U.K. intruded on Mr. Sanders' computer, that intrusion constitutes a search of a U.S. computer conducted without a judicially issued warrant, a fact that was concealed from the trial court. Plainly the record does not conclusively show otherwise.

### D.       The Good-Faith Exception Does Not Excuse the Fourth Amendment Violation.

The government argues that the good-faith exception precludes suppression because the U.S. reasonably relied on the U.K.'s assurances that it "complied with its own laws and did not search a U.S. computer to identify Sanders's IP address." Opp. at 19. First, we now know the U.K. did not act independently. The U.S. agents flew with U.K. agents to Brazil where Santos was apprehended and the server seized. A copy of the server was provided to the U.S. and the U.K. The U.S. could not deanonymize Mr. Sanders' IP address or interfere with his computer to ascertain the website and content it accessed without a judicial warrant. The government cannot turn the server over to the U.K. for analysis, have the U.K. engage in conduct unlawful under U.S. law, and then "tip" the U.S. the results and claim it relied on the tip in good faith. Second, it was not good faith for U.S. law enforcement to rely on the U.K.'s representation that it did not interfere with any computer or device in the U.S. knowing that was false. *See, e.g.*, *United States v. Doyle*, 650 F.3d 460, 467 (4th Cir. 2011) (good-faith exception does not apply where judge issuing warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."). Third, the good-faith exception does not apply where the government omitted material information from its warrant application— that it was working in a joint venture with the U.K., that it participated in seizing the server, that

11

it knew the server hosted multiple websites, that it had provided the server to the U.K., and that it knew the U.K. representation of non-interference with a U.S. computer could not be true.

Citing the policy concerns underlying the exclusionary rule, the government contends that suppression is not warranted because it would have "no legitimate deterrent effect"—indeed, "no effect"—on the U.K. Opp. at 19–20. But the cases on which the government relies, *United States v. Benoit*, 730 F.3d 280 (3d Cir. 2013) and *United States v. Ferguson*, 508 F. Supp. 2d 1 (D.D.C. 2007), each involved an FLA acting independently, not a joint venture partner. The deterrent target here is U.S. law enforcement. Suppression would deter U.S. agents from using foreign partners as a stalking horse to search what they could not constitutionally search on their own.

> **E.     Mr. Sanders' Fourth Amendment Claim Is Not Barred Under Section 2255.**

> **1.     *Stone* Does Not Bar Mr. Sanders' Claim.**

> **a.   *Stone* Does Not Apply to Section 2255 Petitions.**

Citing *Stone v. Powell*, 428 U.S. 465 (1976), the government argues this Court has no power to consider new evidence of a Fourth Amendment violation. Opp. at 9–10. In *Stone*, the Supreme Court held that "where the *State* has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a *state* prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 482 (emphasis added). *Stone* governs § 2254 petitions by state prisoners. *Id.* at 468–69. *Stone* did not reverse *Kaufman v. United States*, 394 U.S. 217,

231 (1969), which held that Fourth Amendment claims are cognizable under § 2255. Nor has *Kaufman* been reversed in the 50 years since *Stone* was decided.[6]

The Fourth Circuit has only extended *Stone* to a § 2255 motion in a non-binding decision. *United States v. Schulte*, 230 F.3d 1356, at *1 (4th Cir. 2000). Other Circuits that have extended *Stone* primarily do so based on a perceived limited deterrent value of the exclusionary rule on habeas review and "in light of the Court's policy of treating grounds for relief as equivalent under § 2254 and § 2255." *See United States v. Cook*, 997 F.2d 1312, 1317 (10th Cir. 1993); *see also Ray v. United States*, 721 F.3d 758, 762 (6th Cir. 2013); *Tisnado v. United States*, 547 F.2d 452, 455–56 (9th Cir. 1976). As the Eighth Circuit has made clear, however, federal review of state convictions implicates different concerns than review of federal convictions. *Baranski v. United States*, 515 F.3d 857, 859–60 (8th Cir. 2008). *Stone* is premised in part on federalism concerns: federal courts are reluctant to second guess state courts. Conversely, "the supervisory power of federal appellate courts over district courts is broader than [their] authority to review state court decisions under § 2254." *Id.* at 860. This Court should follow *Baranski*.

### b. Even if *Stone* Applied, Mr. Sanders' Claim Would Be Cognizable Under the "Full and Fair Opportunity" Exception.

Even if the Court were to apply *Stone* to this § 2255 motion, *Stone* would not bar Mr. Sanders's claim. He did not receive a full-and-fair opportunity to litigate the issue before the trial court because the government concealed the evidence on which his claim is based. Indeed, the

---

[6] *Stone* acknowledged there are reasons why *Kaufman* may have reached a different result in the context of § 2255. *See* 428 U.S. at 481 n.16 (*Kaufman* may rest on "the supervisory role of [the Supreme Court] over the lower federal courts."). *Stone*'s reasoning rested in part on the long passage of time between a state conviction and § 2254 review. *See id.* at 493. Federal prisoners, on the other hand, need not exhaust state remedies and there is one-year filing deadline.

13

government concedes that a petitioner may overcome the *Stone* bar by establishing "that the government 'conceal[ed]' the purportedly new evidence relevant to his claim." Opp. at 11.

The government's concealment is why the trial court deemed the notion of a joint investigation involving the U.S. speculative. *See* pp. 3–6, *supra*. The government concealed that, contrary to its representations to the trial court that the U.K. was acting independently, U.S. law enforcement was in fact in an active joint venture with its foreign partners throughout the investigation. In its Opposition, the government fails to engage with any of the new evidence directly contradicting its representation to the trial court "that the [U.K.] identified Sanders's IP address independently, lawfully, and without the involvement of U.S. law enforcement." *See* Opp. at 12 (claiming, without explanation, that none of the new evidence contradicts the sworn statements in the warrant application).

As detailed above, the new evidence demonstrates the government knew it was an active participant in the investigation of Hurt Meh and other sites; along with the U.K., worked with Brazil in identifying the server hosting Hurt Meh and unmasking its IP address; coordinated with foreign law enforcement partners leading to the search in Brazil and seizure of the server; learned there were multiple sites using the same IP address; and therefore knew that the U.K. "tip" related to Mr. Sanders claiming it was developed without intruding on his computer was false. By concealing these facts, it deprived Mr. Sanders of a full and fair hearing before the trial court.

### 2.    Mr. Sanders Has Not Waived His Fourth Amendment Argument.

The government faults Mr. Sanders for not arguing in his opening brief why *Stone* does not bar his Fourth Amendment claim. Opp. at 10. The government does not contend, nor could it, that Mr. Sanders did not raise his Fourth Amendment claim, only that he did not brief issues not yet raised by the government, namely, whether *Stone* applies to § 2255 motions or why, if *Stone* is applicable, it does not act as a bar. But a party waives an argument only by "failing to present

14

[or develop] it in its opening brief." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). Mr. Sanders fully presented and developed his Fourth Amendment claim in his opening motion, including by detailing the newly discovered evidence—evidence the government concealed from the trial court. *See* Mot. at 4–21. This case is unlike *United States v. Sutherland*, the government's sole authority on waiver, where the petitioner failed to address an "essential element" of his claim. 103 F.4th 200, 211 (4th Cir. 2024). Mr. Sanders need not anticipate every argument the government might raise, especially where, as here, no binding Fourth Circuit decision has extended *Stone* to § 2255 petitions. *See* pp. 12–13, *supra*.

### 3. Mr. Sanders' Fourth Amendment Claim Is Not Procedurally Barred.

The government also argues Mr. Sanders' claim is procedurally barred because he raised the same argument on direct appeal and the newly discovered evidence "does not matter" because it is not relevant to his guilt and does not bear on the constitutionality of his detention. Opp. at 12–13. The government erroneously conflates two distinct legal standards. It cites *Griffin v. Clarke*—a case discussing the cause-and-prejudice standard for overcoming procedural default when a § 2254 petitioner's prior state habeas petition was dismissed as untimely—for the standard governing the re-litigation bar. *See* No. 1:15cv658 (LMB/TCB), 2015 WL 11117147, at *2 (E.D. Va. June 1, 2015). But those standards are not interchangeable.[7]

A petitioner may overcome the re-litigation bar under § 2255 by presenting new evidence that "could not reasonably have been included in the direct appeal record." *United States v. Caro*, 733 F. App'x 651, 660 (4th Cir. 2018) (unpublished). Mr. Sanders has done so. On direct appeal, Mr. Sanders could offer only the speculative evidence available in the trial record. *See Sanders*,

---

[7] Even if the standard for procedural default applied, which it does not, a § 2255 petitioner must show cause excusing the default and prejudice from the errors he challenges *or* actual innocence, not both. *United States v. Draven*, 77 F.4th 307, 315 (4th Cir. 2023).

107 F.4th at 254 n.16. The newly discovered evidence turns that speculation into, at a minimum, *prima facie* proof that the U.K.'s "tip" was the product of a joint venture that violated Mr. Sanders' Fourth Amendment rights.

## II. TRIAL COUNSEL'S FAILURE TO FILE A TIMELY MOTION TO SUPPRESS INVOLUNTARY STATEMENTS CONSTITUTES INEFFECTIVE ASSISTANCE

### A. Mr. Sanders Has Satisfied *Strickland*'s "Performance" Prong.

The government does not dispute that Mr. Sanders' trial counsel missed the deadline to move to suppress statements recorded during the FBI's raid of Mr. Sanders' residence, it also concedes that when trial counsel belatedly moved to suppress these statements as involuntary, the motion was "denied as untimely." Opp. at 21–22. Nonetheless, the government claims Mr. Sanders does not satisfy *Strickland*'s performance prong because: (1) missing the deadline was a "strategic" decision; and (2) a suppression motion would have lacked "some substance." *Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 525 (4th Cir. 2016). Neither argument has merit.

#### 1. Missing a Deadline Was Not a Reasonable Strategic Decision.

Although a court generally will not second guess an attorney's strategic decision, the failure to file a suppression motion is only insulated from review if it is justified by "*reasonable* strategic reasons." *United States v. McNeil*, 126 F.4th 935, 942 (4th Cir. 2025) (emphasis added); *see also United States v. Pressley*, 990 F.3d 383, 388 ("[W]e ask whether *reasonable* strategic reasons warranted not filing the motion.") (emphasis added). Even accepting *arguendo* the accuracy of the recollection by trial counsel, Mr. Jeffress, of the events, the government's argument lacks merit because missing the deadline to move to suppress was not the product of a *reasonable* defense strategy. Mr. Jeffress' proffered reasons for not filing the motion—that the defense planned to litigate the Fourth Amendment issue and, failing a win on that claim, hoped to negotiate

16

a plea agreement that would permit an appeal of the Fourth Amendment claim—are not reasonable strategic decisions.

*First*, Mr. Jeffress' affidavit does not offer any reason why trial counsel could not have pursued the Fourth Amendment motion while *also* filing a timely motion to suppress Mr. Sanders' statements. Mr. Jeffress says he believed filing any motions beyond the Fourth Amendment motion would "result in a worse appellate record" and that "even a successful appeal on the statements would have resulted in a new trial only, whereas a successful appeal on the [Fourth Amendment] motion to suppress tangible evidence would effectively have ended the prosecution." ECF 707-2 ("Jeffress Aff.") ¶ 14–15. That justification might make sense if the issue were deciding which arguments to pursue on appeal. An appellate brief "that raises every colorable issue runs the risk of burying good arguments." *Jones v. Barnes*, 463 U.S. 745, 753 (1983). But counsel would have remained free to raise the Fourth Amendment issue as the sole issue in any hypothetical appeal, even if counsel had timely moved to suppress Mr. Sanders' statements—filing a timely suppression motion in the trial court would not somehow force appellate counsel's hand.

*Second*, Mr. Jeffress claims the decision to focus solely on the Fourth Amendment issue (Jeffress Aff. ¶¶ 7–8, 11) was because the government might at some point offer an advantageous conditional plea that preserved that issue for appeal. There is no evidence that such a conditional plea was ever extended, much less was on the table when the motion to suppress was due. Mr. Sanders says none was ever extended (Ex. 2, Declaration of Zackary Sanders ("Sanders Decl.") ¶ 13) and Mr. Jeffress does not claim otherwise. And "however important a role plea bargaining assumes in an attorney's representation of a client, the attorney must be prepared for the possibility that negotiations might fail and the case might actually go to trial." *Rummel v. Estelle*, 498 F. Supp. 793, 797 (W.D. Tex. 1980) (granting habeas petition based on IAC claim); *cf. United States v.*

17

*Walden*, 625 F.3d 961, 966 (6th Cir. 2010) ("[I]t does not seem unreasonable to require defense counsel to simultaneously pursue a motion to suppress while engaging in plea negotiations…."). Allowing the deadline for filing a motion to suppress to pass in the *hope* of at some point obtaining a conditional plea agreement acceptable to the client, only to file the motion later when it was untimely, is not a reasonable strategic decision. If anything, moving to suppress might have given Mr. Jeffress more leverage in plea negotiations. Thus, Mr. Jeffress's affidavit fails to set forth "reasonable strategic reasons" that "warranted not filing the motion" to suppress Mr. Sanders' statements in compliance with the court ordered deadline. *McNeil*, 126 F.4th at 942. Because the government has not offered a reasonable strategic reason for trial counsel's failure to file a timely motion, Mr. Sanders has established the "performance prong."

In the alternative, to the extent that Mr. Jeffress's affidavit would, if standing alone, make out a reasonable strategic reason for missing the deadline, an evidentiary hearing is necessary because Mr. Jeffress's factual narrative is disputed by Mr. Sanders (*see* Sanders Decl.) and other evidence in the record. Thus, Mr. Sanders "presents a colorable Sixth Amendment claim showing disputed facts beyond the record" and "a credibility determination is necessary to resolve the claim." *McNeil*, 126 F.4th at 943 (remanding for evidentiary hearing on counsel's claimed "reasonable strategic reasons").

Contrary to Mr. Jeffress' recollection, Mr. Sanders says he *never* agreed "to challenge the case exclusively on Fourth Amendment grounds" and then to enter a conditional guilty plea if one was offered should his Fourth Amendment motion be denied. *See* Sanders Decl. ¶¶ 10–11. Rather, Mr. Sanders "[w]anted counsel to pursue every viable ground for [his] defense, including every possible ground for suppression of evidence." *Id.* Trial counsel *never* told Mr. Sanders the defense

18

strategy was to pursue the Fourth Amendment issue *to the exclusion* of other motions and never told Mr. Sanders the defense strategy was to forgo a motion to suppress. *Id.* ¶¶ 11–12.

Mr. Sanders also contests Mr. Jeffress' assertion that there was "general agreement from everyone that proceeding to trial was a bad idea." Jeffress Aff. ¶ 8. Mr. Sanders' consistent position was that he was going to trial unless a plea offer was extended "that would result in minimal incarceration and would not require registration as a sex offender." Sanders Decl. ¶ 7–8. No such plea offer, or anything close, was ever offered by the government. *Id.* ¶ 8; *see also* ECF 177 at 7. Accordingly, Mr. Sanders never wavered from the view that he "wanted [Mr. Jeffress] doing everything possible, including pretrial motion practice, to defend [him]." Sanders Decl. ¶ 8.[8]

Further, Mr. Sanders' declaration is not the only evidence that casts doubt on the accuracy of Mr. Jeffress' recollection. In his affidavit, Mr. Jeffress asserts that after the resolution of motions for reconsideration of Mr. Sanders' Fourth Amendment motion, he believed it was time to seek a conditional plea that would permit an appeal on the Fourth Amendment issue, but Mr. Sanders disregarded his advice, making it necessary to belatedly file the motion to suppress Mr. Sanders' recorded statements. Jeffress Aff. ¶¶ 9, 13. But Mr. Sanders' motion for reconsideration on the Fourth Amendment issue was not denied until September 21, 2021 (*see* ECF 468), more than nine months *after* the defense moved, belatedly, on December 17, 2020, to suppress Mr. Sanders' statements (*see* ECF 149). Thus, Mr. Jeffress' recollection and explanation of how his missing the deadline was an intentional strategic decision is undermined by the actual sequence of events.

The far more logical explanation for why trial counsel belatedly filed the suppression motion is the one trial counsel put forward contemporaneously in response to the trial court's Order

---

[8] The government's argument that Mr. Sanders' opening brief failed to "address[] or refut[e] Mr. Jeffress's recollection," Opp. at 21, is absurd, because Mr. Jeffress did not submit an affidavit addressing Mr. Sanders' IAC claim until *after* Sanders filed this Motion. *See* ECF 698.

to Show Cause, *i.e.*, that the defense filed the motion because the government had given Rule 414 notice of intent to introduce the statements at trial. *See* ECF 177 at 6; *see also* Sanders Decl. ¶ 15. Of course, that explanation does not rebut Mr. Sanders' claim that trial counsels' performance was constitutionally insufficient, because, as the trial court held when it denied the untimely suppression motion, "it should have been clear to defense counsel that defendant's statements could be used at trial" before the government gave Rule 414 notice. ECF 196 at 4.

### 2. The Motion to Suppress Plainly Had "Some Substance."

As explained in Mr. Sanders' opening brief (Mot. at 24–26) and set forth more fully below (pp. 21–25, *infra*), the circumstances surrounding Mr. Sanders' early morning, un-*Mirandized* interrogation by the FBI were sufficiently coercive that a motion to suppress the statements as involuntary clearly had "some substance," which is all Fourth Circuit law requires "to call into question counsel's performance." *Grueninger*, 813 F.3d at 524–25.

The government never truly addresses the lax "some substance" standard. Instead, the government half-heartedly claims Mr. Sanders' suppression motion would not have had "some substance" because the Fourth Circuit supposedly "determined" Mr. Sanders' statements were voluntary. Opp. at 21–22. That argument fails, because the Fourth Circuit only ruled that the trial court did not abuse its discretion in finding the motion to suppress untimely and therefore declining to hold a hearing. *See Sanders*, 107 F.4th at 255 & n.18 (noting that *if* it were to review the district court's preliminary determination of voluntariness (on an abuse of discretion standard), the court would be "satisfied that it was correct."). This comment was *dicta* relegated to a footnote because the *only* issue before the court was whether the district court abused its discretion by refusing to consider the merits of trial counsel's untimely suppression motion.

The government also fails to acknowledge that "the record" the Fourth Circuit reviewed was not an evidentiary record developed at a hearing on the contested facts relating to

voluntariness. "The record" was a paper record—Sanders never received a hearing at which he could test the government's claims about the circumstances of his interrogation *because no timely motion to suppress was filed*. Indeed, in one of the three footnotes the government cites, the trial court explained that "[b]ecause defendant's arguments…were forwarded in an untimely motion to suppress…*only a limited record is available for review by the Court.*" ECF 402 at 6 n.4 (emphasis added). In another, the court explained it was only making "a preliminary determination of voluntariness" under 18 U.S.C. § 3501(a). *See* ECF 492 at 22 & n.13. The Court also noted it had become Mr. Sanders' burden to show involuntariness. *Id*. At a pretrial suppression hearing, it would have been the *government's* burden to prove voluntariness. *United States v. Dodier*, 630 F.2d 232, 236 (4th Cir. 1980). The footnotes fail to rebut Mr. Sanders' showing that a suppression motion would have had "some substance."

**B.    Mr. Sanders Has Satisfied *Strickland*'s "Prejudice" Prong.**

**1.    If Trial Counsel Had Made a Timely Motion, There Is a Reasonable Probability Mr. Sanders' Statements Would Have Been Suppressed.**

Rather than grapple with the evidence in the record showing that Mr. Sanders' statements in response to 6:00 am, un-*Mirandized* questioning by armed FBI agents were involuntary (*see* Mot. at 25), the government cherry-picks and mischaracterizes the trial evidence to present a counterfactual picture of the circumstances of the interrogation and relies on decisions that *support* Mr. Sanders' claim. *See* Opp. at 22. Had trial counsel made a timely motion to suppress and for an evidentiary hearing, the motion "likely would have been granted." *McNeil*, 126 F.4th at 942.

The government's one-sided characterization of the facts relevant to the voluntariness of Mr. Sanders' statements is strongly disputed. *Compare* Opp. at 22 *with* Mot. at 25–26. Indeed, the government's Opposition merely illustrates the point that had trial counsel timely filed a motion to suppress, an evidentiary hearing would have been required "to assess whether [Mr. Sanders']

21

statements were voluntary and admissible." *United States v. Basham*, 789 F.3d 358, 369 (4th Cir. 2015). Because of the error of trial counsel, no evidentiary hearing was ever held at which the government's factual assertions could be tested and a complete record developed. *See* ECF 402 at 6 n.4. At minimum, an evidentiary hearing is required to assess whether the omitted suppression motion "would have been meritorious and likely to have been granted." *Pressley*, 990 F.3d at 390–91 (remanding for an evidentiary hearing "to resolve disputed facts" and holding that question of prejudice "cannot be answered on the present record because the motion was never filed.").

For example, the government claims that during the interrogation, Mr. Sanders did not ask for counsel, was "permitted to…privately consult" with his family, and "was not restrained." Opp. at 22. But the record reflects the agents failed to stop the questioning when Mr. Sanders said, "[o]bviously…I should have the advice of a lawyer." ECF 691-14 ("Search Tr.") 8:19–9:20; *see also id.* at 4:7–8 ("don't I need like a lawyer or something before I answer?"). The record also shows Mr. Sanders' mother repeatedly asked to consult with Mr. Sanders, but the FBI did not permit her to see him and did not stop the interrogation to permit her to speak with a lawyer. ECF 150-2 ¶ 16. Contrary to the government's claim that the room in which Mr. Sanders was questioned was "neither locked nor obstructed" (Opp. at 22), Mr. Sanders could not leave during the interrogation, because armed FBI agents were blocking the doors. Nov. 26, 2021 Trial Tr. (ECF 550) 89:20–90:4. Unsurprisingly, Mr. Sanders did not believe that he was free to leave during the interrogation. *Id.* at 89:11–13; *see also United States v. Hashime*, 734 F.3d 278, 285 (4th Cir. 2013) ("subjective factor[s]" are relevant "to the *voluntariness*" of a defendant's statements).[9]

---

[9] In one of its worst mischaracterizations, the government claims it was necessary for officers to draw weapons because Mr. Sanders "initially locked himself in his bedroom with a knife." Opp. at 22. Mr. Sanders was naked when the search began with brandished weapons. When he asked to be allowed to put on a pair of pants, he told law enforcement there was a small pocketknife in the pocket so they could remove it before he put them on. Search Tr. 7:1–4.

22

The government tries to minimize the coercive nature of the FBI's conduct by arguing that the FBI's threats to "tak[e] all the devices in your house," including "your parents' stuff" (*see* Mot. 25) were just permissible "description[s] of what the warrant authorized." Opp. at 22. But even *United States v. Holmes*—a case on which the government relies—notes that statements by law enforcement can be coercive when they exceed an "acceptable ambit" of truth and constitute "threats." 670 F.3d 586, 592–93 (4th Cir. 2012). *United States v. Braxton*, which the government also cites, likewise holds that statements "extracted by *any* sort of threats" are involuntary and inadmissible. 112 F.3d 777, 780 (4th Cir. 1997) (en banc) (emphasis added).

Each time Mr. Sanders hesitated to answer questions, FBI agents warned that if he did not cooperate, they would seize the phones, computers, and other electronic devices that Mr. Sanders, his mother, a doctor, and his father relied on for their livelihoods (and which contained privileged medical information), and threatened Mr. Sanders "might not see" those devices "for…a long time." *E.g.*, Search Tr. 76:07–18, 108:18–21, 146:6–7; ECF 150-2 ¶¶ 2, 16. The FBI made the economic nature of their threats explicit by warning that if the family's devices were taken, "that's potentially going to affect your business." Search Tr. 75:10–12. The Fourth Circuit has held that these sorts of threats of "adverse economic consequences" render statements inadmissible. *United States v. Giddins*, 858 F.3d 870, 881 (4th Cir. 2017). The economic threats coupled with the other circumstances of the interrogation, justify suppression, or at minimum, an evidentiary hearing.

The FBI's explicit threats were made without ever advising Mr. Sanders of his *Miranda* rights, making the case for suppression even stronger. *See, e.g.*, *United States v. Pelton*, 835 F.2d 1067, 1072 (4th Cir. 1987) (absence of *Miranda* warnings is relevant to voluntariness). The Fourth Circuit has twice held on similar facts that a defendant's un-*Mirandized* statements were custodial and should have been suppressed. *See Hashime*, 734 F.3d at 284; *United States v. Colonna*, 511

23

F.3d 431, 436 (4th Cir. 2007). The fact that Mr. Sanders was subjected to circumstances the Fourth Circuit has held amount to a custodial interrogation is yet another reason a suppression motion would have likely been successful if timely filed, because "the setting of the interview, and the details of the interrogation" are highly relevant to voluntariness. *Braxton*, 112 F.3d at 781. Indeed, the basis for the *Miranda* rule is the Supreme Court's recognition that custodial interrogations are "inherently coercive." *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011).

**2.      There Is a Reasonable Probability the Outcome Would Have Been Different If Mr. Sanders' Involuntary Statements Were Suppressed.**

The government opened *and* closed on Mr. Sanders' statements, calling them "significant." Nov. 19, 2021 Trial Tr. (ECF 552) 151:3–13; Nov. 26, 2021 Trial Tr. (ECF 550) 141:17–19, 162:24–163:5. The government used them to argue Mr. Sanders had been knowingly downloading child pornography because he was "curious." Nov. 26, 2021 Trial Tr. (ECF 550) 163:3. The government argued the statements were an admission Mr. Sanders had been intentionally "accessing and downloading child pornography for years." *Id*. 141:17–19.

It is difficult to imagine a more damning piece of evidence than a statement that permits the government to argue that the defendant has, in effect, confessed, "given the potential that a confession will have 'a devastating and pervasive effect on the outcome of a trial.'" *Pressley*, 990 F.3d at 391 (quoting *Grueninger*, 813 F.3d at 531). The "seriousness and extent of [the] incriminating statements," along with the "important role they played at trial," confirms that the admission of those statements prejudiced Mr. Sanders' defense. *Hashime*, 734 F.3d at 285 n.2.

The involuntary statements were also highly prejudicial on the production counts. As the government concedes, it was required to show Sanders instructed minors to engage in sexual acts "for the *express purpose* of producing visual depictions of the conduct." Opp. at 24–25 (emphasis added). Mr. Sanders testified that he never caused the videos to be made for the purpose of

24

depicting sexual acts; his purpose with respect to the visual depictions was for them to serve as confirmation that the conduct discussed had occurred. Mot. at 27. None of the conduct, whether deemed sexual or otherwise, was itself unlawful. If the jury had accepted Mr. Sanders' testimony as to his purpose, it would have acquitted on the production counts. But the government used the involuntary statements to "damage [Mr. Sanders'] credibility before the jury," *Giddins*, 858 F.3d at 886, by arguing that he had falsely denied he "had caused or wanted minors to send him sexually explicit images," thus evidencing his consciousness of guilt. Nov. 19, 2021 Trial Tr. (ECF 552) 151:10–13; *see also United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018) (statements that show "consciousness of guilt" and "destroy Defendant's credibility" not harmless).

The government claim suppression of the involuntary statements would not have altered the outcome because the other evidence was substantial. Opp. at 24–25. That argument, even if it were based on an accurate characterization of the record, would be insufficient to defeat Mr. Sanders' *Strickland* claim. "To reach a conclusion of prejudice, [a court] need not hold that the government's other evidence was insubstantial, or that the other evidence could not have supported a guilty verdict in the absence of the" involuntary statements. *Pressley*, 990 F.3d at 391 (cleaned up). *Strickland*'s prejudice standard is not a sufficiency-of-the-evidence test. *See Strickland v. Washington*, 466 U.S. 668, 693 (1984) (petitioner need not show counsel's deficiency "more likely than not altered the outcome in the case"). All that is required is a *reasonable probability* the result would have been different absent counsel's errors. "[Mr. Sanders'] incriminating statements reasonably could have impacted the jury's assessment of his guilt." *Pressley*, 990 F.3d at 392.

## CONCLUSION

For the foregoing reasons, this Court should vacate Mr. Sanders' conviction. At minimum, the Court should order an evidentiary hearing on the disputed facts relevant to Mr. Sanders' claims.

Dated:  August 6, 2026                    Respectfully submitted,

    */s/ Jeffrey Zimmerman*
Jeffrey Zimmerman
JEFFREY ZIMMERMAN, PLLC
108 N. Alfred Street
Alexandria, Virginia 22314
Tel: (703) 565-1825
zimpacer@gmail.com

Barry J. Pollack
Admitted *pro hac vice*
HARRIS TRZASKOMA LLP
1300 19th Street NW, Suite 700
Washington, DC 20036
Tel: (934) 667-3824
bpollack@harristrz.com

*Attorneys for Zackary Sanders*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of August 2026, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

_/s/ Jeffrey Zimmerman_____
Jeffrey Zimmerman